# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CELGENE CORPORATION, NOVARTIS PHARMACEUTICALS CORPORATION and NOVARTIS PHARMA A.G., <br><br> Plaintiffs, <br><br> v. <br><br> ABRIKA PHARMACEUTICALS, INC., and ABRIKA PHARMACEUTICALS, LLLP, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 06-741 (SLR) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO STAY OR STRIKE

Andre G. Bouchard (Bar No. 2054)
John M. Seaman (Bar No. 3868)
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
Phone: (302) 573-3508
Fax: (302) 573-3501

OF COUNSEL:

James D. Veltrop (*pro hac vice*)
Jonathan A. Harris (*pro hac vice*)
Chad A. Landmon (*pro hac vice*)
Jo-Anne M. Kokoski (*pro hac vice*)
AXINN VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 275-8100
Fax: (860) 275-8101

*Attorneys for Defendants*

January 9, 2007

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ........................................................................................................ 1

NATURE AND STAGE OF THE PROCEEDING ................................................... 2

BACKGROUND .......................................................................................................... 3

ARGUMENT ................................................................................................................ 4

I.      PLAINTIFFS' MOTION TO STAY IGNORES THE LAW. .......................... 6

        A.      To Prevent Forum Shopping, The First-Filed Doctrine Does Not Apply
                To Identical Actions Filed In Separate Venues by the Same Plaintiff. ............ 6

        B.      Under The First-Filed Doctrine, This Action Should Proceed
                In Delaware, As This Court Is The First To Establish Jurisdiction. ............ 9

        C.      The Hatch-Waxman Act Requires
                that this Action Proceed Expeditiously. ......................................... 11

II.     PLAINTIFFS' MOTION TO STRIKE IS EQUALLY FLAWED. ................. 12

CONCLUSION .......................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

Adams Respiratory Therapeutics, Inc. v. Pharmaceutical Holdings Co., et al,

    No. 2:06-cv-4700 (HAA) (D.N.J. Nov. 16, 2006) ........................................................... 7

Adams Respiratory Therapeutics, Inc. v. Pharmaceutical Holdings Corp., et al.,

    No. 2:06-cv-4418-PD (E.D. Pa. Nov. 2, 2006) ........................................................... 1, 6

Aventis Pharma Deutschland GMBH v. Lupin Ltd.,

    403 F. Supp. 2d 484 (E.D. Va. 2005) ........................................................... 7, 9, 11, 13

Bristol-Myers Squibb Co. v. Andrx Pharms., LLC,

    No. 03-cv-2503, 2003 U.S. Dist. LEXIS 21967 (S.D.N.Y. Dec. 5, 2003) ..................... 8

Burke v. Quartey,

    969 F. Supp. 921 (D.N.J. 1997) ................................................................................... 8

Crosley Corp. v. Hazeltine Corp.,

    122 F.2d 925 (3d Cir. 1941)......................................................................................... 11

E.E.O.C. v. University of Pennsylvania,

    850 F.2d 969 (3d Cir. 1988)........................................................................................... 5

Exxon Mobil v. Saudi Basic Indus. Corp.,

    544 U.S. 280 (2005)..................................................................................................... 12

Garcha v. City of Beacon,

    351 F. Supp. 2d 213 (S.D.N.Y. 2005)........................................................................... 9

Great West Life Assurance Co. v. Levithan,

    834 F. Supp. 858 (E.D. Pa. 1993) .............................................................................. 13

Jefferson Ward Stores, Inc. v. The Doody Company,

    560 F. Supp. 35 (E.D. Pa 1983) ................................................................................. 10

Kahn v. General Motors Corp.,

    889 F.2d 1078 (Fed. Cir. 1989).................................................................................... 11

Kohn, Savett, Klein & Graf v. Cohen,

    No. 89-2173, 1990 U.S. Dist. LEXIS 4150 (E.D. Pa. Apr. 11, 1990) .......................... 13

Landis v. North American Co.,

    299 U.S. 248 (1936)....................................................................................................... 5

Lony v. E.I. Du Pont de Nemours & Co.,
    935 F.2d 604 (3d Cir. 1991)........................................................................................... 8

National Patent Development Corp. v. American Hospital Supply Corp.,
    616 F. Supp. 114 (S.D.N.Y. 1984) ............................................................................... 10

Newcomb v. Daniels, Saltz, Mongeluzzi & Barrett, Ltd.,
    847 F. Supp. 1244 (D.N.J. 1994) .................................................................................. 9

Old Charter Distillery Co. v. Continental Distilling Corp.,
    59 F. Supp. 528 (D. Del. 1945)..................................................................................... 10

Poole v. Taylor,
    No. 99-635, 2006 U.S. Dist. LEXIS 91902 (D. Del. Dec. 19, 2006) ............................ 5

Rhines v. Weber,
    544 U.S. 269 (2005)....................................................................................................... 12

Roscoe v. Federal Home Loan Mortgage Ass'n,
    No. 99-2234, 1999 U.S. App. LEXIS 32274 (10th Cir. Dec. 10, 1999)........................ 9

Smithkline Beecham Corp. v. Excel Pharmaceuticals, Inc.,
    No. 2:02-cv-51 (E.D. Va. Apr. 12, 2002) ...................................................................... 8

Tuff Torq Corp. v. Hydro-Gear Limited Partnership,
    882 F. Supp. 359 (D. Del. 1994)................................................................................... 5

Union Pacific R. Co. v. Department of Revenue of Ore.,
    920 F.2d 581 (9th Cir. 1990) ........................................................................................ 12

Vacqueria Tres Monjitas, Inc. v. Rivera Cubano,
    230 F.R.D. 278 (D.P.R. 2005) ...................................................................................... 8

**Statutes**

21 U.S.C. § 355.............................................................................................................. 3, 4, 11

21 U.S.C. § 355(j)(2)(A)(vii)...................................................................................................... 3

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ............................................................................................... 3

21 U.S.C. §355(j)(2)(B).............................................................................................................. 4

28 U.S.C. § 1404........................................................................................................................ 9

ii

**Regulations**

21 C.F.R. § 314.95 ................................................................................................................. 4

{BMF-W0037658.}

## INTRODUCTION

Plaintiffs chose to sue defendants in this Court and now cannot be heard to complain about that choice. Plaintiffs' efforts to prevent this case from moving forward are contrary to all applicable precedent – none of which is cited by plaintiffs – as well as the mandates of the Hatch-Waxman Act, which require that this case be expedited. Plaintiffs filed two identical actions against defendants, one in New Jersey and one here, and now seek to have the New Jersey action proceed despite the filing of defendants' Answer and Counterclaims in this Court prior to service in New Jersey and a jurisdictional dispute in New Jersey anticipated by plaintiffs at the time of filing.

Courts in the Third Circuit and other circuits have rejected this type of gamesmanship under virtually identical facts. Plaintiffs cannot point to a single case where the first-filed doctrine enabled a plaintiff to pick and choose among multiple fora after filing identical actions in separate venues and learning the identity of the assigned judges in each. But even if the first-filed doctrine were to apply, courts in the Third Circuit unequivocally agree that the first-filed action is the one where jurisdiction is established first, *i.e.*, the instant action. Plaintiffs' counsel is intimately familiar with these guiding legal principles, having recently filed an unsuccessful stay motion under identical circumstances in <u>Adams Respiratory Therapeutics, Inc. v. Pharmaceutical Holdings Corp.</u>, No. 2:06-cv-4418-PD (E.D. Pa. Nov. 2, 2006) (Ex. A.).

Plaintiffs also move to strike defendants' entire Answer and Counterclaims. Plaintiffs cite no authority supporting such a motion where defendants have merely answered one complaint and have yet to answer an identical complaint filed in another jurisdiction. Rather, plaintiffs rely solely on the same flawed reasoning employed in

{BMF-W0037658.}

connection with their stay motion, and come nowhere near satisfying the stringent standards applicable to a motion to strike.

## NATURE AND STAGE OF THE PROCEEDING

This is a patent infringement action that has been brought pursuant to certain provisions of the Hatch-Waxman Act. It alleges infringement of U.S. Patent Nos. 5,837,284 and 6,635,284 (the "'284 patents"), which are directed to methods and dosage forms for releasing methylphenidate within the body of a patient in a specific fashion. (Methylphenidate itself no longer enjoys patent protection, and its use in the treatment of attention deficit disorders has been known since at least the 1960s.)

On December 4, 2006, plaintiffs Celgene Corporation, Novartis Pharmaceuticals Corporation and Novartis Pharma A.G. (collectively "plaintiffs") filed suit in the District of New Jersey alleging infringement of the '284 patents by defendants Abrika Pharmaceuticals, Inc. ("Abrika") and Abrika Pharmaceuticals, LLLP[1] (collectively "defendants"). Two days later, plaintiffs filed an identical action here. (D.I. #1.) Plaintiffs apparently recognized that jurisdiction over defendants might not exist in New Jersey (Ex. B (email indicating same)), and filed this action as a safety net.

The Delaware action has progressed while the New Jersey action has not. In Delaware, defendants answered the Complaint and Abrika filed Counterclaims on December 8, 2006; the action may proceed immediately. (D.I. #6.) In New Jersey, plaintiffs did not even serve their Complaint until December 18, 2006, with full knowledge that Defendants had already answered in Delaware. Further, defendants

---

[1] Abrika Pharmaceuticals, LLLP neither filed a Paragraph IV certification nor sent a notice letter to plaintiffs. As such, Abrika Pharmaceuticals, LLLP is not properly a party to suit.

{BMF-W0037658.}

intend to file jurisdictional motions in New Jersey, which will prompt discovery concerning whether defendants have sufficient contacts with New Jersey to maintain personal jurisdiction (they do not). Notwithstanding that plaintiffs can adjudicate their patent claims more quickly and efficiently in Delaware, plaintiffs now ask the Court to stay this case until the jurisdictional issues in New Jersey are resolved.

## BACKGROUND

Plaintiffs have pursued this unusual two-forum strategy because, under the Hatch-Waxman Act, the Food and Drug Administration ("FDA") cannot approve Abrika's Abbreviated New Drug Application ("ANDA") No. 78-458 for methylphenidate hydrochloride capsules (20, 30 and 40 mg) until the earlier of (a) 30 months after the receipt of Abrika's notice letter or (b) a district court finding that the '284 patents are invalid, unenforceable and/or not infringed. Accordingly, plaintiffs have every incentive to postpone a decision on the merits until the end of the 30-month period.

The following discussion explains this important regulatory context in greater detail. The Hatch-Waxman Act is designed to encourage competition from generic pharmaceuticals by allowing generic firms to enter the market by filing an ANDA with FDA. 21 U.S.C. § 355. An ANDA is "abbreviated" because it may rely upon, rather than duplicate, the safety and efficacy data contained in the previously approved brand firm's New Drug Application ("NDA"). A generic firm seeking to enter a drug market, where the brand company claims its product is covered by a patent, must make a certification as to each patent identified as covering the brand drug. 21 U.S.C. § 355(j)(2)(A)(vii). One way a generic firm can satisfy this obligation is by filing what is commonly referred to as a Paragraph IV certification, pursuant to which the generic firm

3

certifies that the relevant patent is invalid, unenforceable and/or not infringed. 21 U.S.C. § 355(j)(2)(A)(vii)(IV). That is the avenue pursued by Abrika in this case.

An ANDA applicant submitting a Paragraph IV certification must also send a notice letter to the patent owner and NDA holder, setting forth reasons why the referenced patents are invalid, unenforceable and/or not infringed. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.95. On October 23, 2006, Abrika sent the requisite notice letter to plaintiffs. (D.I. #1 ¶ 14.)

If the patent holder files suit within 45 days of receiving the notice letter, as plaintiffs did here, FDA is prohibited from approving the ANDA until 30 months after such notice or until a court decision in favor of the ANDA holder, whichever is sooner. 21 U.S.C. § 355(j)(5)(B)(iii). Simply by filing these lawsuits, therefore, plaintiffs have ensured that FDA cannot approve Abrika's ANDA for 30 months, unless a district court earlier decides the patent claims in Abrika's favor. Because the introduction of a generic drug typically results in a dramatic reduction in a brand-name drug's market share, plaintiffs have a strong incentive to prolong this litigation for 30 months.

The Hatch-Waxman Act, however, prohibits undue delay in Paragraph IV cases and specifically requires that such actions be expedited. The Act directs the parties to "reasonably cooperate in expediting the action." 21 U.S.C. § 355(c)(3)(C).

## ARGUMENT

In an effort to manipulate the Hatch-Waxman regime, plaintiffs first filed their lawsuit in New Jersey, where they expect jurisdiction to be challenged, and then filed the same action in this Court two days later, where the parties agree jurisdiction exists. The Court should deny plaintiffs' Motions to Stay and Strike for the following reasons:

4

{BMF-W0037658.}

1) The first-filed doctrine does not apply to situations where plaintiffs file identical actions in multiple fora and then choose the order in which the actions proceed, because improper forum and judge shopping would result;

2) Even if the first-filed doctrine were applicable, in the Third Circuit it is the court to first obtain jurisdiction over the parties – in this case Delaware – that is considered to have the first-filed action; and

3) Granting plaintiffs' Motion would run counter to the Hatch-Waxman Act's mandate directing litigants to "reasonably cooperate in expediting the action."

The applicable standards are strict. The Supreme Court has explained that, "the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." Landis v. North American Co., 299 U.S. 248, 255 (1936).

Application of the first-filed doctrine lies within the sound discretion of the district court. See E.E.O.C. v. University of Pennsylvania, 850 F.2d 969, 972 (3d Cir. 1988). Thus, this Court has held that there is no "mandate directing wooden application of the [first-filed] rule without regard to . . . bad faith or forum shopping." Tuff Torq Corp. v. Hydro-Gear Limited Partnership, 882 F. Supp. 359, 364 (D. Del. 1994) (Robinson, J.) (citation omitted) (departing from first-filed doctrine and denying motion to stay).

Similarly, motions to strike are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties or if the allegations confuse the issues." Poole v. Taylor, No. 99-635, 2006 U.S. Dist. LEXIS 91902, at *14-15 (D. Del. Dec. 19, 2006) (Robinson, J.) (Ex. C.)

5

I.    <u>PLAINTIFFS' MOTION TO STAY IGNORES THE LAW</u>.

Plaintiffs' reliance on the first-filed doctrine is woefully misplaced. Courts in this

circuit and other circuits routinely deny such motions where the plaintiff has filed both

actions, where jurisdiction is first established in the second action and/or where the

Hatch-Waxman Act is implicated.

A.    To Prevent Forum Shopping, The First-Filed Doctrine Is Inapplicable
       <u>To Identical Actions Filed In Separate Venues by the Same Plaintiff.</u>

On virtually identical facts, courts have repeatedly and consistently rejected

attempts by patent holders in Hatch-Waxman actions to file multiple lawsuits and then

invoke the first-filed doctrine, so as to delay resolution of the underlying patent dispute.

Recently, the U.S. District Courts for the Eastern District of Pennsylvania and the

District of New Jersey were confronted with this very issue. <u>See</u> <u>Adams Respiratory</u>

<u>Therapeutics, Inc. v. Pharmaceutical Holdings Corp.</u>, No. 2:06-cv-4418-PD (E.D. Pa.

Nov. 2, 2006) (denying motion for stay) (Ex. A.). In <u>Adams</u>, plaintiff first filed suit in

New Jersey, where jurisdiction was in dispute. <u>Id.</u> at 1. Two days later, in order to

ensure that it did not lose the benefit of the Hatch-Waxman Act's automatic 30-month

delay, plaintiff filed an identical suit in the Eastern District of Pennsylvania, where it

knew jurisdiction could not be challenged. <u>Id.</u> Like here, plaintiff asked the

Pennsylvania court to issue a stay until the New Jersey court had an opportunity to

resolve the jurisdictional dispute. <u>Id.</u> The Pennsylvania court denied plaintiff's motion:

> I believe granting a stay here would encourage judge-shopping. I do not
> believe the "first-filed" rule – on which Plaintiff almost exclusively relies –
> applies in the unique circumstances presented here. . . .  I believe it would be
> inappropriate to allow a plaintiff to file identical actions in different courts and
> then pick the court in which it wishes to proceed while the other action is
> stayed pending the result in the first-filed action. Plaintiff has chosen to sue

6

here; it can not credibly complain that proceeding with this suit is prejudicial.
Id. at 2.

Dissatisfied with the Pennsylvania court's ruling, plaintiff then moved the New Jersey court to enjoin the Pennsylvania action. In denying this request, the New Jersey court relied on similar reasoning, explaining that "[t]he 'first-filed rule' is intended to prevent duplicative litigation, but I do not believe the rule was intended to provide a single plaintiff the opportunity to institute identical suits in various jurisdictions and then put all but the first one on the back burner until such time as the plaintiff deems convenient." Adams Respiratory Therapeutics, Inc. v. Pharmaceutical Holdings Co., Civil Action No. 2:06-cv-4700 (HAA) (D.N.J. Nov. 16, 2006) (order denying motion to enjoin) (Ex. D).

Similarly, in Aventis Pharma Deutschland GMBH v. Lupin Ltd., 403 F. Supp. 2d 484 (E.D. Va. 2005), the Eastern District of Virginia faced exactly the same situation as is presented to this Court here, and squarely rejected the attempt by the brand company to escape the court's jurisdiction. The plaintiffs in Aventis first sued the defendants in Maryland and then filed an identical action in the Eastern District of Virginia "as a protective measure." Id. at 488. When the defendant challenged jurisdiction in Maryland, but not Virginia, plaintiffs requested a stay in Virginia by invoking the first-filed rule because the Maryland action had been filed two business days earlier. See id.

In refusing to stay the Virginia action, the court showed particular disdain for plaintiffs' attempt to avoid litigating in a forum of their own choosing.

> Plaintiffs, and no one else, filed two identical lawsuits in two different forums. Plaintiffs, and no one else, alleged jurisdiction and venue in this Court in their Complaint. They should not be surprised this lawsuit is proceeding, as that is

7

what happens when you file suit in this District. This Court is of the firm
belief that justice delayed is justice denied.

Id. at 491. See also Bristol-Myers Squibb Co. v. Andrx Pharms., LLC, No. 03-cv-2503,

2003 U.S. Dist. LEXIS 21967, *14 (S.D.N.Y. Dec. 5, 2003) (in motion to transfer

context, plaintiff's double-filing "cut against" forum choice) (Ex. E); Smithkline

Beecham Corp. v. Excel Pharmaceuticals, Inc., Civil Action No. 2:202cv51 (E.D. Va.

Apr. 12, 2002) (denying motion for extension of time under Rule 56(f) based on

foregoing concerns). (Ex. F.)

Plaintiffs chose to file suit in Delaware and the applicable rules of law require

them to live with that decision. Not only did plaintiffs select Delaware as a forum for this

action, but the parties agree that jurisdiction is proper in this Court and the case is already

proceeding. Particularly troublesome is the fact that plaintiffs only served their New

Jersey Complaint and filed this Motion after learning the identity of the judges assigned

to the New Jersey and Delaware actions. See Vacqueria Tres Monjitas, Inc. v. Rivera

Cubano, 230 F.R.D. 278, 279 (D.P.R. 2005) ("we cannot permit a litigant to test the mind

of the trial judge like a boy testing the temperature of the water in the pool with his toe,

and if found to his liking, decides to take a plunge") (citation omitted).

Noticeably absent from plaintiffs' Motion is citation to even a single case granting

a motion to stay one of two identical actions filed by the same plaintiff in different courts,

let alone legal precedent for granting such a stay in a Hatch-Waxman action. Instead,

plaintiffs point to cases where a plaintiff's chosen forum is accorded weight in

completely different contexts – in, for example, cases involving dismissal and transfer

motions filed by defendants seeking to avoid plaintiffs' single chosen forum. See Lony

8

v. E.I. Du Pont de Nemours & Co., 935 F.2d 604 (3d Cir. 1991) (seeking dismissal on

*forum non conveniens* grounds); Burke v. Quartey, 969 F. Supp. 921 (D.N.J. 1997)

(same); Market Transition Facility of New Jersey v. Twena, 941 F. Supp. 462 (D.N.J.

1996) (seeking transfer under 28 U.S.C. § 1404); Newcomb v. Daniels, Saltz,

Mongeluzzi & Barrett, Ltd., 847 F. Supp. 1244 (D.N.J. 1994) (same).

Recognizing the deficiencies in these cited cases, plaintiffs ironically accuse

defendants of forum shopping because defendants answered plaintiffs' Delaware

Complaint prior to service.  Yet, plaintiffs cite to no prohibition to answering a complaint

filed in federal court prior to service.[2]  And there is none.  See, e.g., Roscoe v. Federal

Home Loan Mortgage Ass'n, No. 99-2234, 1999 U.S. App. LEXIS 32274, at *14 (10th

Cir. Dec. 10, 1999) (treating answer filed prior to service as proper) (Ex. G); Garcha v.

City of Beacon, 351 F. Supp. 2d 213, 215-16 (S.D.N.Y. 2005) (same).  Further, as the

Aventis court explained, "[d]efendants have been savvy, clearly, but to accuse them of

forum shopping strains credulity."  Aventis, 403 F. Supp. 2d at 491.  Plaintiffs chose to

sue in this Court, not defendants.

  B.    Under The First-Filed Doctrine, This Action Should Proceed
        In Delaware, As This Court Is The First To Establish Jurisdiction.

To the extent the first-filed doctrine does apply, Delaware, as opposed to New

Jersey, is the appropriate forum because jurisdiction was first established in this Court.

In the Third Circuit, where two similar actions are proceeding in different courts and

there is a jurisdictional dispute in one or both, the case should proceed in the first court to

---

[2] Plaintiffs claim they did not intend to serve defendants until after the resolution of the personal jurisdiction dispute in New Jersey. (Pls.' Mot. at 3.)  Local Rule 4.1(a), however, requires "prompt service of the summons and a copy of the pleadings."  In addition, Local Rule 16.2(c) states that trial shall be scheduled to occur within 12 months, if practicable, and no later than 18 months, after the filing of the Complaint . . . ."

9

{BMF-W0037658.}

establish jurisdiction over the parties and subject matter.

In Old Charter Distillery Co. v. Continental Distilling Corp., 59 F. Supp. 528, 530

(D. Del. 1945), the court specifically held:

> the District Court in the 'Columbia' action has ruled that it has jurisdiction
> over defendant and the subject matter of the controversy between the parties.
> It is the court first acquiring jurisdiction and it is entitled to maintain that
> jurisdiction until it makes final adjudication of the matters for determination.

See also National Patent Development Corp. v. American Hospital Supply Corp., 616 F.

Supp. 114, 118 n. 7 (S.D.N.Y. 1984) (observing that while the issue has not been

definitively decided in the Second Circuit, "[t]he Third Circuit appears to be unequivocal

in its adherence to the rule that jurisdiction must be acquired over the parties before a

case may be considered 'first filed.'").

