**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

CELGENE CORPORATION, NOVARTIS )
PHARMACEUTICALS CORPORATION and )
NOVARTIS PHARMA AG, )
                    Plaintiffs, )    Civil Action No. 06-741-SLR
v. )
 )
ABRIKA PHARMACEUTICALS, INC. and )
ABRIKA PHARMACEUTICALS, LLLP, )
 )
              Defendants. )

## <u>DECLARATION OF LESTER J. SAVIT, ESQ.</u>

OF COUNSEL:

Anthony M. Insogna
Lester J. Savit
JONES DAY
12265 El Camino Real, Suite 200
San Diego, CA 92130-4096
(858) 314-1200

F. Dominic Cerrito
JONES DAY
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939

*Attorneys for Plaintiff Celgene Corporation*

Robert L. Baechtold
Henry J. Renk
Nicholas N. Kallas
FITZPATRICK, CELLA, HARPER &
SCINTO
30 Rockefeller Plaza
New York, New York 10112
(212) 218-2100

*Attorneys for Plaintiffs Novartis*
*Pharmaceuticals Corporation and Novartis*
*Pharma AG*
Dated: May 9, 2007

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
provner@potteranderson.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CELGENE CORPORATION, NOVARTIS ) 
PHARMACEUTICALS CORPORATION and ) 
NOVARTIS PHARMA AG, )     Civil Action No. 06-741-SLR
                      ) 
          Plaintiffs, ) 
v. ) 
                      ) 
ABRIKA PHARMACEUTICALS, INC. and ) 
ABRIKA PHARMACEUTICAL, LLLP, ) 
                      ) 
          Defendants ) 
                      )

## DECLARATION OF LESTER J. SAVIT, ESQ.

I, Lester J. Savit, hereby declare as follows:

1.     I am an attorney and partner with the law firm of Jones Day. My offices are located at 3 Park Plaza, Suite 1100, Irvine, California 92614-8505, and 12265 El Camino Real, Suite 200, San Diego, California 92130-2083.

2.     I have personal knowledge of the facts stated herein, unless otherwise indicated.

3.     Attached hereto are true and correct copies of the following documents:

Exhibit A:    Transcript of March 28, 2007 hearing in the above-captioned matter, before the Honorable Sue L. Robinson, Chief Judge;

Exhibit B:    Abrika's Notice of ANDA Filing and Certification of Patent Invalidity or Noninfringement Under 21 U.S.C. § 355, dated October 23, 2006;

Exhibit C:    Transcript of hearing in *Wyeth v. Teva Pharm. USA, Inc.*, Civ. No. 03-1293 (D.N.J. Aug. 5, 2004);

Exhibit D:    Transcript of hearing in *Eisai Co., Ltd. v. Dr. Reddy's Labs., Ltd.*, et al., Civ. No. 03-9053 (S.D.N.Y. Oct. 12, 2004); and

Exhibit E:    Transcript of hearing in *AstraZeneca AB. v. Andrx Pharm., LLC*, Civ. No.

04-80 (D. Del. Aug. 11, 2004).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  May 9, 2007

_____

Lester J. Savit

# EXHIBIT A

Telephone Conference     CondenseIt™     March 28, 2007

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            IN AND FOR THE DISTRICT OF DELAWARE
 3                     - - -
 4   CELEGENE CORPORATION, NOVARTIS   :   CIVIL ACTION
     PHARMACEUTICALS CORPORATION and   :
 5   NOVARTIS PHARMA AG,               :
 6         Plaintiffs                  :
 7           vs.                       :
 8   ABRIKA PHARMACEUTICALS, INC. and  :
     ABRIKA PHARMACEUTICALS, LLP,      :
 9                                     :
            Defendants                 :   NO. 06-741 (SLR)
10                     - - -
11
                         Wilmington, Delaware
12                       Wednesday, March 28, 2007
                         8:35 o'clock, a.m.
13                       *** Telephone Conference
14                     - - -
15   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
16                     - - -
17   APPEARANCES:
18         POTTER, ANDERSON & CORROON
           BY:  PHILIP A. ROVNER, ESQ.
19
20              Counsel for Plaintiffs
21
22
23
                         Valerie J. Gunning
24                       Official Court Reporter
25
```

Page 2