Likewise, in Jefferson Ward Stores, Inc. v. The Doody Company, 560 F. Supp.

35, 37 (E.D. Pa. 1983), the court rejected plaintiff's first-filed argument, holding that

"[b]ecause jurisdiction in this court is clear . . ., and because the issue of jurisdiction has

not been resolved in Ohio . . . , I will allow the action in this court to continue." The

court's observation in reaching this result is equally applicable to the instant action:

> Defendant has misstated the general rule. It is not the first case filed which
> has precedence, but the 'court first *obtaining jurisdiction* of the parties and the
> issues' which should proceed with the litigation.

Id. (internal citation omitted).

While New Jersey has yet to establish jurisdiction over the parties, this Court

established jurisdiction more than three weeks ago, when defendants' Answer admitted

that jurisdiction and venue were proper. Accordingly, because the parties agree that

jurisdiction lies in this Court and a dispute is inevitable in New Jersey, the first-filed

10

doctrine counsels for denial of plaintiffs' stay motion.

The two first-filed cases cited by plaintiffs are not to the contrary. In fact, these cases do not deviate from the Third Circuit rule that jurisdiction over the parties is a prerequisite to being considered first-filed. In Crosley Corp. v. Hazeltine Corp., 122 F.2d 925 (3d Cir. 1941), an accused infringer filed a declaratory judgment action, followed by the filing of an infringement action by the patent holder against the accused infringer in a separate jurisdiction. In applying the first-filed doctrine in favor of the accused infringer, the court stated "the party who first brings a controversy into a court of competent jurisdiction for adjudication should . . . be free from the vexation of subsequent litigation over the same subject matter." Id. at 930.

In the other case, Kahn v. General Motors Corp., 889 F.2d 1078, 1081 (Fed. Cir. 1989), the Federal Circuit vacated an order staying a first-filed action under the customer suit exception, citing, *inter alia*, jurisdictional concerns with the second-filed action. The court also stated that the first-filed doctrine does not apply when forum shopping motivates the choice of sites for the first suit.

C.    The Hatch-Waxman Act Requires
       that this Action Proceed Expeditiously.

To mitigate the harsh consequences of the 30-month delay of FDA approval, the Hatch-Waxman Act directs the parties to "reasonably cooperate in expediting the action." 21 U.S.C. § 355(c)(3)(C). The Aventis court relied on this provision to rule that the filing of the second action as a "protective measure" does not "'expedite the action' as the statute commands." Aventis, 403 F. Supp. 2d at 490. "[I]f the [first-filed] forum is in any way questionable in order to necessitate a 'protective filing' as plaintiffs maintain,

11

then this Court is clearly the better forum, as all of the parties agree that both jurisdiction and venue lie here." Id.

Plaintiffs' citation to case law addressing "protective measure" filings misses the mark. Plaintiffs point to no case or regulation indicating that protective suits in Hatch-Waxman cases are encouraged or necessary. The cases plaintiffs do cite are simply inapposite. See, e.g., Exxon Mobil v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005) (declaratory judgment defendant in state court contract action filed protective suit in federal court); Rhines v. Weber, 544 U.S. 269 (2005) (protective action filed on habeas corpus petition); Union Pacific R. Co. v. Department of Revenue of Ore., 920 F.2d 581 (9th Cir. 1990) (protective action filed to preserve right to appeal valuation assessment made by Oregon Department of Revenues).

In this case, plaintiffs are seeking to delay, rather than expedite the action. Although plaintiffs allude to a "short stay," it is likely that the requisite discovery and motions practice will require several months or more.[3]  Defendants cannot be put to the Hobson's choice of foregoing their jurisdictional rights in order to receive an expeditious day in court. Accordingly, plaintiffs fall well short of making out "a clear case of hardship or inequity in being required to go forward." Landis, 299 U.S. at 254.

II.    PLAINTIFFS' MOTION TO STRIKE IS EQUALLY FLAWED.

As plaintiffs acknowledge, striking defendants' Answer and Counterclaims will accomplish "a similar result" as granting the motion to stay. (Pls.' Mot. at 8). Plaintiffs' Motion to Strike, therefore, should be denied for the same reasons set forth above. To do

---

[3] This Court has recognized that "long delays" can result from personal jurisdictional challenges. See Thales Airborne Sys. S.A. v. Universal Avionics Sys. Corp., No. 05-853-SLR, 2006 U.S. Dist. LEXIS 41895, at *8-9 (D. Del. Jun. 21, 2006) (Robinson, J.) (Ex. H.)

{BMF-W0037658.}

otherwise would permit the worst kind of forum and judge shopping.

Plaintiffs' Motion to Strike is an afterthought that fails to satisfy the stringent standard required to grant such a motion. A motion to strike "is . . . a drastic remedy to be resorted to only when required for the interests of justice." Abbott Laboratories v. Teva Pharmaceuticals USA, Inc., 432 F. Supp. 2d 408, 432 n.21 (D. Del. 2006). In Abbott, this Court correctly denied a motion to strike when the targeted claim was adequately supported by the pleadings. Id.

Plaintiffs lone basis for striking defendants' Answer and Counterclaims is the allegedly "duplicative and wasteful" nature of this pleading. But there is no duplicative-litigation problem here because the Delaware action is proceeding while the New Jersey action is not. To the extent such a duplicative litigation problem exists, plaintiffs created the problem by filing identical lawsuits and can unilaterally remedy it, without resort to this Court, by voluntarily dismissing the New Jersey Action. "[I]f duplicative litigation and inconsistency are plaintiffs' genuine concern, they can only blame themselves . . . ." Aventis, 403 F. Supp. 2d at 491.

Plaintiffs offer no cases striking an answer and counterclaim based on the existence of an identical co-pending action. See Great West Life Assurance Co. v. Levithan, 834 F. Supp. 858 (E.D. Pa. 1993) (striking defendant's averments that plaintiff's allegations were conclusions of law); Kohn, Savett, Klein & Graf v. Cohen, No. 89-2173, 1990 U.S. Dist. LEXIS 4150 (E.D. Pa. April 11, 1990) (striking corporations' answers, affirmative defenses and counterclaims filed by a non-attorney). (Ex. I.)

13

As such, plaintiffs' reliance on Rule 12(f) appears to be but a misguided attempt to avoid the shortcomings of its misplaced reliance on the first-filed doctrine. It defies logic to suggest that defendants' legitimate Answer and Counterclaims should be stricken merely because plaintiffs chose to sue in multiple jurisdictions.

14

# CONCLUSION

For the foregoing reasons, defendants respectfully submit that the Court should

deny plaintiffs' Motion and allow this case to move forward expeditiously.


January 9, 2007                              By: /s/ Andre G. Bouchard
                                                 Andre G. Bouchard (Bar No. 2054)
                                                 John M. Seaman (Bar No. 3868)
                                                 BOUCHARD MARGULES & FRIEDLANDER, P.A.
                                                 222 Delaware Avenue, Suite 1400
                                                 Wilmington, DE  19801
                                                 Phone: (302) 573-3508
                                                 Fax: (302) 573-3501

OF COUNSEL:

James D. Veltrop (*pro hac vice*)
Jonathan A. Harris(*pro hac vice*)
Chad A. Landmon (*pro hac vice*)
Jo-Anne M. Kokoski (*pro hac vice*)
AXINN VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 275-8100
Fax: (860) 275-8101

15

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADAMS RESPIRATORY | : | CIVIL ACTION |
| THERAPEUTICS, INC. | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | NO. 06-4418 |
| | : | |
| PHARMACEUTICAL HOLDINGS | : | |
| CORP., et al. | : | |
|     Defendants | : | |
| | : | |

------------------------------------------------------------------------------------------------------------

## ORDER

AND NOW, this 2nd day of November, 2006, it is **ORDERED** as follows:

1.    Plaintiff's Motion to Stay (Doc. No. 18), filed on October 24, 2006, is **DENIED**.

Plaintiff brings this action under the Hatch-Waxman Act, asking me to conclude that Defendants'

intended manufacture and sale of a generic drug would violate Plaintiff's patent for the drug

"Mucinex." See 21 U.S.C. § 355(j)(5)(B)(iii).  Plaintiff filed the instant Complaint only two days

after filing a nearly-identical Complaint in the District of New Jersey. Adams Respiratory

Therapeutics, Inc. v. Pharmaceutical Holdings Corp., Civ. Action No. 2:06-cv-04700-HAA-MF

(D. N.J., filed October 2, 2006).  Defendants have disputed jurisdiction in New Jersey, but

concede that jurisdiction exists here.  Plaintiff has explained that it filed in this Court so that it

will have a "back-up" forum in the unlikely event that the New Jersey Court determines after

Plaintiff's statutory forty-five day window has elapsed that the District of New Jersey is without

jurisdiction to hear Plaintiff's first-filed action. See 21 U.S.C. § 355(j)(5)(B)(iii) (to stay FDA

final approval of generic drug application, patent owner must bring suit within forty-five days of

receiving notice that generic drug applicant has filed a certification that the patent is invalid or

not infringed). Plaintiff now seeks a stay of the instant matter, pending the New Jersey Court's decision on jurisdiction. Should that Court determine it is without jurisdiction, Plaintiff would then seek to proceed against Defendants in this Court.

Defendants vigorously contend that Plaintiff seeks a stay solely for delay, so that Plaintiff can take advantage of Hatch-Waxman's thirty month non-compete period. See id. (if patent owner files suit within forty-five day window, FDA will place a thirty-month automatic stay on approval of generic drug application, unless the Court issues a decision before expiration of thirty-month period). Plaintiff responds with equal vigor that Defendants have filed an Answer, Counterclaim, and Summary Judgment Motion (before Plaintiff even served the instant Complaint) to create the false impression that the action before me is well on its way to conclusion.

Without impugning the motives of Plaintiff or Defendants, I believe granting a stay here would encourage judge-shopping. I do not believe the "first-filed" rule – on which Plaintiff almost exclusively relies – applies in the unique circumstances presented here. The decisions Plaintiff has cited – in which the "first-filed" rule is applied – are inapposite. See Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970) (plaintiff filed two cases in different districts, and defendant moved to stay); Old Charter Distillery Co. v. Continental Distilling Corp., 59 F. Supp. 528 (D. Del. 1945) (plaintiff filed two cases in different districts, and second court granted plaintiff's motion to stay after first court ruled that it had jurisdiction). I believe it would be inappropriate to allow a plaintiff to file identical actions in different courts and then pick the court in which it wishes to proceed while the other action is stayed pending the result in the first-filed action. Plaintiff has chosen to sue here; it can not credibly complain that proceeding with this suit is prejudicial. Accordingly, I will deny the Motion to Stay.

2.      Defendants' Motion for Summary Judgment (Doc. No. 10), filed on October 17, 2006, is **DENIED WITHOUT PREJUDICE** because it is premature.  Defendants are free to renew their Motion at the close of discovery or at another appropriate time.

3.      Defendants' Motion for Leave to File Trade Secrets and Confidential Business Information Under Seal (Doc. No. 11), filed on October 17, 2006, is **GRANTED**.

4.      The Declarations of Harry G. Brittain and Robert Dettery, along with the attached exhibits, shall be maintained under seal and shall not be made available to the public, except as provided by subsequent Order of this Court.

5.      Defendants shall file, as soon as practicable, a public record version of the Declarations of Harry G. Brittain and Roberty Dettery with redactions of the portions of the declarations that contain the trade secret and confidential business information.

6.      Defendants' Counterclaim (Doc. No. 4), filed on October 10, 2006, appears to turn entirely on the viability of Plaintiff's patent.  Accordingly, resolution of the merits of Plaintiff's Complaint should precede resolution of the Counterclaim.  Thus, Defendants' Counterclaim is **STAYED** pending resolution of the Plaintiff's claims.

IT IS SO ORDERED.

*/s Paul S. Diamond, J.*

_____

Paul S. Diamond, J.

# EXHIBIT B

-----Original Message-----
From: F. Dominic Cerrito [mailto:FDCerrito@JonesDay.com]
Sent: Thursday, December 07, 2006 4:11 PM
To: Lester J. Savit; Scott Lodin
Cc: hrenk
Subject: Re: Celgene/Novartis v. Abrika - U.S.D.C. N.J. Docket No.
2:06-CV-5818 - Complaint Attached


Why did he want this? What advantage do we get by giving it to him.
Probably just a head start on his motion to dismiss. Was he willing at
least to accept service?

This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other
privilege. If you received this e-mail in error, please delete it from
your system without copying it and notify sender by reply e-mail, so
that our records can be corrected.


    From: Lester J. Savit
    Sent: 12/07/2006 03:57 PM
    To: Scott Lodin" <slodin@ABRIKA.com>
    Cc: hrenk@fchs.com
    Subject: Celgene/Novartis v. Abrika - U.S.D.C. N.J. Docket No.
2:06-CV-5818 - Complaint Attached

Scott:
I am attaching a courtesy copy of the Celgene/Novartis v. Abrika
complaint. Regards, Lester


(Embedded image moved to file: pic13780.jpg)


===========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other
privilege. If you received this e-mail in error, please delete it from
your system without copying it and notify sender by reply e-mail, so
that our records can be corrected. ===========

# EXHIBIT C

LEXSEE 2006 U.S. DIST. LEXIS 91902

Analysis
As of: Jan 08, 2007

**SAMUEL TURNER POOLE, Plaintiff, v. STAN TAYLOR and RAPHAEL WIL-LIAMS, Defendants.**

**Civ. No. 99-635-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 91902*

**December 19, 2006, Decided**

**PRIOR HISTORY:** *Poole v. Taylor, 2006 U.S. Dist. LEXIS 64304 (D. Del., Sept. 7, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff inmate filed this action, pursuant to *42 U.S.C.S. § 1983*, against defendant prison officials alleging unconstitutional conditions of confinement. Defendants filed a renewed motion for summary judgment. Plaintiff filed a motion for declaratory judgment and a motion to strike.

**OVERVIEW:** The court first found that plaintiff presented no valid reasons to strike defendants' motion for summary judgment. On the issue of personal involvement of defendants, the court found that while defendants may not have had specific knowledge of plaintiff, the record reflected that they both were aware of the conditions of confinement at the prison. Regarding plaintiff's due process claim, plaintiff claimed of triple celling, sleeping on a mattress on the floor for approximately 180 days, sporadic hot and cold temperatures within the prison, and that he was subjected to insects crawling on him. The court found that providing sleeping accommodations on the floor was in response to overcrowding at the prison. The record reflected that prison officials made efforts to remedy complaints regarding room temperatures and insects. Indeed, nothing in the record supported a finding that actions taken by prison officials were arbitrary or purposeless so as to appear on its face to be punishment. Regarding plaintiffs' medical needs claim, the court found that plaintiff's medical records indicated that he sustained an injury and received medical care for that injury.

**OUTCOME:** Defendants' motion was granted and plaintiff's motions were denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Strike > General Overview*

[HN1] *Fed. R. Civ. P. 12(f)* states that the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. *Fed. R. Civ. P. 12(f)*. A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f). Rule 12(f) motions to strike are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties or if the allegations confuse the issues. It is thus a drastic remedy to be resorted to only when required for the interests of justice.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*

[HN2] A court shall grant summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of proving that no genuine issue of ma-

terial fact exists. Facts that could alter the outcome are "material," and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. If the moving party has demonstrated an absence of material fact, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial. The court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN3] The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview*
[HN4] Pursuant to *Fed. R. Civ. P. 57* and the Declaratory Judgment Act of 1934, the court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. *28 U.S.C.S. § 2201.* The Act does not attempt to change the essential requisites for the exercise of judicial power. It applies to "cases of actual controversy," a phrase which must be taken to connote a controversy of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts. Declaratory judgment is inappropriate solely to adjudicate past conduct. Also, it is not meant simply to proclaim that one party is liable to another.

*Civil Rights Law > Section 1983 Actions > Scope*
*Torts > Vicarious Liability > Employers > General Overview*
[HN5] An individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations that a de-

fendant directed, had actual knowledge of, or acquiesced in, the deprivation of a plaintiff's constitutional rights. Supervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were the moving force behind the harm suffered by the plaintiff.

*Civil Rights Law > Prisoner Rights > Confinement Conditions*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN6] Pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that are enjoyed by convicted prisoners. To assess whether the constitutional rights of a pretrial detainee have been violated, it must be determined whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." In assessing whether the conditions are reasonably related to the assigned purposes, the court must further inquire as to whether these conditions cause inmates to endure such genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them. According to the United States Supreme Court, confining a given number of people in a given amount of space over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment. The inquiry into whether given conditions constitute "punishment" must therefore consider the totality of circumstances within an institution.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
[HN7] On a motion for summary judgment, it is up to the nonmoving party to designate specific facts showing that there is a genuine issue for trial.

*Civil Rights Law > Prisoner Rights > Confinement Conditions*
[HN8] Overcrowding has become a fact of life in prisons and the need for inmates who cannot make bail to be housed somewhere underlies this legitimate governmental purpose.

2006 U.S. Dist. LEXIS 91902, *

*Civil Rights Law > Prisoner Rights > Confinement Conditions*
[HN9] It is peculiarly within the province of correctional officials, based on their expertise, to determine whether conditions are related to a legitimate government interest, and the court should give deference to the correctional officials' opinions unless it is shown that they have blatantly exaggerated.

*Civil Rights Law > Prisoner Rights > Confinement Conditions*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN10] In conducting the Fourteenth Amendment analysis to evaluate punishment of pretrial detainees, the United States Supreme Court has not elaborated upon the duration of confinement that could constitute an extended period of time, nor has it elaborated upon the kind of privations and hardship that could constitute punishment in violation of the Due Process Clause. However, the Court has cautioned that confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment. In the pretrial detainee context, conditions violating the due process rights of a pretrial detainee are those which are arbitrary and purposeless.

*Civil Rights Law > Prisoner Rights > Medical Treatment*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN11] The Due Process Clause of the Fourteenth Amendment affords a pretrial detainee protection for his medical needs claim. When evaluating whether a claim for inadequate medical care by a pretrial detainee is sufficient under the Fourteenth Amendment, the United States Court of Appeals for the Third Circuit has found no reason to apply a different standard than that set forth in Estelle v. Gamble. To evaluate a medical needs claim, the court determines if there is evidence of a serious medical need and acts or omissions by prison officials indicating deliberate indifference to those needs.

*Civil Rights Law > Prisoner Rights > Medical Treatment*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN12] A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious

harm and fails to take reasonable steps to avoid the harm. A prison official may manifest deliberate indifference by intentionally denying or delaying access to medical care. However, a prisoner has no right to choose a specific form of medical treatment, so long as the treatment provided is reasonable. Moreover, allegations of medical malpractice are not sufficient to establish a constitutional violation. Finally, mere disagreement as to the proper medical treatment is insufficient to state a constitutional violation.

**COUNSEL:** [*1] Samuel Turner Poole, Plaintiff, Pro se, PA Dept of Corrections, Huntingdon, PA.

For Stan Taylor, Raphael Williams, Defendants: Marc P. Niedzielski, LEAD ATTORNEY, Department of Justice, Wilmington, DE; Richard W. Hubbard, LEAD ATTORNEY, Department of Justice, Civil Division, Wilmington, DE.

For Stan Taylor, Raphael Williams, Counter Defendants: Richard W. Hubbard, LEAD ATTORNEY, Department of Justice, Civil Division, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: December 19, 2006
Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Plaintiff Samuel Turner Poole, proceeding pro se, filed this action on September 22, 1999, pursuant to *42 U.S.C. § 1983*, alleging unconstitutional conditions of confinement. At the time plaintiff filed the complaint, he was an inmate housed at the Multi-Purpose Criminal Justice Facility ("Gander Hill"). n1 (D.I. 2) A supplement to the complaint was filed on October 29, 2003, adding a medical needs claim. (D.I. 36, 37) Defendants filed an answer and plaintiff filed a "counterclaim" against the defendants. (D.I. [*2] 49, 51, 60)

> n1 Plaintiff is currently incarcerated at a facility run by the Pennsylvania Department of Corrections in Huntingdon, Pennsylvania.

The case was stayed on November 12, 2004, while awaiting an appellate decision in Hubbard v. Taylor, C.A. No. 00-531-SLR, because of the similar issue of triple celling inmates. n2 (D.I. 55) Defendants moved to consolidate the cases and the motion was granted on May 7, 2005. (D.I. 67, 69) The cases were subsequently de-consolidated on August 5, 2005, and the stay was lifted on August 17, 2005. Discovery commenced and on January 30, 2006, defendants filed a motion for summary judgment followed by a motion to supplement the motion for summary judgment. (D.I. 86, 87, 99) The motion for summary judgment was denied with leave to refile. (D.I. 105)

> n2 Hubbard v. Taylor was decided on February 23, 2006, *399 F.3d 150 (3d. Cir. 2005)*, and the case was remanded to the district court. On September 21, 2006, the court granted defendants' motion for summary judgment, and the case is again before the U.S. Court of Appeals for the Third Circuit, Hubbard v. Taylor, C.A. No. 06-4627 (3d Cir.).

[*3]

Now before the court is defendants' renewed motion for summary judgment. (D.I. 107) Plaintiff responded by filing a motion for declaratory judgment and a motion to strike. (D.I. 114, 115) For the reasons set forth below, the court will grant the motion for summary judgment and will deny the motion for declaratory judgment and motion to strike.

## II. BACKGROUND

The complaint and its supplement allege that when plaintiff arrived at Gander Hill on March 24, 1999, he was given a mattress at booking and receiving and, for the first seventy-two hours, was placed in a cell with nineteen or twenty persons. (D.I. 2; D.I. 37) He was moved to the fitness center, an area he alleges is not designed to house inmates nor is it "set up bathroom wise," and was again "placed on the floor" where he slept with fifty to sixty inmates for a month before he was transferred to a housing unit, Block 1-A, cell 3. (D.I. 2, 36, 37)

Once he transferred to the housing unit, plaintiff alleges that he was told to sleep on the floor. Id. Plaintiff alleges that the housing block is designed for twenty inmates, but was fitted with a top bunk to house forty inmates. Id. Plaintiff alleges that [*4] the housing unit now holds sixty inmates because an additional inmate sleeps on the floor. Id. Plaintiff alleges that while housed there, he slept in his clothes at night and it was so cold his feet were numb. (D.I. 37) He also alleges that he saw

"little gray bugs crawling around on the floor." Id. Plaintiff alleges he remained there a month before being transferred to a new housing unit, 2-M cell 7, and was again asked to sleep on the floor. (D.I. 2) He alleges he was subjected to "encounters" with insects such as millepedes and ants. Id. Plaintiff alleges that, while a pretrial detainee, he slept on the floor "for over 180 day[s] total." (D.I. 36)

Plaintiff also alleges that on July 6, 1999, he received an injury to his right eyebrow which required fifteen stitches. (D.I. 37) Plaintiff complains that, even with his injury, he was placed back in a cell on the floor and it was so hot, "it was sweating." Id. Plaintiff appears to allege he was concerned about an infection because he was placed on an unsanitary floor and there was no air conditioning. Id. He alleges no x-rays were taken to see if there was an infection. Id.