```
 1   APPEARANCES (Continued):
 2         JONES DAY
           BY:  LESTER J. SAVIT, ESQ.
 3              (San Diego, California)
 4              -and-
 5         JONES DAY
           BY:  F. DOMINIC CERRITO, ESQ.
 6              (New York, New York)
 7
 8              Counsel for Plaintiff Celegene Corporation
 9         FITZPATRICK, CELLA, HARPER & SCINTO
           BY:  HENRY J. RENK, ESQ.
10              (New York, New York)
11
           Counsel for Plaintiffs
12         Novartis Pharmaceuticals Corporation and
           Novartis Pharma AG
13
14         BOUCHARD MARGULES & FRIEDLANDER, P.A.
           BY:  JOHN M. SEAMAN, ESQ.
15              -and-
16
17         AXINN, VELTROP & HARKRIDER LLP
           BY:  JAMES D. VELTROP, ESQ.,
18              JONATHAN A. HARRIS, ESQ. and
                (Hartford, Connecticut)
19              -and-
20         AXINN, VELTROP & HARKRIDER LLP
           BY:  JOHN WILL ONGMAN, ESQ.
21              (Washington, D.C.)
22
23              Counsel for Defendants
24                     - - -
25
```

Page 3

**PROCEEDINGS**

(REPORTER'S NOTE: The following telephone conference was held in chambers, beginning at 8:35 a.m.)

THE COURT: Good morning, counsel. This is Judge Robinson, and I do have Valerie here as a Court Reporter. If you could identify yourselves when you speak, that would be helpful.

I've reviewed the documents in the case, including the letters filed along with a proposed discovery order and the motions filed. I have to say I've never had a case like this before where a plaintiff is basically doesn't want to go forward in a forum that it chose, for whatever reason, but this is my proposal.

I believe that, as you all know, we in Delaware believe that a plaintiff's choice of forum is an appropriate priority and that particularly if the forum is its state of incorporation, its home state. So I would certainly respect the fact that the judge in New Jersey would choose to go forward there, and if she does, I will stay this case. But in the meantime, I'm going to deny the plaintiff's motions to strike the answer, et cetera.

I just find that extremely odd that this

Page 4

situation happened in the first place and we are going to go forward. And if you are going to have to go forward someplace, we might as well put something in place here. For whatever reason the judge in New Jersey doesn't want your case, then we're all set to go.

So that's what I'm going to do. I'm putting it on the record. And let me go through the proposed scheduling order in the meantime.

With respect to the first paragraph, it seems to me as though the general date of April 4 is the appropriate language, even though I note that defendants have already served their disclosure information.

With respect to the discovery that will be needed on the following subjects, it seems to me as though you all just put in what you think is going to be covered because it's not binding on anyone.

With respect to discovery disputes, I've taken to only scheduling one discovery dispute conference and then going from there so that I don't have all these conferences on my schedule when, many times, the second one isn't needed or there are multiple ones in between the first and second ones.

So we wil start with the July 24, 2007 at 4:30, discovery dispute conference, and then we'll go from there, assuming we are still going forward here in

Celgene v. Abrika     Page 1 - Page 4

Page 5

1 Delaware.
2     With respect to claim construction --
3     MR. SAVIT: Your Honor, this is Lester Savit,
4 from Jones Day. We represent the co-plaintiff, Celgene.
5     I would -- we would ask that the order not be
6 entered at this time for the following reasons, and this is a
7 point that really hasn't been brought up yet.
8     The problem is that entering all these dates
9 is going to give the New Jersey judge the wrong impression
10 that the road is now paved all the way through to trial
11 in this case. And it has already been argued as the
12 planary argument by the defendants in New Jersey
13 that that is the case. And, in fact, this case is --
14 there's no jurisdictional issue, here and certainly
15 it's going to feed the fire if all these dates all the
16 way through until trial are entered.
17     THE COURT: So I thought I remembered
18 seeing something that there has been some discovery
19 taken in New Jersey.
20     There's not a scheduling order in New Jersey?
21     MR. SAVIT: Your Honor, there has been personal
22 jurisdiction discovery, and, yes, that has included 66,000
23 pages of documents and one deposition. But the issue of
24 personal injuries, the personal jurisdiction issue has been
25 briefed as of this week.

Page 6

1     There's also included in that motion a motion to
2 transfer, so that issue has also been served up to the New
3 Jersey judge. The return date on those motions is Monday.
4     MR. ONGMAN: Your Honor, this is John Ongman, and
5 I represent -- I'm with Axinn Veltrop, and I represent the
6 Abrika defendants here.
7     To answer your question, no, there is no
8 scheduling order in New Jersey. This is all -- so far, a
9 contest of whether there's any personal jurisdiction in
10 New Jersey at all.
11     As we said in our letter, the return date
12 is, no longer April 2nd. It will be, at the very
13 earliest, April 23rd, which is the return date on the
14 motion to seal to Celgene's reply. It may be as late
15 as April 30th.
16     Judge Wittington, to whom the case is
17 assigned, is away on vacation, and her clerk advises us
18 that the likelihood this case will be decided any time
19 soon is remote. It's going to be some time, some indefinite
20 time after April 30th because of the timing in her court,
21 and so we have the situation where the clock is ticking on
22 both the public interest and in our revenue stream.
23     We filed our discovery, wanted to get going,
24 and the whole point of the effort, from our perspective of
25 the plaintiff here, is to delay anything really happening,

Page 7

1 and we, for that reason, would very much like to have your
2 order entered so that we can proceed apace, and if for some
3 reason the judge decides in New Jersey, decides that she want
4 to do something else, well, all of this will have been done
5 and we won't have been wasting time waiting for something to
6 start.
7     MR. SAVIT: Judge, this is Lester Savit again.
8     What we're proposing will not prejudice the
9 defendants at all because we can get started with discovery
10 because we've already had our Rule 26(f) conference.
11     You don't need to enter the scheduling order for
12 us to engage in written exchange of written discovery, and,
13 in fact, we've already received interrogatories and document
14 requests from the defendants.
15     And further, I will represent to you now on
16 behalf of the plaintiffs that if, in fact, there is a month
17 or two delay by waiting to enter the pretrial order dates, we
18 will not renegotiate any of our proposed dates.
19     So if we're talking about the timing of resolving
20 this matter, there's absolutely no prejudice to the
21 defendants to just sitting back a matter of weeks, and we
22 can engage in written discovery here in Delaware and get that
23 under way. All that presumably would be useful in New Jersey
24 if we're proceeding there. But just avoid entering the
25 pretrial scheduling order, because that's going to be used as

Page 8

1 grounds -- in fact, it has already been argued as the primary
2 ground to the New Jersey judge as to why we can't proceed
3 in Delaware.
4     THE COURT: But I find -- again, I find this
5 very odd because this is taking place. We're putting in,
6 if not formally by my executing an order, we are talking
7 about it's a matter of record that you're going to go
8 forward in a certain way. And I, frankly, can't believe
9 believe, and, as a matter of record, I've said if the
10 New Jersey judge denies the motions to dismiss and believes,
11 and I assume that she's going to make a decision on the
12 right grounds, believes that the case should stay there
13 and go forward there because there is jurisdiction over
14 the defendant, it was the first-filed case and it is the
15 plaintiffs' home state, she understands that I am fine with
16 staying my case or even dismissing it, but certainly staying
17 the case until the other goes forward.
18     So I, frankly, don't want to be intellectually
19 dishonest by not going forward with all the cards on the
20 table and letting the judge in New Jersey, who is capable of
21 making an informed decision, make it based on what's actually
22 happening.
23     So I do not think that is the correct way to go,
24 and if there is some mischief to be done in New Jersey, then
25 I would like to know about it. And I'm certainly happy to,

Page 9

1   if informed, I'm certainly happy to get on the phone with the
2   judge in New Jersey and have a conversation with her. If she
3   thinks that I'm trying to take this case from her, I'm not.
4   It's just on my docket with pending motions and it's my job
5   to keep my docket going.
6          So when this comes to me, I will enter it, but I
7   will assume that, as officers of the Court, no mischief will
8   come of it, and that my intentions in entering this are not
9   in any way to be construed as influencing the judge's
10  decision in New Jersey in any way.
11         So I think I was on Paragraph 6, and
12  I believe that plaintiffs' proposal, the May 15th date,
13  is a more appropriate one, and so that's the date that
14  should go in.
15         With respect to the pretrial conference and
16  the trial, I usually have pretrial conferences at the
17  end of my trial day, not in the middle of it, so that would
18  be -- and August 15th is a Friday. So I would propose August
19  14, 2008, at 4:30 p.m.
20         And with respect to a trial, it is unusual for us
21  to have three-week trials in this court.
22         Why is it that this case would require three
23  weeks when most of our trials are no more than two weeks?
24         MR. SAVIT: Well, John, it's was your
25  suggestion. This is Lester Savit again.

Page 10

1          John, maybe you should speak to that.
2          MR. ONGMAN: This was in our original discussion
3   draft that we sent over to Jones Day to get the ball
4   rolling.
5          We had thought that, because of the number of
6   people that might have to be put on the stand, that it might
7   take longer.
8          Part of the problem is we don't know exactly
9   how many people in the chain here are going to be -- need
10  to be put on the stand. There are people that are not
11  currently with Celgene. They're not currently with Novartis,
12  who we think maybe have material information and that was
13  our best guess going, going in, and I think that never
14  came to be an issue between the parties in our discussion,
15  so I guess implicitly they thought that that was likely as
16  well.
17         So we don't have anything firmer than that to
18  offer other than our general impression of how many people
19  may have to go on to the stand.
20         THE COURT: All right. Well, generally, those
21  impressions are always exaggerated.
22         So I will put it down for a two-week bench trial
23  starting on September 2nd, 2008.
24         So I would ask the parties to revise the
25  scheduling order and include the changes. And, again, when

Page 11

1   the judge in New Jersey makes her decision, you need to let
2   me know. If she decides to keep the case, then this case
3   will at least be stayed. We'll have another telephone
4   conversation about that. But in the meantime, you all should
5   go forward on the merits so that wherever this case proceeds,
6   you are doing your due diligence.
7          All right, counsel. Thank you very much for your
8   time today.
9          (Counsel respond, "Thank you your Honor." )
10         (Telephone conference concluded at 9:50 a.m.)
11                  - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT B





**Notice of ANDA Filing and Certification of Patent Invalidity or Noninfringement Under 21 U.S.C. § 355**

**I.** Abrika Pharmaceuticals, Inc. (Abrika), having a place of business at 13800 N.W. 2nd Street, Suite 190, Sunrise, Florida 33325 hereby provides notices that it has filed an Abbreviated New Drug Application (ANDA) under 21 U.S.C. § 355(j)(2)(B)(ii) (also referred to as Section 505(j)(2)(B)(ii) of the Federal Food, Drug and Cosmetic Act) in order to obtain approval to engage in the commercial manufacture, use, or sale of the following Abrika products:

> Methylphenidate Hydrochloride Capsule, Extended Release; Oral 20 mg;

> Methylphenidate Hydrochloride Capsule, Extended Release; Oral 30 mg; and

> Methylphenidate Hydrochloride Capsule, Extended Release; Oral 40 mg (collectively, the "Proposed Abrika Products")

**II.**     The following patents have been listed in the Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book patents") in connection with the 10mg, 20mg, 30mg and 40mg strengths of Methylphenidate Hydrochloride extended release capsules that are marketed under the proprietary name Ritalin LA (collectively, the "Brand Reference Products"):

| U.S. Patent No. | Expiration Date |
|---|---|
| 5,837,284 | December 4, 2015 |
| 6,228,398 | November 1, 2019 |
| 6,635,284 | December 4, 2015 |

a) On information and belief, the holder of the New Drug Application for the Brand Reference Products is NOVARTIS PHARMACEUTICALS CORPORATION, located at 59 Route 10, East Hanover, New Jersey 07936-1080.

b) On information and belief, the owner of U.S. Letters Patent Nos. 5,837,284 and 6,635,284 is CELGENE CORPORATION, located at 7 Powder Horn Drive, Warren, New Jersey 07059.

c) On information and belief, the owner of U.S. Letters Patent No. 6,228,398 is ELAN CORPORATION, PLC, , located at Lincoln House, Lincoln Place, Dublin 2, Ireland.

**III.** The FDA has accepted the filing of the Abrika ANDA for the Proposed Abrika Products and has assigned it reference number 78-458.

**IV.** The Abrika ANDA indicates that Abrika intends to engage in the commercial manufacture, use, or sale of the Proposed Abrika Products before the expiration dates of U.S. Patent Nos. 5,837,284, 6,228,398 and 6,635,284, and contains a certification that the

1

Orange Book Patents are invalid or will not be infringed by the Proposed Abrika
Products.

**V.** Together with such other reasons as may hereafter be determined, the following sets
forth a detailed statement of the factual and legal basis for Abrika's certification that the
Orange Book Patents are invalid or will not be infringed by the Proposed Abrika
Products:

### A. U.S. Patent No. 5,837,284

#### (i) Non-Infringement -

All of the claims of U.S. Patent No. 5,837,284 cannot be infringed by the
Proposed Abrika Products.

Claims 1-27 and 30 of U.S. Patent No. 5,837,284 cannot be infringed by the
Proposed Abrika Products, inter alia, because these claims are directed to a dosage form
having an "ammonio methacrylate copolymer."   The Proposed Abrika Products do not
contain an ammonio methacrylate copolymer or an equivalent of an ammonio
methacrylate copolymer.  Therefore, the Proposed Abrika Products cannot infringe any of
claims 1-27 and 30 of U.S. Patent No. 5,837,284.

Claims 28 and 29 of U.S. Patent No. 5,837,284 cannot be infringed by the
Proposed Abrika Products, inter alia, because these claims, when properly construed, are
directed to a dosage form having an "ammonio methacrylate copolymer."  The Proposed
Abrika Products do not contain an ammonio methacrylate copolymer or an equivalent of
an ammonio methacrylate copolymer.  Therefore, the Proposed Abrika Products cannot
infringe claims 28 and 29 of U.S. Patent No. 5,837,284.

Claims 28 and 29 of U.S. Patent No. 5,837,284 also are directed to a dosage form
containing d-threo-methylphenidate, which is an isomer of methylphenidate.  When
properly construed, these claims are limited to a dosage form containing d-threo-
methylphenidate, but which does not contain other isomers of methylphenidate.  The
Proposed Abrika Products contain a racemic mixture of methylphenidate and therefore
include isomers of methylphenidate beyond d-threo-methylphenidate.  Therefore, the
Proposed Abrika Products cannot infringe claims 28 and 29 of U.S. Patent No. 5,837,284.

#### (ii) Invalidity -

(a) At least claims 28 and 29 of U.S. Patent No. 5,837,284 are invalid under 35
U.S.C. § 112, first paragraph.

35 U.S.C. § 112, first paragraph, states that "[t]he specification shall contain a
written description of the invention, and of the manner and process of making and using
it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to
which it pertains, or with which it is most nearly connected, to make and use the same,
and shall set forth the best mode contemplated by the inventor of carrying out his
invention."

2

As stated above, claims 28 and 29, when properly construed, are directed to a dosage form having an "ammonio methacrylate copolymer", and are therefore not infringed by the Proposed Abrika Products. In the event claims 28 and 29 are not construed to include an "ammonio methacrylate copolymer", these claims would be invalid under 35 U.S.C § 112, first paragraph, because dosage forms comprising an ammonio methacrylate copolymer are the only dosage forms discussed and exemplified in the specification.

(b) Claims 1-30 of U.S. Patent No. 5,837,284 are invalid under 35 U.S.C. § 103 as being obvious over the prior art.

A claimed invention is unpatentable under 35 U.S.C. § 103 for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

Claims 1-30 are invalid under 35 U.S.C § 103 as being obvious at least over U.S. Patent No. 5,229,131 to Amidon et al.

Claims 1-30 are also invalid under 35 U.S.C § 103 as being obvious at least over EP 636366 to Oshlack et al.

Alternatively, claims 1-30 are invalid under 35 U.S.C § 103 as being obvious at least over EP 636366 to Oshlack et al. in view of U.S. Patent No. 5,133,974 to Paradissis et al.

**B. U.S. Patent No. 6,635,284**

(i) Non-Infringement

All of the claims of U.S. Patent No. 6,635,284 cannot be infringed by the Abrika proposed products.

Claims 1 and 3-7 of U.S. Patent No. 6,635,284 cannot be infringed by the Proposed Abrika Products, inter alia, because these claims are directed to a dosage form having an "ammonio methacrylate copolymer." The Proposed Abrika Products do not contain an ammonio methacrylate copolymer or an equivalent of an ammonio methacrylate copolymer. Therefore, the Proposed Abrika Products cannot infringe any of claims 1 and 3-7 of U.S. Patent No. 6,635,284.

Claims 2 and 8-11 of U.S. Patent No. 6,635,284 cannot be infringed by the Proposed Abrika Products, inter alia, because these claims, when properly construed, are directed to a dosage form having an "ammonio methacrylate copolymer." The Proposed Abrika Products do not contain an ammonio methacrylate copolymer or an equivalent of an ammonio methacrylate copolymer. Therefore, the Proposed Abrika Products cannot infringe any of claims 2 and 8-11 of U.S. Patent No. 6,635,284.

3

Claims 2 and 8-11 of U.S. Patent No. 6,635,284 also are directed to a dosage form containing d-threo-methylphenidate which is an isomer of methylphenidate. When properly construed, these claims are limited to a dosage form containing d-threo-methylphenidate, but which does not contain other isomers of methylphenidate. The Proposed Abrika Products contain a racemic mixture of methylphenidate and therefore include isomers of methylphenidate beyond d-threo-methylphenidate. Therefore, the Proposed Abrika Products cannot infringe any of claims 2 and 8-11 of U.S. Patent No. 6,635,284.

(ii) Invalidity

(a) At least claims 2 and 8-11 of U.S. Patent No. 6,635,284 are invalid under 35 U.S.C. § 112, first paragraph.

As stated above, claims 2 and 8-11, when properly construed, include the limitation of an "ammonio methacrylate copolymer" and are therefore not infringed by the Proposed Abrika Products. In the event claims 2 and 8-11 are not construed to include an "ammonio methacrylate copolymer" limitation, these claims would be invalid under 35 U.S.C § 112, first paragraph, inter alia, because dosage forms comprising an ammonio methacrylate copolymer are the only dosage forms discussed and exemplified in the specification.

(b) Claims 1-11 of U.S. Patent No. 6,635,284 are invalid under 35 U.S.C. § 103 as being obvious over the prior art.

Claims 1-11 are invalid under 35 U.S.C § 103 as being obvious at least over U.S. Patent No. 5,229,131 to Amidon et al.

Claims 1-11 are also invalid under 35 U.S.C § 103 as being obvious at least over EP 636366 to Oshlack et al.

Alternatively, claims 1-11 are invalid under 35 U.S.C § 103 as being obvious at least over EP 636366 to Oshlack et al. in view of U.S. Patent No. 5,133,974 to Paradissis et al.

C. **U.S. Patent No. 6,228,398 -**

(a) Claims 1-37 of U.S. Patent No. 6,228,398 are invalid under 35 U.S.C. § 102(b) as being anticipated by the prior art.

A claimed invention is unpatentable under 35 U.S.C. § 102(b) for anticipation if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b).

At least claims 1-4, 6, 9, 11, 12, 14-17, 21, 22, 27, 33 and 34 of U.S. Patent No. 6,228,398 are invalid under 35 U.S.C. § 102(b) , inter alia, as being anticipated by U.S. Patent No. 5,229,131 to Amidon et al.

(b) Alternatively, Claims 1-37 of U.S. Patent No. 6,228,398 are invalid under 35 U.S.C. § 103 as being obvious over the prior art.

Claims 1-37 of U.S. Patent No. 6,228,398 are invalid under 35 U.S.C. § 103, inter alia, as being obvious at least over U.S. Patent No. 5,229,131 to Amidon et al.

Further, claims 1-37 of U.S. Patent No. 6,228,398 are invalid under 35 U.S.C. § 103, inter alia, as being obvious at least over U.S. Patent No. 5,133,974 to Paradissis et al. in view of U.S. Patent No. 5,229,131 to Amidon et al.

**VI.**    The information provided herein is supplied for the purpose of complying with the above-referenced statutes and regulations, and neither Abrika nor its attorneys waive any attorney-client privilege or attorney work product immunity concerning the subject matter of this communication.

In accordance with 21 U.S.C. § 355(j)(2)(B)(i), a copy of this notice has been sent by United States registered mail, return receipt requested, to the following:

> CELGENE CORPORATION
> 7 Powder Horn Drive
> Warren, NJ 07059
> (as owner of U.S. Patent Nos. 5,837,284 and 6,635,284)
>
> ELAN CORPORATION, PLC
> Lincoln House, Lincoln Place
> Dublin 2, Ireland
> (as owner of U.S. Patent No. 6,228,298)
>
> NOVARTIS PHARMACEUTICALS CRPORATION
> 59 Route 10
> East Hanover, NJ 07936-1080

(as the holder of the approved New Drug Application for the Brand Reference Products)

**ABRIKA PHARMACEUTICALS, INC.**

James New
Chief Executive Officer

October 23, 2006

5

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WYETH PHARMACEUTICAL,          : Civil Action No. 03-1293(KSH)
                               :
              Plaintiff,       :
                               :
         vs.                   : Newark, New Jersey
                               :
TEVA PHARMACEUTICALS           :
USA, INC.,                     :
                               :  VOLUME 1 OF 2
                               :  PAGES 1 - 142
              Defendant.       : Thursday, August 5, 2004
---------------------------

TRANSCRIPT OF DISCOVERY MOTIONS
BEFORE THE HONORABLE PATTY SHWARTZ, U.S.M.J.

APPEARANCES:

FOR THE PLAINTIFF:        BY:  KEVIN J. MC KENNA, ESQ.,
                               MARA ZAZZALI, ESQ.,
                          (Gibbons, Del Deo, Dolan,
                          Griffinger & Vecchione)
                          One Riverfront Plaza
                          Newark, N.J.  07102
                               -and-
                          BY:  BASIL J. LEWRIS, ESQ.,
                               LINDA A. WADLER, ESQ.,
                          (Finnegan, Henderson, Farabow,
                          Garrett & Dunner)
                          1300 I Street, NW
                          Washington, DC  20005

FOR THE DEFENDANT:        BY:  ALLYN Z. LITE, ESQ.,
                          (Lite, DePalma, Greenberg & Rivas)
                          Two Gateway Center
                          Newark, NJ  07102
                               -and-
                          BY:  DARYL L. WIEBSEN, ESQ.,
                               ELAINE HERRMANN BLAIS, ESQ.,
                          (Goodwin Procter)
                          53 State Street
                          Boston, MA  02109

         Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

*****************************************************************

RAPID TRANSCRIPT SERVICE, INC.
4 Elodie Lane
Randolph, New Jersey 07869
(973) 328-1730   Fax (973) 328-8016
*****************************************************************

1          MS. BLAIS:  We think Glaxo is dispositive.

2          THE COURT:  Okay.  Let me give you the benefit of

3    my thoughts on this bifurcation issue.  We all know that

4    you're here seeking bifurcation of issues of patent liability

5    versus willful infringement and requesting a stay of

6    discovery.  One of the requests for the stay was based on the

7    Knorr-Bremse Systems v. Dana Corp. decision, 344 F.3d. 1336

8    (F.Cir. 2003).  As far as I know, there's been no rulings and

9    we don't know if it's been ruled upon.

10          MS. BLAIS:  There has not been.

11          MR. LEWRIS:  To my knowledge, no ruling.

12          THE COURT:  No, okay.  That was the -- among the

13   requests for the stay.  Then thereafter, the Court received

14   correspondence, and the Court does appreciate have this case

15   law brought to its attention, recent decisions out of the

16   Federal Circuit as recently as July 27, 2004 in Glaxo Corp.

17   v. Apotex, which form the basis upon which Teva has asked the

18   Court to -- I withdraw that -- has asked the plaintiffs to

19   withdraw their willfulness claim under the view that the case

20   says you can't have a -- you can't pursue willfulness in an

21   ANDA filing case.

22          By way of background, the parties are aware of

23   course that on March 24, 2003 they -- Wyeth filed this action

24   asserting Teva infringed three United States patents, the 171

25   patent, 120 patent, and the 958 patent referred to herein as

Court Decision                                                        162

1   collectively the patents in suit, and incorporate, by
2   reference, the full citations from the complaint.
3        They allege the infringement occurred when Teva
4   filed an Abbreviated New Drug Application pursuant to 21
5   U.S.C. 355(j) for approval to market a generic version of
6   Wyeth's antidepressant drug, Effexor XR.  See the amended
7   complaint at Paragraphs 8 and 14, as well as the letter of
8   Teva dated June 29, 2004, Page 1.
9        Wyeth alleges that the proposed generic version of
10  Effexor XR will infringe one or more of the claims of the
11  patent in suit and that Teva has willfully infringed the
12  patents in suit by filing its ANDA.  Counsel has further
13  amplified some of its theories regarding willfulness here
14  today.
15       In its answer, Teva denies Wyeth's claims, asserts
16  a failure to state a claim upon which relief can be granted,
17  alleges noninfringement and patent invalidity as affirmative
18  defenses and has counterclaims for judgments declaring
19  noninfringement and patent invalidity.  The answer does not
20  specifically assert Teva relied on the advice of counsel in
21  filing its ANDA.  The parties have made clear that it's --
22  this is not a case about monetary damages, but rather, when
23  it comes to money, about attorney's fees, and that will occur
24  if there's a finding, perhaps, of willfulness, depending on
25  how one uses the Glaxo case.

Court Decision                                      163

1        There's been discovery demands served, as the
2   Court understands it, seeking information regarding issues of
3   willfulness.  Teva now claims discovery on this willfulness
4   topic either should never occur because in its view, Glaxo
5   holds the filing of an ANDA cannot constitute a willful
6   infringement, or in its papers, it should argue -- it has
7   argued that it should not occur until liability is decided.
8        Are you withdrawing that argument or are you
9   arguing it in the alternative, either don't allow anything to
10  happen, or at least don't let anything happen until liability
11  is found?  MS. BLAIS:  Yes.
12       THE COURT:  Okay.  I just want to make sure you --
13  you want to go through both analysis, okay.
14       MS. BLAIS:  Yes, that's right.
15       THE COURT:  Let me first address the Glaxo case
16  and I do so mindful of the fact that I'm doing it with the
17  eye towards whether or not discovery is relevant, whether or
18  not there's a dispositive finding about the application of
19  the cases for Judge Hayden to make.  So be mindful of how I'm
20  using it, because I'm here evaluating a discovery dispute as
21  I read the case law.
22       As I mentioned already, counsel for Teva provided
23  the Court with a copy of the Glaxo Group, Ltd. v. Apotex
24  case, Civil No. 03-1575, 2004 WL 1660960 (Fed. Cir. 2004).