Defendants rely upon their statement [*5] of facts as set forth in their filings in Hubbard v. Taylor, C.A. No. 00-531-SLR, on the basis that the same conditions are at issue at the same prison during the same time period. n3 The court also gleans certain facts from the voluminous discovery defendants provided to plaintiff. (D.I. 95, 97, 98)

> n3 The original complaint in Hubbard v. Taylor was signed by plaintiffs on April 25, 2000, and filed with the court on May 30, 2000. (C.A. No. 00-531-SLR at D.I. 38) The original complaint does not contain any specific dates. The amended complaint describes the time period of the Hubbard v. Taylor case as "well before the filing of the original complaint . . . and since then. . . ." Id. at D.I. 115.

Defendant Stanley Taylor ("Taylor) has been the Commissioner of the Delaware Department of Correction ("DOC") since the fall of 1995 and defendant Raphael Williams ("Williams") is the warden at Gander Hill. *Hubbard v. Taylor, 399 F.3d 150, 153 (3d Cir. 2005).* Gander Hill was constructed [*6] in 1982 and enlarged when a new wing was added in 1992. Id. In 1995, a prison master plan was developed in response to ongoing prison condition litigation. *Id. at 155.* A prison construction project was undertaken, pursuant to the plan, to eliminate overcrowding at Gander Hill. (D.I. 109, A49 at 79) The actual population, however, was higher than the projected population. (D.I. 109, A50 at 81)

Gander Hill receives approximately 18,000 admissions per year. (D.I. 109, A41 at 46) Commissioner Taylor keeps the Delaware Legislature informed during the annual budget hearing of the actual prison population,

the capacity, and the net growth at Gander Hill. (D.I. 109, A37 at 29) He also has advised the Legislature of the risk of overcrowding. Id.

Pretrial detainees are housed in the west wing of Gander Hill, and sentenced inmates are housed in the east wing. *Hubbard, 399 F.3d at 153-54.* Some sentenced inmates are also housed in the west wing. (D.I. 109, A32 at 12) According to Commissioner Taylor, the division between the pretrial detainees and the sentenced inmates is a function of security and convenience. Id. Specifically, the west wing is closer [*7] to the Justice of the Peace court located at Gander Hill. Id.

The typical west wing modular unit or "pod" contains two housing units connected by a control room from which correctional officers can observe the two units. *Hubbard, 399 F.3d at 154.* Each unit contains a large dayroom of approximately 3,900 square feet, containing a sink, tables, chairs and a television. Id. Twenty cells surround the dayroom. Id. With some minor variation, they are all approximately the same size. Id. The cells on the west wing were originally designed to hold one prisoner. (D.I. 109, A32 at 12) The west wing cells were converted from single to double occupancy and then, in approximately 1998 or 1999, the cells were converted to triple occupancy. (D.I. 109, A33 at 13, 15) Triple occupancy was implemented because the institution was "simply out of bed space". (D.I. 109, A33 at 15) The cells in the east wing, where the sentenced inmates are housed, were originally designed for double occupancy. (D.I. 109, A32 at 12; A33 at 13)

In the west wing, an inmate must sleep on a floor mattress when three are housed in a given cell. *Hubbard, 399 F.3d at 154.* The [*8] newest arrival is required to sleep on a mattress on the floor until one of his cellmates is released or moved. Id. This frees a bunk for the inmate who had been on the floor mattress, and any new arrival in that cell would then take his place on the floor mattress. Id. The west wing cells range in size from 69 to 76 square feet, and the net unencumbered space in the cell (gross footage of 69-76 square feet less space required for a bed, mattress, desk and toilet) is less than 50 square feet or 16 square feet per occupant of each tripled cell. Id.

Inmates are continually transferred out of Gander Hill at the rate of 180 per month. (D.I. 109, A39 at 38) As a result of the prison expansion and the recent opening of a housing unit at the Delaware Correctional Center ("DCC"), at some point in time in 2002, enough inmates were transferred from Gander Hill to DCC to empty the gym that had been used for housing. Id. The gym had been used to house inmates, off and on, for a period of three to four years. (D.I. 109, A39 at 38) According to Commissioner Taylor and Warden Williams, up to 80

persons, typically pretrial detainees, were housed in the gym. (D.I. 109, A39 at 38, A63 [*9] at 21) There is one bathroom in the gym, but inmates also have access to bathrooms directly outside the gym entrance. (D.I. 109, A63 at 21-22) Also, there are three bathrooms in the general area. (D.I. 109, A63 at 23) Except in instances of lock down, inmates are allowed to stand in line to wait for the bathroom. (D.I. 109, A63 at 22-23)

The average monthly housing population in the fitness center for 1999 was as follows: April, 50; May, 48; July, 54; August, 51; September, 51; October, 54; November, 52; and December, 48. (D.I. 98, D1) The average monthly housing population in the gym for 1999 was as follows: February, 60; March 87, April, 81; May, 77; August, 78; September, 76; October, 79; November, 66; and December, 67. Id. Institution monthly reports completed by Warden Williams during 1999 for the months of January through March, May, and June through December refer to concerns of overcrowding, housing of inmates in the gym or fitness center, and maintenance issues. (D.I. 98, D6, D28, D45, D79, D97, D103, D109, D126, D147, D167, D183)

Inmate grievances were filed throughout 1999 and, in January, there were complaints of cold cells and hot cells; in February, of cold cells [*10] and hot cells, being bitten by a mouse while sleeping on the floor, and being bitten by fruit flies in the dorm; in March, of no heat in cells; in April, of cold air, an infestation of bugs, unsafe conditions in the gym, mice and spiders on the floor while sleeping, and water bugs on the floor; in May, of overcrowded conditions, ants all over the unit, and a cold pod; in June, of sentenced inmates being housed with unsentenced inmates, spiders and mice crawling on the floor and sleeping on the floor with mice, rooms too hot, and the temperature "not right"; in July, that the cells were too cold or too hot; in August, problems with the temperature, and too cold in cells; in October, cold air in cells; and in December, too cold in cells and no heat in cells. (D.I. 98, D196, D199-200, D202-203, D205, D207, D214-216, D220, D222, D225-227, D234-235, D237, D240, D245, D248, D249, D332-334, D337, D339, D347, D351-385, D388, D391-395) Also, in 1999 there were maintenance work order requests for temperature issues and bug control in January 1999; in February, for rodent and bug extermination and for temperature issues; in March, for rodent problems; in April, for bugs; in June, for temperature [*11] issues; in July, to spray for ants and for temperature issues; in August, for temperature issues and to exterminate gnats, ants and mice; in September, for temperature issues; and in December, for temperature issues and to remove a dead rodent (D.I. 98, D3039, D3043, D3097, D3104, D3114, D3121, D3147, D3148, D3159, D3323, D3442, D3505, D3635, D3654, D3693, D3878, D3879, D3948,

D4197, D4241, D4272, D4513, D4559, D4620, D4682, D4719, D4720, D4759, D4839, D4859, D4874-4875, D5297, D5397)

Plaintiff filed two grievances complaining of housing conditions. On July 7, 1999, he complained that he had been "laying on the floor since [he] arrive[d] a week in booking and receiving then sent to the fitness center for a month then to # 1A-3 to the floor then they sent [him] up to 2-M-7 and still on the floor also the heat and know one [sic] fixing the air cond, or the exhaust fan." (D.I. 98, D327) The grievance was returned as "not grievable." (D.I. 98, D328) Plaintiff filed a second grievance on August 25, 1999, again complaining of sleeping on the floor and that he was subjected to encounters with insects crawling on him such as millipedes and ants. (D.I. 98, D329) Again, the grievance [*12] was returned as "non-grievable." (D.I. 98, D330)

Douglas A. Rodgers ("Rodgers"), maintenance supervisor, states that the average temperatures of housing units at Gander Hill during the summer are in the 72 to 78 Fahrenheit degree range, and during the winter are in the 68 to 72 degree range. n4 (D.I. 109, A149)

> n4 Defendants submitted a video tape of temperature readings, filmed on August 11, 2002, and temperature survey record form for dates in August 2000 and February 2001. (D.I. 109, A152, A154-160, D.I. 113) The filmed readings are of a time-frame different than complained of in the complaint and, therefore, are irrelevant.

Over $ 2.8 million dollars has been spent on capital improvements at Gander Hill during the past five years to maintain or elevate the living conditions for prisoners. (D.I. 109, A145) Improvements were made to the air conditioning system, fire alarm system, roofing and roof replacement, shower, hot water system, water filtration system, kitchen floor, and duct work. Id.

Plaintiff [*13] arrived at Gander Hill in March 1999, and was transferred from the facility in January 2000. (D.I. A100, A105, A130) Until the filing of this lawsuit, Warden Williams was not aware that plaintiff was housed at Gander Hill in 1999. (D.I. 109, A72) Plaintiff's housing complaints and/or grievances were not brought to Warden Williams' attention and Warden Williams' records do not indicate that he was contacted by plaintiff in any manner. Id. According to Warden Williams, Commissioner Taylor would have no reason to be aware that plaintiff was housed at Gander Hill. Id.

Medical records indicate that on July 6, 1999, plaintiff sustained a large cut over the right eye. (D.I. 109, A129) Sutures were necessary to close the cut, the wound was dressed, and plaintiff was given pain medication, an antibiotic, and a tetanus injection. (D.I. 109, A100, A129, A136). Plaintiff presented to medical on July 27, 1999, complaining that the wound was infected. Id. at A130. Plaintiff was examined and advised that, if his wound did not decrease in size or there was redness, he should return to medical. Id.

## III. MOTION TO STRIKE

Plaintiff filed a motion to strike defendants' petition. [*14] (D.I. 115) While not clear, it appears that plaintiff moves to strike defendants' motion for summary judgment. He appears to contend that defendants' discovery practices warrant the striking of the pleading as he argues that defendants used fraud in the discovery as part of their defense. (D.I. 118) Plaintiff also argues that Hubbard v. Taylor, a case whose discovery is relied upon by defendants, has "nothing to do with [his] case."

[HN1] *Rule 12(f) of the Federal Rules of Civil Procedure* states that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f).* "A court possesses considerable discretion in disposing of a motion to strike under *Rule 12(f)*." *River Rd. Dev. Corp. v. Carlson Corporation - Northeast, 1990 U.S. Dist. LEXIS 6201, C.A. No. 89-7037, 1990 WL 69085, at *2 (E.D. Pa. May 23, 1990).* Rule 12(f) motions to strike are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties or if the allegations confuse the issues. . . [*15] .It is thus a drastic remedy to be resorted to only when required for the interests of justice." *Plaum v. Jefferson Pilot Fin. Ins. Co., 2004 U.S. Dist. LEXIS 28968, No. C.A. No. 04-4597, 2004 WL 2980415, at *2 (E.D. Pa. Dec. 22, 2004).*

Plaintiff presents no valid reasons to strike defendants' motion for summary judgment. Defendants have complied with discovery, and plaintiff's belief that Hubbard v. Taylor is inapplicable to the present case does not provide a ground to strike the motion for summary judgment. Therefore, the court will deny the motion to strike. (D.I. 114)

## IV. STANDARD OF REVIEW

### A. Summary Judgment

[HN2] A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party bears the burden of proving that no genuine issue

of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* "Facts that [*16] could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)).* The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).*

[HN3] The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* [*17] If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

**B. Declaratory Judgment**

[HN4] Pursuant to *Federal Rule of Civil Procedure 57* and the Declaratory Judgment Act of 1934 ("the Act"), the court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. *28 U.S.C. § 2201.* The Act "does not attempt to change the essential requisites for the exercise of judicial power." *Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 325, 56 S. Ct. 466, 80 L. Ed. 688 (1936).* It "applies to 'cases of actual controversy,' a phrase which must be taken to connote a controversy of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts." Id. (citation omitted). Declaratory judgment is inappropriate [*18] solely to adjudicate past conduct. *Corliss v. O'Brien, 2006 U.S. App. LEXIS 23905, No. 05-4799, 2006 WL 2686633, at *3 (3d Cir. 2006)* (citing *Gruntal & Co., Inc. v. Steinberg, 837 F.Supp. 85, 89 (D.N.J. 1993)).* Also, it is not meant simply to proclaim that one party is liable to another. Id. (citing *Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1553-54 (Fed. Cir. 1994)* (en banc) (concluding that the plaintiff's prayer for a "declaration" of a regulatory taking was "dif-

ferent from a formal declaration under the Declaratory Judgement Act.")).

**V. DISCUSSION**

**A. Personal Involvement**

Defendants argue that plaintiff has neither pled nor presented evidence of knowledge or personal involvement of a constitutional deprivation by either defendant Taylor or Williams. Defendants refer to the affidavit wherein Warden Williams denies any knowledge, during the relevant time period, that plaintiff was housed at Gander Hill, of plaintiff's housing conditions there, or of plaintiff's injury. Defendants also rely upon the Williams' affidavit to show that Commissioner Taylor had no reason to know about plaintiff or his conditions of confinement. [*19]

[HN5] "'A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior.'" *Evancho v. Fisher, 423 F.3d 347, 353* (quoting *Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).* Personal involvement can be shown through allegations that a defendant directed, had actual knowledge of, or acquiesced in, the deprivation of a plaintiff's constitutional rights. Id.; see *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).* Supervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. *Sample v. Diecks, 885 F.2d 1099, 1117-118 (3d Cir. 1989)*; see also *City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*; *Heggenmiller v. Edna Mahan Corr. Inst. for Women, No. 04-1786, 128 Fed. Appx. 240 (3d. Cir. 2005).*

While defendants may not have had specific knowledge of plaintiff, the [*20] record reflects they both were aware of the conditions of confinement at Gander Hill. Monthly reports prepared by Warden Williams reflect that he was aware of overcrowding and maintenance issues associated with overcrowding. Also, the record reflects that Commission Taylor spoke to the Legislature of the risks of overcrowding and was aware of the triple celling practice. Accordingly, the court will deny the motion for summary judgment on the issue of personal involvement.

**B. Due Process Violation**

Plaintiff alleges that, as a pretrial detainee at Gander Hill, he was subjected to conditions of confinement in violation of his right to due process. More particularly, he complains of triple celling, sleeping on a mattress on

the floor for approximately 180 days, sporadic hot and cold temperatures within Gander Hill, and that he was subjected to insects crawling on him. He alleges that the fitness center where he was housed for a month was not designed to house inmates and was not "set up bathroom wise." Finally, plaintiff contends that, after he received an eye injury, he was placed in an infected area that was not completely clean and that he could have been placed in the hospital [*21] until the wound closed or healed.

Defendants contend that requiring a pretrial detainee to sleep on a mattress on the floor for a limited period of time is not a due process violation when prison officials have no other choice. They argue there is no evidence of any disease at Gander Hill caused by this practice. They also argue that the fact pretrial detainees are allowed to spend their days in a large dayroom adjoining each cell greatly mitigates any suffering due to a temporary lack of a bunk in the cell. They argue that plaintiff does not allege he had no access to a toilet and point to testimony that inmates housed in the gym n5 had access to two toilets, unless there was a lock-down, and then they were required to use the bathroom one at a time. Defendants contend that the housing units are generally 72 to 78 degrees Fahrenheit in the summer, and 68 to 72 degrees Fahrenheit in the winter. Finally, defendants argue that there is no evidence of any intent on the part of Commissioner Taylor or Warden Williams to punish pretrial detainees.

> n5 Plaintiff does not allege that he was required to sleep in the gym. Rather, he alleges that he was required to sleep on the floor in the fitness center. There is no evidence in the record on the availability of bathrooms in the fitness center.

[*22]

Defendants rely upon this court's recent ruling in *Hubbard v. Taylor, 452 F. Supp. 2d 533, 541 (D. Del. Sep 20, 2006)*, that during approximately the same time period, requiring pretrial detainees to sleep on a mattress on the floor of their cells for a period of three to seven months did not violate the detainees' *Fourteenth Amendment* due process rights. Hubbard, however, was limited to the issue of whether a pretrial detainee's constitutional right was violated when he was required to sleep on a mattress on the floor. *Hubbard, 399 F.3d at 154 n.4*. Here, plaintiff raises a host of conditions of confinement complaints, including triple celling and sleeping on the floor.

In response to the motion for summary judgment, plaintiff argues, in general, that placing over 300 pretrial detainees on the floor for a long period of time of at least 180 days is an abuse of process. (D.I. 114) Specifically, plaintiff states in his motion for declaratory judgment that, he was housed in the fitness center for a month, and, during that time, he slept on the floor with fifty to sixty other inmates. Id. The motion for declaratory judgment states that plaintiff [*23] continued to sleep on a mattress on the floor after he was transferred from the fitness center to housing unit 1-A-3, and again, when he was transferred to the 2-M-pod. (D.I. 114) Plaintiff alleges in his complaint that, as a pretrial detainee, he slept on the floor for approximately 180 days. (D.I. 37)

Plaintiff argues that placing sentenced inmates on the new side of Gander Hill shows an abuse of pretrial detainees' rights. (D.I. 114) Finally, plaintiff argues that Commissioner Taylor and Warden Williams were aware that pretrial detainees were sleeping on the floor on mattresses, but turned a blind eye to what the prison employees were doing to the inmates at Gander Hill. Id.

[HN6] "[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that. . . are enjoyed by convicted prisoners." *Bell v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)*. To assess whether the constitutional rights of a pretrial detainee have been violated, it must be determined whether the "disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell v. Wolfish, 441 U.S. 520, 539, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)*; [*24] see also *Hubbard, 399 F.3d at 165*. "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell, 441 U.S. at 538*. "In assessing whether the conditions are reasonably related to the assigned purposes, [the court] must further inquire as to whether these conditions cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them." *Hubbard, 399 F.3d at 159-160* (citing *Bell, 441 U.S. at 542*) (internal quotation marks omitted). According to the Supreme Court, "confining a given number of people in a given amount of space. . .over an extended period of time might raise serious questions under the *Due Process Clause* as to whether those conditions amounted to punishment." *Bell, 441 U.S. at 542*. The "inquiry into whether given conditions constitute 'punishment' must therefore consider the totality of circumstances within an institution." *Ford v. Mercer County Corr. Ctr., 171 Fed. Appx. 416, 419 (3d Cir. 2006)* [*25] (citing *Hubbard, 399 F.3d at 160*).

To survive summary judgment, plaintiff must present sufficient evidence to persuade a reasonable jury that the conditions at Gander Hill constituted punishment. *Ford v. Mercer County Corr. Ctr., 171 Fed. Appx. 416, 419 (3d Cir. 2006)*. Plaintiff has many arguments

why summary judgment is not appropriate, but he presents no evidence that the conditions at Gander Hill constituted punishment or an unreasonable danger to his health. [HN7] It is up to plaintiff to "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

As to the allegations of excessive heat and cold and insect problems, while the record reflects numerous complaints, it also reflects numerous work orders for temperature repairs and pest control. Also, plaintiff merely alleges that the fitness center is not set up for bathroom, but as defendants correctly note, plaintiff does not allege that he was denied access to toilet facilities. Indeed, plaintiff points to no specific facts to show there is a genuine issue for trial on these claims.

Plaintiff's main complaint is that, [*26] as a pretrial detainee, he was required to sleep on a mattress on the floor for a total of approximately 180 days. The facts do not indicate that plaintiff was being punished by being forced to sleep on the floor but, rather, that triple-celling occurred in the west wing because the institution ran out of bed space. [HN8] Overcrowding has become a fact of life in prisons and the need for inmates who cannot make bail to be housed somewhere underlies this legitimate governmental purpose. See *Bell v. Wolfish, 441 U.S. at 539-540*.

As is well established, [HN9] it is peculiarly within the province of correctional officials, based on their expertise, to determine whether conditions are related to a legitimate government interest, and the court should give deference to the correctional officials' opinions unless it is shown that they have blatantly exaggerated. *Bell v. Wolfish, 441 U.S. at 547-548; Hubbard, 399 F.3d at 159*. The facts before the court are that the actual number of inmates was greater than projected and that, even with prison expansions, overcrowding occurred. Prison officials determined that triple-celling pretrial detainees was a method [*27] to deal with their overcrowded facilities.

The court must next ask if the conditions imposed on plaintiff amounted to punishment. *Hubbard, 399 F.3d at 155*. [HN10] In conducting the *Fourteenth Amendment* analysis to evaluate punishment of pretrial detainees, the Supreme Court has not "elaborate[d] upon the duration of confinement that could constitute an extended period of time, nor [has] it elaborate[d] upon the kind of privations and hardship that could constitute punishment in violation of the *Due Process Clause*." *Hubbard, 399 F.3d at 159* (citing *Bell, 441 U.S. at 542*). However, the Court has cautioned that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the *Due Process Clause* as to whether those conditions amounted to punishment." *Bell, 441 U.S. at 542*. In the pretrial detainee context, conditions violating the due process rights of a pretrial detainee are those which are arbitrary and purposeless. *Bell, 441 U.S. at 539*.

As noted above, pretrial [*28] detainees at Gander Hill were sometimes required to sleep on a mattress on the floor because of lack of space, with the newest resident sleeping on the floor. As soon as a bed became available elsewhere, a detainee was moved. Here, the sleeping conditions lasted for a total of approximately 180 days. This district has held that a pretrial detainee plaintiff was not punished by being forced to sleep on the floor of his cell for a three to seven month period. *Hubbard v. Taylor, 452 F. Supp. 2d 533 (D. Del. 2006)*; see also, *Brookins v. Williams, 402 F. Supp. 2d 508, 512-13 (D. Del. 2005)* (pretrial detainee not punished when forced to sleep on the floor for a five day period); but see *Yelardy v. Taylor, 2006 U.S. Dist. LEXIS 9832, Civ. No. 03-1032-GMS, 2006 WL 680660 at *8 (D. Del. March 14, 2006)* (forced to sleep on a mattress on the floor of a cell for over 22 months stated a claim that the pretrial detainee's due process rights may have been violated). It has been determined that a pretrial detainee forced to sleep on the floor on many occasions over a two-year period was not punishment. *Askew v. Fairman, 880 F. Supp. 557 (N.D. Ill. 1995)*(analyzed [*29] under the *Eighth Amendment*). There was no *Fourteenth Amendment* violation when a pretrial detainee was forced to sleep on the floor for an extended time during a four-month period. *Jones v. Sheehan, No. 91 C 8146, 1993 U.S. Dist. LEXIS 6256, 1993 WL 153829 (N.D. Ill 1993)*. Other courts have found that requiring a pretrial detainee to sleep on a mattress on the floor violates the *Fourteenth Amendment* "without regard to the number of days for which a prisoner is so confined." See *Lyons v. Powell, 838 F.2d 28 (1st Cir. 1988); Vazquez v. Gray, 523 F. Supp. 1359 (S.D.N.Y. 1981)*.