25  In that case, the Federal Circuit, at least as I read it,

Court Decision                    164

1    held that the filing of an ANDA without more cannot support

2    the claim that a manufacturer willfully infringed existing

3    patents to support the award of attorney's fees.

4          Teva has argued that given Wyeth's sole allegation

5    of infringement is based on the filing of the ANDA, the Glaxo

6    case renders Wyeth's claims of willfulness moot, and the

7    Court should preclude discovery on any claims regarding

8    willfulness.  Wyeth argues that Glaxo is indistinguishable

9    from this case and, therefore, does not render Teva's

10   bifurcation motion moot or preclude it from proceeding with

11   discovery on willfulness.  They argue that Glaxo is

12   distinguishable because it involved an ANDA, which did not

13   contain a Paragraph 4 certification and they further argue

14   that the case is more akin to Yamanouchi Pharmaceutical

15   Company, Ltd. v. Danbury Pharmacal, Inc., 231 F.3d 1339, 1342

16   (Fed. Cir.) in which the Federal Circuit upheld a legal fee

17   award because of willfulness in an ANDA case, based in part

18   on the ANDA filer's submission of an unfounded Paragraph 4

19   certification.  That's Wyeth's reading of the case.

20         Wyeth argues Yamanouchi should be read

21   harmoniously with Glaxo and that Glaxo would be

22   distinguishable here.  Looking at the Glaxo case, the Federal

23   Circuit reversed the District Court's finding of willful

24   infringement and noted, "the highly artificial" act of

25   infringement of filing an ANDA and that the "limited set of

Court Decision                                                165

1   statutorily defined consequences [to such a filing] set forth

2   in 35 U.S.C. 271(e)(4)." See the Glaxo case at Page 8. And

3   I'm using the WestLaw cite.

4       The court specifically noted that Section

5   271(e)(4) which limits remedies to an innovator company

6   related to the filing of an ANDA to delaying the effective

7   date of the ANDA approval until the expiration of the

8   existing patent be enjoining the infringer from marketing the

9   infringing product and see money damages only "if there has

10  been commercial manufacturer use offered to sell or sale

11  within the United States." See the Glaxo case at Page 8.

12      Otherwise, a court may award attorney's fees under

13  Section 285 for an ANDA seeking approval of an infringing

14  drug. Section 285, the Glaxo court noted, provides for an

15  award of legal fees to the prevailing party only in

16  exceptional circumstances such as "inequitable conduct before

17  the PTO, litigation misconduct such as vexatious or

18  unjustified litigation or frivolous findings, and willful

19  infringement." See the Glaxo case also at Pate 8.

20      Counsel has argued today that in Glaxo the courts

21  were stating that while "a myriad of factual circumstances

22  may give rise to a finding of cases exceptional for the

23  purposes of 35 U.S.C. 285, this court has limited what types

24  of conduct may give rise to award of attorney's fees for the

25  purposes of Section 271(e)(4)."

Court Decision                    166

1    The Glaxo court continued by examining the
2    Yamanouchi case and in Glaxo, in summarizing the District
3    Court's decision in Yamanouchi, the Glaxo court stated, "The
4    District Court [in Yamanouchi] had found that the generic
5    company's ANDA filing constituted willful infringement, but
6    we did not adopt the rationale on appeal.  Instead, we
7    caution the trial court need not have elevated the ANDA
8    certification into a finding of willful infringement and held
9    that the Danbury entire conduct justified the award of
10   attorney's fees, noting that the generic company failed to
11   present even a prima facie case of invalidity in filing its
12   Paragraph 4 certification, hence making a baseless filing and
13   proceeded to present its case in litigation, despite glaring
14   weaknesses."  Internal quotation marks are omitted and it's a
15   citation by Glaxo to Yamanouchi at 231 F.3d. at 1347.

16   Therefore, the court continued, "In Yamanouchi we
17   did not agree that the generic company had engaged in willful
18   infringement, but rather determined an award of attorney's
19   fees was permitted because the generic had filed numerous
20   baseless filings supporting its fruitless and meritless
21   arguments both in its cases at trial and in its ANDA
22   certification.  Such unjustified litigation misconduct has
23   always justified a finding of an exceptional case.
24   Consequently, as suggested by Yamanouchi, we now hold that
25   the mere fact that a company has filed an ANDA application or

1    certification cannot support a finding of willful

2    infringement for the purposes of awarding attorney's fees

3    pursuant to 35 U.S.C. 271(e)(4)...because 35 U.S.C. 271(e)(2)

4    is designed to create an artificial act of infringement for

5    purposes of establishing jurisdiction in federal courts, we

6    hold the District Court committed a clear legal error in

7    finding a mere filing of an ANDA could form the basis of a

8    willful infringement finding."

9         I've read this decision, its language, and

10   considered it in light of Yamanouchi and based on its reading

11   the Court concludes that discovery could be permissible on

12   issues of willfulness because there could be activity that

13   would support willfulness on top of the filing of the ANDA.

14   I understand the Glaxo case to be teaching that just the ANDA

15   filing, without more, is not going to give you a finding of

16   willfulness, but there could be circumstances that would

17   support a finding of willfulness potentially, and that a

18   dispositive motion on this point may be appropriate at the

19   appropriate time, but for this purpose, and based on my

20   reading of this case, it appears that the willfulness issue

21   is still a proper issue to pursue.  Whether or not the ANDA

22   filing alone is enough is a different issue.

23        So for those reasons, the Court will not --

24   withdraw that.  Let me strike that.

25        For those reasons, the Court will address the

Court Decision                                168

1  propriety of whether willfulness discovery should go forward

2  in a bifurcated or nonbifurcated fashion.

3        Now turning to the application for bifurcation.

4  Teva seeks an order to bifurcate these cases in two phases.

5  First, on liability of whether Teva infringed the patents in

6  suit and whether Teva infringed willfully.  Teva argues

7  bifurcating the case and staying discovery on willfulness

8  would expedite the resolution of the liability issues and

9  defer or avoid costly, possibly unnecessary, litigation on

10 the issues of willfulness, which would be reached only upon a

11 finding of liability.

12       Teva further argues that bifurcating the trial

13 would spare it from having to choose during the liability

14 phase of trial to waive the attorney-client privilege in

15 order to assert an opinion of counsel defense and risking an

16 inference of willfulness to preserve the privilege, which is

17 a problem that's described in -- as the Quantum dilemma, and

18 it's named for the Quantum Corp. v. Tandon Corporation case,

19 940 F.2d. 642, 643-44 (Fed. Cir. 1991).

20       Teva also argues that staying the willfulness

21 phase of the trial is advisable because the Federal Circuit

22 is considering the issues in the Knorr-Bremse case, which I

23 made reference to at the outset, and this may, in their view,

24 affect this case and the decision of the court will likely

25 occur during the pendency of this litigation.

Court Decision                                        169

1      Finally, Teva argues bifurcation advances the

2  purpose of the Hatch-Waxman Act, which would require the FDA

3  to withhold approval of any ANDA that is subject to an

4  infringement action for 30 months, or until a decision

5  rendered on validity and infringement, whichever is shorter.

6  Bifurcation, Teva argues, would result in a quicker

7  adjudication of the validity of the patents in suit and thus,

8  assuming there's a finding of liability in Teva's favor,

9  expeditiously bring "affordable prescription drugs to the

10  public." See its brief at Pages 5 and 6.

11      In opposition, Wyeth has argued separate trials

12  would be inefficient and would inconvenience the Court,

13  witnesses, and the parties.  Wyeth further argues since

14  there's no issues of damages in an ANDA case, a basis upon

15  which courts have historically bifurcated patent cases, and

16  since this is a bench trial rather than a jury trial, the

17  risk of confusing a fact finder is lessened and bifurcation

18  is unwarranted.

19      Wyeth further argues the case is analogous to

20  those in which courts have denied bifurcation and stays of

21  discovery relating to issues of willfulness.  Wyeth further

22  argues that separate trials may waste judicial resources

23  because of the significant overlaps of proofs between

24  infringement and willfulness.

25      Wyeth further argues that the Hatch-Waxman Act

1  would be frustrated rather than furthered because bifurcation

2  here would delay trial. Wyeth further argues it would be

3  prejudiced by bifurcation and a stay would delay -- because

4  of the delay in trial, duplication of discovery and

5  duplication of witness testimony.

6          They further argue and they've made that argument

7  here today that the Quantum dilemma issue is not presented

8  because the court has not been presented by way of in-camera

9  submission the documents at issue. In absence of such

10  evidence, Wyeth argues the Court should reject Teva's

11  invitation of bifurcation and staying this case. They

12  further argue that there should be no stay pending the Knorr-

13  Bremse decision.

14          Wyeth has made additional and related arguments

15  here in open court today. Moreover, Wyeth seeks an order

16  requiring Teva to produce the opinions of counsel -- make the

17  election of whether it's going to produce or not by a date

18  certain.

19          Federal Rule of Civil Procedure 42 provides, "The

20  court, in furtherance of convenience and to avoid prejudice

21  or when separate trials would be conducive to expeditious and

22  economy, may order a separate trial of any claim, cross-

23  claim, counterclaim, or third-party claim, or of any separate

24  third-party claims or issues." FRCP 42(b). The decision on

25  whether to bifurcate is based on the circumstances of the

1  individual case at issue and is within the District Court's

2  sound discretion.  Gardco Manufacturing, Inc. v. Herst

3  Lighting Company, Inc., 820 F.2d 1209, 1212 (Fed. Cir. 1987).

4  See also Barr Labs, Inc. v. Abbott Labs, 978 F.2d 98, 115 (3d

5  Cir. 1992).

6          The decision to bifurcate is within the Court's

7  sound discretion and that's been recognized in both the Third

8  Circuit and the Federal Circuit.  While it may be appropriate

9  to order separate trials in some cases, separation is not the

10 usual course that's followed.  Response of Carolina, Inc. v.

11 Lesco Response, Inc. (phonetic), 537 F.2d 1307, 1323-24 (5th

12 Cir. 1976).  Kimberly-Clark Corp. v. James River Corp. of

13 Virginia, 131 FRD 607-608 (N.D. Ga. 1989).  See also Fuji

14 Machine Manufacturing v. Hover-Davis, Inc., 982 F.Supp. 923,

15 924 (W.D.N.Y. 1997).  In the Fuji case the court succinctly

16 stated that bifurcation is the exception, not the rule.

17         Teva as "The party seeking bifurcation has the

18 burden of showing that bifurcation is proper in light of the

19 general principle that a single trial tends to lessen the

20 delay, expense, and inconvenience to all parties."  Miller v.

21 N.J. Transit Authority Rail Operations, 160 FRD 37-40 (D.N.J.

22 1995) quotations and internal citations omitted.  See also

23 Fuji 982 F.Supp. at 924.

24         The party seeking bifurcation must further

25 demonstrate it would be prejudiced if separate trials were

C...

1  not granted. Thus, in deciding this motion this court must

2  consider whether Teva has met its burden of showing judicial

3  economy would be served by bifurcation and that it would

4  avoid if a prejudice if issues of willfulness were bifurcated

5  from those of liability.

6      While there is a great deal of nonbinding

7  authority suggesting bifurcation may be appropriate in

8  certain cases, see for example, Princeton Biochem v. Beckman

9  Instruments, Inc., 180 FRD 254, 258 (D.N.J. 1997), Apatar

10 Group, Inc. v. Owens Illinois, Inc. (phonetic), Civil No. 02-

11 56058, 2003 WL 21557632 at 1 (N.D. Ill. 2003), Naxen v. GTE

12 Info Systems (phonetic), 89 FRD 341, 342 Note 10. It does

13 not appear judicial economy is necessarily served by

14 bifurcating discovery or trial here and many cases addressing

15 these topics have agreed.

16      First, the argument that willfulness and liability

17 issues do not overlap and, therefore, simultaneous trials

18 would be confusing is not persuasive under the circumstances

19 of this case. Courts are split over the general proposition

20 of whether issues of willfulness overlap with those of

21 liability. Compare William Rieber, LLC v. Samsung

22 Electronics America, Inc. (phonetic), 220 FRD 533, 541 (N.D.

23 Ill. 2004) where the court found a significant overlap

24 between information and witnesses related to both liability

25 and willfulness and went as far as saying unified discovery

1   of those issues, with the exception of attorney opinions made

2   sense and was the better course.

3           Real v. Bunn-O-Matic Corp.), 195 FRD 618, 625

4   (N.D. Ill. 2000) where the court found a willfulness

5   determination; that is, the defendant's state of mind when it

6   infringed the patent, was a finding inextricably bound to the

7   facts underlying the alleged infringement. See also

8   Kimberly-Clark, Corp., 131 FRD 609 finding in the same way.

9   And you can compare that with the Princeton Biochem case

10  which made an observation that "a determination regarding

11  patent infringement did not require detail according to

12  elements of willful infringement."

13          So different courts have viewed this in different

14  ways. The parties -- I guess, Wyeth in its papers suggested

15  that there was evidence in support of an overlap of evidence

16  and this Court can envision a circumstance where there would

17  be overlapping evidence. Indeed, this evidence will all be

18  presented to one fact finder. Whether Her Honor chooses to

19  have you stagger what's presented when will be a judgment

20  call for her.

21          And this relates to the second reason why

22  bifurcation doesn't seem to make sense. Unlike many cases

23  seeking bifurcation, the risk of jury confusion is absent

24  here. This is a bench trial. Unlike a jury, the District

25  Judge is well positioned and able to disregard irrelevant

1  evidence, and as I've already mentioned, the parties could
2  approach the Court with perhaps staggering the presentation
3  of evidence saving willfulness until and if liability is
4  established.

5       On the other hand, Her Honor could accept all of
6  the evidence simultaneously, and I believe the parties would
7  have no great fear that there would be anything but a proper
8  consideration of the evidence for its proper purposes.

9       Third, there's nothing before the Court to suggest
10  the willfulness proof is going to be particularly complex, or
11  excessive, or expensive to put together.  Teva has not shown
12  there's been any -- there will be any relevant benefit in
13  terms of savings of time and expense in staying willfulness
14  discovery or bifurcating the trials.  And for this
15  proposition, courts such as the Real case, 195 FRD at 623,
16  624 has come to the same conclusion.

17       Fourth, staying discovery until after liability
18  could just build in more delay and complications.
19  Theoretically, if we were to stay everything on the
20  willfulness component, it could go forward to Judge Hayden,
21  have your trial on liability, and have to come back before
22  this Court for a new discovery schedule, a new final pretrial
23  order, and that is not consistent with what Rule 1 talks
24  about is just, speedy, and inexpensive resolution of cases.
25  See Johns Hopkins, 160 FRD at Page 36, and the full cite for

Court Decision                                    175

1  Johns Hopkins is Johns Hopkins University v. Cellpro, 160 FRD

2  30. The point I was citing from was Page 36 (D. Del. 1995).

3          Finally, judicial economy and conserving resources

4  of the parties supports allowing all discovery to go forward

5  and not bifurcating the trial. If bifurcation would be

6  granted, particularly in a case like this where we're talking

7  about foreign depositions, it's possible we could have

8  multiple depositions of witnesses, some of whom reside in

9  foreign countries, and expense, and inconvenience to both

10 counsel and those witnesses would be apparent. Moreover, it

11 is much more efficient to work towards one trial and one

12 appeal. See the Johns --

13          (Tape 119 ends, Tape 120 begins. Tapes don't

14 match up.)

15          THE COURT: -- would not be an economical use of

16 the Court or the litigant's resources, and on those grounds

17 the Court is denying the application to bifurcate the trial

18 and staying discovery.

19          Now the other reason why a stay is being sought is

20 based on the so-called Quantum dilemma. As I understand the

21 application from Teva, they don't believe they should be

22 forced, at this time, to indicate whether or not they're

23 going to rely -- a certain reliance on counsel defense. They

24 argue by requiring it to participate in discovery on the

25 issue of willfulness we would be prejudiced because we're

Court Decision                                176

1  required to disclose privileged materials or face an adverse
2  inference for failing to do so, as they read the case law out
3  of the Federal Circuit.

4        The Federal Circuit has considered these
5  circumstances in the Quantum case, as I've already cited, and
6  I imagine counsel here is very familiar with the Quantum case
7  and its procedural background.  For the purposes of the
8  record, during the pretrial discovery phase, Quantum moved to
9  compel Tandon to produce opinion letters regarding the
10 patents in suit or, in the alternative, be precluded from
11 making any reference to, or reliance upon counsel as a
12 defense.

13       After an in-camera review, the District Court
14 granted Quantum's motion to compel and later denied the
15 motion to bifurcate discovery at trial and willfulness.
16 Tandon appealed.  The Federal Circuit dismissed the appeal as
17 interlocutory, but noted in dicta, "An accused
18 infringer...should not, without the trial court's careful
19 consideration, be forced to choose between waiving the
20 privilege in order to protect itself from a willfulness
21 finding in which case it may risk prejudicing itself on the
22 question of liability and maintaining the privilege, in which
23 case it may risk being found to be a willful infringer if
24 liability is found.  Trial courts thus should give serious
25 consideration to a separate trial on willfulness whenever the

1  particular attorney-client communications, once inspected by

2  the court in-camera, reveal the defendant is indeed

3  confronted with this dilemma." See the Quantum case at Pages

4  643-44. The court did not consider whether the District

5  Court decisions were proper, but recommended this procedure

6  of reviewing the documents in-camera.

7        In a case decided by Judge Sarokin -- former Judge

8  Sarokin, the Norex (phonetic) case, he construed the dicta in

9  Quantum as "Suggesting that once defendant asserts he's faced

10 with dilemma identified in Quantum, the trial court should

11 inspect the defendant's attorney-client documents in-camera

12 to ascertain that the dilemma is legitimate and "if the

13 dilemma is real...bifurcation of the willfulness issue is an

14 appropriate way to proceed." The Norex case is 1993 WL

15 592531. And quote I just read was from Page 2.

16       Judge Sarokin provided alternative ways that this

17 could be dealt with. He -- just give me a moment. The

18 District Judge further opined, "If the Magistrate decides

19 that early discovery of defendant's documents would unfairly

20 prejudice defendant on the liability issue, the Magistrate

21 could order the issue of willfulness to be severed.

22 Defendant would then have the opportunity, after a liability

23 determination was reached, to decide whether to assert their

24 reliance upon the advice of counsel defense. Conversely, if

25 the Magistrate determines that a defendant would not be

1   unfairly prejudiced by early disclosure of its attorney-

2   client communications, the Court would be justified in

3   refusing to sever the issue of willfulness and ordering a

4   unified trial. At this point, defendant would be required to

5   make an election regarding his defenses. If the defendant

6   chose to assert the advice of counsel defense, plaintiff

7   would be entitled to timely discovery of the attorney-client

8   communications, otherwise, the attorney-client privilege

9   would be preserved." See the case at Page 2.

10          Judge Sarokin noted, however, that the Magistrate

11  Judge could "still decide not to sever the issue of

12  willfulness based on such other considerations as prejudice

13  to the plaintiff, unnecessary expense and delay, and

14  duplication of evidence."

15          Taking these cases together, the inference is if

16  there's -- there must be an in-camera inspection. There's

17  been no submission to this Court for any review of any

18  documents. In any case, after careful consideration, and

19  even when there is an in-camera review, the level of relief

20  granted to a defendant who seeks a stay and bifurcation very

21  much is a fact-sensitive inquiry. Some courts have granted

22  bifurcation and a stay, even at the mere risk of a Quantum

23  dilemma. See Novopharm, Ltd. v. Torpharm, Inc., 181 FRD 308

24  at 312 (E.D. N.C. 1998). See the Princeton Biochem case, 180

25  FRD at 258.

Court Decision                                                                179

1        Other courts have allowed discovery to proceed on
2   all issues, but phased the trial.  See the Johns Hopkins
3   University case, 160 FRD at Page 36, Haney v. Timesavers,
4   Inc., Civil No. 92-270 (1992 WL 36536 at Page 1), Armstrong
5   Manufacturing v. Wright Machines Tool Company (phonetic),
6   Civil No. 91-1021,  1992 WL 58733 at Page 1 (D.Or. 1992),
7   Latrim Corp. v. Hewlett-Packard (phonetic), 791 F. Supp. 113,
8   118 (E.D.La. 1992).

9        Another option is to allow discovery to proceed on
10  all issues except the advice of counsel issue, leaving the
11  defendant to its Quantum choice of whether to assert the
12  privilege or waive it only after the disposition of
13  dispositive motions.  See the A.L. Hanson Manufacturing v.
14  Bauer Products, Civil No. 03-3642, 2004 WL 1125911 at Page 3
15  (N.D. Ill. 2001).  See William Rieber, LLC, 220 FRD 541.

16       Other courts have concluded willfulness shouldn't
17  be bifurcated at all, discovery should go forward because
18  there'd be no undue prejudice to the defendant.  See the Real
19  case, 195 FRD 625-26, Puff Machines, 982 F.Supp. at 924.  In
20  those cases the courts have noted that proof of defendant's
21  state of mind was intertwined with the facts underlying the
22  alleged infringement and that the issue of willfulness may be
23  relevant to both liability and damages.  See the Kimberly-
24  Clark case, 131 FRD 609, Smith v. Alaska Pipeline, 538
25  F.Supp. 977, 986 (D.Del. 1982), Braun, Inc. v. Dynamics

Court Decision                                    180

1   Corp., 975 F.2d 815 at 822.

2        Some courts have required an election by the date

3   dispositive motions are to be filed.  Kind of the bottom line

4   to all this case law is, different courts are doing different

5   things based on what the cases say and what the circumstances

6   of those cases are.

7        What really informs this Court in large part is

8   the fact this is a bench trial and the concerns can be

9   addressed by virtue of the fact that we're not talking about

10  a jury misusing information, number one.  Number two, there's

11  been no submissions to this Court to review what privilege --

12  what prejudice would occur if the documents were disclosed.

13  So not only would judicial economy be frustrated by the stay,

14  but I don't have anything before me that shows that the

15  Quantum problem is apparent.

16       In Novopharm v. Teva Pharm., the District Court in

17  the Northern District of Illinois denied Teva's motion to

18  bifurcate issues of willfulness and damages from liability

19  finding "judicial economy will be promoted by one trial on

20  all relevant patent issues."  And in response to Teva's

21  Quantum dilemma argument, the court found, "It had failed to

22  show that prejudice would be avoided by a separate trial of

23  willfulness and damages issues" because it produced no

24  documents for in-camera review.

25       Accordingly, Teva's motion is denied.  Discovery

1  will proceed on all issues.  I will set a date by which you

2  can make your election and we can proceed after that.  And

3  I've made reasons with respect to judicial economy, the lack

4  of showing of any prejudice all weigh in favor.

5          With respect to the request to stay everything

6  pending the outcome of -- I mean willfulness discovery with

7  -- pending the Knorr-Bremse case, even if the Federal Circuit

8  is well-positioned to resolve this dilemma, it's been the

9  subject of many different opinions already.  See the A.L.

10 Hanson Manufacturing case.  The decision by the Federal

11 Circuit could be some time off and this Court, like others,

12 will not stay a matter in whole or in part pending its

13 arrival.  See the Cimi v. PPG Industries, Inc. (phonetic),

14 218 FRD 416, 418 (D.Del. 2003).  In that case the court

15 recognized the multitude of litigation related to the opinion

16 of counsel defense and how that may be impacted by the Knorr-

17 Bremse case but noted that "the day of clarification is

18 somewhere in the future and the present parties require an

19 answer now."  See also Pioneer Hybrid International, Inc. v.

20 Ottowa Plant Food, Inc., 219 FRD 135, 147 (N.D. Ia. 2003)

21 finding it "inappropriate for this court to attempt to

22 predict or anticipate what the ruling of the Federal Circuit

23 Court of Appeals may be at some indefinite time in the

24 future.  Rather, the court must follow what is controlling at

25 law at this time."

Court Decision                                              182

1       For similar reasons, this Court will not grant a
2    stay pending the outcome of the Knorr-Bremse case. That's
3    not to say the parties can't stagger when they do things.
4    You may all make a decision that it makes sense to stagger
5    when you accomplish certain types of discovery, but that's a
6    different issue.

7       Okay. The next issue is -- that relates to this
8    is a request for leave to make a dispositive motion on the
9    Glaxo case. So I really didn't hear from the other side on
10   the application on that point.

11      MR. LEWRIS: Your Honor, this whole issue has been
12   before the -- has been on the table since last July. They
13   can go forward and rely on the Glaxo case. They don't have
14   to produce any opinions of counsel.

15      THE COURT: So you don't think -- but I think what
16   they're -- well, let me let you speak for yourself, sorry.

17      MS. BLAIS: The case was decided last week and we
18   think it's legitimate to move on that basis.

19      THE COURT: Tell me about the other dispositive
20   motion practice that would happen in this case. At what
21   point would it happen, after all expert discovery?

22      MR. LEWRIS: Dispositive motions on substantive
23   issues presumably after expert discovery.

24      THE COURT: It would have to be that far out?

25      MR. LEWRIS: Yeah. I would think that -- I don't

# EXHIBIT D

1

4ackeisa

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   EISAI CO., LTD.,

 4              Plaintiff,

 5          v.                        03 CV 9053
                                      03 CV 9223
 6   DR. REDDY'S LABORATORIES, LTD.,  04 CV 0656
     et al.,
 7
               Defendants.
 8
     ------------------------------x
 9
                                      New York, N.Y.
10                                    October 12, 2004
                                      2:15 p.m.
11

12

13   Before:

14
                        HON. GERARD E. LYNCH,
15

16                                    District Judge

17

18

19

20

21

22

23

24

25
```