In the case at bar, providing sleeping accommodations on the floor was in response to overcrowding at Gander Hill. The record reflects that prison officials made efforts to remedy complaints regarding room temperatures and insects. Indeed, nothing in the record supports a finding that actions taken by prison officials were arbitrary or purposeless so as to appear on its face to be punishment. Notably, plaintiff failed to identify any intention on the part of the defendants to punish plaintiff. Based on the record before the court, plaintiff's period of triple-celling and the other conditions [*30] he complains of cannot be considered punishment and, therefore, they are not a constitutional violation. n6 Accordingly, the court will grant defendants' motion for summary judgment on the due process claim.

n6 Because there is no due process violation, plaintiff's § 1983 claim must fail. Hence, the court will not address the issue of qualified immunity.

### C. Medical Needs Claim

Plaintiff raises a medical needs claim regarding an injury he sustained on July 6, 1999, while he was housed at Gander Hill. Defendants argue this claim should be dismissed for plaintiff's failure to exhaust his administrative remedies. n7 Alternatively, they argue that plaintiff admits he was given medical attention for the head injury. Further, defendants argue that plaintiff alleges no serious medical injury or illness but, rather, that he was at risk for infection to his stitches.

> n7 The court will not address the exhaustion issue inasmuch as there is no constitutional violation.

[*31]

[HN11] As a pretrial detainee, the *Due Process Clause of the Fourteenth Amendment* affords plaintiff protection for his medical needs claim. *Ingraham v. Wright, 430 U.S. 651, 671-72 n.40(1977, 97 S. Ct. 1401, 51 L. Ed. 2d 711)* See also *Bell v. Wolfish, 441 U.S. 520, 535 n.16, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).* When evaluating whether a claim for inadequate medical care by a pre-trial detainee is sufficient under the *Fourteenth Amendment,* the Third Circuit has found no reason to apply a different standard than that set forth in *Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). Natale v. Camden County Correctional Facility, 318 F.3d 575, 581 (3d Cir. 2003).* To evaluate a medical needs claim, the court determines if there is evidence of a serious medical need and acts or omissions by prison officials indicating deliberate indifference to those needs. *Id. at 582.*

[HN12] A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).* A prison official may manifest deliberate indifference by "intentionally denying or delaying [*32] access to medical care." *Estelle v. Gamble, 429 U.S. at 104-05.* However, "a prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley, 219 F.3d 132, 138-140 (2d Cir. 2000).* Moreover, allegations of medical malpractice are not sufficient to establish a constitutional violation. *White v. Na-*

*poleon, 897 F.2d 103, 108-09 (3d Cir. 1990)* (citations omitted); see also *Daniels v. Williams, 474 U.S. 327, 332-34, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)* (negligence is not compensable as a Constitutional deprivation). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. See *Spruill v. Gillis, 372 F.3d 218, 235 (3d. Cir. 2004)* (citations omitted).

Plaintiff's medical records indicate that he sustained an injury and received medical care for that injury. The treatment included sutures, bandaging the wound, and the administration of medication, as well as a follow-up visit. Plaintiff was also given instructions to contact the medical department for any perceived problems with the wound. Nothing in the record [*33] indicates that, after the injury, plaintiff either sought additional treatment for the wound or that such treatment was refused or denied. He argues that he should have seen a plastic surgeon and that he has a scar. This argument does not fall within the ambit of a medical needs claim, but is similar to a malpractice claim, something not viable under § 1983.

There is no genuine issue of fact. Defendants did not demonstrate deliberate indifference to a serious medical need, and the record indicates that plaintiff received reasonable medical care. Therefore, the court will grant the motion for summary judgment on this issue.

### VI. CONCLUSION

For the reasons discussed above, defendants' renewed motion for summary judgment is granted. (D.I. 107) Plaintiff's motion for declaratory judgment and motion to strike are denied. (D.I. 114, 115) An order shall issue.

### ORDER

At Wilmington this 19th day of December, 2006, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendants' renewed motion for summary judgment (D.I. 107) is granted.

2. Plaintiff's motion for declaratory judgment (D.I. 114) is denied.

3. Plaintiff's motion to strike [*34] the defendants' petition (D.I. 115) is denied.

4. The clerk of the court is ordered to enter judgment in favor of defendants and against plaintiff.

Sue L. Robinson

United States District Judge

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHAMBERS OF
*HAROLD A. ACKERMAN*
SENIOR JUDGE

UNITED STATES DISTRICT COURT
POST OFFICE BOX 999
NEWARK, NEW JERSEY 07101-0999

November 16, 2006

## TO ALL COUNSEL OF RECORD

Re:   *Adams Respiratory Therapeutics, Inc. v. Mutual Pharm. Holdings Co.,* Civil Action No.
06-4700

Dear Counsel:

I have reviewed the letters from counsel regarding Plaintiff's request that this Court hold
an immediate status conference "to resolve issues relating to an identical case pending in the
Eastern District of Pennsylvania." (Pl.'s Letter to Court 11/9/06 at 1.)  After careful
consideration, this Court denies Plaintiff's request.

Plaintiff Adams Respiratory Therapeutics, Inc. ("Adams") filed the instant action in this
Court on October 2, 2006.  Prior to filing its Complaint in this Court, Adams learned that
Defendant Mutual Pharmaceutical Holdings, Co. ("Mutual") had challenged this Court's
personal jurisdiction in an unrelated case, *Eisai Co., Ltd. v. Mutual Pharmaceutical,* Civ. No. 06-
3613 (D.N.J. filed August 3, 2006).  As Adams notes, Eisai's response to Mutual's personal
jurisdiction challenge has been stayed pending jurisdictional discovery.

Understandably concerned that a successful challenge to the personal jurisdiction of this
Court by Mutual in the *Eisai* action conceivably could cause Adams problems in its own suit
against Mutual, Adams filed an identical action in the Eastern District of Pennsylvania two days
after filing in this Court.  This was necessary, from Adams's viewpoint, to preserve "certain
substantive rights provided under the Hatch-Waxman Act." (Pl.'s Letter to Court 11/9/06 at 2.)
Subsequent to filing in Pennsylvania, Adams moved that court to stay proceedings there pending
the outcome of the jurisdictional issue in this Court.  The Eastern District of Pennsylvania denied
the motion to stay and the case is proceeding apace in that District.

Adams requests that I exercise my discretion as the Court in which the first action was
filed and enjoin the Eastern District of Pennsylvania from proceeding with the case filed in that
jurisdiction. (Pl.'s Letter to Court 11/9/06 at 3 (citing *Triangle Conduit & Cable, Inc. v.
National Electric Prod. Corp.,* 125 F.2d 1008, 1009-10 (3d Cir. 1942); *Crosley Corp. v.
Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir. 1941)).)  While I recognize that I have the power to
direct the Eastern District of Pennsylvania to stay its related, subsequently-filed proceeding, I
decline to exercise that power.

1

The "first-filed rule" is intended to prevent duplicative litigation, but I do not believe the rule was intended to provide a single plaintiff the opportunity to institute identical suits in various jurisdictions and then put all but the first one on the back burner until such time as the plaintiff deems convenient. *See Triangle*, 125 F.2d at 1008-09 (reversing district court of first-filed case for not enjoining second case filed by *defendant* in another district).

Presumably, Adams would like me to decide the *Eisai v. Mutual* personal jurisdiction issue, which would give Adams some indication of whether it would prevail on the same issue, especially now that Mutual has raised the same personal jurisdiction issue in the *Adams v. Mutual* case as well. If Adams were satisfied with my ruling in the *Eisai v. Mutual* case, then, ostensibly, it would voluntarily dismiss the Pennsylvania action and proceed with its identical case in this Court. Alternatively, now that Mutual has moved this Court to dismiss for lack of personal jurisdiction, it would be of great benefit to Adams if I decided that motion out of turn.

With respect to the *Eisai v. Mutual* motion, I cannot decide a motion that has not been fully briefed and that is stayed pending jurisdictional discovery. With respect to the more recently filed motion by Mutual in this case, I am disinclined to make any decision of such importance in haste. Moreover, as I am sure counsel can appreciate, my docket contains many other motions that were filed well in advance of this one that are of equal importance to the respective parties. While I am sympathetic to Adams's predicament, the situation is of its own making. If Adams wants to proceed in its first choice of forum, it knows how to unilaterally effectuate that circumstance.

This Court hereby DENIES Adams's request for an immediate status conference and hereby DENIES Adams's request that this Court enjoin the Eastern District of Pennsylvania action.

SO ORDERED

s/ Harold A. Ackerman
U.S.D.J.

HAA:amb

2

# EXHIBIT E

LEXSEE 2003 U.S. DIST. LEXIS 21967

Positive
As of: Jan 08, 2007

**BRISTOL-MYERS SQUIBB COMPANY and E.R. SQUIBB & SONS, LLC, Plaintiffs, -against- ANDRX PHARMACEUTICALS, LLC and ANDRX PHARMACEUTICALS, INC., Defendants.**

**03 Civ. 2503 (SHS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 21967; 72 U.S.P.Q.2D (BNA) 1596*

**December 4, 2003, Decided**
**December 5, 2003, Filed**

**DISPOSITION:** [*1] Case transferred to the Southern District of Florida.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent infringement action, defendants filed a motion to dismiss and, in the alternative, filed a motion to transfer the action pursuant to 28 U.S.C.S. § 1404(a) to a different federal district court where an identical action was pending.

**OVERVIEW:** Plaintiffs' principal place of business was in New York and New Jersey, respectively. Both defendants' principal place of business was in Florida. Plaintiffs filed identical patent infringement actions in Florida and New York. Defendant sought to have the New York action transferred to Florida. In granting plaintiffs' motion to transfer, the court held that jurisdiction and venue were proper in Florida. The court held that, considering all of the relevant factors, the convenience of parties and witnesses and the interests of justice would be better served by a transfer. The court held that (1) most witnesses were either in Florida or would have to travel to either New York or Florida, (2) although most documents were in New York, they could be relocated without undue expense, (3) the locus of operative facts was in Florida where the alleged infringement occurred, and (4) although the court was familiar with the subject matter of the action, having presided over a trial on the same patent at issue, because the Florida case was already underway, it was in the interests of judicial economy to avoid

a duplication of efforts and to have the two lawsuits consolidated into one action.

**OUTCOME:** The court granted defendants' motion to transfer.

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN1] In order to prevail on a motion to transfer pursuant to 28 U.S.C.S. § 1404(a), the moving party bears the burden of establishing that the convenience of parties and witnesses and the interests of justice will be better served by transfer to another forum. That burden is heavy: unless the balance is strongly in favor of defendant, plaintiff's choice of forum should rarely be disturbed. While plaintiff's choice of forum is entitled to substantial consideration, the emphasis that a court places on plaintiff's choice of forum diminishes where the facts giving rise to the litigation bear little material connection to the chosen forum.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN2] The prerequisite to evaluating the propriety of a transfer is whether there is a transferee forum available with proper jurisdiction and venue.

2003 U.S. Dist. LEXIS 21967, *; 72 U.S.P.Q.2D (BNA) 1596

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Venue > Motions to Transfer > Choice of Forum*
[HN3] Once a finding has been made that the proposed transferee forum has jurisdiction as well as proper venue, a court should assess the "convenience" and "fairness" of a transfer. The court considers factors such as (1) convenience of the witnesses; (2) location of relevant documents and the relative ease of access to sources of proof; (3) locus of operative facts; (4) convenience of the parties; (5) availability of process to compel attendance of unwilling witnesses; (6) relative means of the parties; (7) forum's familiarity with the governing law; (8) weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice based on the totality of the circumstances. An evaluation of the convenience and fairness of granting a transfer should be based on an individualized, case-by-case consideration of convenience and fairness.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN4] The convenience of the parties and witnesses is generally the most important factor for a court to consider when deciding whether a change of venue is proper. However, the costs and burdens should not merely be shifted from one party to the other.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN5] The location of documents in the transferor forum is entitled to little weight unless defendant makes a detailed showing as to the burden it would incur absent transfer.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*
[HN6] The locus of operative facts is traditionally an important factor to be considered in deciding where a case should be tried. In a patent infringement action, the locus of operative facts is the jurisdiction where the design and development of the infringing patent occurred.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*

[HN7] The convenience of counsel is not relevant to an evaluation of whether to grant a transfer pursuant to 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN8] The parties' convenience is a neutral factor where transfer would only shift the burden from one party to another.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN9] The relative means of the parties cannot be considered absent documentary proof of any economic hardship that would flow to either party as a result of transferring the action.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN10] A court can transfer an action pursuant to 28 U.S.C.S. § 1404(a) without resolving whether personal jurisdiction exists over defendants in the transferor forum.

**COUNSEL:** For Bristol-Myers Squibb Company, ER Squibb & Sons, LLC, PLAINTIFFS: David F Ryan, Pasquale A Razzano, Robert L Baechtold, Fitzpatrick, Cella, Harper & Scinto, New York, NY USA.

For Bristol-Myers Squibb Company, ER Squibb & Sons, LLC, PLAINTIFFS: Henry Park, Res, Astoria, NY USA.

For Andrx Pharmaceuticals, LLC, DEFENDANT: Alan Bruce Clement, Peter J Fallon, Hedman & Costigan, James V Costigan, Hedman & Costigan, PC, New York, NY USA.

For Andrx Pharmaceuticals, LLC, Counter CLAIMANT: Alan Bruce Clement, Peter J Fallon, Hedman & Costigan, James V Costigan, Hedman & Costigan, PC, New York, NY USA.

For Bristol-Myers Squibb Company, ER Squibb & Sons, LLC, Counter DEFENDANTS: David F Ryan, Pasquale A Razzano, Robert L Baechtold, Fitzpatrick, Cella, Harper & Scinto, New York, NY USA.

For Bristol-Myers Squibb Company, ER Squibb & Sons, LLC, Counter DEFENDANTS: Henry Park, Res, Astoria, NY USA.

2003 U.S. Dist. LEXIS 21967, *; 72 U.S.P.Q.2D (BNA) 1596

**JUDGES:** SIDNEY H. STEIN, U.S. District Judge.

**OPINION BY:** SIDNEY H. STEIN

**OPINION:**

OPINION AND ORDER

SIDNEY H. STEIN, U.S. District Judge.

Defendants in this patent infringement action, Andrx Pharmaceuticals, LLC and Andrx Pharaceuticals, [*2] Inc., ("Andrx, LLC" and "Andrx, Inc." or collectively "Andrx") have moved to dismiss the claims brought against them by Bristol-Myers Squibb Company and E.R. Squibb & Sons, LLC (collectively "Bristol") for lack of personal jurisdiction pursuant to *Fed.R.Civ.P. 12(b)(2)*, or alternatively, for a transfer pursuant to *28 U.S.C. § 1404(a)* to the United States District Court for the Southern District of Florida where an identical action is pending before Judge Paul C. Huck. See *Bristol-Myers Squibb Co. et al, v. Andrx Pharmaceuticals, et al.*, No. 03 Civ. 60703 (S.D. Fla. 2003); (Trans. of Oral Arg. before Judge Huck, Sept. 5, 2003, p. 7).

**I. Background**

A. The Parties

Bristol-Myers Squibb Company is a Delaware corporation with its principal place of business in New York. E.R. Squibb & Sons, LLC is a Delaware corporation with its principal place of business in New Jersey. Bristol is also the owner of *United States Patent No. 5,006,344* ("*344 patent*") that forms the underlying grounds for this action. (Compl. PP 1, 2, 7).

Defendant Andrx, LLC is a Delaware limited liability company with a principal place [*3] of business in Florida. Defendant Andrx, Inc. is a Florida corporation with a principal place of business in Florida. Andrx, Inc. conducts business in New York regularly, but Andrx, LCC does not. Both entities are subsidiaries of Andrx Corporation. (Compl. PP 3, 4, 5, 11-16).

B. The Alleged Infringement

Plaintiffs own a patent on a fosinopril formulation which was issued in 1991. (Compl. P7, 8, 10). In 2003, Andrx, Inc. submitted an Abbreviated New Drug Application ("ANDA") for two products: fosinopril sodium and fosinopril sodium with hydrochlorothiazide. (*Id.*). Those ANDA applications are the basis for this infringement litigation pursuant to *35 U.S.C. § 271(e)(2)*. At some point prior to the litigation, Andrx, Inc. assigned the ANDA applications to Andrx, LLC. (Compl. P11, 12). Andrx, LLC mailed to Bristol, pursuant to *21 CFR § 314.95*, certain statutorily required "Paragraph IV certification" notices that alert a patent-holder to a challenge or prospective non-infringing use. (*Id.*).

After receiving these notices, Bristol filed this lawsuit in the United States District Court for the Southern District of New York. [*4] Subsequently, Bristol also filed an identical complaint in the United States District Court of the Southern District of Florida, and that action is currently underway in Florida. No party contests jurisdiction in the Florida action, although Bristol maintains that it only filed that action to preserve its rights in light of certain misrepresentations by defendants, but not as an exercise of its jurisdictional preference. (See Trans. Oral Arg. before Judge Huck, Sept. 5, 2003, 5:13-18, Def's Mot. to Dismiss, p. 13).

**II. Discussion**

Plaintiffs have requested that this Court transfer this action pursuant to *28 U.S.C. § 1404(a)*, which allows a district court to transfer an action for "the convenience of parties and witnesses" and "in the interest of justice" to another judicial district where it might have been brought. n1 Such a grant is within the discretion of the district court. *In re Cuyahoga Equipment Corp., 980 F.2d 110, 117 (2d. Cir. 1992)*.

> n1 That section reads in its entirety as follows: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

[*5]

A. Defendants' Burden

[HN1] In order to prevail on a motion to transfer pursuant to *section 1404(a)*, the moving party bears the burden of establishing that the convenience of parties and witnesses and the interests of justice will be better served by transfer to another forum. See *Nabisco, Inc. v. Brach's Confections, Inc., 2000 U.S. Dist. LEXIS 16168, No. 00 Civ. 5875, 2000 WL 1677935, at *3 (S.D.N.Y. Nov. 6, 2000)*; *Toy Biz. Inc. v. Centuri Corp., 990 F. Supp. 328, 330 (S.D.N.Y. 1998)*; *Christina Canada Inc. v. Wior Corp., 702 F. Supp. 461, 464 (S.D.N.Y.1988)*. "That burden is heavy: 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *Id. at 463* (quoting *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947))*. While the plaintiff's choice of forum is "'entitled to substantial consideration,'" *Warrick v. General Elec. Co. (In re Warrick), 70 F.3d 736, 741 (2d*

*Cir.1995)* (quoting *A. Olinick & Sons v. Dempster Bros., Inc., 365 F.2d 439, 444 (2d Cir.1966)),* "the emphasis that a court places on plaintiff's choice of [*6] forum diminishes where ... the facts giving rise to the litigation bear little material connection to the chosen forum." *Fontana v. E.A.R., 849 F. Supp. 212, 215 (S.D.N.Y. 1994).*

Here, plaintiffs' selected forum has only a slight or "tenuous" connection to the operative facts of the litigation, because "plaintiff's selection of [the] forum has an artificial quality that entitles a court to give it less weight." Id. see also *Anadigics, Inc. v. Raytheon Co., 903 F. Supp. 615, 616 (S.D.N.Y.1995); Coker v. Bank of America, 984 F. Supp. 757, 766 (S.D.N.Y. 1997)* (collecting cases). Bristol-Myer Squibb Company is headquartered in New York, but the research and development of the *'344 patent* took place at E.R. Squibb & Sons, LLC in New Jersey. More importantly, the facts giving rise to this action took place in Florida, as will be fully set forth below. Therefore, the emphasis normally placed on plaintiff's choice of forum is lessened in this instance.

B. Transfer Pursuant to *section 1404(a)*: "Convenience" and "Interest of Justice"

[HN2] The prerequisite to evaluating the propriety of a transfer is whether there is a transferee forum [*7] available with proper jurisdiction and venue. *Alfadda v. Fenn, 159 F.3d 41, 44 (2d Cir. 1998).* As noted, an identical action is underway in the Southern District of Florida and all parties agree that jurisdiction and venue are proper there.

[HN3] Once a finding has been made that the proposed transferee forum has jurisdiction as well as proper venue, a court should assess the "convenience" and "fairness" of a transfer. The court considers factors such as (1) convenience of the witnesses; (2) location of relevant documents and the relative ease of access to sources of proof; (3) locus of operative facts; (4) convenience of the parties; (5) availability of process to compel attendance of unwilling witnesses; (6) relative means of the parties; (7) forum's familiarity with the governing law; (8) weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice based on the totality of the circumstances. See *Kiss My Face Corp. v. Bunting, 2003 U.S. Dist. LEXIS 17096, 2003 WL 22244587, at *1 (S.D.N.Y. 2003); Telebrands Corp. v. Wilton Indus., Inc., 983 F. Supp. 471, 477 (S.D.N.Y. 1997).* An evaluation of the convenience and fairness of granting [*8] a transfer should be based on an "individualized, case-by-case consideration of convenience and fairness." *In re Cuyahoga Equip. Corp., 980 F.2d at 117.* The Court shall now turn to a consideration of each of the relevant factors.

1. The Convenience of the Witnesses

"[HN4] The convenience of the parties and witnesses is generally the most important factor for a court to consider when deciding whether a change of venue is proper." *Telebrands Corp. v. Wilton Industries, Inc., 983 F. Supp. 471, 477 (S.D.N.Y., 1997).* "However, the costs and burdens should not merely be shifted from one party to the other." Id.

Bristol has made a showing that a trial in the Southern District of New York would be easier for four of its witnesses, who are located in the New York tri-state area. (Def's Mem. in Opp. to Mot. to Dismiss, p. 20). For the purposes of this analysis, the Court "dismisses from consideration the convenience of witnesses who are located outside both the current and transferee forums." *Wechsler v. Macke Int'l Trade, Inc., 1999 U.S. Dist. LEXIS 19800, No. 99 Civ. 5725, 1999 WL 1261251, at *6 (S.D.N.Y. 1999).* Therefore, the convenience of Bristol's witness located [*9] in California, and of its expert traveling from an unspecified location, is not relevant. Andrx has indicated that "all of the fact witnesses regarding the formulation of the alleged infringing product who may be called to testify are located in Florida." (Def's Mot. to Dismiss, p. 16). While Andrx fails to list and name these prospective witnesses, the corporation is located in Florida and a number of employees are located there. Additionally, the witnesses who have already presented testimony in this action, Mr. Whitlock and Mr. Lodin, appear to be employed by Andrx in Florida. Moreover, there is no indication that Bristol's witnesses will not be able to either travel to Florida or provide testimony by deposition. This factor favors transfer of this action to Florida.