2

4ackeisa

1
                              APPEARANCES

2

FITZPATRICK CELLA
3         Attorneys for plaintiff
    BY:   ROBERT L. BAECHTOLD
4         BRUCE M. WEXLER
          JOSEPH M. O'MALLEY, JR.
5

SULLIVAN & CROMWELL
6         Attorneys for plaintiff
    BY:   BRUCE M. WEXLER
7

BUDD LARNER GROSS PICILLO ROSENBAUM GREENBERG & SADE
8         Attorneys for defendant Dr. Reddy's Laboratoties
    BY:   LOUIS H. WEINSTEIN
9         MAURICE ROSS

10

GOODWIN PROCTER
          Attorneys for defendant Teva Pharmaceuticals
11  BY:   DAVID M. HASHMALL
          FREDERICK REIN
12

ROTHWELL FIGG ERNST & MANBECK
13        Attorneys for defendant Mylan Laboratories
    BY:   JOSEPH A. HYNDS

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 3 - 3

3

4ackeisa

1        THE CLERK:  Eisai v. Dr. Reddy's Laboratories, et al.

2        Counsel, if you would identify yourselves.

3        MR. BAECHTOLD:  Good afternoon, your Honor.  Robert

4   Baechtold for the plaintiff.

5        THE COURT:  Mr. Baechtold.

6        MR. TULCHIN:  Good afternoon, your Honor.  David

7   Tulchin, also for plaintiff.

8        THE COURT:  Do we need everybody?  Who is going to

9   speak?