2. Location of the Documents and Sources of Proof

Bristol also states that the documents to be produced by all parties in this action are located in the Southern District of New York. (Aff. Park, P4-7). Andrx has not contended otherwise. [HN5] The location of documents in New York is "entitled to little weight unless the defendant makes a detailed showing as to the burden it would incur absent transfer." *Royal Ins. Co. of America v. Tower Records, Inc., 2002 U.S. Dist. LEXIS 20109, 2002 WL 31385815, at *6 (S.D.N.Y. Oct 22, 2002).* [*10] There has been no such "detailed" showing in this action, and therefore the Court presumes that in this "era of photocopying, fax machines and Federal Express" the documents can be relocated to Florida without undue expense. *Coker, 984 F. Supp. at 766;* see also *Constitution Reinsurance Corp. v. Stonewall Ins. Co., 872 F. Supp. 1247, 1251 (S.D.N.Y. 1995).*

3. Locus of Operative Facts

Case 1:06-cv-00741-SLR    Document 15-2    Filed 01/09/2007    Page 26 of 27

Page 5

2003 U.S. Dist. LEXIS 21967, *; 72 U.S.P.Q.2D (BNA) 1596

[HN6] The locus of operative facts is "traditionally an important factor to be considered in deciding where a case should be tried." *Royal Ins. Co., 2002 U.S. Dist. LEXIS 20109, 2002 WL 31385815, at *3*. Andrx is the alleged patent infringer, and that alleged infringement originated at the Florida headquarters of the company. In a patent infringement action, the locus of operative facts is the jurisdiction where the design and development of the infringing patent occurred. *Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp., 11 F. Supp. 2d 729, 730 (S.D.N.Y. 1998)*. It is also relevant that the designers, developers, and marketers of the allegedly infringing patent are employed in the transferee forum. See *Wechsler, 1999 U.S. Dist. LEXIS 19800, 1999 WL 1261251, at *4* [*11] (citing *Bionx Implants, Inc. v. Biomet, Inc., 1999 U.S. Dist. LEXIS 8031, 1999 WL 342306, at *4 (S.D.N.Y. May 27, 1999))*. It therefore makes little difference that the development of the underlying Bristol patent took place in New Jersey, where the Bristol research facilities are located. The only action taking place in New York was that Andrx mailed certain Paragraph IV notifications to Bristol headquarters in New York. Therefore this factor favors a transfer to Florida; the Southern District of New York has only a tenuous connection to the facts of this litigation.

4. Convenience of the Parties

Not surprisingly, all parties to this action would prefer to try the action in their respective home jurisdictions. The attorneys for all parties appear to be based in New York, but both sets of attorneys are also able to appear in Florida, and have already demonstrated that they are prepared to do so in this matter. Moreover, [HN7] the convenience of counsel is not relevant to an evaluation of whether to grant a transfer pursuant to *section 1404(a)*. See *Bionx Implants, 1999 U.S. Dist. LEXIS 8031, 1999 WL 342306, at * 4*. The inconvenience to Andrx caused by a suit in New York, though defendants claim it would [*12] be great, cannot be overwhelming when Andrx has previously appeared in actions here. See *Astra Aktiebolag v. Andrx Pharms., Inc., 208 F.R.D. 92 (S.D.N.Y. 2002)*. Bristol alleges that Andrx actually transferred the Aktiebolag litigation to the Southern District of New York from the Southern District of Florida, pursuant to *section 1404(a)*. (Def.'s Mem. in Opp. to Mot. to Dismiss, p. 7). Similarly, the inconvenience to Bristol of a suit in the Southern District of Florida could not be overwhelming in light of the fact that it has filed a concurrent action in that forum. Moreover, [HN8] the parties' convenience is a neutral factor where transfer would only shift the burden from one party to another. *Transatlantic Reinsurance Co. v. Cont'l Ins. Co., 2003 U.S. Dist. LEXIS 20933, No. 03 Civ. 3227, 2003 WL 22743829, at *6 (S.D.N.Y. Nov 20, 2003)*. Thus this factor is not decisive one way or the other.

5. Ability to Compel Unwilling Witnesses

Neither jurisdiction provides an advantage in the ability of the parties to compel unwilling witnesses. No party has set forth any witnesses who would refuse to appear in either forum; therefore, this factor is also neutral.

6. Relative [*13] Means of the Parties

No party has indicated that it will not be able to sustain the expenses of litigating in either jurisdiction. [HN9] This factor cannot be considered absent documentary proof of any economic hardship that would flow to either party as a result of transferring this action. See *Federman Assocs. v. Paradigm Medical Indus., Inc., 1997 U.S. Dist. LEXIS 23685, No. 96 Civ. 8545, 1997 WL 811539, at *4 (S.D.N.Y. Apr. 8, 1997)*.

7. Forum's Familiarity with Governing Law

The forum's familiarity with the governing law favors neither the Southern District of New York nor the Southern District of Florida. Patent law is federal law and "any district court may handle a patent case with equal skill." *Bionx Implants, 1999 U.S. Dist. LEXIS 8031, 1999 WL 342306, at *5; Recoton Corp. v. Allsop, Inc., 999 F. Supp. 574, 578 (S.D.N.Y. 1998)*.

8. Plaintiff's Choice of Forum

"Attention must always be paid ... to the eighth factor --'the weight accorded the plaintiff's choice of forum'-- for 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *Amersham Pharmacia Biotech, 11 F. Supp. 2d at 730* (citing [*14] *Ford Motor Co. v. Ryan, 182 F.2d 329, 330 (2d Cir.1950))*. However, as set forth above, in this action, the importance of plaintiff's choice of forum is greatly diminished for two reasons.

First, the forum selected by plaintiff for this action, the Southern District of New York, has only a tenuous connection to the operative facts of the litigation. See e.g. *Fontana v. E.A.R., 849 F. Supp. 212, 215 (S.D.N.Y. 1994)*. Second, it is plaintiffs who have filed actions in two forums. Bristol contends that it filed in Florida only to preserve its rights: it feared it would not have proper *in personam* jurisdiction over Andrx, LLC in New York. Only because Bristol believed Andrx, LLC to be a necessary party, it filed the second suit. Therefore, Bristol believes its choice of the Southern District of New York as a forum should still be afforded credit, especially because it has already sought to have the Florida action transferred to the Southern District of New York. (Trans. Oral Arg. before Judge Huck, Sept. 5, 2003, 15:3-6). Nevertheless, plaintiffs' double-filing does cut against its choice of the Southern District of New York.

Case 1:06-cv-00741-SLR    Document 15-2    Filed 01/09/2007    Page 27 of 27

Page 6
2003 U.S. Dist. LEXIS 21967, *; 72 U.S.P.Q.2D (BNA) 1596

9. Trial Efficiency and [*15] the Interests of Justice Based on the Totality of the Circumstances

The parties assert that a trial in their respective chosen forums would be more efficient and just. As Bristol points out, this Court has already presided over a trial on the same patent underlying this action and has rendered a decision on that matter. See *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc., 288 F. Supp. 2d 562, 2003 U.S. Dist. LEXIS 19105, No. 01 Civ. 5572, 2003 WL 22434211 (S.D.N.Y. Oct. 27, 2003)*. To the extent that the parties intend to litigate the same issues here, this factor weighs against a transfer. Bristol believes that the Court's familiarity with "active ingredients" in the tablets, and problems Bristol faced in trying to market a successful tablet free of interaction problems, as well as the Court's exposure to expert testimony, will be relevant. (Plt.'s Mem. In Opp. to Mot. to Dismiss, p. 22). Andrx counters that the issues in this trial will be sufficiently distinct to prevent a duplication of effort in familiarizing a second judge with the facts at issue. (Aff. Blischak P17-19). The Teva action involved a lubricant in the patent, and the issue here relates to other excipients. (*Id.*) As proof [*16] of the fact that the issues in the two litigations are perceived by the parties as being different, Andrx quotes Bristol from a discovery dispute in the Southern District of Florida action where Bristol objected to turning over the documents that related to Bristol-Myers Squibb Company v. Teva Pharmaceuticals USA, Inc. because Bristol considered those papers to be "irrelevant and not reasonably calculated to lead to admissible evidence." (Def.'s Reply in Supp. of Mot. to Dismiss, p. 9).

Transferring this case to the Southern District of Florida will still serve judicial economy in that the case will cover different issues and this Court's familiarity may not be relevant. The case is also already underway in the Southern District of Florida and there is a scheduled trial date of February 23, 2004. (Def.'s Mot. to Dismiss, Exh. B). Although the action was recently stayed, Judge Huck has told the parties to prepare the case for litigation in Florida, and to continue discovery proceedings. (Trans. Oral Arg. before Judge Huck, Sept. 5, 2003, 15:22-16:18). It is in the interests of judicial economy to avoid a duplication of efforts and to have these two lawsuits consolidated into one [*17] action.

In light of the fact that the motion to transfer this action is being granted, the Court will not consider Andrx's alternative request to dismiss this action for lack of personal jurisdiction. [HN10] The Court can transfer an action pursuant to *section 1404(a)* without resolving whether personal jurisdiction exists over the defendants in the transferor forum. See *Fort Knox Music Inc. v. Baptiste, 257 F.3d 108, 111-12 (2d Cir. 2001)*.

## III. Conclusion

Andrx has made a clear showing that this case should be transferred, both for the convenience of the parties and in the interest of justice. Therefore, for the reasons set forth above, this action is transferred to the Southern District of Florida.

Dated: December 4, 2003

SO ORDERED:

Sidney H. Stein, U.S.D.J.

# EXHIBIT F

ORIGINAL

1

1                IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                   Norfolk Division

FILED

APR 2 5 2002

CLERK

7  SMIKTHKLINE BEECHAM CORPORATION,  )
                             )
8          Plaintiff,         )
                             )      CIVIL ACTION
9     v.                  )
                             )      NO. 2:02cv51
10  EXCEL PHARMACEUTICALS, INC.,     )
                             )
11        Defendant.        )

12

13

14

15                 TRANSCRIPT OF PROCEEDINGS

16                   Norfolk, Virginia

17                   April 12, 2002

18

19         (Hearing on Motions for Summary Judgment)

20

21

22

   Before:   THE HONORABLE REBECCA BEACH SMITH
23              United States District Judge

24

25

34

1    decision, which we supplied to supplement as soon as we became

2    aware of it, did not wait and guess as to what the Supreme

3    Court may or may not do.

4            Then finally, Your Honor, I do agree that in

5    addition to the benefit to the public, certainly if we can end

6    litigation now, it does save all the parties costs and

7    resources so we can move forward.

8            On those grounds, we rest.   Thank you.

9            THE COURT:   All right.   The first thing that I will

10   rule on is plaintiff's motion for an extension of time

11   pursuant to Rule 56(f) at this juncture, and I deny that

12   motion, and I will give the reasons that I deny that motion.

13           Plaintiff bases his request for an extension of time

14   on three arguments.   The first argument, it says it believes

15   that New Jersey is the more appropriate venue for the case.

16   If that's the case, A, why, did you file it down here?

17   Clearly you can't just be out there choosing your forums and

18   say, all right, let's see where we think we are going to get

19   the better result.

20           On January 25, 2002, GlaxoSmithKline filed a

21   complaint in the Eastern District of Virginia, and they also

22   filed an identical complaint in the District of New Jersey.

23   There is no question that jurisdiction is appropriate here for

24   this case in the Eastern District of Virginia, and I see no

25   persuasive argument at this point, given particularly the

1   current status of the New Jersey case and its lack of movement

2   and so forth, that New Jersey is any more appropriate than the

3   Eastern District of Virginia, and you all chose the forum to

4   begin with.  So I'm certainly not going to open up discovery

5   on an issue like this at this juncture in the case.

6        The second argument was that the plaintiff had

7   insufficient information with which to oppose the motion for

8   summary judgment.  And despite this claim, I'm of the opinion

9   that you don't need more time to respond to the threshold

10  issue presented in the defendant's motion, basically whether

11  you are barred from pursuing an infringement claim under the

12  doctrine of equivalents.

13       The court doesn't get to the doctrine of equivalents

14  if prosecution history estoppel bars a plaintiff from arguing

15  infringement under the doctrine of equivalents.  So first, to

16  save everybody time and money, let's decide that question.  If

17  you prevail on that question, then there can be adequate

18  discovery.  I won't rule on the doctrine of equivalents.  But

19  I don't know that discovery is necessary there yet.

20       And the final argument for extension is that the

21  Supreme Court has granted cert in the case of _Festo_ Corp. and

22  that Excel relies on _Festo_ to argue that plaintiff is barred

23  from arguing the doctrine of equivalents in this case.  I note

24  three things.  Number one, Excel relies on numerous other

25  Federal Circuit cases which strongly support its position, as

GLORIA S. SMITH, OFFICIAL REPORTER

# EXHIBIT G

LEXSEE 1999 U.S. APP. LEXIS 32274

Analysis
As of: Jan 08, 2007

**BENJAMIN J. ROSCOE; GERALDINE M. ROSCOE, Plaintiffs-Appellants, v. FEDERAL HOME LOAN MORTGAGE ASSOCIATION; BANK UNITED OF TEXAS FSB, Defendants-Appellees.**

**No. 99-2234**

**UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

*1999 U.S. App. LEXIS 32274; 2000 Colo. J. C.A.R. 6617*

**December 10, 1999, Filed**

**NOTICE:** [*1] RULES OF THE TENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1999 U.S. App. LEXIS 36496.* Certiorari Denied October 2, 2000, Reported at: *2000 U.S. LEXIS 5201.*

**PRIOR HISTORY:** (D.N.M.). (D.C. No. CIV-98-1500-BB/LFG).

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant husband and wife challenged an order from the United States District Court for the District of New Mexico granting summary judgment for appellee bank and government lending agency in a suit brought by appellants seeking a refund of a prepayment premium on a loan.

**OVERVIEW:** When appellants prepaid a loan and were charged a prepayment premium, appellants filed suit against appellee bank and appellee government mortgage agency, seeking a refund. The district court granted appellees' motion for judgment as a matter of law. On appeal, the court affirmed. Appellants contended that the district court lacked jurisdiction; improperly denied appellants' default judgment; improperly granted defen-

dants' motions for summary judgment; and should have granted summary judgment in appellants' favor. The documents before the district court were sufficient to permit removal. Appellees' answers were timely; therefore, appellants' motion for default judgment was unfounded. Appellants' assertion that appellees conceded liability by choosing not to file a motion for summary judgment was incorrect. No evidence existed to support appellants' argument that defendant bank breached their agreement. Appellants' reliance on state law was unfounded because it did not apply to multi-unit apartment complexes like the one refinanced by appellants.

**OUTCOME:** The judgment of the district court was affirmed. The district court did not err in denying appellants' motion for default. Appellees had not conceded liability by not filing motions for summary judgment. No evidence existed that there was a breach of an agreement. Appellants' reliance on state law was unfounded.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pretrial Judgments > Default > Entry of Default Judgments*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Real Property Law > Financing > Secondary Mortgage Market > Federal Home Loan Mortgage Corporation*
[HN1] Decisions to enter judgment by default are committed to the district court's sound discretion, and review is for abuse of discretion.

Case 1:06-cv-00741-SLR    Document 15-3    Filed 01/09/2007    Page 7 of 29

Page 2

1999 U.S. App. LEXIS 32274, *; 2000 Colo. J. C.A.R. 6617

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] A court reviews a grant of summary judgment de novo.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN3] Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. When applying this standard, a court views the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Civil Procedure > Summary Judgment > Appellate Review > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
*Civil Procedure > Appeals > Standards of Review*
[HN4] In reviewing a grant of summary judgment, a court does not consider materials not before the district court.

*Civil Procedure > Appeals > Briefs*
*Civil Procedure > Appeals > Reviewability > Preservation for Review*
[HN5] *Fed. R. App. P. 28(a)(9)(A)* provides that the appellant's initial brief must contain appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies. In the same vein, a litigant who mentions a point in passing but fails to press it by supporting it with pertinent authority forfeits the point.

*Civil Procedure > Appeals > Standards of Review > Reversible Errors*
*Contracts Law > Defenses > Unconscionability > General Overview*

[HN6] While a contract may be held to be substantively unconscionable under New Mexico law, the threshold for such a holding is very high.

*Contracts Law > Defenses > Unconscionability > General Overview*
[HN7] To be unconscionable a contract must be such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.

*Contracts Law > Defenses > Unconscionability > General Overview*
[HN8] The doctrine of unconscionability was intended to prevent oppression and unfair surprise, not to relieve a party of a bad bargain.

*Contracts Law > Remedies > Restitution*
[HN9] New Mexico recognizes that a person receiving a benefit has been unjustly enriched if retention of the benefit would be unjust.

*Contracts Law > Breach > General Overview*
*Real Property Law > Financing > Secondary Mortgage Market > Federal Home Loan Mortgage Corporation*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN10] To pursue a claim for tortious interference with existing or prospective contractual relations, a plaintiff must establish that the defendant interfered with an improper motive or by improper means, or acted without justification or privilege.

*Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview*
[HN11] See *N.M. Stat. Ann. § 56-8-30* (Michie 1998).

*Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview*
*Real Property Law > Mobilehomes & Mobilehome Parks > Maintenance & Use*
[HN12] See *N.M. Stat. Ann. § 56-8-24* (Michie 1998).

*Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview*
[HN13] *N.M. Stat. Ann. § 56-8-24* (Michie 1998) contemplates protecting purchasers of dwellings intended to house four families or less.

1999 U.S. App. LEXIS 32274, *; 2000 Colo. J. C.A.R. 6617

**COUNSEL:** For BENJAMIN J. ROSCOE, Plaintiff - Appellant: Benjamin J. Roscoe, Albuquerque, NM.

For FEDERAL HOME LOAN MORTGAGE ASSOCIATION, Defendant - Appellee: Thomas J. McBride, Hinkle, Cox, Eaton, Coffield & Hensley, Albuquerque, NM. Hyacinth Grey Kucik, McLean, VA.

For Bank UNITED OF TEXAS FSB, Defendant - Appellee: Timothy M. Sheehan, Kim A. Griffith, Sheehan, Sheehan and Stelzner, Albuquerque, NM.

**JUDGES:** Before ANDERSON, KELLY and BRISCOE, Circuit Judges.

**OPINION BY:** MARY BECK BRISCOE

**OPINION:**

### ORDER AND JUDGMENT *

    * This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[*2]

    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See *Fed. R. App. P. 34(a)(2)*; *10*th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

    Pro se plaintiffs Benjamin J. Roscoe and Geraldine M. Roscoe ("the Roscoes") sued the defendants, Federal Home Loan Mortgage Association ("Freddie Mac") and Bank United of Texas, FSB ("Bank United"), in New Mexico state court. The crux of the Roscoes' complaint was that the defendants unlawfully "extracted" a financial premium when the Roscoes prepaid a loan. After the defendants removed the case to federal court, the district court denied the Roscoes' motion for a default judgment and granted the defendants' motion for judgment as a matter of law. We affirm.

I.

    This litigation stems from a "Loan Agreement" ("Agreement") signed by the Roscoes and Bank United on June 28, 1994. Through the Agreement, the Roscoes obtained a 20-year loan from Bank United in the amount

of $ 2,325,000. The purpose of the loan was to refinance apartment property owned by the Roscoes in Albuquerque, New Mexico ("apartment [*3] property"). The apartment complex on this property contains more than 100 units. The Agreement contained the following provision:

> WHEREAS, [the Roscoes] shall of even date herewith execute and deliver to [Bank United] certain loan documents including, without limitation, a Multifamily Note with attachments . . . and a Multifamily Mortgage, Assignment of Rents and Security Agreement with attachments . . . (the Note, the Mortgage, and all other documents evidencing, securing, and relating to the Note are collectively referred to herein as the "Loan Documents") . . . .

Record on Appeal ("ROA"), Doc. 23, Exh. 4, at 1. The parties acknowledged in the Agreement that Freddie Mac would "purchase the loan and take an assignment of the Loan Documents in accordance with the Freddie Mac Multifamily Guide and the terms of Freddie Mac's commitment letter dated May 31, 1994 . . . ." Id. n1

    n1 On June 2, 1994, Bank United sent a letter agreement to the Roscoes. The letter agreement included a copy of Freddie Mac's May 31, 1994 "commitment letter" and stipulated (among other things) that (1) Bank United would sell the loan to Freddie Mac and (2) the Roscoes could prepay the note in accordance with Freddie Mac's requirements "together with the payment of a prepayment premium calculated pursuant to [Freddie Mac's] form yield maintenance formula with a yield maintenance period of ten (10) years." The Roscoes signed the letter agreement on June 7, 1994. ROA, Doc. 23, Exh. 3, at 1-2, 6.

[*4]

    In compliance with the terms of the Agreement, the Roscoes executed a Multifamily Note ("Note"). The Note incorporated by reference a "Rider to Multifamily Note (Prepayment Premium/Yield Maintenance)" ("Rider"). Id., Exh. 6, at 2. This Rider explained that a "prepayment premium" would be calculated and assessed if the Roscoes prepaid the loan. The Roscoes signed the Rider and agreed to waive "any right to prepay the loan in whole or in part prior to the maturity date of the Note, except as expressly provided" in the Rider. Id., Exh. 7, at 1-3. The Roscoes also acknowledged in the Rider that "in the event of any such prepayment," Bank United

1999 U.S. App. LEXIS 32274, *; 2000 Colo. J. C.A.R. 6617

shall be entitled to damages for the detriment caused thereby, but . . . it is extremely difficult and impractical to ascertain the extent of such damages. Borrower [i.e., the Roscoes] therefore acknowledges and agrees that the prepayment premiums set forth in this Rider represent reasonable estimates of such damages to [Bank United], which sum Borrower agrees to pay upon demand. Borrower acknowledges that the prepayment premium provisions of this Rider are a material part of the consideration for the loan.

Id. [*5] at 3.

In 1996, the Roscoes decided to refinance the apartment property again. To obtain another loan from a different lender, the Roscoes made a business decision to prepay the Bank United loan. Id., Exh. 1, at 87-89. Before they made the prepayment, the Roscoes received a "payoff quote" from Bank United indicating that the premium (or "prepayment penalty") would be $ 394,684.39. Id., Exh. 9. The Roscoes paid the premium but still received over $ 1,000,000 in cash from the new loan proceeds after payment of the Bank United loan. Id., Exh. 1, at 119-20; Exh. 10.