10       MR. BAECHTOLD:  I am, your Honor.

11       THE COURT:  OK, Mr. Baechtold.  Who on behalf of the

12  defendants?

13       MR. HASHMALL:  Your Honor, good afternoon.  David

14  Hashmall for defendant Teva Pharmaceuticals.

15       THE COURT:  Mr. Hashmall, are you going to be arguing

16  this motion?

17       MR. HASHMALL:  Yes, I am, your Honor.

18       THE COURT:  OK.  Reading the papers, even after this

19  has been discussed at least twice in informal conferences,

20  leaves me with the impression that we are not arguing about

21  what we purport to be arguing about in this motion.  In the

22  narrowest sense, let me ask Mr. Baechtold, isn't it agreed that

23  if the defendants are entitled to judgment on the pleadings,

24  for want of a better term, that plaintiffs are not entitled to

25  a declaration of willful infringement?

4

4ackeisa

1        MR. BAECHTOLD:  No, your Honor, it is not agreed.

2        THE COURT:  Is there such a thing as a declaration of

3    willful infringement as a remedy for patent infringement?

4        MR. BAECHTOLD:  Certainly a basis for a finding of

5    willful infringement, and that can result in an award of

6    attorneys' fees.

7        THE COURT:  But there are many findings that the court

8    could make or that a jury could make along the way to granting

9    relief.  We don't in a slip and fall case say that the

10   plaintiff gets damages and also a declaration of causation or a

11   declaration of negligence or anything of the sort.  Do we?

12       MR. BAECHTOLD:  No, we don't, your Honor, but

13   historically, willful infringement has been an issue that is

14   pleaded and decided as an issue, even though it is just a

15   predicate for finding the case to be exceptional, justifying

16   the award of attorneys' fees.

17       THE COURT:  Isn't it more because it is a predicate

18   finding for enhanced damages under section 284?

19       MR. BAECHTOLD:  No, it is not, your Honor, and that

20   was clear in the recent en banc case in Noremsy, where there

21   were no damages.  That is the case that the Federal Circuit

22   took en banc to decide whether you could draw an inference from

23   the assertion of attorney-client privilege.  In that case,

24   there were no sales, there were no actual damages, there was no

25   possibility of a multiplier of actual damages, and the case was

4ackeisa

1   sent back to the district court to determine willful

2   infringement.  It actually came up on a finding of willful

3   infringement and came back solely as the basis for an attorney

4   fee award.

5          THE COURT:  Right, but the court didn't say that there

6   needs to be a judgment of willfulness or that a jury needs to

7   find willfulness, did it?

8          MR. BAECHTOLD:  If that is the basis for the

9   exceptional case finding it is a necessary finding, and if

10  there is a jury in the case -- I don't recall if Noremsy has a

11  jury or not, but if there is, that is a jury issue.  That is a

12  separate issue presented to the jury.

13         THE COURT:  I am very puzzled by that.  I had been

14  told, and I have even done it, that you put the issue of

15  willfulness to a jury.  I haven't thoroughly researched this,

16  but I notice in Sand's jury instruction treatise it says that

17  the Federal Circuit has approved of putting willfulness to a

18  jury, though the case that is footnoted for that proposition is

19  simply one in which it was put to a jury, apparently, and the

20  Federal Circuit didn't say much one way or the other about it,

21  and I am not sure I understand why it needs to be put to a jury

22  in a patent case, particularly if the only reason why it is in

23  issue is because it is one of many potential predicates for

24  finding an exceptional case and awarding attorneys' fees.

25         MR. BAECHTOLD:  The determination of exceptional case

6

4ackeisa

1   is placed in the hands of the court, bench, according to the

2   statute. So the question is, if you have a jury trial you then

3   have to make the determination who will decide the underlying

4   fact issue, that is relevant to the question of exceptional

5   case.

6         THE COURT: But there are a lot of fact issues that

7   might be relevant. Litigation misconduct, for example, is one

8   basis for finding exceptional case, and I have never heard of

9   submitting that to a jury to decide whether there was

10  litigation misconduct. There are many things, I am sure, in

11  patent law that I haven't heard of, but that would seem very

12  odd, wouldn't it?

13        MR. BAECHTOLD: Yes, it would, your Honor.

14        THE COURT: I can think of reasons why willfulness is

15  different in the ordinary patent case. In the ordinary patent

16  case, the jury is deciding what did the defendant do, what are

17  its products like, do those products infringe, and how did it

18  come to be, as a sort of naturally allied question, that the

19  infringing product got out on the market. But in this case I

20  am having a harder time seeing why willfulness becomes part of

21  the case in the same way.

22        MR. BAECHTOLD: I think the answer, your Honor, is

23  whether the case is decided by judge or jury. If it is decided

24  by the judge and the judge makes a finding on exceptional

25  case -- and I think there is no doubt that we are entitled to

4ackeisa

1   plead for the relief that we can get on the exceptional case --

2   the court has to articulate its findings of fact supporting

3   that.  One of the allegations we make is that their

4   infringement was willful.  Whether we plead it as a separate

5   allegation or not, if your Honor decides it was willful, that

6   becomes a basis for finding the exceptional case.

7            THE COURT:  Then why aren't the defendants right that

8   this really all depends on who is the prevailing party?  I

9   mean, there are a lot of cases in law in which there is a

10  discretionary possibility of awarding attorneys' fees, and the

11  court has to give its reasons for exercising its discretion,

12  and sometimes those reasons have to do with questions of fact,

13  what actually happened.  But we typically leave that until we

14  see who won, and at that point I suspect that what most judges

15  do is have some preliminary sense of, does this seem to be

16  really one-sided or not.

17           At that point there may be fact questions.  Maybe a

18  party says, well, our former counsel misled us or something,

19  and even though this looks like it was a sanctionable, terrible

20  litigation position, it wasn't our fault, we got bad legal

21  advice, and maybe then there is some inquiry into that.

22           But in the first instance you do the merits, and you

23  don't have discovery up front into what was the other side's

24  lawyers telling it from day one of the litigation.  First you

25  find out who wins, and the winner may have been told by some

8

4ackeisa

1    lawyer from the beginning, it's a terrible case, you shouldn't

2    even bring it, but if they win, we never hear about that

3    mistake and we never inquire into whether it was a frivolous

4    claim or not, in somebody's opinion, as of when it was brought.

5    It is only when you lose that there may be further scrutiny of

6    whether your position was ever justified.

7            MR. BAECHTOLD:   It is certainly true, your Honor, that

8    you make the determination of exceptional case after you know

9    who is the prevailing party.  But there is nothing that says

10   that you can't make that concurrently with the decision on the

11   merits.  I can see in some cases it might make sense, it might

12   be efficient to separate the two and say we are not even going

13   to think about it until we know who the prevailing party is.

14   But that always depends on the facts of the case.

15           First we can say that Yamanouchi was an approved

16   procedure, so in one sense you can say the court can't go wrong

17   by doing what Judge Owen did in Yamanouchi, which was to allow

18   the discovery to go forward, hear the case on the merits, and

19   determine whether or not the certification was baseless and

20   whether or not the facts at trial which tracked the

21   certification were also baseless.  We certainly think it is

22   more efficient to do that.

23           .  THE COURT:   But is there any indication in Yamanouchi

24   that the court had ordered discovery on attorneys' opinions?

25   There is a reference in the opinion, I thought, that one party

9

4ackeisa

1    put in --

2            MR. BAECHTOLD:    Page 1347.

3            THE COURT:    Yes, on page 1347 the court refers to

4    Danbury's choice to produce during trial an opinion from its

5    patent attorney.    That doesn't indicate that if there were no

6    such choice, if there were no reliance on advice of counsel,

7    that anyone would get to inquire into what advice Danbury's

8    counsel had given it, with a view to, if Danbury loses,

9    asserting a claim for attorneys' fees on the grounds that they

10   proceeded in bad faith and willfully contrary to the advice of

11   their lawyers.

12           MR. BAECHTOLD:    Yes.    In fact, your Honor, in the

13   Yamanouchi case they did not elect to waive privilege and they

14   did not elect to rely on the advice of counsel and they

15   withheld every document that was a basis for privilege but one

16   opinion.    I was counsel for the plaintiff.    I can't tell you

17   what their strategy was in deciding to give up that one opinion

18   while asserting they were not relying upon it.    But that is the

19   fact of the case.

20           THE COURT:    Then if I follow the procedure that

21   happened there, I would be on solid ground, it sounds like, in

22   not requiring defendants to give up otherwise privileged

23   information, at least at this stage.

24           MR. BAECHTOLD:    I think unless they decide to waive

25   the privilege and rely on it, there is no compulsion to give it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
EXHIBIT 3 - 10

10

4ackeisa

1   up.  We might argue about the extent to which providing a

2   certification is in fact some sort of a waiver.

3           But the Yamanouchi case made clear that it was the

4   certification.  There was a duty under the Hatch-Waxman Act to

5   use due care.  That was a key factor in finding that the case

6   was exceptional.

7           THE COURT:  It was objectively baseless.

8           MR. BAECHTOLD:  It was objectively baseless.  It may

9   turn out that Teva decides they don't want to rely on advice of

10  counsel.  In that case we can't argue that they waived it, they

11  simply can't rely on it.  It may well be one of the things we

12  want to explore, within the company was there a recognition

13  that their case was dead on with the Yamanouchi case and in

14  fact the certification was baseless, and there was a race to

15  get to the FDA.

16          The goal in these cases, the plum always is that the

17  generic wants to be the first one to certify, and the first

18  available date for certification was the four-year anniversary

19  of our client's approval.  We got three on that day.  So we

20  don't know until we get the discovery, but it may be that Teva

21  cobbled this thing together and said let's get a piece of paper

22  on file so we get a priority.  If that is so, we think we are

23  entitled to discover that and we think that should be part of

24  the trial on the merits, not something that your Honor comes

25  back to three months, six months, a year after you have heard

4ackeisa

1    the arguments on the merits.

2          One of the reasons for believing this is in fact

3    likely is, as your Honor knows, at least one defendant has

4    agreed that the invalidity defense is baseless and they have

5    dropped it. Teva is asserting it. We couldn't force them to

6    drop it. They are asserting inequitable conduct as their only

7    defense, but it still comes down to efficiency. First, there

8    is no motion to sever and stay the issue of exceptional case.

9    So whatever is pertinent to exceptional case one must say is

10   fair game to discovery. So we could ask, do you have an

11   attorney opinion. If they say no, we are going to assert the

12   attorney-client privilege and not produce it, we can't take it

13   any further than that. But we can ask. If they choose to rely

14   on it, then they produce it.

15         THE COURT: Let me try and get the answer to what I

16   have to think is a somewhat metaphysical question. You

17   certainly take the position, and I will ask Mr. Hashmall if he

18   agrees, although I don't know how he could disagree, that the

19   statute explicitly says that one possible remedy in this kind

20   of lawsuit is an award of attorneys' fees for exceptional case.

21         MR. BAECHTOLD: Correct.

22         THE COURT: I take it your reading of Yamanouchi after

23   Glaxo is that one possible way that a 271(e)(ii) case can be

24   exceptional is if the infringement was willful.

25         MR. BAECHTOLD: Yes, your Honor, and we say Glaxo has

12

4ackeisa

1    not -- this is a motion for judgment on the pleadings, and they

2    correctly stated the legal basis for that in their brief, that

3    you have to show that plaintiff can prove no set of facts to

4    support the claim.

5         So the question is, does Glaxo say that in an ANDA

6    case there is no conceivable set of facts in which anyone could

7    prove willful infringement?  But all Glaxo holds is that the

8    mere filing -- and in their brief they leave out "mere"

9    constantly -- of an ANDA alone can't be the basis for a willful

10   infringement claim.

11        THE COURT:  They also say the mere filing of an

12   application or certification.

13        MR. BAECHTOLD:  Yes, and four times in the Glaxo case

14   they refer to the "mere filing."  Three times they only say "an

15   application."  The fourth time they throw in the words "or

16   certification."  There was no certification in the Glaxo case.

17        The best you could say about that statement is that it

18   is dictum, but it clearly has nothing to do with the facts of

19   that case, and in fact they distinguish Yamanouchi by saying

20   unlike Yamanouchi, Glaxo didn't make a certification.

21        THE COURT:  Well, yes, but they also distinguish

22   Yamanouchi, and Yamanouchi itself in the circuit says we don't

23   have to rely on the certification because there was litigation.

24        MR. BAECHTOLD:  Yes.  Yamanouchi says we don't need to

25   get there.  Glaxo says, if all you've got at the time filing of

13

4ackeisa

1    an ANDA is the failure to get an attorney opinion, which is the

2    only thing the court relied upon -- there were no findings in

3    the case they presented -- you can't say that's willful.

4    That's all that Glaxo says.  Glaxo doesn't say there is no

5    conceivable basis, and the two district courts who have looked

6    at this so far have said the same thing.

7         If at some point the defendant wants to make a motion

8    for summary judgment, saying OK, we have had discovery now and

9    we say that there is no genuine dispute of fact and we are

10   entitled to summary judgment of no willfulness, that is a

11   different animal.  What they are trying to do is stop this

12   before we get any discovery.

13        THE COURT:  What are the facts, or example of facts,

14   that would show willfulness?  Let me try one out and see if you

15   can think this, and, if not, you can give me a better one.  The

16   filing of an application based on a certification that is

17   objectively and subjectively baseless?

18        MR. BAECHTOLD:  That would be one element, yes, your

19   Honor, because the Yamanouchi case says that the Hatch-Waxman

20   Act, because of the certification requirements that weren't in

21   the Glaxo case, imposes a duty of due care on the generic.  I

22   gave your Honor an example before.  I don't know who approved

23   this in discovery, but if people inside the Teva organization

24   said, you know, we have all read the Yamanouchi case, this

25   certification we are filing we don't have a chance on but we

14

4ackeisa

1    have to get it on file, that is an additional fact.  In

2    Yamanouchi, nobody said that Danbury didn't believe in the

3    case.  They said the case was objectively baseless, but maybe

4    they had a misguided belief in the case.  If we were to show

5    that the Teva didn't believe in the case, that would establish

6    willfulness, but if we never get discovery, we never find out

7    that's one of the facts.