The Roscoes filed suit against Bank United and Freddie Mac in 1998. Seeking a refund of the prepayment premium plus interest and damages, the Roscoes attempted to assert eight claims. The Roscoes alleged in their state court complaint that (1) the Rider was an impermissible and unenforceable "amendment" to the Agreement; (2) Freddie Mac was unjustly enriched by its receipt of the prepayment premium; (3) their promise to pay the prepayment premium lacked consideration; (4) the terms of the Rider were vague, ambiguous, and contrary to state law; (5) the Rider was an "illegal promise" because "the formula for determining [*6] the prepayment premium" revolved around "outcomes of events which depend on chance;" (6) the amount of the prepayment premium was unconscionable and in violation of the implied covenant of good faith and fair dealing; (7) Bank United's use of the Rider constituted "consumer fraud" and a "deceptive business practice" under New Mexico's Unfair Practices Act; and (8) Freddie Mac tortiously interfered with the Roscoes' Agreement by inducing Bank United to breach the contract. Id., Doc. 1, Exh. A, at 1-9.

Freddie Mac removed the case to federal court pursuant to *12 U.S.C. § 1452*(f). n2 Id., Doc. 1, at 1-2. Shortly thereafter, the Roscoes filed a motion for default

judgment. The Roscoes asserted in the motion that Bank United and Freddie Mac were served with process on November 12, 1998, but failed to respond to the complaint within 30 days. Id., Doc. 6, at 1. The district court denied the motion, holding that (1) the 30-day time period did not begin on November 12, 1998 because the Roscoes did not receive an "acknowledgment of service" from the defendants as required by New Mexico Rule of Civil Procedure 1-004(E); n3 and (2) the defendants answered the [*7] complaint even though the service effected by the Roscoes was inadequate, thus rendering the answers timely. Id., Doc. 30, at 1-2. The Roscoes then moved for reconsideration or permission to file an interlocutory appeal. Id., Docs. 41-42. The Roscoes later withdrew this motion, stating that upon reflection they believed the order denying their request for a default judgment "was well within the Court's discretion and was correct and just." Id., Doc. 43, at 1.

n2 Section 1452(f) provides that "all civil actions" to which the Federal Home Loan Mortgage Corporation ("Corporation") is a party "shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such actions, without regard to amount or value . . . ." The statute further provides that:

> any civil or other action, case or controversy in a court of a State, or in any court other than a district court of the United States, to which the Corporation is a party may at any time before the trial thereof be removed by the Corporation, without the giving of any bond or security, to the district court of the United States for the district and division embracing the place where the same is pending . . . . by following any procedure for removal of causes in effect at the time of such removal.

[*8]

n3 Rule 1-004(E) states in relevant part:

> A summons and complaint may be served upon a defendant . . . by mailing a copy of the summons and of the complaint (by first-class mail, postage prepaid) to the person to be served, together

Case 1:06-cv-00741-SLR    Document 15-3    Filed 01/09/2007    Page 10 of 29

Page 5

1999 U.S. App. LEXIS 32274, *; 2000 Colo. J. C.A.R. 6617

with two (2) copies of a notice and acknowledgment conforming with the form set out below and a return envelope, postage prepaid, addressed to the sender. If no acknowledgment of service under this subdivision of this rule is received by the sender within twenty (20) days after the date of mailing, service of such summons and complaint shall be made by a person . . . . Unless good cause is shown for not doing so, the court shall order the payment of the costs of personal service by the person served if such person does not complete and return within twenty (20) days after mailing the notice and acknowledgment of receipt of summons. . . .

In the meantime, Bank United filed a motion for summary judgment. Id., Docs. 22-23. Freddie Mac adopted Bank United's motion in toto, adding a single undisputed fact: Before the Roscoes obtained the Bank United loan, [*9] they prepaid a prior loan on the apartment property and, as a consequence, paid a separate prepayment premium to Freddie Mac. Id., Docs. 36, 40; Doc. 44, at 2. The district court granted the defendants' motions, concluding that (1) the Agreement, including the attached Rider, was a valid contract, id., Doc. 49, at 5-6; (2) the Rider was incorporated by reference and therefore was not an "amendment" to the contract, id. at 7; (3) the prepayment provision of the Agreement was enforceable under New Mexico law, id. at 7-8; and (4) the amount of the prepayment premium was not unconscionable, tantamount to "unjust enrichment," or otherwise illegal. Id. at 9-10. Even though the defendants did not specifically address the Unfair Practices Act in their motions, the district court entered summary judgment sua sponte on that claim because the Roscoes failed to identify any false, deceptive, or misleading statements. Id. at 10-11.

## II.

The Roscoes present four arguments on appeal. They contend that the district court (1) lacked jurisdiction over the case and should have remanded the dispute to state court; (2) improperly denied their motion for a default judgment; [*10] (3) improperly granted the defendants' motions for summary judgment; and (4) should have granted summary judgment in the Roscoes' favor on all claims "conceded" by the defendants.

## A. Jurisdiction and Removal

The Roscoes' challenge to the district court's jurisdiction is twofold. First, they contend that the state court record was not transmitted to the district court. According to the Roscoes, the absence of these documents should have prevented the district court from exercising jurisdiction. Second, they point to the district court's language in the order denying their motion for a default judgment that the "attempted service by mail" on Bank United and Freddie Mac was "ineffective." Id., Doc. 30, at 2. If this service was ineffective, say the Roscoes, then the defendants were not parties to the case and could not have been subject to the district court's jurisdiction. Because removal is typically an issue of statutory construction, "we review a district court's determination of the propriety of removal de novo." *Huffman v. Saul Holdings Ltd. Partnership, 183 F.3d 1180, 1999 WL 791587,* at *3 (10th Cir. 1999) (citation omitted). [*11]

We conclude the Roscoes' arguments lack merit. First, the documents before the district court were sufficient to permit removal. To its notice of removal, Freddie Mac attached copies of the summonses served on itself and Bank United, the Roscoes' complaint, and each document appended to the complaint. No more was required under *28 U.S.C. § 1446.* See *28 U.S.C. § 1446*(a) (stating that a defendant or defendants "desiring to remove any civil action" shall file a notice of removal "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action"). Second, the Roscoes' "ineffective service" argument also fails. Putting aside the issue of whether the Roscoes could have pursued their complaint in any court if they failed to serve the defendants in accordance with state law, the defendants answered the complaint and subjected themselves to the district court's jurisdiction. ROA, Docs. 2, 5. Moreover, it is clear that Freddie Mac's notice of removal was otherwise proper, since *12 U.S.C. § 1452* provided [*12] the district court with original jurisdiction over the action. n4

> n4 The defendants also note that the Roscoes did not object to Freddie Mac's notice of removal in the district court. Given their obvious substantive deficiencies, we decline to address whether the Roscoes waived these objections by failing to raise them below.

## B. Default Judgment

Case 1:06-cv-00741-SLR   Document 15-3   Filed 01/09/2007   Page 11 of 29

Page 6

1999 U.S. App. LEXIS 32274, *; 2000 Colo. J. C.A.R. 6617

The Roscoes' defense of their motion for a default judgment proceeds along the following lines. The Roscoes mailed summonses dated November 6, 1998 to Bank United and Freddie Mac. The defendants received these summonses on November 12, 1998. The Roscoes maintain that under New Mexico Rule 1-004(E), the defendants had 30 days from the date of the summonses (November 6) to respond to the complaint. As a result, because Freddie Mac did not file its notice of removal until December 7, 1998 - and Bank United did not file a responsive pleading until some time after December 7 - the district court should have entered a default judgment in the Roscoes' favor. n5 "Decisions [*13] [HN1] to enter judgment by default are committed to the district court's sound discretion, and our review is for abuse of discretion." *Dennis Garberg & Associates, Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767, 771 (10th Cir. 1997).*

n5 The Roscoes further assert that Freddie Mac neglected to respond to their motion for a default judgment. This is plainly false. Although the district court inadvertently omitted the response from its minute entries, the record on appeal includes a file-stamped copy of Freddie Mac's "Response In Opposition To Plaintiffs' Application For Default Judgment." ROA, Doc. 54. The Roscoes argue that we should not consider Freddie Mac's response because Freddie Mac did not bring the omission to the district court's attention until after the case was on appeal. Whether or not the district court had the authority to correct its own minute entries after the Roscoes filed an appeal, Freddie Mac's response brief is part of the record and need not be ignored by this court.

The Roscoes' [*14] attack on the denial of their motion for judgment by default is unpersuasive. As an initial matter, the Roscoes failed to mention in their notice of appeal any issue connected with the district court's denial of their motion for a default judgment. ROA, Doc. 50. This alone is fatal to the Roscoes' position, for we have jurisdiction to review "only the judgment or part of the judgment designated in the notice of appeal." *Averitt v. Southland Motor Inn of Oklahoma, 720 F.2d 1178, 1180 (10th Cir. 1983); accord Foote v. Spiegel, 118 F.3d 1416, 1422 (10th Cir. 1997).* n6 Furthermore, even if the Roscoes had identified this issue in their notice of appeal, the district court properly denied their request for judgment by default. New Mexico Rule 1-004(E) provides that a plaintiff may serve a defendant by mail with a copy of the summons, a copy of the complaint, and copies of a notice and acknowledgment form. If, however, the acknowledgment form is not returned to the

plaintiff within 20 days, the plaintiff must effect personal service on the defendant. Here, Bank United and Freddie Mac never returned the acknowledgment forms, and the Roscoes did not serve [*15] the defendants personally. Accordingly, the district court correctly determined that the Roscoes' attempted service by mail was "ineffective." ROA, Doc. 30, at 2. n7 Since the defendants chose to file their answers before personal service was effected, those answers were timely and the Roscoes' motion for a default judgment was unfounded.

n6 The defendants contend that the Roscoes also waived any challenge to the district court's denial of their motion for a default judgment by conceding in their motion to withdraw that the court's order was "correct and just." Once again, the balance of our opinion makes it unnecessary for us to address this argument.

n7 Courts interpreting the former version of *Federal Rule of Civil Procedure 4(c)(2)(C)(ii),* which is similar to New Mexico Rule 1-004(E), likewise recognize that service by mail is "ineffective" if the defendants do not return the acknowledgment form within the allotted time period. See, e.g., *Hajjiri v. First Minnesota Sav. Bank, F.S.B., 25 F.3d 677, 678 (8th Cir. 1994); Mason v. Genisco Tech. Corp., 960 F.2d 849, 852 (9th Cir. 1992); see also Tso v. Delaney, 969 F.2d 373, 375 (7th Cir. 1992)* ("Service by mail . . . is not complete unless the acknowledgment form is returned by the defendant."); *Carimi v. Royal Carribean Cruise Line, Inc., 959 F.2d 1344, 1347 (5th Cir. 1992)* ("If mail service is attempted and the acknowledgment form is not returned, there is no service.").

[*16]

## C. Summary Judgment

[HN2] We review a grant of summary judgment de novo. *King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1089 (10th Cir. 1999); Martin v. Kansas, 190 F.3d 1120, 1128 (10th Cir. 1999).* [HN3] Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* When applying this standard, we "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Martin, 190 F.3d at*

*1129;* accord *King of the Mountain Sports, 185 F.3d at 1089.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Martin, 190 F.3d at 1129* (quoting *Hardy v. S.F. Phosphates Ltd. Co., 185 F.3d 1076, 1078-80 (10th Cir. 1999)).*

The Roscoes object to the district court's grant of summary [*17] judgment on several grounds. First, the Roscoes assert that the Rider was an unauthorized "amendment" to the Agreement. In support of this argument, the Roscoes highlight an integration clause stating that the Loan Agreement "embodies the entire agreement between the parties, supersedes all prior agreements and understandings," and "may be amended only by an instrument in writing executed by all of the parties hereto." ROA, Doc. 23, Exh. 4, at 2. Second, the Roscoes argue that the clause of the Agreement incorporating the Rider is only "prefatory" and not binding because it begins with the word "whereas." Third, the Roscoes aver that the Rider was invalid because there was no consideration for it. Fourth, Mr. Roscoe maintains that the Rider was disclosed "near the end of the transactions conducted at the closing meeting," Appellants' Opening Brief at 11, and that he did not fully understand the import of the Rider. n8

> n8 The Roscoes make several other arguments in passing. For instance, the Roscoes assert that "there are more than two plausible interpretations of the Loan Agreement." Appellants' Opening Brief at 20. In support of this argument, however, the Roscoes merely restate their position that the Rider impermissibly "amended" the contract. The Roscoes also claim that there are disputed issues of material fact, but do not support this argument with citations to evidence in the record. Instead, they again restate their position that the Rider "amended" the contract and could not have been incorporated into the Agreement through a non-binding "whereas" clause.

[*18]

These objections are, to say the least, ill-conceived. The district court properly disposed of the Roscoes' first argument:

> The prepayment rider was incorporated by reference into the note itself, attached thereto, and separately agreed upon by Mr. Roscoe. Mr. Roscoe cannot expect this Court to believe that he agreed to the terms of the note, including the attached prepayment rider, but that such rider is invalid because a prior written

agreement to amend was not executed. The absurdity of such argument need not be further discussed.

ROA, Doc. 49, at 7; see also *Crow v. Capitol Bankers Life Ins. Co., 119 N.M. 452, 891 P.2d 1206, 1210-11 (N.M. 1995)* ("If two or more writings are part of a single transaction and concern the same subject matter, then they are a single contract."). The Roscoes' second argument fares no better. The Roscoes cite no authority to show that the language in the contract preceded by the word "whereas" should simply be disregarded. In any event, even if the language in the "whereas" clause was not strictly "binding," it notified the Roscoes that the Note and the Rider - which were signed by all interested parties - were part of the [*19] loan transaction. The Roscoes' third argument similarly ignores the plain language of the contract. In exchange for their consent to the terms of the Agreement, the Roscoes received a loan worth $ 2,325,000. The Roscoes expressly acknowledged that "the prepayment premium provisions of the Rider are a material part of the consideration for the loan." ROA, Doc. 23, Exh. 7, at 3. Finally, the Roscoes' fourth argument lacks evidentiary support. The only evidence cited by the Roscoes on this point is an affidavit executed by Mr. Roscoe that was not presented to the district court. [HN4] "In reviewing a grant of summary judgment, we do not consider materials not before the district court." *Myers v. Oklahoma County Bd. of County Commissioners, 151 F.3d 1313, 1319 (10th Cir. 1998)* (citing *John Hancock Mut. Life Ins. Co. v. Wiseman, 27 F.3d 500, 506 (10th Cir. 1994)).* n9

> n9 Even if this affidavit had been presented to the district court, it would have been insufficient to forestall summary judgment. Over the last 30 years, Mr. Roscoe (who has a Ph.D. from Johns Hopkins University in electrical engineering) has purchased 10 to 12 income-producing properties. ROA, Doc. 23, Exh. 1, at 4-5, 8, 68-69. Mr. Roscoe was familiar with prepayment premiums, having paid such a penalty to another Freddie Mac lender before entering into the contract with Bank United. Id., Doc. 44, Exh. A, at 11, 19-22. The defendants informed Mr. Roscoe several weeks before the Agreement was executed that the contract would include a prepayment premium provision. See id., Doc. 23, Exh. 3, at 1-2, 6. Mr. Roscoe was given an opportunity to review the Rider and other loan documents, read the Rider before signing it, and was capable of understanding the mathematical formula for calculating the premium. Id., Exh. 1, at 25, 68-69,

Case 1:06-cv-00741-SLR    Document 15-3    Filed 01/09/2007    Page 13 of 29

Page 8
1999 U.S. App. LEXIS 32274, *; 2000 Colo. J. C.A.R. 6617

105-06. Given Mr. Roscoe's background, the circumstances surrounding the execution of the Agreement, and his obligation to carefully review the contract under New Mexico law, see *Smith v. Price's Creameries, 98 N.M. 541, 650 P.2d 825, 829 (N.M. 1982)* ("Each party to a contract has a duty to read and familiarize himself with its contents before he signs and delivers it . . . ."), his proclaimed ignorance of the meaning of the prepayment premium provision is highly suspect. Mr. Roscoe's own deposition testimony speaks volumes: "I knew the prepayment penalty before I signed on with the loan . . . . I thought I would be a good enough investor that maybe I could overcome this prepayment penalty, [this] high amount, so it was a business decision at that point to pay it." ROA, Doc. 23, Exh. 1, at 87-88. If that were not enough, Mr. Roscoe's professed ignorance appears to be immaterial to most of the issues raised on appeal. Our cases make clear that "only material factual disputes preclude summary judgment," and a party cannot avoid judgment as a matter of law by submitting "conclusory and self-serving" affidavits. *Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991)*; accord *Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995)*.

[*20]

The Roscoes additionally argue that the district court improperly granted summary judgment on all claims asserted in the complaint. According to the Roscoes, the defendants sought judgment as a matter of law only on claims one ("The Rider is Unenforceable"), three ("Express Consideration For the Prepayment Premium is Absent"), and five ("Rider is Illegal Promise"). See ROA, Doc. 1, Exh. A, at 3, 5, 6; id., Doc. 23. The Roscoes maintain that by failing to challenge them in their motion for summary judgment, the defendants "conceded" their claims for unjust enrichment, relief under a state statute prohibiting "prepayment premiums on loans secured by residential property," unconscionability and breach of the implied covenant of good faith and fair dealing, consumer fraud and deceptive business practices, and tortious interference with contract.

The Roscoes' assertion that a defendant "concedes" liability by choosing not to file a motion for summary judgment is obviously incorrect, but their argument that the district court should not have dismissed the complaint in its entirety requires more analysis. In its motion for summary judgment, Bank United repeatedly emphasized that [*21] it was seeking judgment as a matter of law "on all claims asserted against it in Plaintiffs' Complaint." ROA, Doc. 23, at 1, 3, 19. However, as the Ros-

coes accurately note, Bank United did not analyze the complaint on a claim-by-claim basis. Instead, Bank United argued that certain uncontested facts "established that the Prepayment Rider was an integral part of the loan transaction . . . which was freely and knowledgeably entered into and of reciprocal benefit to both Bank United and the Plaintiffs." Id. at 8. Citing cases from New Mexico and other jurisdictions, Bank United then argued that (1) "where . . . the terms of a contract are freely and knowledgeably agreed upon by the parties, the duty of the courts is to enforce the contract," id.; and (2) prepayment premiums are "fully enforceable" when "a borrower voluntarily prepays a note prior to maturity." Id. at 11. In connection with these arguments, Bank United also discussed principles of fraud, mistake, illegality, unreasonableness, and unconscionability. Id. at 9, 16-18; see also id., Doc. 44, at 2-3 (indicating that Freddie Mac also discussed principles of illegality and unconscionability in its supplement [*22] to Bank United's summary judgment motion).

Even though Bank United did not dedicate a specific section in its summary judgment motion to each of the Roscoes' claims, we conclude that the district court properly dismissed the complaint in its entirety. As one commentator has explained in an analogous context,

the major concern in cases in which the court wants to enter summary judgment without a Rule 56 motion by either party is not really one of power. . . . Rather, the question raised by the court's action is whether the party against whom the judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted. If no opportunity is provided, then obviously summary judgment should not be entered. If the court provides this opportunity, however, there seems to be no reason for preventing the court from acting on its own. To conclude otherwise would result in unnecessary trials and would be inconsistent with the objective of Rule 56 of expediting the disposition of cases.

10A Charles Alan Wright et al., Federal Practice and Procedure § 2720, at 339-45 (3d ed. 1998) (footnotes omitted); [*23] see also *Howell Petroleum Corp. v. Leben Oil Corp., 976 F.2d 614, 620 (10th Cir. 1992)* ("[A] district court in appropriate circumstances may grant summary judgment on a ground not formally raised in a summary judgment motion."); *Durtsche v. American*

Case 1:06-cv-00741-SLR    Document 15-3    Filed 01/09/2007    Page 14 of 29

Page 9

1999 U.S. App. LEXIS 32274, *; 2000 Colo. J. C.A.R. 6617

*Colloid Co., 958 F.2d 1007, 1009 n.1 (10th Cir. 1992)* ("District courts are widely acknowledged to possess the power to enter summary judgment sua sponte.") (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 326, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)).* Applying these criteria to the case at hand, it is evident that the Roscoes were given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not have been granted on all of their claims. Bank United clearly stated that it was seeking judgment as a matter of law on each of the Roscoes' claims. The evidence submitted by Bank United demonstrated that several facts relevant to all of the Roscoes' claims were incontestable. The Roscoes were given an opportunity to submit a response to Bank United's motion, which they did. In short, the Roscoes' claim that they could not have anticipated that the district [*24] court was poised to dismiss the complaint cannot be squared with the record. n10

> n10 The Roscoes asserted below and reiterate on appeal that they did not have an opportunity to conduct discovery before the district court granted the defendants' motions for summary judgment. However, the "facts" the Roscoes claim they had no opportunity to discover are largely (if not wholly) irrelevant to the issues resolved by the district court. See Appellants' Opening Brief at 19-20. Moreover, if the Roscoes believed they needed additional discovery, their proper recourse was to file a motion accompanied by an affidavit pursuant to *Federal Rule of Civil Procedure 56(f).* As we observed in *International Surplus Lines Ins. Co. v. Wyoming Coal Refining Sys., Inc., 52 F.3d 901 (10th Cir. 1995):*
>
>> "Although the Supreme Court has held that, under *Fed. R. Civ. P. 56(f),* summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition, this protection arises only if the nonmoving party files an affidavit explaining why he or she cannot present facts to oppose the motion." The party must state with specificity why extra time is needed and how the additional time and material will rebut the summary judgment motion. "Mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavail-

able" is insufficient to invoke Rule 56(f).

> *Id. at 905* (first set of quotation marks added, citations omitted).

[*25]

   With one exception (see infra at 23-25), our rejection of the Roscoes' "lack of notice" argument resolves all of the issues raised in this appeal. In their appellate brief, the Roscoes do not cite any authority to rebut the district court's conclusion that their claims for unjust enrichment, tortious interference, unconscionability, and breach of the implied covenant of good faith fail as a matter of law. Nor do the Roscoes highlight any evidence in the record to support these claims; they simply repeat the allegations in their complaint. Compare ROA, Doc. 1, Exh. A, at 4-6, 7-9 (plaintiffs' complaint) with Appellants' Opening Brief at 12-14, 22-26. [HN5] *Federal Rule of Appellate Procedure 28(a)(9)(A)* provides that the appellant's initial brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies . . . ." In the same vein, "[a] litigant who mentions a point in passing but fails to press it 'by supporting it with pertinent authority . . . forfeits the point.'" *United States v. Callwood, 66 F.3d 1110, 1115 n.6 (10th Cir. 1995)* (quoting *Pelfresne v. Village of Williams Bay, 917 F.2d 1017, 1023 (7th Cir. 1990));* [*26] accord *Phillips v. Calhoun, 956 F.2d 949, 953-54 (10th Cir. 1992); see also Primas v. City of Oklahoma City, 958 F.2d 1506, 1511 (10th Cir. 1992)* (stating that a litigant "has a duty to provide authority for any argument that he raises"). n11

> n11 We recognize that pro se pleadings must be "construed liberally." *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).* In the context of a motion to dismiss, "this rule means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." Id. Even so, it is not the proper function of a court to "assume the role of advocate for the pro se litigant." Id.; see also *United States v. Pinkey, 548 F.2d 305, 311 (10th Cir. 1977)* ("He who proceeds pro se with full knowledge and understanding of the risks does so with no greater rights than a litigant represented by a

Case 1:06-cv-00741-SLR    Document 15-3    Filed 01/09/2007    Page 15 of 29

Page 10

1999 U.S. App. LEXIS 32274, *; 2000 Colo. J. C.A.R. 6617

lawyer, and the trial court is under no obligation to become an 'advocate' for or to assist and guide the pro se layman through the trial thicket."). That maxim is particularly applicable here. Although the Roscoes are proceeding pro se, they are not wholly exempt from the Federal Rules of Appellate Procedure or the requirements of *Federal Rule of Civil Procedure 56*.