8            THE COURT:  All right, I think that may do.  Mr.

9    Hashmall --

10           MR. BAECHTOLD:  Your Honor, there was one other thing

11   I wanted to mention.  Your Honor asked about making the finding

12   of exceptional case concurrent with the merits of the case.

13   That is what happened in Yamanouchi and the circuit approved

14   it.  There is also a case called L Tech Systems where the

15   plaintiff was held to have presented a frivolous case, decided

16   concurrently with the merits, because that was the most

17   appropriate time for the court to look at those issues.

18           THE COURT:  OK, and just again, to get at what

19   difference it all makes, and you are saying if this motion were

20   granted or what the defendants are really up to or something

21   is, what is at stake is the subjective mental state of

22   executives of the defendants in filing their application.

23   That's really what this is all about.

24           MR. BAECHTOLD:  I would say that's one of the possible

25   facts.

15

4ackeisa

1        THE COURT:  Because I am not sure how you have

2    discovery into the objective baselessness of a claim other than

3    by having discovery into the merits of the claim.

4        MR. BAECHTOLD:  And we have the certification and we

5    know exactly what it says.  Your Honor can read it and see that

6    it tracks exactly the Yamanouchi case.

7        THE COURT:  I understand that, but I am saying, you

8    don't need a willfulness allegation to inquire into the

9    objective merits of the claim.  It is either objectively

10   meritorious or objectively meritless or objectively so

11   meritless that it is frivolous.  So the only thing that is

12   extra here is the mental state of the defendants, a recognition

13   within the company at the time that what they were doing was

14   baseless, and when I say that is one example, I can't conjure

15   up every possible example.

16       MR. BAECHTOLD:  But what I am sure is going to happen,

17   although there has been no motion to sever and stay, that is

18   exactly what Teva has in mind, and as soon as we start asking

19   discovery questions, if your Honor grants this motion, every

20   question is going to come back that relates to willfulness.

21       THE COURT:  I think the defendants' position now is

22   that they don't need to sever anything, that is just your

23   relevant period, or it becomes relevant only to some attorneys'

24   fees claim later on.

25       MR. BAECHTOLD:  That is their position, but we say it

16

4ackeisa

1    is perfectly appropriate for you to decide exceptional case

2    concurrently with the decision on the merits.  In order to do

3    that, we have to have the discovery, and when you reread the

4    revisor's notes they even recommend taking that promptly after

5    the merits decision.

6           So if it is not decided we are going to have a raft of

7    discovery disputes that are going to come to you, because in

8    each case they will say we are not going to give discovery on

9    that, that is only for after there is a determination on the

10   merits.

11          THE COURT:  All right.  Mr. Hashmall, is Mr. Baechtold

12   right that that is what this is really about?

13          MR. HASHMALL:  There are two things I think this is

14   about, your Honor.  One is simply the issue that the plaintiff

15   is not entitled to seek a declaration that the defendants, my

16   client or the other defendants, have willfully infringed the

17   patent.

18          THE COURT:  Suppose I give you that, that there is no

19   separate relief known as a declaration of willfulness.  Isn't

20   it nevertheless the case that they are entitled to seek

21   attorneys' fees, they are entitled to argue that this is an

22   exceptional case under section 285, and willfulness is a

23   possible component, at least, of something being an exceptional

24   case?

25          MR. HASHMALL:  I agree that the prevailing party,

17

4ackeisa

1   whether it be Eisai, Teva or Dr. Reddy, has the right to make

2   an application pursuant to section 285 to have the case

3   declared exceptional and have an award of attorneys' fees, and

4   there are a host of cases that talk about the factors that a

5   court should consider in determining whether a case is

6   exceptional or not.  I think what the Glaxo v. Apotecs holds is

7   that when the active infringement alleged is artificial

8   pursuant to 271(e)(ii), the willfulness component drops out.

9   There cannot be willful infringement -- I mean, I don't know

10  how else to read the holding of that case, and I think that

11  what Eisai tries to rely upon about whether there has been

12  certification or not is a distinction without difference, your

13  Honor.

14       THE COURT:  Maybe you can enlighten me on how there

15  can be a distinction without certification.

16       MR. HASHMALL:  If you have the statute in front of

17  you, 271(e)(ii), it says it shall be an active infringement to

18  submit -- that's the preamble to (e)(ii).  B.  An application

19  under section 512 of such act -- I am going to skip it a little

20  bit -- which is claimed in a patent, or the use of which is

21  claimed in a patent, and then it continues, if the purpose of

22  such submission is to obtain approval under the act to engage

23  in the commercial manufacture, use or sale of a drug.

24       There is a little quirk in these biologics.  In the

25  Glaxo v. Apotec case, and I think we also cited the Teva case

4ackeisa

1    in our brief, Biologics did not use to have a list of patents

2    in the orange book when they were NDA approved and they used

3    not to have to file certification when you wanted to market a

4    generic version of a biologic drug. But you still had to file

5    an NDA and that is what happened in Glaxo v. Apotec.

6    Therefore, the court said, we have jurisdiction under

7    271(e)(ii).

8          If you look at the Northern District of Illinois's

9    discussion in Teva v. Abbott, which we reference in page 3 of

10   our reply brief, the court goes through an extended discussion

11   on the history of the biologic and the nonbiologics and the

12   difference in statutory scheme, and concludes, as in the Glaxo

13   case, that either way there is jurisdiction for an artificial

14   enactment infringement.

15         That brings us to the Glaxo v. Apotec decision, which,

16   as I read it, is based on two fundamental principles, one that

17   271(e)(ii) infringements are different than every other patent

18   in the statute. It is an artificial infringement which the

19   court in Eli Lilly defined as simply for the basis of creating

20   jurisdiction in a case in controversy. That rationale for the

21   Federal Circuit's decision applies equally whether there is a

22   certification or not. The only issue that is relevant is that

23   you have jurisdiction under 271(e)(ii).

24         THE COURT: It may be an artificial act but it is an

25   artificial infringement for the purpose of creating litigation

4ackeisa

1    about the validity of the patent.  Isn't that the point?

2          MR. HASHMALL:  Exactly, before an actual active

3    infringement takes place.

4          THE COURT:  But does that mean that a generic

5    manufacturer could undertake a thorough study of a patent,

6    decide that it was perfectly valid, get all the scientific and

7    legal advice they can garner, all of which tells them it is

8    perfectly valid, and then they can go in and file an

9    application for the purpose of triggering an expensive lawsuit

10   in the hope of coercing somebody into settling?  I guess you

11   haven't much chance of settling if there is a billion dollars

12   at stake.  But theoretically, isn't the concept of a bad faith

13   application a perfectly intelligible concept?

14         MR. HASHMALL:  It is a concept that would be relevant

15   to a potential finding of exceptional circumstances, just as,

16   your Honor, if we expect to prevail at trial and we expect to

17   have this court rule that Eisai engaged in inequitable conduct,

18   if at the end of the trial we prevail we intend to ask your

19   Honor to rule this case exceptional, that they did not do a

20   good faith investigation of their ability to pursue a patent

21   infringe claim against my client.  It would be the same flip

22   side.  I agree that if you rule against us they can seek to

23   obtain a ruling of exceptional circumstances based upon a

24   baseless, bad faith filing.  I don't dispute that.  Nor would

25   they dispute, I think, that we would have the right to seek

20

4ackeisa

1   exceptional circumstances if it could be shown that they had no

2   good-faith basis to file the lawsuit to begin with.

3           THE COURT:  If I follow what you just said, how is

4   that different from willfulness, bad faith?

5           MR. HASHMALL:  I read Yamanouchi talking about

6   objectively baseless.  Perhaps there is an element of

7   subjective intent -- I am not sure, your Honor.

8           THE COURT:  Wouldn't it be relevant in the exercise of

9   a court's discretion to say this looks like a very, very thin

10  claim, but still, if the party had good faith I'm not going to

11  stick them with attorneys' fees?  That would be something that

12  is highly relevant, isn't it, whether not only was it baseless,

13  always a kind of judgment call between you lose and you lose so

14  badly that we are going to say this is totally baseless?  Isn't

15  it germane to that, whether the party knew perfectly well it

16  was baseless and had bad motives in doing what it did?  That

17  would make it a pretty exceptional case.

18          MR. HASHMALL:  Yes, but if you read Glaxo, they are

19  careful to distinguish bad faith finding versus willful

20  infringement to support exceptional circumstances.  Maybe the

21  difference is more semantic than substance.  It is hard to say,

22  your Honor, unless you are confronted with a specific issue of

23  discovery or disputed fact relevant to the two issues.  But

24  certainly Glaxo's holding is that there can be no willful

25  infringement in the ANDA case.

4ackeisa

1        THE COURT:  They don't say that there can be no

2    willful infringement in an ANDA case.  If they did, it would be

3    much clearer and even Mr. Baechtold's creative argument, I

4    think, would be taxed.  But I think they say that the mere

5    filing of an application or certification -- I will give you

6    that for this round -- can't be the basis for a finding of

7    willfulness.

8        Now, I don't know what is the difference between a

9    mere filing of something and a filing of something in bad faith

10   that is outrageously baseless.  But they don't actually say

11   that a filing of an application for certification can never be

12   a component of a finding of willfulness, do they, or that there

13   can't be such a thing as willfulness in an ANDA case?  Is there

14   language to that effect?

15       MR. HASHMALL:  This is a quote from I believe page

16   1350.  It says "While a myriad of factual circumstances may

17   give rise to a finding that a case is exceptional for purposes

18   of 35 USC 285, this court has limited what types of conduct

19   might give rise to an award of attorneys' fees for purposes of

20   section 270(e)(iv)."

21       The only limitation they could possibly be referring

22   to, it seems to me there, is that an ANDA filing or

23   certification cannot be the basis for willful infringement.

24       THE COURT:  What they go on to say is that in

25   Yamanouchi this court determined that a baseless and wholly

22

4ackeisa

1    unjustified certification when combined with litigation

2    misconduct warranted an exceptional case finding.

3              Again, that may mean that a baseless and wholly

4    unjustified certification standing alone can't be the basis for

5    an exceptional case finding, but it seems to imply quite

6    directly that a baseless and wholly unjustified certification

7    plus is a potential basis.

8              MR. HASHMALL:  For exceptional circumstances, but not

9    willful infringement.

10             THE COURT:  I guess I have trouble understanding what

11   is the difference.  In other words, if the basis for finding an

12   exceptional case were something like a baseless and wholly

13   unjustified certification plus bad faith, is there anything in

14   either Yamanouchi or Glaxo that says that can't be a basis for

15   a finding of exceptional case?

16             MR. HASHMALL:  There are two parts to the rationale of

17   the decision.  One is, I think, premised on the Supreme Court's

18   ruling in Eli Lilly that this is an artificial act and the

19   infringement is really a way of getting jurisdiction before the

20   court.  And the second part of the decision is reference to the

21   statutory language itself, and I think it is significant that

22   when the Federal Circuit cited section 271(e)(iv) in its

23   decision, it put out in bold, it bolded that part of the

24   statute that says these are the only remedies available.

25   Again, I don't know what was the purpose of doing that, unless

23

4ackeisa

1    to make the point that there cannot be a finding of willful

2    infringement.

3                THE COURT:  I don't see that, because the part that

4    they emphasize says these are the only remedies except for an

5    award of attorneys' fees under section 285, and there is no

6    willfulness award of attorneys' fees except under 285, is

7    there?

8                MR. HASHMALL:  No, it is typically done under 284, as

9    your Honor pointed out.

10               THE COURT:  284 is a reason for enhanced damages, and

11   I think we are all in agreement that that's not in play in an

12   ANDA case.

13               MR. HASHMALL:  Right.

14               THE COURT:  But under 285 is where you get your

15   attorneys' fees, and willfulness is a subcategory of

16   exceptional case.

17               MR. HASHMALL:  That is where I disagree, with due

18   respect, your Honor.  First, there is no reference to

19   willfulness in 285.

20               THE COURT:  There is no reference to willfulness in

21   284 either.  Maybe you patent lawyers can tell me where I am

22   missing it in the statute but I haven't found the language.

23               MR. HASHMALL:  That is correct.  284 does not apply to

24   a Hatch-Waxman case in any event.  But if Glaxo stands for

25   anything, it is that you can't have willful infringement in an

24

4ackeisa

1   ANDA.  The only act of the infringement against the defendants

2   is the mere filing of ANDA certification.  There is no other

3   alleged act of infringement.

4          I am not running away from the word "mere," your

5   Honor.  That is the only act of infringement we are alleged to

6   have engaged in.  In response to that, in their papers Eisai

7   points to this notice letter that we sent out to them, and if I

8   could just spend a minute, the notice letter is not an act of

9   infringement and is not provided for in 271(e)(ii) but

10  separately provided for in 21 USC 355.  If you read Eisai's

11  papers, they say they intend to show that that notice letter

12  was baseless and didn't adequately state the law, etc., etc.

13  If all that is true, that if you read that notice letter your

14  Honor concludes it is a terrible notice letter, it is not an

15  act of infringement.  It is merely sending a letter.  The only

16  act alleged against the defendant is the mere filing of the

17  ANDA certification, and Glaxo, by reference to the statute and

18  in reliance on the Supreme Court's discussion of the

19  legislative history of the statute, says you can't on that

20  jurisdictional peg hang a finding of willful infringement.

21          THE COURT:  Eli Lilly didn't say that.

22          MR. HASHMALL:  They do talk about limited remedies and

23  Eli Lilly does talk about that this is a jurisdictional

24  conferring statute, it is an artificial act of infringement

25  simply to give the court jurisdiction to hear what is really a

4ackeisa

1  declaratory judgment action.

2          THE COURT:  Right, but I think we have agreed, and

3  maybe I misheard what you said, that a totally frivolous ANDA

4  application could constitute an exceptional case.

5          MR. HASHMALL:  I would read that if coupled with

6  litigation misconduct seems to be the suggestion in Glaxo.  I

7  don't know that the issue has otherwise been resolved.

8          THE COURT:  I am not sure how you would escape

9  engaging in litigation misconduct if you filed a totally --

10  well, there is a way.  If you filed a totally frivolous,

11  utterly baseless and bad faith application, you are saying

12  there is no possibility of finding that an exceptional case

13  warranting an award of attorneys' fees to a prevailing

14  plaintiff who wins the resulting infringement lawsuit.