[*27]

Even if we ignore the Roscoes' failure to comply with these precedents and the Federal Rules of Appellate Procedure, we cannot conclude that the district court committed reversible error. The Roscoes' "unconscionability" claim is illustrative. [HN6] While a contract "may be held to be substantively unconscionable" under New Mexico law, "the threshold for such a holding is very high." *Monette v. Tinsley, 1999 NMCA 40, 975 P.2d 361, 365, 126 N.M. 748 (N.M. Ct. App. 1999)*. [HN7] To be unconscionable a contract must be "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *State ex rel. State Highway and Transp. Dep't v. Garley, 111 N.M. 383, 806 P.2d 32, 39 (N.M. 1991)* (citations and internal quotation marks omitted). [HN8] "The doctrine of unconscionability was intended to prevent oppression and unfair surprise, not to relieve a party of a bad bargain." *Id.* (citation omitted); see also *Smith v. Price's Creameries, 98 N.M. 541, 650 P.2d 825, 829 (N.M. 1982)* ("The fact that some of the terms of the agreement resulted in a hard bargain or subjected a party to exposure [*28] of substantial risk, does not render a contract unconscionable where it was negotiated at arm's length, and absent an affirmative showing of mistake, fraud or illegality."). Nothing in the record (or in the language of the Rider) even comes close to suggesting that the Roscoes were victims of oppression. To the contrary, uncontested evidence indicates that the Roscoes knowingly entered into an agreement they now believe was a "bad bargain."

The Roscoes' claims for unjust enrichment, tortious interference, and relief under the Unfair Practices Act are similarly flawed. The Roscoes' unjust enrichment claim in many ways parallels their "unconscionability" claim, and fails for the same reasons. [HN9] New Mexico recognizes that "[a] person receiving a benefit has been unjustly enriched if retention of the benefit would be unjust." *Sunwest Bank of Albuquerque, N.A. v. Colucci, 117 N.M. 373, 872 P.2d 346, 349 (N.M. 1994)*; see also *id.* ("Where a plaintiff has paid money in the mistaken belief that an enforceable contract exists, the plaintiff is entitled to recover the money paid, as restitution.") (citation omitted). Uncontested evidence submitted by the defendants demonstrates [*29] that the Roscoes knew or

should have known that the Rider imposed a penalty for prepaying the loan. Bank United and Freddie Mac received the benefits of the bargain they negotiated with the Roscoes, and no more. The gravamen of the Roscoes' tortious interference claim is that Freddie Mac induced Bank United to breach the Agreement. See ROA, Doc. 1, Exh. A, at 8-9. There is no evidence to support the underlying premise of this claim, i.e., that Bank United breached the Agreement. In any case, [HN10] to pursue a claim for tortious interference with existing or prospective contractual relations, a plaintiff must establish that the defendant "interfered with an improper motive or by improper means, or acted without justification or privilege." *Quintana v. First Interstate Bank of Albuquerque, 105 N.M. 784, 737 P.2d 896, 898 (N.M. Ct. App. 1987)*. Uncontroverted evidence demonstrates that Freddie Mac's actions in this case were proper and supported by legitimate business expectations. Essential elements of the Roscoes' Unfair Practices Act claim likewise lack evidentiary support. To invoke the Unfair Practices Act, a plaintiff must show that (1) the defendant made a "false [*30] or misleading" representation; (2) the misrepresentation was knowingly made "in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts;" (3) the misrepresentation occurred in the regular course of trade or commerce; and (4) the representation was of the type that "may, tends to or does, deceive or mislead any person." *Stevenson v. Louis Dreyfus Corp., 112 N.M. 97, 811 P.2d 1308, 1311 (N.M. 1991)* (citations omitted). No evidence indicates that the defendants knowingly made any false or misleading representations to the Roscoes in connection with the Agreement.

In contrast to their other claims, the Roscoes do cite relevant legal authority in their appellate brief to support their claim that the Rider was prohibited by state law. The Roscoes contend that the prepayment provision was precluded by § [HN11] 56-8-30 of the New Mexico Residential Home Loan Act ("Act"). That section of the Act provides: "No provision in a home loan, the evidence of indebtedness of a home loan, a real estate contract or an obligation secured by a real estate mortgage requiring a penalty or premium for prepayment of the balance [*31] of the indebtedness is enforceable." *N.M. Stat. Ann. § 56-8-30 (Michie 1998)*. The Roscoes argue that § 56-8-30 applies in this instance because "by statute Freddie Mac acts to make capital available for home financing," and because the apartment property "is zoned residential by the City of Albuquerque." Appellants' Opening Brief at 24-25.

This claim is deficient as a matter of law as well. Section 56-8-30 does not apply to multi-unit apartment complexes like the one refinanced by the Roscoes. That

Case 1:06-cv-00741-SLR    Document 15-3    Filed 01/09/2007    Page 16 of 29

Page 11

1999 U.S. App. LEXIS 32274, *; 2000 Colo. J. C.A.R. 6617

much is evident from the statutory definitions of Act's operative terms:

[HN12] A. "residence" means a dwelling and the underlying real property designed for occupancy by one to four families, and includes mobile homes and condominiums;

B. "home loan" means:

(1) a loan made to a person, all or a substantial portion of the proceeds of which will be used to purchase, construct, improve, rehabilitate, sell a residence or refinance a loan on a residence and which loan will be secured in whole or in part by a security interest in the residence evidenced by a real estate mortgage;

(2) the principal amount secured by a real estate mortgage on a residence when that real estate [*32] mortgage was executed by the mortgagor in connection with his purchase of the property, and the obligation secured represents part of the deferred purchase price; or

(3) the deferred balance due under a real estate contract made for the purchase or sale of a residence . . .

E. "real estate contract" means a contractual document creating rights and obligations between a seller and buyer of a residence under which the seller agrees to transfer legal title to the residence to the buyer after payment over time of all or part of the purchase price of the residence;

F. "real estate mortgage" means any document creating a security interest in a residence owned by a person to secure the payment of a home loan . . . .

*N.M. Stat. Ann. § 56-8-24* (Michie 1998) (emphasis added). [HN13] In short, "the Act contemplates protecting purchasers of dwellings intended to house four families or less." *Naumburg v. Pattison, 103 N.M. 649, 711 P.2d 1387, 1390 (N.M. 1985).* n12

n12 The district court did not discuss § 56-8-24 in its order dismissing the Roscoes' claim. Nevertheless, "we may affirm the judgment of the district court on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *V-1 Oil Co. v. Means, 94 F.3d 1420, 1423 (10th Cir. 1996).*

[*33]

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe

Circuit Judge

# EXHIBIT H

LEXSEE 2006 U.S. DIST. LEXIS 41895


**THALES AIRBORNE SYSTEMS S.A. and THALES AVIONICS S.A., Plaintiffs, v. UNIVERSAL AVIONICS SYSTEMS CORPORATION, Defendant.**

**Civ. No. 05-853-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 41895*

**June 21, 2006, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, French corporations, filed a complaint for patent infringement against defendant Arizona corporation. The Arizona corporation filed an action in the District of New Jersey against one of the French corporations asserting noninfringement and invalidity of four patents. The French corporations then filed a motion to enjoin the New Jersey proceedings, and the Arizona corporation filed a 28 U.S.C.S. § 1404(a) motion to transfer.

**OVERVIEW:** Weighing the parties' arguments against the appropriate balancing test, the court found that the asserted advantages of moving the case to the District of New Jersey were insufficient to warrant a transfer. Much argument was made over the ties between the French corporations and a New Jersey-based corporation. Although the French corporations shared similar names with the New Jersey corporation and all three corporations had the same corporate parent, neither the corporate parent nor the New Jersey corporation were parties to the instant action. The Arizona corporation had not shown that the New Jersey corporation had any connection to the present action, let alone a strong enough connection such that the French corporations' choice of forum should be ignored. Beyond the factors regarding the forum preferences of the parties, most of the balancing factors did not favor either jurisdiction. In light of the court's decision to deny the Arizona corporation's motion to transfer, among other things, the French corporations' motion to enjoin the New Jersey declaratory judgment action was granted to the extent it involved two patents at issue in the instant litigation.

**OUTCOME:** The Arizona corporation's motion to transfer was denied, and the French corporations' motion to enjoin the New Jersey action was granted to the extent it involved two patents at issue in the instant litigation.

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN1] Under 28 U.S.C.S. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice. Congress intends through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN2] The burden of establishing the need to transfer rests with the movant to establish that the balance of convenience of the parties and witnesses strongly favors the defendants. Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN3] The deference afforded a plaintiff's choice of forum will apply as long as the plaintiff has selected the forum for some legitimate reason. Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its home turf or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defen-

2006 U.S. Dist. LEXIS 41895, *

dants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*

[HN4] The analysis for transfer is very broad. Although emphasizing that there is no definitive formula or list of factors to consider, a court has identified potential factors characterized as either private or public interests. The private interests include (1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). The public interests include (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

[HN5] A United States district court which first obtains jurisdiction of the parties and issues may enjoin proceedings involving the same issues and parties begun thereafter in another United States district court. While invocation of this "first-filed" rule is the norm, exceptions are not rare, and district courts are given discretion in retaining jurisdiction when justice or expediency requires.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN6] While the Federal Circuit has a strong preference for adhering to the first-filed rule, its application seems limited to actions involving the same patents.

**COUNSEL:** [*1] For Thales Airborne Systems S.A., Thales Avionics S.A., Plaintiffs: John G. Day, Steven J. Balick, Tiffany Geyer Lydon, Ashby & Geddes, Wilmington, DE.

For Universal Avionics Systems Corporation, Defendant: Frederick L. Cottrell, III, Alyssa M. Schwartz, Richards, Layton & Finger, Wilmington, DE.; John G. Day, Ashby & Geddes, Wilmington, DE.

For Universal Avionics Systems Corporation, Counter Claimant: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM ORDER

At Wilmington this 21st day of June, 2006, having considered plaintiffs' motion to enjoin, defendant's motion to transfer, and the papers submitted in connection therewith;

IT IS ORDERED that defendant's motion to transfer (D.I. 9) is denied, for the reasons that follow:

1. **Introduction.** On December 12, 2005, at 8:34 am, plaintiffs Thales Airborne Systems S.A. and Thales Avionics S.A. filed a complaint for patent infringement against defendant Universal Avionics Systems Corporation. (D.I. 1) That same day, at 9:46 am, defendant filed a declaratory judgment action in the District of New Jersey against [*2] Thales S.A. asserting noninfringement and invalidity of four patents. n1 This action only involves U.S. Patent-No. 5,488,563 ("the '563 patent") and *U.S. Patent No. 5,638,282* ("the *'282 patent*"), whereas the New Jersey action also involves *U.S. Patent Nos. 5,414,631* ("the *'631 patent*") and 6,088,654 ("the '654 patent"). Plaintiffs filed a motion to enjoin the New Jersey proceedings. (D.I. 5, 6) Defendant then filed an answer and this cross motion to transfer to the District of New Jersey. (D.I. 7, 9, 10) Defendant filed its opposition to plaintiffs' motion to enjoin, to which plaintiffs have replied. (D.I. 10, 14) Plaintiffs also filed their opposition to the motion to transfer (D.I. 14), to which defendant has replied. (D.I. 19)

2. **Background.** Plaintiff Thales Airborne Systems S.A. is a French corporation and owns the rights to the patents-in-suit. (D.I. 6, Ex. A) Plaintiff Thales Avionics S.A. is also a French corporation and has been granted licenses and the right to enforce the patents-in-suit. (Id.) Thales S.A. ("Thales"), a French corporation, is the parent corporation of both plaintiffs. (Id.) Thales Avionics, Inc., a Delaware corporation with its principal place [*3] of business in New Jersey, is a wholly-owned subsidiary of Thales, but is not a party to either the Delaware or New Jersey action. n2 (D.I. 14 at 10)

3. Defendant Universal Avionics Systems Corporation is an Arizona corporation with its principal place of business in Arizona. Defendant and plaintiffs are competitors in the avionics equipment market, including terrain awareness and warning systems ("TAWS"). In May 2005, Thales sent a letter to defendant alleging that its manufacturing and sale of its TAWS products infringed the patents-in-suit. (D.I. 6 at 2) Subsequently, both parties engaged in negotiations regarding the patents-in-suit and entered into a standstill agreement prohibiting either party from initiating litigation through December 9, 2005. (Id.)

5. **Standard of Review.**[HN1]  Under *28 U.S.C. § 1404(a)*, a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice. Congress intended through *§ 1404* to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration [*4] of convenience and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988)*; *Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp.2d 192, 208 (D. Del. 1998)*.

6. [HN2] The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981)* (citing *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)*. "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". *ADE Corp. v. KLA-Tencor Corp., 138 F. Supp.2d 565, 567 (D. Del. 2001)*; *Shutte, 431 F.2d at 25.*

7. [HN3] The deference afforded a plaintiff's choice of forum will apply as long as the plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp., 997 F. Supp. 556, 562 (D. Del 1998)*; *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 U.S. Dist. LEXIS 20803, 2001 WL 1617186 (D. Del. Nov. 28, 2001)*; *Continental Cas. Co. v. American Home Assurance Co., 61 F. Supp.2d 128, 131 (D. Del. 1999)*. [*5] Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its "'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re M.L.-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993)*.

8. The Third Circuit Court of Appeals has indicated that [HN4] the analysis for transfer is very broad. *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)*. Although emphasizing that "there is no definitive formula or list of factors to consider," id., the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses [*6]  but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* (citations omitted).

9. The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." Id. (citations omitted).

10. **Discussion.** Defendant asserts that its choice of forum should be given greater deference than plaintiffs' choice of forum because plaintiffs did not file suit on their "home turf." (D.I. 10 at 16) Defendant also points out that none of the parties are incorporated in Delaware, nor does any party have a physical presence in Delaware. (Id.) Defendant suggests that litigation in New Jersey would be more convenient and less expensive because [*7]  of plaintiffs' "substantial ties" to New Jersey through the headquarters of Thales Avionics, Inc. (D.I. 19 at 3) Lastly, defendant contends that "the interest of justice" requires the case be transferred because "the Delaware action could not dispose of all remaining issues between the parties." n3 (Id. at 4)

11. Plaintiffs contend that, as French corporations, Delaware is their "home turf," so their choice of forum should be given full deference. (D.I. 14 at 19) Additionally, plaintiffs argue that Delaware has an interest in the litigation because defendant's allegedly infringing products are sold in the State. Plaintiffs repeatedly question the benefits of a New Jersey forum because none of the parties are incorporated or maintain a physical presence in New Jersey. (D.I. 14 at 21 n.12) Lastly, there is a suggestion in the record that plaintiffs may challenge personal jurisdiction in New Jersey, which could affect the efficiency of litigation in New Jersey, as well as the enforceability of any judgment from a New Jersey court. (Id. at 20)

12. Weighing the parties' arguments against the *Jumara* balancing test, the court finds that the asserted advantages of moving the [*8] case to the District of New Jersey are insufficient to warrant a transfer. Much argument is made over the ties between plaintiffs and New Jersey-based Thales Avionics, Inc. Although plaintiffs share similar names with Thales Avionics, Inc. and all three corporations have the same corporate parent, neither Thales Avionics, Inc., nor Thales, are parties to this action. Defendant has not shown that Thales Avionics, Inc. has any connection to this patent infringement action, let alone a strong enough connection such that plaintiffs' choice of forum should be ignored.

13. Beyond the factors regarding the forum preferences of the parties, most of the *Jumara* factors do not favor either jurisdiction. For a patent infringement suit between an Arizona corporation and two French corporations, New Jersey and Delaware seem equally inconvenient for all parties. While defendant correctly points out that no party has a physical presence in Delaware, the same is true of New Jersey. Both parties argue that the other side's choice of forum makes little sense, but only plaintiffs maintain the ability to challenge jurisdiction in one of the forums in question. Transfer of this action is only appropriate [*9] to a jurisdiction where the action "might have been brought," and long delays could result were plaintiffs to challenge personal jurisdiction in the New Jersey declaratory judgment action.

14. Defendant contends that "the interest of justice" requires the case be transferred because additional issues exist in the pending New Jersey action that are not addressed in this Delaware action. Defendant is free to raise the additional patents in the action at bar in order to resolve them in one proceeding.

15. **Conclusion.** For the reasons stated, defendant's motion to transfer (D.I. 9) is denied.

n1 The New Jersey action was later amended to include both Thales Airborne Systems S.A. and Thales Avionics S.A. as defendants.

n2 The parties disagree about the significance of Thales Avionics, Inc. to both motions. See infra PP 10-12.

n3 The "remaining issues" being the *'631* and '654 patents.

IT IS FURTHER ORDERED that plaintiffs' motion to enjoin (D.I. 5) is granted in part and denied in part, for the [*10] reasons that follow:

1. **Standard of Review.** It has long been settled that[HN5] "a United States district court which first obtains jurisdiction of the parties and issues may . . . enjoin proceedings involving the same issues and parties begun thereafter in another United States district court." *Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 927 (3d Cir. 1941).* While invocation of this "first-filed" rule is the norm, exceptions are not rare, and district courts are given discretion in retaining jurisdiction "when justice or expediency requires." *Genentech, Inc. v. Eli Lilly and Co., 998 F.2d 931, 937 (Fed. Cir. 1993); EEOC v. University of Pennsylvania, 850 F.2d 969, 972 (3d Cir. 1988).*

2. Although courts hearing patent cases must apply "the procedural law of the regional circuit in matters that are not unique to patent law, . . . the regional circuit practice need not control when the question is important to national uniformity in patent practice." *Laboratory Corporation of America Holdings v. Chiron Corp., 384 F.3d 1326, 1330 (Fed. Cir. 2004).* The Federal Circuit has held that "injunctions arbitrating between [*11] co-pending patent declaratory judgment and infringement cases in different district courts are reviewed under the law of the Federal Circuit." *Id. at 1331.* In this context, co-pending patent infringement and declaratory judgment actions are those involving "the same patents and the same parties." *Id. at 1328.*

3. **Discussion.** The parties spend much of their briefs arguing over whether the first-filed rule applies to actions filed within hours of one another, while comparatively little argument is made over whether the first-filed rule applies when the second action involves additional patents. In *APV North America, Inc. v. Sig Simonazzi North America, Inc., 295 F. Supp.2d 393, 398 (D. Del. 2002),* the court refused to use the first-filed rule to dismiss a case because the second case involved "different patents and different technologies." Although all four of the patents asserted in the New Jersey declaratory judgment action involve TAWS technology, the '631 and '654 patents arguably involve different aspects of this broad category of technology than do the '563 and *'282 patents* asserted at bar. (D.I. 19 at 7)

4. Plaintiffs cite [*12] several cases for the proposition that only the same general subject matter between the two actions is needed if additional claims are raised in a subsequently-filed action. (D.I. 14 at 15) None of the cases cited are Federal Circuit patent cases, however, and[HN6] while the Federal Circuit has a strong preference for adhering to the first-filed rule, its application seems limited to actions "involving the same patents." *Laboratory Corporation, 384 F.3d at 1328.*

5. **Conclusion.** In light of the above discussion and the court's decision to deny defendant's motion to trans-

2006 U.S. Dist. LEXIS 41895, *

fer this action to the District of New Jersey, plaintiffs' motion to enjoin the New Jersey declaratory judgment action is granted to the extent it involves the '563 and *282 patents* at issue in the instant litigation.

Sue L. Robinson

United States District Judge

# EXHIBIT I

LEXSEE 1990 U.S. DIST. LEXIS 4150

Cited
As of: Jan 08, 2007

## KOHN, SAVETT, KLEIN & GRAF, P.C. v. ROBERT M. COHEN, HARTSELL, INC., and CHEYENNE CORPORATION

### Civil Action No. 89-2173

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1990 U.S. Dist. LEXIS 4150*

### April 10, 1990, Decided and Filed; April 11, 1990, Entered

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff attorneys filed an action against defendants, corporations and officer, to recover fees for legal services, and the corporations and the officer filed counterclaims. The attorneys filed a motion to strike the answer, affirmative defenses, and counterclaims of the corporations and a motion to dismiss two of the counterclaims of the corporations and the officer on *42 Pa. Cons. Stat. § 5524(7)* (1989) limitations grounds.

**OVERVIEW:** The attorneys represented the corporations and the officer in a trial in which the corporations and the officer lost. More than two years after the completion of the trial, the attorneys filed an action against the corporations and the officer, seeking to recover unpaid legal fees. The corporations and the officer, represented only by the non-attorney officer, filed counterclaims against the attorneys, alleging malpractice. The court granted the motion of the attorneys to strike the answer, affirmative defenses, and counterclaims of the corporations, ruling that only an attorney could represent a corporation in federal court. The court denied the attorneys' motion to dismiss two of the counterclaims on the basis of the two-year statute of limitations in *42 Pa. Cons. Stat. § 5524(7)* (1989). The court ruled that one of the claims sounded in contract and, thus, was subjected to a six-year statute of limitations. The court found that the other claim sounded in tort and was filed more than two years after the trial. The court held, however, that, at

the pleadings stage, it was too early to tell when the officer would have been expected to have discovered the injury and its cause.

**OUTCOME:** The court granted the attorneys' motion to strike the corporations' answer, affirmative defenses, and counterclaims, but denied the motion to dismiss two of the counterclaims of the corporations and the officer.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Strike > Scandalous Matters*
*Civil Procedure > Pleading & Practice > Pleadings > General Overview*
*Evidence > Judicial Notice > General Overview*
[HN1] Under *Fed. R. Civ. P. 12(f)*, a court may strike from any pleading any redundant, immaterial, impertinent, or scandalous matter. Motions to strike are normally disfavored, but they are appropriately used to remove material that is plainly improper as a matter of law and that would prejudice the other parties. As with most motions under Rule 12, a motion to strike must rise or fall on whatever is within the four corners of the pleadings or within the scope of judicial notice.

*Civil Procedure > Parties > Self-Representation > General Overview*

*Civil Procedure > Counsel > General Overview*
[HN2] Only attorneys may represent corporations.