15          MR. HASHMALL:  I don't know the answer to that

16  question, your Honor.  I think the litigation conduct has to

17  play into the court's determination of that issue.

18          I have not yet discussed the whole issue that has been

19  the focus of Eisai's papers and the presentation of

20  Mr. Baechtold, how does all this affect discovery.

21          THE COURT:  Why don't you move on to it.

22          MR. HASHMALL:  I think we are entitled to the relief

23  we requested in the motion, which is the striking of the

24  paragraphs.  The next question is, of course, what is the

25  significance of that.  We did not make a discovery motion, nor

4ackeisa

1    has Eisai, so I really don't think that the issue is before

2    your Honor at this point.  The parties have not come to a point

3    where we disagreed on any specific discovery request or had a

4    meet and confer on it.

5        THE COURT:  But Mr. Baechtold is going to run right

6    out and subpoena your CEO or somebody, whoever is in charge of

7    making these applications, and he is going to ask him why do

8    you think that we should have our patent declared invalid.  Is

9    that a legitimate question for him to ask?

10        MR. HASHMALL:  I think that the cases, the

11    overwhelming authorities that we researched and cite in our

12    briefs talk about exceptional circumstances as a collateral

13    proceeding after there is a determination of a prevailing

14    party.  It looks like in Yamanouchi that Judge Owen treated it

15    all at once, although it is not clear from the case that I read

16    whether there was any discovery on the issue.  It appears like

17    there was not.  I think under 54(d) the judge probably has some

18    discretion to hear it all at once.  I wouldn't dispute that.

19        But I think in this case it would be a terrible idea.

20    This is a complicated case.  There are a number of defendants.

21    We have foreign inventors we need to depose.  To start

22    conducting, and it would be mutual, discovery of each other's

23    executives about what you knew when you filed the certification

24    and what was the basis and asking Mr. Baechtold's clients what

25    they think they had a basis for suing my client for

4ackeisa

1    infringement, when were they aware of what we think are hot

2    documents, it is going to become a complete -- it is going to

3    swallow up the litigation of the merits.

4        Again, this was not, I think, an issue yet to be

5    presented to your Honor, but I think the best way to proceed in

6    this case is, let's have the trial, let's determine the

7    prevailing party, and then if either side wants to make an

8    application under 285 and Rule 54(d), it can be considered by

9    the court.

10       THE COURT:  Can I ask Mr. Baechtold a quick question,

11   what came up in Mr. Hashmall's reply papers at the very end,

12   what might have seemed a throw-away for additional

13   consideration.  Do you agree that it is sauce for the goose and

14   that they can take whatever discovery might be relevant to the

15   theory, whatever theory they have of bad faith or exceptional

16   circumstance because they might turn out to be the prevailing

17   party?

18       MR. BAECHTOLD:  They can take whatever discovery they

19   are entitled to, and if we decide not to waive privilege and

20   not rely on advice of counsel, we won't rely on advice of

21   counsel.

22       THE COURT:  But they can query your nonlegal

23   executives as to what the basis was other than advice of

24   counsel.

25       MR. BAECHTOLD:  If there was anything other than

28

4ackeisa

1   advice of counsel they can ask about it.  It's an empty pail,

2   but they can ask about it.

3           THE COURT:  All right, anything else?

4           MR. BAECHTOLD:  If I may, I think your Honor put your

5   finger on it.  Why do they care if at the end of the day we

6   have the same considerations for willfulness as for the

7   exceptional case, and I think the answer just came out.  If you

8   leave willfulness in the case, Teva has to move to bifurcate,

9   otherwise they can't resist the discovery.  So they are doing

10  an end run-around.  They are saying leave the exceptional case

11  in the case, we are just going to say nobody gets discovery on

12  it until you decide who is the prevailing party.  That's the

13  real motivation for this.

14          Your Honor asked before, we talked about this

15  artificial act of infringement, and I think your Honor put your

16  finger on that.  Until the Hatch-Waxman Act, we didn't need an

17  artificial act of infringement.  When they did the testing to

18  get FDA approval, that was an act of infringement.  That was a

19  trigger for litigation.  So they made the testing for

20  regulatory purposes immune from a claim of infringement, but

21  they said we've got to litigate these things if there is a real

22  controversy, so we will put in this artificial act.

23          The end result is the same.  We are here litigating a

24  case at considerable expense, and our position is that we

25  shouldn't be here.  They shouldn't have made the certification

4ackeisa

1    that they made.

2        I think your Honor might ask, or Mr. Hashmall said why

3    would somebody make the certification, and the answer is, you

4    hope, when I get into discovery, maybe I will make some finding

5    that will make the case for me.  Mr. Hashmall stands here today

6    and says we found all these hot documents.  That is the reason

7    people make baseless certifications, to get into the game, in

8    the hope that you turn something up.

9        THE COURT:  And you are saying that should be a

10   gamble, because if they do find something, then they win, but

11   if they don't, they should have to pay a penalty.

12       MR. BAECHTOLD:  Exactly.  It is a no-lose proposition.

13   If Glaxo really says that a generic can never be guilty of

14   infringement, they have a free shot at it.  If they find

15   something, they win.  If they don't, they still don't have to

16   pay.

17       On this willful infringement, there is a distinction

18   on what is objectively baseless and what parties believe.  By

19   definition, to be a willful infringer you have lost the case.

20   You can't be an infringer unless you lost the case.  That

21   means, whatever your reasoning at the beginning it was wrong.

22   However, you are not willful if you believed it was right, but

23   you are willful if you didn't believe it was right.  In

24   Yamanouchi, there is no finding that Danbury didn't believe in

25   the merits of its case, as objectively baseless as it was.  We

4ackeisa

1   want the opportunity to show that these people, after reading

2   the Yamanouchi decision, had to know that their case was

3   baseless and they went ahead and filed it anyway.

4        MR. HASHMALL:  Your Honor, one, we did plead

5   inequitable conduct in the answer before filing the case before

6   the production of documents.  It is a very detailed pleading,

7   the allegation of inequitable conduct.  Two, on the issue of

8   willful infringement, aside and apart from the issue that we

9   don't think it is part of the case properly, there is a taint

10  associated with being declared a willful infringer.  It is a

11  public company.  It is in the business of marketing

12  pharmaceuticals and selling generics around the world.  The

13  simple finding of infringement is viewed by my client as a

14  taint, in a sense as a scarlet letter, and therefore it is

15  important to Teva that that declaration, if it is not

16  permissible under the law, that it is not one of the available

17  remedies, not be one of the declarations issued by this court

18  at the conclusion of the hearing.

19       THE COURT:  Let me just try and follow this piece up.

20  In the ordinary kind of infringement case, the question of

21  willfulness is put to the jury.  The jury returns a verdict,

22  and let's say it returns a verdict and checks the box yes for

23  willful infringer.  At that point it then becomes a

24  discretionary issue for the court, as to whether there is going

25  to be enhanced damages or attorneys' fees, and let's say the

4ackeisa

1    court decides no.  I guess I will ask both sides, does the

2    judgment read anything more than judgment for plaintiff in the

3    amount of X dollars, having been found to infringe the patent?

4    Isn't that all that happens?

5         MR. BAECHTOLD:  Of course if the court decides it,

6    there will be a written decision, and the written decision will

7    say even though the infringement was willful I am not going to

8    award it.

9         But Teva is in the business of making patent

10   challenges.  Recently it was published that they have at least

11   50 cases where they have challenged patents and they have been

12   sued.  They are not going to be tainted unless there is a

13   finding that they were willful infringers.  So if anything,

14   they should want the issue in the case so that they can be

15   exonerated for their exemplary conduct.

16        THE COURT:  I am sure they would.

17        Well, all right, this is very interesting and

18   enlightening.  It does seem to me to be an exercise in how many

19   angels can dance on the head of a pin.  I find myself

20   reasonably clear about many of the legal points and still

21   somewhat in doubt as to whether the bottom line is to grant the

22   motion or deny it, because I think that the actual relief asked

23   by the motion is quite narrow and doesn't really have all the

24   implications that are raised by each side.

25        The motion appears to me, notwithstanding the legal

32

4ackeisa

1   theories that it is based on, to seek no more relief than

2   effectively the striking of paragraph 22(b) of the complaint.

3   That is, defendants say that they are entitled to a judgment on

4   the pleadings, that plaintiff cannot be entitled to what that

5   paragraph seeks, which is that a judgment be entered that

6   defendants' infringement of the patent in question was and is

7   willful, and plaintiffs are entitled to their reasonable

8   attorneys' fees.

9        So the extent that defendants seek to strike the

10  demand for attorneys' fees, the motion is clearly denied,

11  because section 271(e)(iv) specifically provides that in this

12  kind of action the plaintiff can be entitled to an award of

13  attorneys' fees.

14       To the extent that that paragraph seeks a judgment

15  that infringement was willful, I don't know that there is any

16  authority in any patent case, though I need not go so far for

17  the court entering such a declaratory judgment.  Clearly under

18  section 271(e(iv), there are very specific forms of relief

19  provided, and none of them includes a declaration of

20  willfulness.

21       So, so far as the dual motion is concerned, it seems

22  to me that the not very satisfying, not very powerful

23  conclusion is that the motion is granted with respect to the

24  words "that defendants' infringement of the '552 patent was and

25  is willful," but it is denied insofar as it seeks a judgment on

33

4ackeisa

1    the pleadings that plaintiffs are not entitled to the relief,

2    judgment be entered that plaintiffs are entitled to their

3    reasonable attorneys' fees pursuant to 35 U.S. Code section

4    285, and that seems to me to be a rather straightforward

5    conclusion that doesn't actually get either side what it seems

6    to be aiming at.

7            So I will go a little further, to the extent it gives

8    the parties any guidance on how this litigation is to be

9    conducted.  First, there is a significant dispute between the

10   parties about the interpretation of the Federal Circuit's

11   holding in Glaxo Group Ltd. v. Apotecs Incorporated, 376 F.3d,

12   1339.  It is a 2004 case.  It is so recent that rehearing was

13   denied just a month ago.  In that case, I think the defendants

14   have a good point that it is hard to read this opinion without

15   getting a sense that what the Second Circuit may have thought

16   it was doing, at least some parts of the opinion, was

17   suggesting that there simply can be no finding of willful

18   infringement in what the parties refer to as an ANDA case, a

19   case where the only act of infringement alleged is the filing

20   of a new drug application which is made an infringement by 35

21   USC 271(e)(ii).

22           At the same time, there are two troubling facts about

23   that reading of the case.  The first is, the court doesn't

24   actually say that in so many words, though some of its

25   reasoning suggests that that's what it thinks.  What it says

34

4ackeisa

1   is, the mere fact of filing an application or certification

2   cannot support a filing of willful infringement.  At the same

3   time, the court also distinguished its prior decision in

4   Yamanouchi v. Danbury, 231 F.3d, 1339.  Federal Cert 2000.  It

5   distinguishes Yamanouchi by saying that in that case, the court

6   determined that a baseless and unjustified certification, when

7   combined with litigation misconduct, warranted an exceptional

8   case finding, the finding of exceptional case being

9   prerequisite to an award of attorneys' fees under section 285.

10          That is mystifying to me.  The court does not say that

11  a finding of litigation misconduct is what warrants an

12  exceptional case finding and that the conclusion of the

13  district court in Yamanouchi that the certification was

14  baseless and wholly unjustified was totally relevant to the

15  finding of exceptional case.  It seems to think that something

16  about a paragraph for certification can be a part of a finding

17  of exceptional case.  So what exactly the court means is not as

18  clear as defendants seem to think.

19          Secondly, it is very hard for me to believe that the

20  court could mean that a totally baseless and unjustified

21  certification made in bad faith can never be the basis for a

22  finding of exceptional case.  Indeed, I think it was hard for

23  Mr. Hashmall to answer questions on that because I think it was

24  hard for him to reach a conclusion that such a bad faith filing

25  could be disregarded by a court in making inquiry to an

4ackeisa

1    exceptional case. I don't know exactly what is the difference

2    between willfulness and bad faith in this setting. I grant

3    that Congress obviously intended that there be litigation when

4    it passed the Hatch-Waxman Act. It is an act that says let

5    there be litigation, and there was litigation. In that sense

6    the infringement here is artificial, in the sense that it is a

7    trigger for the litigation. At the same time, frivolous

8    triggers for litigation and frivolous litigation are classic

9    issues in which courts have often recognized that attorneys'

10   fees are to be awarded, and it is hard for me to think that a

11   party who abuses the privilege set forth in the act could be

12   exempt from a finding of exceptional case and award of

13   attorneys' fees, if that is what follows.

14          Whether that is called willfulness or is called

15   something else, it does seem intrinsically to involve an

16   inquiry into the subjective as well as objective. If

17   uncertified action can warrant an exceptional case finding,

18   then it seems to me all the more clear that a subjectively

19   baseless and unjustified certification or application, at least

20   when combined about with other factors, warrants an exceptional

21   case finding.

22          That brings us to the scope of discovery issue, and

23   here I am just giving guidance. I suppose we may well see some

24   fight when this issue ripens, and maybe it never will ripen,

25   but it does seem to me that it behooves me to give some

. . .

36

4ackeisa

1    guidance on this front.  I am sure that Mr. Hashmall is correct

2    that in the ordinary course an application for attorneys' fees

3    certainly does not arise until after one party has won or lost.

4    On the other hand, it does not seem to me to make a great deal

5    of sense to have a litigation, have one party win and then

6    conduct what can be a months long discovery process into

7    various people's subjective state of mind.  I don't think that

8    it swamps the discovery process to acknowledge that issues

9    relating to the state of mind of those who took all the actions

10   that were taken here that might give rise to an exceptional

11   case finding be the subject of discovery.  I think that is a

12   more efficient way to proceed, even though it means both sides

13   may have some inquires to make, rather than to wait and then

14   conduct an entirely separate inquiry into one side's

15   motivations, which would mean bringing people back not just for

16   the deposition they are having anyway but for entirely

17   different discovery.  So I don't think anything should preclude

18   either side from making inquiries that might ultimately be

19   relevant on the grounds that this is a truly exceptional case

20   because one side or the other engaged in some conduct or one

21   side or the other made claims in bad faith in the course of the

22   litigation.  I think it has been made clear on both sides that

23   such inquiries don't justify the invasion of the

24   attorney-client privilege until or unless one side waives the

25   privilege by asserting that advice of counsel is something that

4ackeisa

1  is relevant to prove their good faith.  So I suppose it is open

2  to either side to say in response to a question of the ilk that

3  we have been talking about, witness, the reason why I did that

4  has to do with advice of counsel and I can't say anything more

5  about it, and that might be the end of it, and there are no

6  other inquiries that were made to turn over to the lawyers and

7  get advice on whether they should make these filings or not.