*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Counsel > Admissions Pro Hac Vice*
*Governments > Courts > Rule Application & Interpretation*
[HN3] In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein. *28 U.S.C.S. § 1654.*

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
[HN4] Under *Fed. R. Civ. P. 12(b)(6),* the applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether the plaintiff could prove any set of facts in support of his claim that would entitle him to relief. Furthermore, a statute of limitations defense may be raised by a motion to dismiss only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.

*Contracts Law > Breach > Causes of Action > Assumpsit*
*Governments > Legislation > Statutes of Limitations > General Overview*
*Torts > Malpractice & Professional Liability > Attorneys*
[HN5] In Pennsylvania, an action for legal malpractice may be brought in either contract or tort. The plaintiff in a legal malpractice action has a choice between suing the attorney in assumpsit, on the grounds that the lawyer failed to adhere to express directives thereby breaching contractual obligations, or in trespass, premised upon the lawyer's failure to exercise the general duty of care an attorney owes to a client.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*

*Contracts Law > Defenses > Statutes of Limitations*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN6] Actions upon written contracts have a six-year limitations period. *42 Pa. Cons. Stat. § § 5527(2)* (1981). In contrast, an action brought in tort for injury to the person or property which is founded on negligent or otherwise tortious conduct is to be commenced within two years. § 5524(7) (1989).

*Contracts Law > Breach > General Overview*
*Contracts Law > Defenses > Statutes of Limitations*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN7] If the damages requested stem from negligence or other tortious misconduct, then an action sounds in tort and the two-year statute of limitations applies. If the damages arise from a breach of an explicit contractual term, and if the request is only for compensatory damages appropriate in contract, then the action sounds in contract.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Commencement & Prosecution > General Overview*
*Torts > Procedure > Statutes of Limitations > Accrual of Actions > Discovery Rule*
[HN8] The limitations period generally runs from the time of the negligent act. Lack of knowledge, mistake, or misunderstanding will toll the running of the statutory period only if the aggrieved party cannot reasonably be expected to have discovered the injury and its cause.

**COUNSEL:** [*1]

Robert A. Swift, Esq., Philadelphia, Pennsylvania, Denis F. Sheils, Esq.

ROBERT M. COHEN HARTSELL, INC. & CHEYENNE CORP. Robert M. Cohen, Philadelphia, Pennsylvania.

**OPINION BY:**

CAHN

**OPINION:**

MEMORANDUM

EDWARD D. CAHN, UNITED STATES DISTRICT JUDGE

Kohn, Savett, Klein & Graf, P.C. ("KSK&G"), a professional corporation engaged in the practice of law,

has sued Robert M. Cohen, Hartsell, Inc., ("Hartsell") and Cheyenne Corporation ("Cheyenne") to recover fees for legal services that it performed for the defendants. KSK&G has moved to strike the Answer, Affirmative Defenses and Counterclaims of Hartsell and Cheyenne and to dismiss the first and third counterclaims for all defendants. The motion to strike shall be granted; the motion to dismiss shall be denied.

## I. BACKGROUND

The underlying facts are straightforward. The current dispute has its genesis in an action in which this court resolved issues related to the employee stock option plan of Psychiatric Hospitals of America. *Castle v. Cohen, 676 F. Supp. 620 (E.D. Pa. 1987).* In that action, KSK&G represented Cohen, Hartsell, and Cheyenne.

Cohen, Hartsell, and Cheyenne originally asked KSK&G to represent them on or about June 10, 1987. Complaint, [*2] para. 8. In a written agreement dated June 18, 1987, KSK&G agreed to represent the defendants at its usual rates, billing monthly for fees and costs. Complaint, para. 9. The trial in Castle v. Cohen took place between August 24, 1987 and September 14, 1987. The jury reached a verdict on September 18, 1987, and this court entered an opinion and order on September 23, 1987, modifying it on September 28, 1987. Cohen, Hartsell, and Cheyenne then appealed. Oral argument occurred on January 7, 1988. On February 11, 1988, the Court of Appeals rendered its decision. *Castle v. Cohen, 840 F.2d 173 (3d Cir. 1988).*

KSK&G filed this suit on March 27, 1988 to recover damages allegedly arising from the defendants' failure to pay it for the legal services billed from August of 1987 to July of 1988, when representation ceased. Complaint, paras. 10-11. Cohen, Hartsell, and Cheyenne originally hired an attorney to represent them in this matter. However, this court subsequently granted that attorney's motion to withdraw. Apparently, Hartsell and Cheyenne did not retain new counsel; on November 21, 1989, KSK&G was served with a document entitled "Answer, Affirmative Defenses and Counterclaim," [*3] signed by Robert M. Cohen on behalf of himself, Hartsell, and Cheyenne. Hartsell and Cheyenne are corporations. Complaint, paras. 6-7.

In Count I of their Counterclaim, the defendants allege that KSK&G negligently conducted their case, and that its malpractice resulted in losses in excess of $ 8,000,000.00. n1 Counterclaim, para. 33. Specifically, they contend that they engaged KSK&G because they were assured that Harold Kohn would conduct the trial and remain intimately involved in the case. Counterclaim, para. 29. However, the defendants allege that Mr. Kohn "remained aloof at numerous critical junctures . . .,

failed to oversee the case, allowed his subordinates to make and implement negligent and harmful strategical decisions, and was inadequately prepared to conduct the trial with the requisite command of the facts." Counterclaim, para. 30. In an amended pleading dated January 8, 1990, Cohen, Hartsell, and Cheyenne added a third counterclaim for breach of contract. This pleading was also signed by Cohen on behalf of all defendants.

n1 Count II of the Counterclaim is not at issue here.

KSK&G argues that the Answer, Affirmative Defenses and Counterclaim and the Amended Answer [*4] and Counterclaim entered by Hartsell and Cheyenne should be stricken because it was signed by Cohen, who is not a member of the bar. KSK&G also argues that Counts I and III of the defendants' counterclaims should be dismissed because they are untimely. These issues will be addressed in turn. n2

n2 This court notes at the outset that Cohen, Hartsell, and Cheyenne have filed no response to the motions at issue. Under Local Rule of Civil Procedure 20(c), motions not responded to on time may be treated as uncontested. Since Cohen litigates pro se, though, I must act with the utmost lenience; thus, I shall reach the merits on both motions. *Haines v. Kerner, 404 U.S. 519 (1972)* (per curiam).

## II. DISCUSSION

### A. Motion to Strike

[HN1] Under *Federal Rule of Civil Procedure 12(f)*, a court may strike from any pleading "any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are normally disfavored, but they are appropriately used to remove material that is plainly improper as a matter of law and that would prejudice the other parties. See, e.g., *United States v. Marisol, Inc., 725 F. Supp. 833, 836 (M.D. Pa. 1989); United States v. Geppert Bros., Inc.,* [*5] *638 F. Supp. 996, 998 (E.D. Pa. 1986).* As with most motions under Rule 12, a motion to strike must rise or fall on whatever is within the four corners of the pleadings or within the scope of judicial notice. *Zappala v. Hub Foods, Inc., 683 F. Supp. 127, 131 (W.D. Pa. 1988).*

KSK&G seeks to strike the pleadings signed by Cohen on behalf of Hartsell and Cheyenne because Cohen is not a member of the bar of this court, or, in-

deed, of any bar at all. They contend that, though Cohen may represent himself in this action, he may not properly represent others. The first contention that Cohen is not an attorney -- is, on the basis of the pleadings before me, correct. Cohen has not supplied an attorney identification number, and this court takes judicial notice of the fact that his name does not appear on the roll of those admitted to the bar of the United States District Court for the Eastern District of Pennsylvania. Furthermore, in the period since KSK&G raised this question, Cohen has not answered it with a simple affidavit establishing his status as an attorney-at-law. I must thus conclude that Cohen is not a qualified attorney.

The second contention -- that [HN2] only attorneys may represent [*6] corporations -- is also correct. The relevant federal statute states that, [HN3] "in all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." *28 U.S.C. § 1654.* In turn, Local Rules 11, 12, and 13 of this court limit practice before this court to attorneys who are members of its bar, attorneys admitted pro hac vice, and students supervised by a member of its bar. Since Cohen is not, on the face of the pleadings, in the latter group, it follows that he may not conduct a case as counsel. The question then becomes whether he can represent a corporation before this court, even one intimately connected with his own affairs. n3

> n3 Although the pleadings do not state that Hartsell and Cheyenne are Cohen's alter egos, a generous reading of the facts would permit me to infer that they may well be.

The Court of Appeals addressed this issue in *Simbraw, Inc. v. United States, 367 F.2d 373 (3d Cir. 1966)* (per curiam). There a corporation, represented by its president, brought an action against the United States. The Court of Appeals, relying [*7] upon *Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 737 (1824)* (Marshall, C.J.), held that a corporation could only appear in court through an attorney-at-law. *Simbraw, 367 F.2d at 374.* As this court observed in *MOVE Org. v. United States Dep't of Justice, 555 F. Supp. 684 (E.D. Pa. 1983),* "[b]ecause organizational personality is a legal fiction, appearance in propria persona is impossible." *555 F. Supp. at 693.* Furthermore, the broad range of supervisory powers that this court has over members of its bar do not, in the main, exist over non-members. Without these, this court cannot effectively ensure the standards of litigation before it. As Judge Noonan put it, "[p]rofessional competence and professional responsibility are the sine qua non of federal litigation and effective

judicial response." *C.E. Pope Equity Trust v. United States, 818 F.2d 696, 698 (9th Cir. 1987).* The Simbraw rule is adhered to by a vast array of courts. See *MOVE Org., 555 F. Supp. at 693 n.32* (collecting cases); see also, e.g., *Lewis v. Lenc-Smith Mfg. Co., 784 F.2d 829, 831-32 (7th Cir. 1986)* (per curiam); *National Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib.* [*8] *Co., 748 F.2d 602, 609-10 (11th Cir. 1984); Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983); Richdel, Inc. v. Sunspool Corp., 699 F.2d 1366, 1366 (Fed. Cir. 1983)* (per curiam); *Sermor, Inc. v. United States, 13 Cl. Ct. 1, 5-6 (1987).*

The one significant exception to this rule is distinguishable. Partners have been held appropriate representatives of the partnership. *United States v. Reeves, 431 F.2d 1187, 1188-89 (9th Cir. 1970)* (per curiam). Partnerships are generally considered extensions of the individual partners, though, and so an individual partner, speaking for the partnership, in truth advances only his personal interests. Cf. *Carden v. Arkoma Assocs., 110 S. Ct. 1015 (1990)* (partnership considered citizen of all states in which partners are citizens for diversity purposes). In contrast, Hartsell and Cheyenne are corporations, which have independent status as persons. *Carden, 110 S. Ct. at 1017-18.* n4

> n4 At least one court has held that an especially skilled layperson may represent a corporation of which the person is an officer. *In re Victor Publishers, Inc., 545 F.2d 285, 286* n.* (1st Cir. 1976) (per curiam) (referring to and distinguishing away *In re Las Colinas, Inc., 453 F.2d 911 (1st Cir. 1971)).* Even that court limited such representation to extraordinary circumstances, though, and rejected it in the case before it. *545 F.2d at 286.* Moreover, to permit this would flatly contradict this court's rules and clear Court of Appeals precedent. I thus decline to follow this path.

[*9]

Consequently, the Answer, Affirmative Defenses, and Counterclaims filed by Cohen on behalf of Hartsell and Cheyenne are impertinent, as the word is used in Rule 12(f). They shall thus be stricken as to those parties (though not as to Cohen, who acts in propria persona here). See *Lewis, 784 F.2d at 831* (striking more appropriate than dismissal).

B. Motion to Dismiss

KSK&G also seeks dismissal of Cohen's first and third counterclaims because they are time-barred under Pennsylvania law. n5 [HN4] Under *Fed. R. Civ. P. 12(b)(6),* "[t]he applicable standard of review requires

Case 1:06-cv-00741-SLR    Document 15-3    Filed 01/09/2007    Page 28 of 29

Page 5
1990 U.S. Dist. LEXIS 4150, *

the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn there-from, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989); Glass Bottle Blowers Ass'n v. National Bottle Co., 584 F. Supp. 971, 972 (E.D. Pa. 1983).* The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether the plaintiff could prove any set of facts in support of his claim that would entitle him to relief. *Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Scheuer* [*10] *v. Rhodes, 416 U.S. 232, 236 (1974).* Furthermore, a statute of limitations defense may be raised by a motion to dis-miss only if "'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Bethel v. Jendoco Constr. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978)* (quoting *Hanna v. United States Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir. 1975))* (emphasis in origi-nal); *Linker v. Custom-Bilt Mach., Inc., 594 F. Supp. 894, 903 (E.D. Pa. 1984).*

> n5 State law determines the statute of limita-tions in diversity suits. *Guaranty Trust Co. v. York, 326 U.S. 99, 110 (1945).*

The first issue is thus which statute of limitations applies. [HN5] In Pennsylvania, an action for legal mal-practice may be brought in either contract or tort. *Guy v. Liederbach, 501 Pa. 47, 55, 459 A.2d 744, 748 (1983); Garcia v. Community Legal Services Corp., 362 Pa. Su-per. 484, 489, 524 A.2d 980, 982 (1987).* Thus, the plain-tiff in a legal malpractice action has a choice between suing the attorney in assumpsit, on the grounds that the lawyer failed to adhere to express directives thereby breaching contractual obligations, [*11] or in trespass, premised upon the lawyer's failure to exercise the general duty of care an attorney owes to a client. *Duke & Co. v. Anderson, 275 Pa. Super. 65, 70, 418 A.2d 613, 616 (1980).* The difference is significant because the statutes of limitations are not the same. [HN6] Actions upon written contracts have a six-year limitations period. *42 Pa. Cons. Stat. Ann. § § 5527(2)* (Purdon 1981). In con-trast, an action brought in tort for injury to the person or property "which is founded on negligent . . . or otherwise tortious conduct" is to be commenced within two years. *42 Pa. Cons. Stat. Ann. § 5524(7)* (Purdon Supp. 1989). If this action sounds in contract, then there is no possible statute of limitations problem. n6 If, however, it sounds in tort, problems may arise: the counterclaims were filed more than two years after the conduct of the trial.

> n6 This would also be true if the cause of ac-tion rested on an unwritten contract or a contract

implied in law, for which the statute of limita-tions is four years. *42 Pa. Cons. Stat. Ann. § § 5525(3)-(4)* (Purdon 1981).

Of course, virtually all legal representation occurs within the scope of a contract between lawyer and client. This [*12] does not, however, mean that the contractual limitations period automatically applies. Rather, the courts have looked to the terms of the contract allegedly breached and to the nature of the injury asserted. [HN7] If the damages requested stem from negligence or other tortious misconduct, then the action sounds in tort and the two-year statute of limitations applies. *Garcia, 362 Pa. Super. at 490, 524 A.2d at 982; Murray v. University of Pa. Hosp., 340 Pa. Super. 401, 405, 490 A.2d 839, 841 (1985).* If the damages arise from a breach of an explicit contractual term, and if the request is only for compensatory damages appropriate in contract, then the action sounds in contract. *Moore v. McComsey, 313 Pa. Super. 264, 270, 459 A.2d 841, 844 (1983);* see also *Sherman Indus., Inc. v. Goldhammer, 683 F. Supp. 502, 506 (1988).* Although the damages requested in Count I are compensatory, they are not alleged to arise from the breach of a specific contractual term. Instead, they are alleged to result from negligence on the part of Kohn and his firm. Because this malpractice counterclaim is prem-ised upon the plaintiff's negligent conduct of the case, it sounds in tort and thus carries [*13] a two-year limita-tion period. Count III, on the other hand, is explicitly a breach of contract claim, for which incidental and conse-quential damages are requested. The six-year statute of limitations therefore applies, and so the motion to dis-miss must be denied for Count III.

The two-year limit for Count I could create prob-lems for Cohen. The conduct complained of took place at trial. Consequently, the alleged tortious misconduct oc-curred, at the latest, by September 14, 1987. All trial-related proceedings were finished by September 28, 1987, when this court issued its modified final order. Either date is more than two years before November 20, 1989, when Cohen entered his first counterclaim. If a strict time of occurrence rule were used here, the claims would be barred. Fortunately for Cohen, such a rule does not apply here.

[HN8] The limitations period generally runs from the time of the negligent act. *Moore, 313 Pa. Super. at 270, 459 A.2d at 844.* Lack of knowledge, mistake, or misunderstanding will toll the running of the statutory period only if the aggrieved party cannot reasonably be expected to have discovered the injury and its cause. *Pocono Intern. Raceway v. Pocono Produce,* [*14] *Inc., 503 Pa. 80, 85, 468 A.2d 468, 471 (1983); Garcia, 362 Pa. Super. at 495, 524 A.2d at 985.* The problem here thus becomes whether, on the basis of the allega-tions before this court, it is clear that Cohen would be

expected to have discovered the injury and its cause before November 20, 1987.

The allegations do not make such a conclusion possible. Though Cohen might have known of the injury and its cause when the final order issued, one can infer otherwise from Cohen's use of KSK&G to argue the appeal. See *Trice v. Mozenter, 356 Pa. Super. 510, 520 & n.2, 515 A.2d 10, 15 & n.2 (1986)* (date of cessation of representation relevant). Moreover, it would vitiate the discovery rule were discovery and occurrence to be equated. Cohen, a layman, ought not be presumed to have known that malpractice occurred merely because the trial turned out poorly. Indeed, some of the allegations appear to rest on facts that would have emerged only after the trial. Counterclaim at para. 31; see also *Moore, 313 Pa. Super. at 271, 459 A.2d at 845* (averments that was unable to discover operative facts toll statute of limitations).

Whether the statute of limitations is actually tolled is [*15] thus best left to later motions with proper factual predicates. This is especially so because of an unbriefed issue: whether the statute of limitations for a malpractice action is tolled until the end of the appellate process. n7 Pennsylvania courts have not spoken clearly on this point. In *Moore*, the Superior Court found the filing of a petition for post-conviction relief "entirely inadequate to toll the running of the statute [of limitations]." *Moore, 313 Pa. Super. at 271, 459 A.2d at 845;* accord *Trice, 356 Pa. Super. at 521, 515 A.2d at 15.* In both *Moore* and *Trice*, though, the appellate actions alleged ineffective assistance of counsel. The decision not to toll is thus consistent with the discovery rule.

n7 If this happened, Cohen's malpractice counterclaims would be timely filed.

In contrast, the *Garcia* court observed, in dictum, that a rule tolling the statute of limitations until the appeals on the primary action are complete "has theoretical merit." *Garcia, 362 Pa. Super. at 498, 524 A.2d at 986.* Because an appellate court may remove the actual injury, and because injury is a requirement for a tort action, the court noted that tolling might ensure [*16] that malpractice suits be filed only when injury is certain. Id. These conflicting opinions leave this court free to consider all relevant sources of law in its attempt to predict how the Pennsylvania Supreme Court would resolve the matter. *Wilson v. Asten-Hill Mfg. Co., 791 F.2d 30, 32 (3d Cir. 1986); Jones & Laughlin Steel Corp. v. Johns-Mansville Sales Corp., 626 F.2d 280, 285 (3d Cir. 1980).*

This court, construing Pennsylvania law, has supported tolling. *Sherman Indus., Inc., 683 F. Supp. at 508 & n.8; Bowman v. Abramson, 545 F. Supp. 227, 231 (E.D. Pa. 1982).* Other courts, however, have differed sharply. Compare *Northwestern Nat'l Ins. Co. v. Osborne, 573 F. Supp. 1045, 1050-51 (E.D. Ky. 1983)* (appellate tolling); *Bonnano v. Potthoff, 527 F. Supp. 561, 564-65 (N.D. Ill. 1981)* (same); *Amfac Dist. Corp. v. Miller, 138 Ariz. 152, 673 P.2d 792 (1983)* (same; cited in Garcia); *Haghayegh v. Clark, 520 So. 2d 58 (Fla. Dist. Ct. App. 1988)* (same); and *Neylan v. Moser, 400 N.W.2d 538 (Iowa 1987)* (same) with *Knight v. Furlow, 553 A.2d 1232 (D.C. 1989)* (no appellate tolling); *Zupan v. Berman, 142 Ill. App. 3d 396, 491 N.E.2d 1349 (1986)* (same); [*17] *Suzuki v. Holthaus, 221 Neb. 72, 375 N.W.2d 126 (1985)* (same); and *Zimmie v. Calfee, Halter and Griswold, 43 Ohio St. 3d 54, 538 N.E.2d 398 (1989)* (same); see generally 2 R. Mallen & J. Smith, Legal Malpractice § 18.11 (3d ed. 1989). The closeness of the question makes it especially suited to later resolution, appropriately briefed and argued. In this procedural posture, I need not reach this far to hold that the pleadings are not facially infirm on statute of limitations grounds.

An order follows.

ORDER

AND NOW, upon consideration of Plaintiff's Motion to Strike the Answer, Affirmative Defenses and Counterclaims of Defendants Hartsell, Inc. and Cheyenne Corporation and Plaintiff's Motion to Dismiss Counts I and III of Defendants' Counterclaims, IT IS ORDERED that:

1. The Motion to Strike is GRANTED. The Answer, Affirmative Defenses, and Counterclaim and the Amended Answer and Counterclaim are STRICKEN from the record for Defendants Hartsell, Inc. and Cheyenne Corporation.

2. The Motion to Dismiss is DENIED.

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January, 2007, I caused to be served a copy of the **Memorandum of Law in Support of Defendants' Opposition to Plaintiffs' Motion to Stay or Strike** upon the following counsel via CM/ECF:

Philip A. Rovner, Esquire
Potter Anderson & Corroon
1313 N. Market Street
Wilmington, DE 19801
provner@potteranderson.com

I further certify that on January 9, 2007, I caused copies of the foregoing document to be served by e-mail on the above-listed counsel and on the following non-registered participants.

Anthony M. Insogna, Esquire
Lester J. Savit, Esquire
JONES DAY
2750 High Bluff Drive, Suite 300
San Diego, CA 92130-2083
858.314.1200
*aminsogna@jonesday.com*
*ljsavit@jonesday.com*
*nnkallas@jonesday.com*

F. Dominic Cerrito, Esquire
JONES DAY
222 East 41st Street
New York, New York 10017-6702
*fdcerrito@jonesday.com*

Robert L. Baechtold, Esquire
Henry J. Renk, Esquire
Nicholas N. Kallas, Esquire
FITZPATRICK, CELLA HARPER & SCINTO
30 Rockefeller Plaza
New York, NY 10112
*rbaechtold@fchs.com*
*hrenk@fchs.com*
*nkallas@fchs.com*

  /s/ Andre G. Bouchard
Andre G. Bouchard (#2504)

{BMF-W0037664.}