8  If that is what people say, all of this becomes not very much

9  of a distraction and very much a waste of everyone's time.

10        But I think that is the ruling on the motion, and at

11  least my not particularly learned thoughts on what may turn out

12  to be a rather abstruse question of whether willfulness is a

13  category or not a category for a finding of exceptional case.

14  It obviously leaves open any question of whether the

15  willfulness inquiry will ever be put to a jury, and if they

16  ever get there I will have to make up my mind about that.  But

17  I will say that it seems much less natural to ask a question

18  whether there was willful infringement about a case of this

19  kind where there has to be a rather artificial definition of

20  what it would mean to willfully infringe.  It is pretty

21  straightforward.  Someone is manufacturing a product that it

22  thinks has a patent and asks the jury, and yes, the product

23  does incorporate, did the defendant do what it says willfully?

24  Meaning, did it know that there was a patent and did it have

25  any good faith basis for thinking it was on solid ground.  It

38

4ackeisa

1    is a little odder in a case like this, where the issue of was

2    there an infringement is simply did they file an application,

3    and there is automatically an infringement once it is

4    determined that the patent is valid.

5         So the question of was it willful seems a more

6    confusing question to ask a jury, and if what we are really

7    do -- the attorneys' fee inquiry is for the court anyway.  If

8    we are going to put that to the jury it may be because somebody

9    persuades me that is actually required, to put a willfulness

10   question to a jury.

11        That is getting way ahead of us.  I say that only

12   because we did have some discussion of it today.  If we ever

13   get there, the parties will no doubt brief it and maybe they

14   will manage to show me my ignorance yet again.

15        Is there anything we need to do today?

16        MR. WEINSTEIN:  Yes, your Honor.  This is Lou

17   Weinstein for Reddy.

18        We have a scheduling issue.  We have raised a number

19   of disputes with Eisai, discovery disputes and privilege

20   disputes and advice of counsel disputes.  We have asked for a

21   meet and confer.  Last week you wrote a letter asking me to ask

22   them to set a date to confer.  We are having trouble setting a

23   date.  We are asking the court to help us, since we are all

24   here, to set up a date for a meet and confer.

25        THE COURT:  I am not everybody's secretary.  I take a

4ackeisa

1   calendar and take a dart and shoot the dart at the calendar,

2   and that's the date.  It is not a very good way of taking a

3   date because it may be very inconvenient for all the lawyers

4   involvement involved.  So I reasonably assume that the lawyers

5   can work out a date within a reasonable time on their own

6   without my having to resort to such expedience.  I am not going

7   to sit here and ask people to block out dates and serve as a

8   scheduling assistant to somebody.

9           You are going to respond to this?

10          MR. O'MALLEY:  Yes, your Honor.  Joe O'Malley.

11          THE COURT:  There can't be a good problem with respect

12  to timing.

13          MR. O'MALLEY:  You are right, your Honor.  First, the

14  claim came late last week, on the eve of a fundamental problem.

15  However, there is a missing link.  Mr. Weinstein assumes there

16  will be a dispute that we have to trouble the court with.  He

17  raised several issues.  We wrote back, and took the time to

18  respond substantively.  We want to hear Mr. Weinstein's

19  response to our very specific issues that we have raised, and

20  then we will know is there a dispute that we want to trouble

21  the court with.

22          Just by way of example, Mr. Weinstein has said many of

23  your claims of privilege are unfounded in the privilege log,

24  let's set a meet and confer so we know what is inevitable.  We

25  want to know his challenge to our privilege, and perhaps none

40

4ackeisa

1   is necessary.  Perhaps Mr. Weinstein identifies some documents

2   that we inadvertently withheld that we can just give to him.

3   Our position is that we have a letter written, we will get it

4   to Mr. Weinstein today.  We want to further define the issues

5   so we don't trouble the court unnecessarily and have a meet and

6   confer very promptly after that.

7            THE COURT:  Let me give my take on that.  What you

8   describe, Mr. O'Malley, is reasonable and to some extent I

9   think it is a confer, not a meet.  It is within the spirit of

10  the rules that the parties change views before troubling the

11  court.  That's the point of a meet and confer.  On the other

12  hand, it isn't the point that everybody has to do everything in

13  writing and take a lot of time.  I don't know that

14  Mr. Weinstein has to be under the burden of engaging in a lot

15  of written briefing in order to get his point across.  It is

16  obviously a judgment call, how far one goes with this written

17  back and forth before it becomes apparent that one side is

18  stalling or that the parties have intractable disagreements,

19  and I don't know why one party should be precluded from

20  presenting an issue to a court when it thinks the issue is

21  ripe.  This puts a certain premium in my book on lawyers being

22  reasonable with each other and being reasonable with and fair

23  to the court.  I am not particularly happy when parties provoke

24  a discovery dispute, or bring a discovery dispute to the court,

25  and at the end of the day, after spending an hour or two hours

4ackeisa

1   in court thrashing things out, it turns out that really

2   everybody is in agreement, or at least once there is an adult

3   in the room everyone has to admit there is no reasonable basis

4   for not being in agreement.  The court has spent a lot of time

5   accomplishing what the parties could have accomplished

6   themselves.  On the other hand, neither am I very happy if the

7   discovery dispute turns into one in which there is a genuine

8   dispute, and one party has been jerking the other party around

9   for weeks by engaging in shadow boxing that is expensive and

10  makes all the lawyers happy and all the clients unhappy and

11  doesn't really advance the ball.

12          I don't know which description this falls under, but

13  let's be clear how this thing is going to be conducted.  If,

14  Mr. Weinstein, you have put something to these folks right

15  before what at least in the courthouse is treated as a

16  three-day weekend, OK, they've got a fair opportunity to

17  respond to you.  That doesn't necessarily mean that you have to

18  engage in endless -- if all they are saying is write me a

19  brief, I will think that is a very fair response on their part.

20  But if they are still about to give you a substantive response

21  objecting to what your position is, maybe at that point we do

22  have a ripe issue today.  Talk to each other.  There are such

23  things as telephones.  I encourage informal communication.

24  Figure out what your disagreement is, and if you have a

25  disagreement, bring it to the court and bring it quickly.

4ackeisa

1        I will say no more about that. You don't need a date

2   to bring something before the court. The procedure is simple.

3   You lay out each side's position. Mr. O'Malley has written a

4   letter, he says. You submit yours, and then we are off to the

5   races for a ruling.

6        MR. WEINSTEIN: The issues haven't teed up for week.

7   My letter of Wednesday of last week was just enough to set up a

8   meet and confer.

9        THE COURT: You pick up the phone, I am here to meet

10  and confer. Then you put it, and if you can't reach some

11  agreement that he is going to turn over item 62F, 42B and

12  nothing else, as to the nothing else, come to court. I will be

13  happy to hear you pretty much at a moment's notice.

14        Anything else?

15        MR. TULCHIN: Just a point of information, your Honor.

16  At the end of the court's ruling on the potentiality of putting

17  willfulness to a jury in this case, I wanted to remind the

18  court that there is no jury here.

19        THE COURT: Well, good.

20        MR. TULCHIN: We stipulate that this is a bench trial.

21        THE COURT: Then all the easier, because then it would

22  be incredibly easy for me to finesse the issue of willfulness,

23  if I think it is an exceptional case and there is no danger

24  that Glaxo will rear its head. If I don't, then I think it is

25  the appropriate case for award of attorneys' fees and, two, I

4ackeisa

1    think it is not that hard to moot the question of willfulness.

2    So we will see where we wind up, but yes, if that's not even an

3    issue, that I don't see many problems are going to rear their

4    heads on this front from here on in.

5             Thank you very much.

6             (Proceedings adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF DELAWARE

 3
    ASTRAZENECA AB, AKTIEBOLAGET
 4  HASSLE, and ASTRAZENECA, LP          :    CIVIL ACTION

 5         Plaintiffs.                    :
                                         :
 6      v.                               :
                                         :
 7  ANDRX PHARMACEUTICALS, LLC and       :
    ANDRX CORPORATION,                   :
 8                                       :
         Defendants.                     :    NO. 04-80 (SLR)
 9

10                     Wilmington, Delaware
                  Wednesday, August 11, 2004 at 8:40 a.m.
11                     TELEPHONE CONFERENCE

12

13  BEFORE:       HONORABLE SUE L. ROBINSON, Chief Judge

14
    APPEARANCES:
15

16      MORRIS NICHOLS ARSHT & TUNNELL
        BY:  JACK B. BLUMENFELD, ESQ.
17
            -and-
18
        FITZPATRICK CELLA HARPER & SCINTO
19      BY:  LISA B. PENSABENE, ESQ.
             (New York, New York)
20
                  Counsel for Plaintiffs
21

22

23

24

25                    Brian P. Gaffigan
                      Official Court Reporter
```

EXHIBIT 2 - 1

1    APPEARANCES (Continued):

2

3    MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
     BY:  KEVIN J. CONNORS, ESQ.

4         -and-

5    GRAY CARY WARE & FREIDENRICH, LLP
     BY:  STEVEN M. MADDOX, ESQ.

6         (Washington, District of Columbia)

7              Counsel for Defendants

8

9

10

11

12              - oOo -

13         P R O C E E D I N G S

14    (REPORTER'S NOTE:  The following telephone

15    conference was held in chambers, beginning at 8:40 a.m.)

16         THE COURT:  Counsel, this is Judge Robinson

17    again.  Brian is here as our court reporter so you will need

18    to identify yourselves each time you speak.

19         Before we go on to the issue of the documents

20    relating to the parent patent, let me just reiterate the

21    conversation we had about willfulness.  I had indicated that

22    by my reading of the Glaxo case, that the mere filing of an

23    ANDA is not, cannot be deemed willfulness but that it can be

24    one factor in a willfulness determination is my reading of

25    what the Federal Circuit decided.  Therefore, willfulness

EXHIBIT 2 - 2

3

1   discovery will go forward starting six weeks before the end

2   of fact discovery in this case, whatever that date is, but

3   defendant may file, may engage in a motion practice if

4   they're convinced that the only factor that the plaintiff can

5   prove in this case is the filing of the ANDA and there are no

6   other critical factors that would influence the willfulness

7   determination.

8           Now, this next issue is a question of whether

9   the document request related to the parent patent had been,

10  whether plaintiffs had complied with that request.  And I'll

11  let plaintiffs' counsel reiterate what was said prior to our

12  being on record, and then we'll let defense counsel respond.

13          MR. BLUMENFELD:  Your Honor, Jack Blumenfeld.

14  Before we do that, I have a 9:00 o'clock trial with Judge

15  Jordan.  So in about three minutes, if I sign-off, I hope

16  your Honor will understand.

17          THE COURT:  Absolutely.  Thank you.

18          MR. BLUMENFELD:  Thank you, your Honor.

19          MS. PENSABENE:  Your Honor, this is Lisa

20  Pensabene for the plaintiff.  I understand that the issue

21  is documents related to the '318 patent on August 9th.  I

22  believe we told the defendants that we produced all of the

23  nonprivileged, nonimmune materials on the '318 patent that

24  it has been able to locate in its possession, custody and

25  control.

EXHIBIT 2 - 3

4

1          MR. MADDOX:  This is Steven Maddox for the

2     defendant.  We're presenting on the record that the requests

3     concerning the '318 patent, request number 3 through 17 of

4     defendants' second request for document requests served on

5     May 12th of '04.  And if the representation being made by

6     plaintiffs is that the nonprivileged documents responsive to

7     these requests has been produced, then we have our record.

8          THE COURT:  All right.  So that there is no need

9     for a motion to compel, but if defendant wants to go forward

10    with its motion related to willfulness, then I will try to

11    address that as soon as its briefed before willfulness

12    discovery is supposed to start.

13          Is there anything else we need to address this

14    morning, counsel?

15          MS. PENSABENE:  Your Honor, there is one other

16    issue that perhaps we can short-circuit.  That is the

17    response to contention interrogatories.  We served them

18    about two months ago and we have gotten an objection that

19    they're premature and their refusal to respond.  Meanwhile,

20    we also were served with contention interrogatories from the

21    defendants and we were wondering if you would provide some

22    guidance on how to handle that.

23          THE COURT:  Yes.  I require contention interrog-

24    atories to be answered and supplemented, but generally I

25    require, if asked what I will say, is that the party with the

EXHIBIT 2 - 4

5

1   burden of proof on any issue has to provide their responses

2   to contention interrogatories first and then the opposing

3   party can respond to the contentions of the party with the

4   burden of proof, if that makes any sense.  In other words, in

5   terms of infringement contentions, plaintiff would have to

6   respond first and then defendant would need to respond to

7   whatever contention interrogatories have been propounded by

8   plaintiff and vice-versa in terms of defenses.  Does that

9   make any sense to you?

10           MS. PENSABENE:  Yes.  Certainly, your Honor.  It

11   certainly does.  Thank you very much.

12           THE COURT:  Is there anything else, counsel?

13           MR. MADDOX:  Not from defendants, your Honor.

14           MS. PENSABENE:  No, your Honor.  Thank you.

15           THE COURT:  Thank you, counsel.  Good-bye now.

16           (Telephone conference ends at 8:45 a.m.)

17

18

19

20

21

22

23

24

25

EXHIBIT 2 - 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 9, 2007, the within document was

filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to

the following; that the document was served on the following counsel as indicated; and that the

document is available for viewing and downloading from CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Andre G. Bouchard, Esq.
John M. Seaman, Esq.
Bouchard Margules & Friedlander, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
abouchard@bmf-law.com
jseaman@bmf-law.com

I hereby certify that on May 9, 2007 I have sent the foregoing document by E-

mail to the following non-registered participants in the manner indicated:

Jonathan A. Harris, Esq.
Chad A. Landmon, Esq.
Jo-Anne M. Kokoski, Esq.
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103
jah@avhlaw.com;
cal@avhlaw.com; jmk@avhlaw.com

John Will Ongman, Esq.
Axinn, Veltrop & Harkrider LLP
1801 K Street
Suite 411
Washington, DC 20006-1322
jwo@avhlaw.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

768868