## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CELGENE CORPORATION, NOVARTIS )
PHARMACEUTICALS CORPORATION and )
NOVARTIS PHARMA A.G., )
                         )
      Plaintiffs )
                    v. )        Civil Action No. 06-741 (SLR)
                         )
ABRIKA PHARMACEUTICALS, INC., and )
ABRIKA PHARMACEUTICAL, LLLP, )
                         )
      Defendants. )

## DECLARATION OF JOHN M. SEAMAN
## IN SUPPORT OF DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION
## FOR A VOLUNTARY DISMISSAL WITHOUT PREJUDICE

STATE OF DELAWARE      )
                           ) ss.
COUNTY OF NEW CASTLE   )

    1.    I am an associate at the firm of Bouchard Margules & Friedlander, P.A. I

submit this Declaration in Support of Defendants' Memorandum of Law in Opposition to

Plaintiffs' Motion for a Voluntary Dismissal Without Prejudice.

    2.    Attached as Exhibit A is a true and correct copy of the transcript of a

Scheduling Conference held in the above matter on March 28, 2007.

    3.    Attached as Exhibit B is a true and correct copy of a Letter from Charles

M. Lizza to The Honorable Susan D. Wigenton, dated June 12, 2007, in *Celgene Corp. v.*

*Abrika Pharmaceuticals, Inc.*, C.A. No. 06-CV-5819 (SDW) (MCA) (D.N.J.).

    4.    Attached as Exhibit C is a true and correct copy the Statement of Ajaz S.

Hussain, Ph.D., Vice President & Global Head of Biopharmaceutical Development,

Sandoz, on Behalf of the Novartis Group of Companies Before the Senate HELP Committee Hearing, on March 8, 2007.

5.      Attached as Exhibit D is a true and correct copy of a letter from Stuart Reiser to The Honorable Susan D. Wigenton, dated June 5, 2007, in *Celgene Corp. v. Abrika Pharmaceuticals, Inc.*, C.A. No. 06-CV-5819 (SDW) (MCA) (D.N.J.).

6.      Attached as Exhibit E is a true and correct copy of a Letter Order Pursuant to Rule 16.1 from The Honorable Madeline Cox Arleo, dated June 15, 2007, in *Celgene Corp. v. Abrika Pharmaceuticals, Inc.*, C.A. No. 06-CV-5819 (SDW) (MCA) (D.N.J.).

7.      Attached as Exhibit F is a true and correct copy of an article titled Prevalence, Severity, and Comorbidity of 12-Month DSM-IV Disorders in the National Comorbidity Survey Replication, by Ronald C. Kessler, PhD., *et al.*, Archives of General Psychiatry, 62(6) (June, 2005).

8.      Attached as Exhibit G is a true and correct copy of the Testimony of Bruce L. Downey Chairman and CEO, Barr Pharmaceuticals, Inc., "Assessing The Impact Of A Safe And Equitable Biosimilar Policy In The United States," Before the House Energy and Commerce Subcommittee on Health, U.S. House of Representatives, dated May 2, 2007.

9.      Attached as Exhibit H is a true and correct copy of the Access to Life-Saving Medicine Act, H.R 1032, 110th Cong. (2007).

10.     Attached as Exhibit I is a true and correct copy of the Access to Life-Saving Medicine Act, S. 623, 110th Cong. (2007).

11.     Attached as Exhibit J is a true and correct copy of a report of the Congressional Budget Office, How Increased Competition from Generic Drugs Has

Affected Prices and Returns in the Pharmaceutical Industry, (July 1998).

12.    Attached as Exhibit K is a true and correct copy of a transcript of proceedings on Motions for Summary Judgment in *Smithkline Beecham Corp. v. Excel Pharmaceuticals, Inc.*, No. 02-51 (RBS) (E.D. Va. Apr. 12, 2002).

13.    Attached as Exhibit L is a true and correct copy of an Order Denying Motion to Stay in *Adams Respiratory Therapeutics, Inc. v. Pharmaceutical Holdings Corp.*, No. 06-4418 (PSD) (E.D. Pa. Nov. 2, 2006).

14.    Attached as Exhibit M is a true and correct copy of an Order Denying Motion to Enjoin in *Adams Respiratory Therapeutics, Inc. v. Pharmaceutical Holdings Co.*, No. 06-4700 (HAA) (D.N.J. Nov. 16, 2006).

15.    Attached as Exhibit N is a true and correct copy of an Order Denying Request for Reconsideration in *Adams Respiratory Therapeutics, Inc. v. Pharmaceutical Holdings Co.*, No. 06-4700 (HAA) (D.N.J. Nov. 17, 2006).

16.    I declare under the penalty of perjury that the foregoing is true and correct.

John M. Seaman (Bar. No. 3868)

Dated: June 18, 2007

# EXHIBIT A

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          IN AND FOR THE DISTRICT OF DELAWARE
 3                      - - -
 4   CELEGENE CORPORATION, NOVARTIS    :   CIVIL ACTION
     PHARMACEUTICALS CORPORATION and  :
 5   NOVARTIS PHARMA AG,              :
 6            Plaintiffs             :
 7        vs.                        :
 8   ABRIKA PHARMACEUTICALS, INC. and :
     ABRIKA PHARMACEUTICALS, LLP,     :
 9            Defendants            :   NO. 06-741 (SLR)
10                      - - -
11                          Wilmington, Delaware
12                          Wednesday, March 28, 2007
13                          8:35 o'clock, a.m.
                            *** Telephone Conference
14
15   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
16                      - - -
17   APPEARANCES:
18            POTTER, ANDERSON & CORROON
             BY:  PHILIP A. ROVNER, ESQ.
19
20                    Counsel for Plaintiffs
21
22
23                          Valerie J. Gunning
24                          Official Court Reporter
25
```

Page 2

```
 1   APPEARANCES (Continued):
 2        JONES DAY
          BY:  LESTER J. SAVIT, ESQ.
 3             (San Diego, California)
 4             -and-
 5        JONES DAY
          BY:  F. DOMINIC CERRITO, ESQ.
 6             (New York, New York)
 7             Counsel for Plaintiff Celegene Corporation
 8
 9        FITZPATRICK, CELLA, HARPER & SCINTO
          BY:  HENRY J. RENK, ESQ.
10             (New York, New York)
11
12             Counsel for Plaintiffs
               Novartis Pharmaceuticals Corporation and
13             Novartis Pharma AG
14        BOUCHARD MARGULES & FRIEDLANDER, P.A.
          BY:  JOHN M. SEAMAN, ESQ.
15
16             -and-
17        AXINN, VELTROP & HARKRIDER LLP
          BY:  JAMES D. VELTROP, ESQ.,
18             JONATHAN A. HARRIS, ESQ. and
               (Hartford, Connecticut)
19             -and-
20        AXINN, VELTROP & HARKRIDER LLP
          BY:  JOHN WILL ONGMAN, ESQ.
21             (Washington, D.C.)
22
23             Counsel for Defendants
24                      - - -
25
```

Page 3

```
 1
 2                    P R O C E E D I N G S
 3
 4        (REPORTER'S NOTE:  The following telephone
 5   conference was held in chambers, beginning at 8:35 a.m.)
 6
 7            THE COURT:  Good morning, counsel.  This is
 8   Judge Robinson, and I do have Valerie here as a Court
 9   Reporter.  If you could identify yourselves when you speak,
10   that would be helpful.
11        I've reviewed the documents in the case,
12   including the letters filed along with a proposed discovery
13   order and the motions filed.  I have to say I've never had a
14   case like this before where a plaintiff is basically doesn't
15   want to go forward in a forum that it chose, for whatever
16   reason, but this is my proposal.
17        I believe that, as you all know, we in Delaware
18   believe that a plaintiff's choice of forum is an appropriate
19   priority and that particularly if the forum is its state of
20   incorporation, its home state.  So I would certainly respect
21   the fact that the judge in New Jersey would choose to go
22   forward there, and if she does, I will stay this case.  But
23   in the meantime, I'm going to deny the plaintiff's motions to
24   strike the answer, et cetera.
25        I just find that extremely odd that this
```

Page 4

```
 1   situation happened in the first place and we are going to go
 2   forward.  And if you are going to have to go forward
 3   someplace, we might as well put something in place here.  For
 4   whatever reason the judge in New Jersey doesn't want your
 5   case, then we're all set to go.
 6        So that's what I'm going to do.  I'm putting it
 7   on the record.  And let me go through the proposed scheduling
 8   order in the meantime.
 9        With respect to the first paragraph, it seems to
10   me as though the general date of April 4 is the appropriate
11   language, even though I note that defendants have already
12   served their disclosure information.
13        With respect to the discovery that will be needed
14   on the following subjects, it seems to me as though you all
15   just put in what you think is going to be covered because
16   it's not binding on anyone.
17        With respect to discovery disputes, I've taken to
18   only scheduling one discovery dispute conference and then
19   going from there so that I won't have all these conferences
20   on my schedule when, many times, the second one isn't needed
21   or there are multiple ones in between the first and second
22   ones.
23        So we wil start with the July 24, 2007 at 4:30,
24   discovery dispute conference, and then we'll go from
25   there, assuming we are still going forward here in
```

Telephone Conference                CondenseIt™                March 28, 2007

## Page 5

1 Delaware.
2      With respect to claim construction --
3      MR. SAVIT: Your Honor, this is Lester Savit,
4 from Jones Day. We represent the co-plaintiff, Celgene.
5 I would -- we would ask that the order not be
6 entered at this time for the following reasons, and this is a
7 point that really hasn't been brought up yet.
8      The problem is that entering all these dates
9 is going to give the New Jersey judge the wrong impression
10 that the road is now paved all the way through to trial
11 in this case. And it has already been argued as the
12 planary argument by the defendants in New Jersey
13 that that is the case. And, in fact, this case is --
14 there's no jurisdictional issue, here and certainly
15 it's going to feed the fire if all these dates all the
16 way through until trial are entered.
17      THE COURT: So I thought I remembered
18 seeing something that there has been some discovery
19 taken in New Jersey.
20      There's not a scheduling order in New Jersey?
21      MR. SAVIT: Your Honor, there has been personal
22 jurisdiction discovery, and, yes, that has included 66,000
23 pages of documents and one deposition. But the issue of
24 personal injuries, the personal jurisdiction issue has been
25 briefed as of this week.

## Page 6

1      There's also included in that motion a motion to
2 transfer, so that issue has also been served up to the New
3 Jersey judge. The return date on those motions is Monday.
4      MR. ONGMAN: Your Honor, this is John Ongman, and
5 I represent -- I'm with Axinn Veltrop, and I represent the
6 Abrika defendants here.
7      To answer your question, no, there is no
8 scheduling order in New Jersey. This is all -- so far, a
9 contest of whether there's any personal jurisdiction in
10 New Jersey at all.
11      As we said in our letter, the return date
12 is, no longer April 2nd. It will be, at the very
13 earliest, April 23rd, which is the return date on the
14 motion to seal to Celgene's reply. It may be as late
15 as April 30th.
16      Judge Wittington, to whom the case is
17 assigned, is away on vacation, and her clerk advises us
18 that the likelihood this case will be decided any time
19 soon is remote. It's going to be some time, some indefinite
20 time after April 30th because of the timing in her court,
21 and so we have the situation where the clock is ticking on
22 both the public interest and in our revenue stream.
23      We filed our discovery, wanted to get going,
24 and the whole point of the effort, from our perspective of
25 the plaintiff here, is to delay anything really happening,

## Page 7

1 and we, for that reason, would very much like to have your
2 order entered so that we can proceed apace, and if for some
3 reason the judge decides in New Jersey, decides that she want
4 to do something else, well, all of this will have been done
5 and we won't have been wasting time waiting for something to
6 start.
7      MR. SAVIT: Judge, this is Lester Savit again.
8      What we're proposing will not prejudice the
9 defendants at all because we can get started with discovery
10 because we've already had our Rule 26(f) conference.
11      You don't need to enter the scheduling order for
12 us to engage in written exchange of written discovery, and,
13 in fact, we've already received interrogatories and document
14 requests from the defendants.
15      And further, I will represent to you now on
16 behalf of the plaintiffs that if, in fact, there is a month
17 or two delay by waiting to enter the pretrial order dates, we
18 will not renegotiate any of our proposed dates.
19      So if we're talking about the timing of resolving
20 this matter, there's absolutely no prejudice to the
21 defendants to just sitting back a matter of weeks, and we
22 can engage in written discovery here in Delaware and get that
23 under way. All that presumably would be useful in New Jersey
24 if we're proceeding there. But just avoid entering the
25 pretrial scheduling order, because that's going to be used as

## Page 8

1 grounds -- in fact, it has already been argued as the primary
2 ground to the New Jersey judge as to why we can't proceed
3 in Delaware.
4      THE COURT: But I find -- again, I find this
5 very odd because this is taking place. We're putting in,
6 if not formally by my executing an order, we are talking
7 about it's a matter of record that you're going to go
8 forward in a certain way. And I, frankly, can't believe
9 believe, and, as a matter of record, I've said if the
10 New Jersey judge denies the motions to dismiss and believes,
11 and I assume that she's going to make a decision on the
12 right grounds, believes that the case should stay there
13 and go forward there because there is jurisdiction over
14 the defendant, it was the first-filed case and it is the
15 plaintiffs' home state, she understands that I am fine with
16 staying my case or even dismissing it, but certainly staying
17 the case until the other goes forward.
18      So I, frankly, don't want to be intellectually
19 dishonest by not going forward with all the cards on the
20 table and letting the judge in New Jersey, who is capable of
21 making an informed decision, make it based on what's actually
22 happening.
23      So I do not think that is the correct way to go,
24 and if there is some mischief to be done in New Jersey, then
25 I would like to know about it. And I'm certainly happy to,

Celgene v. Abrika                                    Page 5 - Page 8

Page 9

1  if informed, I'm certainly happy to get on the phone with the
2  judge in New Jersey and have a conversation with her. If she
3  thinks that I'm trying to take this case from her, I'm not.
4  It's just on my docket with pending motions and it's my job
5  to keep my docket going.
6      So when this comes to me, I will enter it, but I
7  will assume that, as officers of the Court, no mischief will
8  come of it, and that my intentions in entering this are not
9  in any way to be construed as influencing the judge's
10  decision in New Jersey in any way.
11      So I think I was on Paragraph 6, and
12  I believe that plaintiffs' proposal, the May 15th date,
13  is a more appropriate one, and so that's the date that
14  should go in.
15      With respect to the pretrial conference and
16  the trial, I usually have pretrial conferences at the
17  end of my trial day, not in the middle of it, so that would
18  be -- and August 15th is a Friday. So I would propose August
19  14, 2008, at 4:30 p.m.
20      And with respect to a trial, it is unusual for us
21  to have three-week trials in this court.
22      Why is it that this case would require three
23  weeks when most of our trials are no more than two weeks?
24  MR. SAVIT: Well, John, it's was your
25  suggestion. This is Lester Savit again.

Page 10

1      John, maybe you should speak to that.
2  MR. ONGMAN: This was in our original discussion
3  draft that we sent over to Jones Day to get the ball
4  rolling.
5      We had thought that, because of the number of
6  people that might have to be put on the stand, that it might
7  take longer.
8      Part of the problem is we don't know exactly
9  how many people in the chain here are going to be -- need
10  to be put on the stand. There are people that are not
11  currently with Celgene. They're not currently with Novartis,
12  who we think maybe have material information and that was
13  our best guess going, going in, and I think that never
14  came to be an issue between the parties in our discussion,
15  so I guess implicitly they thought that that was likely as
16  well.
17      So we don't have anything firmer than that to
18  offer other than our general impression of how many people
19  may have to go on to the stand.
20  THE COURT: All right. Well, generally, those
21  impressions are always exaggerated.
22      So I will put it down for a two-week bench trial
23  starting on September 2nd, 2008.
24      So I would ask the parties to revise the
25  scheduling order and include the changes. And, again, when

Page 11

1  the judge in New Jersey makes her decision, you need to let
2  me know. If she decides to keep the case, then this case
3  will at least be stayed. We'll have another telephone
4  conversation about that. But in the meantime, you all should
5  go forward on the merits so that wherever this case proceeds,
6  you are doing your due diligence.
7      All right, counsel. Thank you very much for your
8  time today.
9      (Counsel respond, "Thank you your Honor." )
10      (Telephone conference concluded at 9:50 a.m.)
11      - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Telephone Conference                    CondenseIt™                                    -and - judge

-and [3]  2:4      2:15
2:19
06-741 [1]         1:9
14 [1]   9:19
15th [2]  9:12    9:18
2007 [2] 1:12     4:23
2008 [2] 9:19     10:23
23rd [1] 6:13
24 [1]   4:23
26 [1]   7:10
28 [1]   1:12
2nd [2]  6:12     10:23
30 [2]   4:23     9:19
30th [2] 6:15     6:20
35 [2]   1:12     3:5
4 [3]    4:10     4:23
9:19
50 [1]   11:10
6 [1]    9:11
66,000 [1]        5:22
8 [2]    1:12     3:5
9 [1]    11:10
a.m [3]  1:12     3:5
11:10
Abrika [3]        1:8
1:8      6:6
absolutely [1]    7:20
ACTION [1]        1:4
advises [1]       6:17
AG [2]   1:5      2:12
again [4]         7:7
8:4      9:25     10:25
along [1]         3:12
always [1]        10:21
ANDERSON [1]
1:18
answer [2]        3:24
6:7
apace [1]         7:2
APPEARANCES [2]
1:17     2:1
appropriate [3] 3:18
4:10     9:13
April [5]         4:10
6:12     6:13     6:15
6:20
argued [2]        5:11
8:1
argument [1]      5:12
assigned [1]      6:17
assume [2]        8:11
9:7
assuming [1]      4:25
August [2]        9:18
9:18
avoid [1]         7:24
away [1] 6:17
Axinn [3]         2:16
2:20     6:5
ball [1] 10:3
based [1]         8:21
beginning [1]     3:5

behalf [1]        7:16
believes [2]      8:10
8:12
bench [1]         10:22
best [1]  10:13
between [3]       4:21
10:14
binding [1]       4:16
BOUCHARD [1]
2:14
briefed [1]       5:25
brought [1]       5:7
C [1]     3:2
California [1]    2:3
capable [1]       8:20
cards [1]         8:19
case [18] 3:11    3:14
3:22     4:5      5:11
5:13     5:13     6:16
6:18     8:12     8:14
8:16     8:17     9:3
9:22     11:2     11:2
11:5
Celegene [2]      1:4
2:7
Celgene [1]       5:4
10:11
Celgene's [1]     6:14
CELLA [1]         2:9
CERRITO [1]       2:5
certain [1]       8:8
certainly [5]     3:20
5:14     8:16     8:25
9:1
cetera [1]        3:24
chain [1]         10:9
chambers [1]      3:5
changes [1]       10:25
Chief [1]         1:15
choice [1]        3:18
choose [1]        3:21
chose [1]         3:15
CIVIL [1]         1:4
claim [1]         5:2
clerk [1] 6:17
clock [1]         6:21
co-plaintiff [1]  5:4
concluded [1]     11:10
conference [7]    1:13
3:5      4:18     4:24
7:10     9:15     11:10
conferences [2] 4:19
9:16
Connecticut [1]2:18
construction [1]
5:2
construed [1]     9:9
contest [1]       6:9
Continued [1]     2:1
conversation [2]
9:2      11:4
Corporation [4] 1:4
1:4      2:7      2:12

correct [1]       8:23
CORROON [1] 1:18
counsel [7]       1:20
2:7      2:11     2:22
3:7      11:7     11:9
court [10]        1:1
1:24     3:7      3:8
5:17     6:20     8:4
9:7      9:21     10:20
covered [1]       4:15
D [2]    2:17     3:2
D.C [1]  2:21
date [6] 4:10     6:3
6:11     6:13     9:12
9:13
dates [4] 5:8     5:15
7:17     7:18
decided [1]       6:18
decides [3]       7:3
7:3      11:2
decision [4]      8:11
8:21     9:10     11:1
defendant [1]     8:14
defendants [8]    1:9
2:22     4:11     5:12
6:6      7:9      7:14
7:21
Delaware [6]      1:2
1:11     3:17     5:1
7:22     8:3
delay [1]         6:25
7:17
denies [1]        8:10
deny [1] 3:23
deposition [1]    5:23
Diego [1]         2:3
diligence [1]     11:6
disclosure [1]    4:12
discovery [11]    3:12
4:13     4:17     4:18
4:24     5:18     5:22
6:23     7:9      7:12
7:22
discussion [2]    10:2
10:14
dishonest [1]     8:19
dismiss [1]       8:10
dismissing [1]    8:16
dispute [2]       4:18
4:24
disputes [1]      4:17
DISTRICT [2]      1:1
1:2
docket [2]        9:4
9:5
document [1]      7:13
documents [3]     3:11
5:23
doesn't [2]       3:14
4:4
DOMINIC [1]       2:5
done [2] 7:4      8:24
down [1]          10:22
draft [1] 10:3

due [1]  11:6
E [2]    3:2      3:2
earliest [1]      6:13
effort [1]        6:24
end [1]  9:17
engage [2]        7:12
7:22
enter [3] 7:11    7:17
9:6
entered [1]       5:6
5:16     7:2
entering [3]      5:8
7:24     9:8
ESQ [8]  1:18     2:2
2:5      2:9      2:14
2:17     2:17     2:20
et [1]   3:24
exactly [1]       10:8
exaggerated [1] 10:21
exchange [1]      7:12
executing [1]     8:6
extremely [1]     3:25
f [2]    2:5      7:10
fact [3] 3:21     5:13
7:13     7:16     8:1
far [1]  6:8
feed [1] 5:15
filed [3] 3:12    3:13
6:23
fine [1] 8:15
fire [1] 5:15
firmer [1]        10:17
first [4] 4:1     4:9
4:21
first-filed [1]   8:14
FITZPATRICK [1]
2:9
following [3]     3:4
4:14     5:6
formally [1]      8:6
forum [3]         3:15
3:18     3:19
forward [10]      3:1
3:22     4:2      4:2
4:25     8:8      8:13
8:17     8:19     11:5
frankly [1]       8:8
8:18
Friday [1]        9:18
FRIEDLANDER [1]
2:14
G [1]    3:2
general [2]       4:10
10:18
generally [1]     10:20
goes [1] 8:17
Good [1]          3:7
ground [1]        8:2
grounds [2]       8:1
8:12
guess [2]         10:13
10:15
Gunning [1]       1:23

happening [2]     6:25
8:22
happy [2]         8:25
9:1
HARKRIDER [2]
2:16     2:20
HARPER [1]        2:9
HARRIS [1]        2:17
Hartford [1]      2:18
held [1] 3:5
helpful [1]       3:10
HENRY [1]         2:9
home [1]          3:20
8:15
Honor [4]         5:3
5:21     6:4      11:9
HONORABLE [1]
1:15
identify [1]      3:9
implicitly [1]    10:15
impression [1]    5:9
10:18
impressions [1] 10:21
INC [1]  1:8
include [1]       10:25
included [2]      5:22
6:1
including [1]     3:12
incorporation [1]
3:20
indefinite [1]    6:19
influencing [1]   9:9
information [2] 4:12
10:12
informed [2]      8:21
9:1
injuries [1]      5:24
intellectually [1]
8:18
intentions [1]    9:8
interest [1]      6:22
interrogatories [1]
7:13
issue [5] 5:14    5:23
5:24     6:2      10:14
J [3]    1:23     2:2
2:9
JAMES [1]         2:17
Jersey [18]       3:21
4:4      5:9      5:12
5:19     5:20     6:3
6:8      6:10     7:3
7:23     8:2      8:10
8:20     8:24     9:2
9:10     11:1
job [1]  9:4
John [5] 2:14     2:20
6:4      9:24     10:1
JONATHAN [1]
2:17
Jones [4]         2:2
2:5      5:4      10:3
judge [14]        1:15
3:8      5:25     4:4

Celgene v. Abrika

**Telephone Conference**    **CondenseIt™**    **judge's – yourselves**

5:9  6:3  6:16
7:3  7:7  8:2
8:10  8:20  9:2
11:1
judge's [1]  9:9
July [1] 4:23
jurisdiction [4] 5:22
5:24  6:9  8:13
jurisdictional [1]
5:14
keep [2] 9:5  11:2
L [1]  1:15
language [1]  4:11
late [1]  6:14
least [1] 11:3
Lester [4]  2:2
5:3  7:7  9:25
letter [1] 6:11
letters [1]  3:12
letting [1]  8:20
likelihood [1]  6:18
likely [1]  10:15
LLP [3] 1:8  2:16
2:20
longer [2]  6:12
10:7
M [1]  2:14
makes [1]  11:1
March [1]  1:12
MARGULES [1]
2:14
material [1]  10:12
matter [4]  7:20
7:21  8:7  8:9
may [4] 6:14  9:12
10:19
meantime [3]  3:23
4:8  11:4
merits [1]  11:5
middle [1]  9:17
might [3]  4:3
10:6  10:6
mischief [2]  8:24
9:7
Monday [1]  6:3
month [1]  7:16
morning [1]  3:7
most [1] 9:23
motion [3]  6:1
6:1  6:14
motions [5]  3:13
3:23  6:3  8:10
9:4
multiple [1]  4:21
N [1]  3:2
need [3] 7:11  10:9
11:1
needed [2]  4:13
4:20
never [3]  3:13
10:13
New [22]  2:6
2:6  2:10  2:10
3:21  4:4  5:9

5:12  5:19  5:20
6:2  6:8  6:10
7:3  7:23  8:2
8:10  8:20  8:24
9:2  9:10  11:1
note [2] 3:4  4:11
Novartis [5]  1:4
1:5  2:12  2:12
10:11
now [2] 5:10  7:15
number [1]  10:5
O [1]  3:2
o'clock [1]
odd [2]  3:25  8:5
offer [1] 10:18
officers [1]  9:7
Official [1]  1:24
one [4]  4:18  4:20
5:23  9:13
ones [2] 4:21  4:22
Ongman [1]  2:20
6:4  6:4  10:2
order [11]  3:13
4:8  5:5  5:20
6:8  7:2  7:11
7:17  7:25  8:6
10:25
original [1]  10:2
P [1]  3:2
P.A [1]  2:14
p.m [1]  9:19
pages [1]  5:23
paragraph [2]  4:9
9:11
Part [1]  10:8
particularly [1] 3:19
parties [2]  10:14
10:24
paved [1]  5:10
pending [1]  9:4
people [4]  10:6
10:9  10:10  10:18
personal [4]  5:21
5:24  5:24  6:9
perspective [1] 6:24
Pharma [2]  1:5
2:12
Pharmaceuticals [4]
1:4  1:8  1:8
2:12
PHILIP [1]  1:18
phone [1]  9:1
place [3] 4:1  4:3
8:5
plaintiff [3]  2:7
3:14  6:25
plaintiff's [2]  3:18
3:23
plaintiffs [4]  1:6
1:20  2:11  7:16
plaintiffs' [2]  8:15
9:12
planary [1]  5:12
point [2] 5:7  6:24

POTTER [1]  1:18
prejudice [2]  7:8
7:20
presumably [1] 7:23
pretrial [4]  7:17
7:25  9:15  9:16
primary [1]  8:1
priority [1]  3:19
problem [2]  5:8
10:8
proceed [2]  7:2
8:2
proceeding [1]  7:24
proceeds [1]  11:5
proposal [3]  3:16
9:12
propose [1]  9:18
proposed [3]  3:12
4:7  7:18
proposing [1]  7:8
public [1]  6:22
put [5]  4:3  4:15
10:6  10:10  10:22
putting [2]  4:6
8:5
R [1]  3:2
really [2]  5:7
6:25
reason [4]  3:16
4:4  7:1  7:3
reasons [1]  5:6
received [1]  7:13
record [3]  4:7
8:7  8:9
remembered [1]
5:17
remote [1]  6:19
renegotiate [1]  7:18
RENK [1]  2:9
reply [1] 6:14
Reporter [1]  1:24
3:9
REPORTER'S [1]
3:4
represent [4]  5:4
6:5  6:5  7:15
requests [1]  7:14
require [1]  9:22
resolving [1]  7:19
respect [7]  3:20
4:9  4:13  4:17
5:2  9:15  9:20
respond [1]  11:9
return [3]  6:3
6:11  6:13
revenue [1]  6:22
reviewed [1]  3:11
revise [1]  10:24
right [3] 8:12  10:20
11:7
road [1]  5:10
Robinson [2]  1:15
3:8

rolling [1]  10:4
ROVNER [1]  1:18
Rule [1] 7:10
S [1]  3:2
San [1]  2:3
Savit [8] 2:2  5:3
5:3  5:21  7:7
7:7  9:24  9:25
schedule [1]  4:20
scheduling [7]  4:7
4:18  5:20  6:8
7:11  7:25  10:25
SCINTO [1]  2:9
seal [1]  6:14
SEAMAN [1]  2:14
second [2]  4:20
4:21
seeing [1]  5:18
sent [1]  10:3
September [1]  10:23
served [2]  4:12
6:2
set [1]  4:5
sitting [1]  7:21
situation [2]  4:1
6:21
SLR [1] 1:9
someplace [1]  4:3
soon [2] 6:19
speak [2]  3:9
10:1
stand [3]  10:6
10:10  10:19
start [4] 4:23  7:6
started [1]  7:9
starting [1]  10:23
state [3] 3:19  3:20
8:15
STATES [1]  1:1
stay [2]  3:22  8:12
stayed [1]  11:3
staying [2]  8:16
8:16
still [1]  4:25
stream [1]  6:22
strike [1]  3:24
subjects [1]  4:14
SUE [1] 1:15
suggestion [1]  9:25
table [1] 8:20
taking [1]  8:5
telephone [1]  1:13
3:4  11:3  11:10
Thank [2]  11:7
11:9
thinks [1]  9:3
thought [3]  5:17
10:5  10:15
three [1] 9:22
three-week [1]  9:21
through [3]  4:7
5:10  5:16

ticking [1]  6:21
times [1]  4:20
timing [2]  6:20
7:19
today [1]  11:8
transfer [1]  6:2
trial [6] 5:10  5:16
9:16  9:17  9:20
10:22
trials [2]9:21  9:23
trying [1]  9:3
two [2]  7:17  9:23
two-week [1]  10:22
under [1]  7:23
understands [1]8:15
UNITED [1]  1:1
unusual [1]  9:20
up [2]  5:7  6:2
used [1] 7:25
useful [1]  7:23
usually [1]  9:16
vacation [1]  6:17
Valerie [2]  1:23
3:8
Veltrop [4]  2:16
2:17  2:20  6:5
vs [1]  1:7
waiting [2]  7:5
7:17
Washington [1]2:21
wasting [1]  7:5
Wednesday [1] 1:12
week [1] 5:25
weeks [3]  7:21
9:23  9:23
wherever [1]  11:5
whole [1]  6:24
wil [1]  4:23
Wilmington [1]1:11
Wittington [1]  6:16
written [3]  7:12
7:12  7:22
wrong [1]  5:9
yet [1]  5:7
York [4]2:6  2:6
2:10  2:10
yourselves [1]  3:9

Telephone Conference                 CondenseIt™                              -and - judge

-and [3]  2:4      2:15
2:19
06-741 [1]          1:9
14 [1]     9:19
15th [2]   9:12     9:18
2007 [2] 1:12      4:23
2008 [2] 9:19     10:23
23rd [1] 6:13
24 [1]    4:23
26 [1]    7:10
28 [1]    1:12
2nd [2]   6:12    10:23
30 [2]    4:23     9:19
30th [2] 6:15     6:20
35 [2]    1:12     3:5
4 [3]     4:10     4:23
9:19
50 [1]    11:10
6 [1]     9:11
66,000 [1]        5:22
8 [2]     1:12     3:5
9 [1]     11:10
a.m [3]   1:12     3:5
11:10
Abrika [3]         1:8
1:8     6:6
absolutely [1]    7:20
ACTION [1]        1:4
advises [1]       6:17
AG [2]    1:5     2:12
again [4]         7:7
8:4     9:25    10:25
along [1]         3:12
always [1]       10:21
ANDERSON [1]
1:18
answer [2]        3:24
6:7
apace [1]         7:2
APPEARANCES [1]
1:17     2:1
appropriate [3] 3:18
4:10     9:13
April [5]         4:10
6:12     6:13    6:15
6:20
argued [2]        5:11
8:1
argument [1]      5:12
assigned [1]      6:17
assume [1]        8:11
9:7
assuming [1]      4:25
August [2]        9:18
9:18
avoid [1]         7:24
away [1] 6:17
Axinn [2]         2:16
2:20     6:5
ball [1]  10:3
based [1]         8:21
beginning [1]     3:5

behalf [1]        7:16
believes [2]      8:10
8:12
bench [1]        10:22
best [1]  10:13
between [1]       4:21
10:14
binding [1]       4:16
BOUCHARD [1]
2:14
briefed [1]       5:25
brought [1]       5:7
C [1]     3:2
California [1]     2:3
capable [1]       8:20
cards [1]         8:19
case [18] 3:11    3:14
3:22     4:5     5:11
5:13     5:13    6:16
6:18     8:12    8:14
8:16     8:17    9:3
9:22     11:2    11:2
11:5
Celegene [2]      1:4
2:7
Celgene [2]       5:4
10:11
Celgene's [1]     6:14
CELLA [1]         2:9
CERRITO [1]
certain [1]       8:8
certainly [5]     3:14
5:14     8:16    8:25
9:1
cetera [1]        3:24
chain [1]         10:9
chambers [1]      3:5
changes [1]      10:25
Chief [1]         1:15
choice [1]        3:18
choose [1]        3:21
chose [1]         3:15
CIVIL [1]         5:2
claim [1]         5:2
clerk [1] 6:17
clock [1]         6:21
co-plaintiff [1]  5:4
concluded [1]    11:10
conference [7]    1:13
3:5      4:18    4:24
7:10     9:15    11:10
conferences [2] 4:19
9:16
Connecticut [2] 2:18
construction [1]
5:2
construed [1]     9:9
contest [1]       6:9
Continued [1]     2:1
conversation [2]
9:2      11:4
Corporation [4] 1:4
1:4      2:7     2:12

correct [1]       8:23
CORROON [1] 1:18
counsel [7]       1:20
2:7      2:11    2:22
3:7      11:7    11:9
court [10]        1:1
1:24     3:7     3:8
5:17     6:20    8:4
9:7      9:21   10:20
covered [1]       4:15
D [2]     2:17    3:2
D.C [1]   2:21
date [6]  4:10    6:3
6:11     6:13    9:12
9:13
dates [4] 5:8     5:15
7:17     7:18
decided [1]       6:18
decides [1]       7:3
7:3      11:2
decision [4]      8:11
8:21     9:10    11:1
defendant [1]     8:14
defendants [8]    1:9
2:22     4:11    5:12
6:6      7:9     7:14
7:21
Delaware [6]      1:2
1:11     3:17    5:1
7:22     8:3
delay [1]         6:25
7:17
denies [1]        8:10
deny [1] 3:23
deposition [1]    5:23
Diego [1]         2:3
diligence [1]     11:6
disclosure [1]    4:12
discovery [11]    3:12
4:13     4:17    4:18
4:24     5:18    5:22
6:23     7:9     7:12
7:22
discussion [2]   10:2
10:14
dishonest [1]     8:19
dismiss [1]       8:10
dismissing [1]    8:16
dispute [2]       4:18
4:24
disputes [1]      4:17
DISTRICT [2]     1:1
1:2
docket [2]        9:4
9:5
document [1]      7:13
documents [1]     3:11
5:23
doesn't [2]       3:14
4:4
DOMINIC [1]      2:5
done [2] 7:4      8:24
down [1]         10:22
draft [1] 10:3

due [1]   11:6
E [2]     3:2     3:2
earliest [1]      6:13
effort [1]        6:24
end [1]   9:17
engage [2]        7:12
7:22
enter [3] 7:11    7:17
9:6
entered [1]       5:6
5:16     7:2
entering [3]      5:8
7:24     9:8
ESQ [8]  1:18     2:2
2:5      2:9     2:14
2:17     2:17    2:20
et [1]    3:24
exactly [1]      10:8
exaggerated [1] 10:21
exchange [1]      7:12
executing [1]     8:6
extremely [1]     3:25
f [2]     2:5     7:10
fact [3]  3:21    5:13
7:13     7:16    8:1
far [1]   6:8
feed [1]  5:15
filed [3] 3:12    3:13
6:23
fine [1]  8:15
fire [1]  5:15
firmer [1]        10:17
first [3] 4:1     4:9
4:21
first-filed [1]   8:14
FITZPATRICK [1]
2:9
following [3]     3:4
4:14     5:6
formally [1]      8:6
forum [3]         3:15
3:18     3:19
forward [10]      3:15
3:22     4:2     4:2
4:25     8:8     8:13
8:17     8:19    11:5
frankly [1]       8:8
8:18
Friday [1]        9:18
FRIEDLANDER [1]
2:14
G [1]     3:2
general [2]       4:10
10:18
generally [1]    10:20
goes [1]  8:17
Good [1]          3:7
ground [1]        8:2
grounds [1]       8:1
8:12
guess [1]        10:13
10:15
Gunning [1]       1:23

happening [2]     6:25
8:22
happy [1]         8:25
9:1
HARKRIDER [2]
2:16     2:20
HARPER [1]        2:9
HARRIS [1]        2:17
Hartford [1]      2:18
held [1]  3:5
helpful [1]       3:10
HENRY [1]         2:9
home [2]          3:20
8:15
Honor [4]         5:3
5:21     6:4    11:9
HONORABLE [1]
1:15
identify [1]      3:9
implicitly [1]   10:15
impression [1]    5:9
10:18
impressions [1] 10:21
INC [1]   1:8
include [1]      10:25
included [2]      5:22
6:1
including [1]     3:12
incorporation [1]
3:20
indefinite [1]    6:19
influencing [1]   9:9
information [2] 4:12
10:12
informed [2]      8:21
9:1
injuries [1]      5:24
intellectually [1]
8:18
intentions [1]    9:8
interest [1]      6:22
interrogatories [1]
7:13
issue [5] 5:14    5:23
5:24     6:2    10:14
J [3]     1:23    2:2
2:9
JAMES [1]         2:17
Jersey [18]       3:21
4:4      5:9     5:12
5:19     5:20    6:3
6:8      6:10    7:3
7:23     8:2     8:10
8:20     8:24    9:2
9:10     11:1
job [1]   9:4
John [3] 2:14     2:20
6:4      9:24   10:1
JONATHAN [1]
2:17
Jones [4]         2:2
2:5      5:4    10:3
judge [14]        1:15
3:8      3:21    4:4

Celgene v. Abrika                                                    Index Page 1

Telephone Conference                    CondenseIt™                    judge's - yourselves

| | | | | | | |
|---|---|---|---|---|---|---|
| 5:9 | 6:3 | 6:16 | 5:12 | 5:19 | 5:20 | POTTER [1] 1:18 |
| 7:3 | 7:7 | 8:2 | 6:2 | 6:8 | 6:10 | prejudice [2] 7:8 |
| 8:10 | 8:20 | 9:2 | 7:3 | 7:23 | 8:2 | 7:20 |
| 11:1 | | | 8:10 | 8:20 | 8:24 | presumably [1] 7:23 |
| judge's [1] | | 9:9 | 9:2 | 9:10 | 11:1 | pretrial [4] 7:17 |
| July [1] 4:23 | | | note [2] 3:4 | | 4:11 | 7:25 9:15 9:16 |
| jurisdiction [4] 5:22 | | | Novartis [5] | | 1:4 | primary [1] 8:1 |
| 5:24 6:9 | 8:13 | | 1:5 2:12 | | 2:12 | priority [1] 3:19 |
| jurisdictional [1] | | | 10:11 | | | problem [1] 5:8 |
| 5:14 | | | now [2] 5:10 | | 7:15 | 10:8 |
| keep [2] 9:5 | 11:2 | | number [1] | | 10:5 | proceed [2] 7:2 |
| L [1] 1:15 | | | O [1] 3:2 | | | 8:2 |
| language [1] 4:11 | | | o'clock [1] | | 1:12 | proceeding [1] 7:24 |
| late [1] 6:14 | | | odd [2] 3:25 | | 8:5 | proceeds [1] 11:5 |
| least [1] 11:3 | | | offer [1] 10:18 | | | proposal [2] 3:16 |
| Lester [4] | | 2:2 | officers [1] | | 9:7 | 9:12 |
| 5:3 7:7 | 9:25 | | Official [1] | | 1:24 | propose [1] 9:18 |
| letter [1] 6:11 | | | one [4] 4:18 | | 4:20 | proposed [3] 3:12 |
| letters [1] | | 3:12 | 5:23 9:13 | | | 4:7 7:18 |
| letting [1] | | 8:20 | ones [2] 4:21 | | 4:22 | proposing [1] 7:8 |
| likelihood [1] 6:18 | | | Ongman [4] | | 2:20 | public [1] 6:22 |
| likely [1] | | 10:15 | 6:4 6:4 | | 10:2 | put [5] 4:3 4:15 |
| LLP [3] 1:8 | 2:16 | | order [11] | | 3:13 | 10:6 10:10 10:22 |
| 2:20 | | | 4:8 5:5 | | 5:20 | putting [2] 4:6 |
| longer [2] | | 6:12 | 6:8 7:2 | | 7:11 | 8:5 |
| 10:7 | | | 7:17 7:25 | | 8:6 | R [1] 3:2 |
| M [1] 2:14 | | | 10:25 | | | really [1] 5:7 |
| makes [1] | | 11:1 | original [1] | | 10:2 | 6:25 |
| March [1] | | 1:12 | P [1] 3:2 | | | reason [4] 3:16 |
| MARGULES [1] | | | P.A [1] 2:14 | | | 4:4 7:1 7:3 |
| 2:14 | | | p.m [1] 9:19 | | | reasons [1] 5:6 |
| material [1] | | 10:12 | pages [1] | | 5:23 | received [1] 7:13 |
| matter [4] | | 7:20 | paragraph [2] | | 4:9 | record [1] 4:7 |
| 7:21 8:7 | 8:9 | | 9:11 | | | 8:7 8:9 |
| may [3] 6:14 | 9:12 | | Part [1] 10:8 | | | remembered [1] |
| 10:19 | | | particularly [1] 3:19 | | | 5:17 |
| meantime [3] | | 3:23 | parties [2] | | 10:14 | remote [1] 6:19 |
| 4:8 11:4 | | | 10:24 | | | renegotiate [1] 7:18 |
| merits [1] | | 11:5 | paved [1] | | 5:10 | RENK [1] 2:9 |
| middle [1] | | 9:17 | pending [1] | | 9:4 | reply [1] 6:14 |
| might [3] | | 4:3 | people [4] | | 10:6 | Reporter [1] 1:24 |
| 10:6 10:6 | | | 10:9 10:10 | | 10:18 | 3:9 |
| mischief [2] | | 8:24 | personal [4] | | 5:21 | REPORTER'S [1] |
| 9:7 | | | 5:24 5:24 | | 6:9 | 3:4 |
| Monday [1] | | 6:3 | perspective [1] 6:24 | | | represent [4] 5:4 |
| month [1] | | 7:16 | Pharma [2] | | 1:5 | 6:5 6:5 7:15 |
| morning [1] | | 3:7 | 2:12 | | | requests [1] 7:14 |
| most [1] 9:23 | | | Pharmaceuticals [4] | | | require [1] 9:22 |
| motion [1] | | 6:1 | 1:4 1:8 | | 1:8 | resolving [1] 7:19 |
| 6:1 6:14 | | | 2:12 | | | respect [7] 3:20 |
| motions [5] | | 3:13 | PHILIP [1] | | 1:18 | 4:9 4:13 4:17 |
| 3:23 6:3 | 8:10 | | phone [1] | | 9:1 | 5:2 9:15 9:20 |
| 9:4 | | | place [3] 4:1 | | 4:3 | respond [1] 11:9 |
| multiple [1] | | 4:21 | 8:5 | | | return [3] 6:3 |
| N [1] 3:2 | | | plaintiff [3] | | 2:7 | 6:11 6:13 |
| need [3] 7:11 | 10:9 | | 3:14 6:25 | | | revenue [1] 6:22 |
| 11:1 | | | plaintiff's [2] | | 3:18 | reviewed [1] 3:11 |
| needed [2] | | 4:13 | 3:23 | | | revise [1] 10:24 |
| 4:20 | | | plaintiffs [4] | | 1:6 | right [3] 8:12 10:20 |
| never [2] | | 3:13 | 1:20 2:11 | | 7:16 | 11:7 |
| 10:13 | | | plaintiffs' [2] | | 8:15 | road [1] 5:10 |
| New [22] | | | 9:12 | | | Robinson [1] 1:15 |
| 2:6 2:10 | 2:10 | | planary [1] | | 5:12 | 3:8 |
| 3:21 4:4 | 5:9 | | point [2] 5:7 | | 6:24 | |

| | | | | |
|---|---|---|---|---|
| rolling [1] | 10:4 | ticking [1] | | 6:21 |
| ROVNER [1] | 1:18 | times [1] | | 4:20 |
| Rule [1] 7:10 | | timing [1] | | 6:20 |
| S [1] 3:2 | | 7:19 | | |
| San [1] 2:3 | | today [1] | | 11:8 |
| Savit [8] 2:2 | 5:3 | transfer [1] | | 6:2 |
| 5:3 5:21 | 7:7 | trial [6] 5:10 | | 5:16 |
| 7:7 9:24 | 9:25 | 9:16 9:17 | | 9:20 |
| schedule [1] | 4:20 | 10:22 | | |
| scheduling [7] | 4:7 | trials [2] 9:21 | | 9:23 |
| 4:18 5:20 | 6:8 | trying [1] | | 9:3 |
| 7:11 7:25 | 10:25 | two [2] 7:17 | | 9:23 |
| SCINTO [1] | 2:9 | two-week [1] | | 10:22 |
| seal [1] 6:14 | | under [1] | | 7:23 |
| SEAMAN [1] | 2:14 | understands [1] 8:15 | | |
| second [2] | 4:20 | UNITED [1] | | 1:1 |
| 4:21 | | unusual [1] | | 9:20 |
| seeing [1] | 5:18 | up [2] 5:7 | | 6:2 |
| sent [1] 10:3 | | used [1] 7:25 | | |
| September [1] | 10:23 | useful [1] | | 7:23 |
| served [2] | 4:12 | usually [1] | | 9:16 |
| 6:2 | | vacation [1] | | 6:17 |
| set [1] 4:5 | | Valerie [2] | | 1:23 |
| sitting [1] | 7:21 | 3:8 | | |
| situation [2] | 4:1 | Veltrop [3] | | 2:16 |
| 6:21 | | 2:17 2:20 | | 6:5 |
| SLR [1] 1:9 | | vs [1] 1:7 | | |
| someplace [1] | 4:3 | waiting [2] | | 7:5 |
| soon [1] 6:19 | | 7:17 | | |
| speak [2] | 3:9 | Washington [1] 2:21 | | |
| 10:1 | | wasting [1] | | 7:5 |
| stand [3] | 10:6 | Wednesday [1] 1:12 | | |
| 10:10 10:19 | | week [1] 5:25 | | |
| start [2] 4:23 | 7:6 | weeks [3] | | 7:21 |
| started [1] | 7:9 | 9:23 9:23 | | |
| starting [1] | 10:23 | wherever [1] | | 11:5 |
| state [3] 3:19 | 3:20 | whole [1] | | 6:24 |
| 8:15 | | wil [1] 4:23 | | |
| STATES [1] | 1:1 | Wilmington [1] 1:11 | | |
| stay [2] 3:22 | 8:12 | Wittington [1] 6:16 | | |
| stayed [1] | 11:3 | written [3] | | 7:12 |
| staying [2] | 8:16 | 7:12 7:22 | | |
| 8:16 | | wrong [1] | | 5:9 |
| still [1] 4:25 | | yet [1] 5:7 | | |
| stream [1] | 6:22 | York [4] 2:6 | | 2:6 |
| strike [1] | 3:24 | 2:10 2:10 | | |
| subjects [1] | 4:14 | yourselves [1] 3:9 | | |
| SUE [1] 1:15 | | | | |
| suggestion [1] | 9:25 | | | |
| table [1] 8:20 | | | | |
| taking [1] | 8:5 | | | |
| telephone [1] | 1:13 | | | |
| 3:4 11:3 | 11:10 | | | |
| Thank [2] | 11:7 | | | |
| 11:9 | | | | |
| thinks [1] | 9:3 | | | |
| thought [3] | 5:17 | | | |
| 10:5 10:15 | | | | |
| three [1] 9:22 | | | | |
| three-week [1] | 9:21 | | | |
| through [3] | 4:7 | | | |
| 5:10 5:16 | | | | |

# EXHIBIT B

## LeBoeuf, Lamb, Greene & MacRae
### L.L.P.
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

CHARLES M. LIZZA
PARTNER

One Riverfront Plaza
Newark, NJ  07102-5490

(973) 643-6670

E-Mail Address: Charles.Lizza@llgm.com

Writer's Direct Dial: (212) 424-8583

Writer's Direct Facsimile: (212) 649-0474

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

LONDON
A MULTINATIONAL PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LIMITED
MOSCOW
RIYADH
(AFFILIATED OFFICE)
BISHKEK
ALMATY
BEIJING

June 12, 2007

**VIA ECF AND FEDEX**

The Honorable Susan D. Wigenton
United States District Judge
Martin Luther King Jr. Federal Building
50 Walnut Street, Room 2037
Newark, New Jersey 07101

> Re:  *Celgene Corp., et al. v. Abrika Pharmaceuticals, Inc., et al.*
>      Civil Action No. 06-5818 (SDW)(MCA)
>      Plaintiffs' Response to Defendants' Letter of June 5, 2007

Dear Judge Wigenton:

This firm, along with Jones Day, represents plaintiff Celgene Corporation. The Novartis plaintiffs also join in this letter which addresses defendants' lengthy June 5, 2007 correspondence to Your Honor seeking special scheduling treatment for this case. For the reasons stated below, there is no need at this time to abandon the normal scheduling procedures. The request should be denied, and the parties directed in the normal course to meet and confer pursuant to Rule 26(f) in anticipation of a Rule 16 scheduling conference before Your Honor or Magistrate Judge Arleo.

Contrary to the tone of defendants' letter, counsel for the parties have been able to work together to agree on scheduling matters. In the Delaware action, the Rule 26(f) meet and confer discussions were civil and productive, and resulted in a proposal with only one substantive difference for Judge Robinson to decide. Those negotiations were led by Lester J. Savit of Jones Day on plaintiffs' side and John Ongman on defendants' side, both of whom are also lead counsel in this action. Thus, the negotiations for appropriate dates in this case can be expected to go just as smoothly, with the assistance this time of New Jersey counsel familiar with local practices and procedures in place of Delaware counsel.

Plaintiffs object to using the Delaware Scheduling Order as a template for scheduling in this case. The [Proposed] Scheduling Order was negotiated and prepared in light of the way that Judge Robinson prefers to run her cases. For example, her practice is to defer claim construction

Honorable Susan D. Wigenton, U.S.D.J.
June 12, 2007
Page 2

until after expert discovery is completed, and she scheduled the Markman hearing for only two months prior to the trial. In our experience, the better practice, and one usually adopted in New Jersey federal courts, is to complete claim construction before expert discovery to avoid the experts providing lengthy reports that consider many different claim constructions, and to give the parties sufficient notice of the claim construction ahead of settlement discussions and well in advance of trial. A new proposed scheduling order needs to be negotiated between the parties in accordance with practices and procedures in this district and according to Your Honor's preferences.

Moreover, the Delaware Scheduling Order was not intended to be an omnibus ruling creating substantive rights to a trial date. When entering the Order, Judge Robinson specifically warned defendants against attributing any significance to it beyond guidance in the Delaware action, if it went forward:

> So when [the Scheduling Order] comes to me, I will enter it, but I will assume that, as officers of the Court, no mischief will come of it, and that my intentions in entering this are not in any way to be construed as influencing the judge's decision in New Jersey in any way.

Hearing Transcript, March 28, 2007, Exh. 1 to defendants' June 5, 2007 letter to Your Honor, at 8.

In spite of Judge Robinson's clear admonition, defendants have submitted the Delaware Scheduling Order to Your Honor not once, but twice. On March 30, 2007, two days after the Delaware scheduling hearing, defendants submitted the Scheduling Order to try to influence Your Honor to grant their pending motion to dismiss or transfer. This misuse of Judge Robinson's Order was, obviously, not successful.

Undeterred, defendants now submit the same Scheduling Order again, this time to try to influence scheduling. They state:

> If this Court convenes a scheduling conference and enters a scheduling order that leads effectively and efficiently to a firm trial date no later than [the trial date set in Delaware] September 2, 2008, no prejudice will result. The parties could then jointly move to dismiss the Delaware action and the Paragraph IV litigation would proceed in New Jersey.

Defendants' June 5, 2007 letter, at 3. This new misuse should again be rejected by Your Honor.

The bottom line is that there is no reason to believe that plaintiffs, or Your Honor, will be unreasonable in the scheduling that will occur in due course. Past experience with these same parties and same principal trial counsel indicates that the parties can agree to reasonable dates according to the normal rules and practices in this district. To the extent there are scheduling disputes, Your Honor will judiciously resolve them.

Honorable Susan D. Wigenton, U.S.D.J.
June 12, 2007
Page 3

The only prejudice that defendants claim for proceeding just like every other case in this district is that trial will be delayed. However, defendants have no substantive right to any particular trial date, or even to have a trial date set at this early stage of the case. Moreover, to the extent that any delay has occurred in this action, defendants have only themselves to blame.

For strategic reasons, defendants answered the unserved Delaware complaint two days after it was filed. They simultaneously chose to delay this action by filing a meritless jurisdictional motion, wasting valuable time and resources that otherwise could have been used to make progress toward resolving the underlying patent infringement dispute. If they were genuinely interested is quickly getting to trial, instead of jurisdictional jockeying with the hope of avoiding to appear before Your Honor, they would have answered the New Jersey complaint in two days. They chose not to do so. That is not a reason for special treatment in their favor now.

Plaintiffs are not interested in delaying this action, and will not do so. We styled our discovery requests so that any discovery we used in Delaware can be equally used here. Moreover, plaintiffs continue to engage in fact discovery toward its completion as soon as reasonably possible. Plaintiffs will be responding to defendants' counterclaims later this month, and a Rule 16 conference should be set in the ordinary course consistent with the practices of this Court. There simply is no urgency to enter a trial date, particularly since it is more than one year in the future.

Defendants' request for special scheduling treatment should be denied.[1]

Respectfully yours,

s/ Charles M. Lizza
Charles M. Lizza

CML:ab

cc: All Counsel (via email)

---

[1] Plaintiffs will not burden Your Honor by addressing the many factual errors and meritless arguments contained in defendants' June 5 letter as they do not bear on the issue at hand. Clearly, the schedule set in this case does not have Constitutional ramifications.

# EXHIBIT C

STATEMENT OF
AJAZ S. HUSSAIN, PH.D.
VICE PRESIDENT & GLOBAL HEAD OF BIOPHARMACEUTICAL DEVELOPMENT
SANDOZ
ON BEHALF OF
THE NOVARTIS GROUP OF COMPANIES

BEFORE THE SENATE HELP COMMITTEE HEARING

"FOLLOW-ON BIOLOGICS"

SD-430 DIRKSEN SENATE OFFICE BUILDING
THURSDAY, MARCH 8, 2007, 10:00 A.M.

Good morning, I am Dr. Ajaz S. Hussain, Vice President & Global Head of
Biopharmaceutical Development at Sandoz. I want to thank Chairman Kennedy, Senator Enzi
and the other distinguished members of the Senate H.E.L.P Committee for giving me the
opportunity to represent the Novartis Group of companies ("Novartis") at this hearing. As a
former research scientist, as a regulator with ten years of experience at the FDA - where I was
Deputy Director of the Office of Pharmaceutical Sciences until October 2005 - and as an
American who has at various points in my life also been a patient, I believe in the "Gold
Standard" of the FDA approval process and want to see only safe and effective medicines made
available to patients. I believe that this is as achievable for follow-on biologics as it is for all
other drugs, generic and innovator, including biologics.

Novartis is a world leader in the research and development of products to protect and
improve health and well-being both by developing innovator drugs and biologics, and also by
making generics available once patents have expired. Novartis is unique among pharmaceutical
companies because it has made large investments in both branded and generic drugs. Given this,
our position on follow-on biologics is not based on the commercial interests of one particular
product. Instead, Novartis strongly supports a balanced position, which advocates that the same
standard of high quality and science be applied to all medicines, and that there be respect for
legitimate intellectual property, while recognizing the role that both generic drugs and follow-on
biologics can play in the health care system. Novartis' success as a global leader of the

March 6, 2007                                                    1 of 9 pages

innovator biopharmaceutical industry is demonstrated by the approval and launch of fifteen (15) new molecular entities in the US since 2000 – more than any other company. Novartis' global research base, the Novartis Institutes for Biomedical Research, is located in Boston, Massachusetts where thirteen hundred (1,300) researchers work towards developing the next generation of therapies. We also are relocating our Novartis Vaccines and Diagnostics Division Global Leadership to Commonwealth of Massachusetts in the third quarter of this year, and will be bringing together hundreds of additional researchers to develop the next generation of vaccines[1]. We are committed to a future of innovation and new medicines, but we also believe in free markets and competition, and we are not afraid of them.

In the debate so far, you have been hearing essentially two opposite ends of the spectrum on the issue of follow-on biologics. At one end of the spectrum, some have argued that follow-on biologics are impossible and inherently dangerous, while others suggest that this is just a re-run of the 1984 debate when generic drugs were said to be impossible too and that everything we need to develop such products can already be done today. And the former, those adverse to follow-on biologics, do not accept that interchangeable products can ever be produced by other than the original manufacturer. In such a polarized context, Novartis appreciates this opportunity to share an alternative perspective; one that we believe encompasses a viable and responsible solution compatible with the current state of the science.

In considering this public health issue, we start from the premise that follow-on biologics are essential to the future economics of health care both in order to stimulate innovation, and, as important, to ensure that patients have access to the medicines they need at affordable prices. That a fair solution can enable both the innovator industry and the generic industry to prosper such that patients can benefit across the board, is a concept too often lost in this debate as both extremes try to pursue their respective "wish lists." For its part, Novartis believes that a balanced solution is possible, one that will provide greater access to safe and effective medicines through the availability of competitively-priced biologics when patents expire. Toward this end,

---

[1] Note that the Novartis Corporate Headquarters are in New York, and Novartis has facilities in Arkansas, California, Colorado, Georgia, Massachusetts, Michigan, Nebraska, New Jersey, New York, North Carolina, Wisconsin with total US employees numbering 29,000

March 6, 2007                                                                                    2 of 9 pages

Novartis believes it is time for an explicit regulatory pathway that encourages the development and approval of follow-on biologics, including interchangeable products.

We define follow-on biologics broadly to include comparable versions of already-approved biologics and also improved versions of current therapies that depend on the same mechanism of action, are used in the same indications as the originator product, and are developed based upon an extensive and sound set of data generated by the subsequent sponsor, which includes stand-alone product and process development and the demonstration of comparability with the reference product on all relevant levels, that is, chemical, preclinical, and clinical (including immunological) and appropriately qualifying differences.

*The success of the biopharmaceutical industry deserves comparable regulatory progress*

The biopharmaceutical industry has made phenomenal progress since the first biotechnology-based medicine was licensed in the U.S. in 1982. Technologies to make and characterize protein products and other complex biologics have progressed rapidly in the last two decades, and the use of comparability to facilitate manufacturing changes has become established by innovator companies and regulators around the world since FDA led and then first formalized the concept in the US in 1996 with the Comparability Guidance. Comparability allows for flexibility in the development of products that is essential to their optimal manufacture and iterative improvement. It is a science-based regulatory success story, with very few exceptions.

Significant and continual advancements in scientific disciplines such as analytical characterization, product and process design, process control, and clinical assessment based on underlying mechanisms of action provide a sound scientific basis to utilize the fundamental principles and procedures of comparability evaluation for follow-on biologics. We are confident that this science based approach will enable the industry to progress to the greater availability of affordable biologics to which we all aspire.

In supporting a new regulatory pathway based on comparability such as that described in the "Access to Life-Saving Medicines Act", Novartis is merely recognizing the next logical step in the evolution of the biopharmaceutical industry. The biotech industry is a success story with multiple blockbuster products and well-capitalized companies, as well as those small and emerging companies that hopefully will contribute to its future. Its very success, creativity, and growth, since insulin was approved as the first biotechnology product back in 1982, is what makes this next step possible. With key patents expired and expiring, the time is appropriate to enable greater access to these medicines.

In proposing that the development and approval of follow-on biologics be enabled, Novartis is drawing on its own decades of experience as well as its current capabilities and portfolio across the full breadth of the biotechnology and pharmaceutical industry. While care must be taken and standards maintained, the dramatic progress in biotechnology has already enabled development of the first follow-on biologic products. Indeed, some would say the entire industry is already a follow-on industry because most of the first-generation biotechnology products themselves were follow-ons to their naturally-sourced counterparts. We believe that this great success achieved by the biopharmaceutical industry working with the FDA regulatory experts should be the bridge to an even greater future. We envision the advancement of public health through the increased therapeutic options that become available and are accessible when follow-on biologics are approved through the appropriate application of the new regulatory pathway. Just as we trust the FDA to judge the appropriateness of comparability for innovators, so we can trust them to apply the same principles carefully and responsibly to all other sponsors.

*Interchangeability is an important public health need*

A regulatory pathway that encourages the integration of appropriate public prior knowledge, as well as one that enables a subsequent sponsor to submit data comparing their candidate to a previously approved product, are natural progressions in enabling the safest and most effective products to be made available to patients. Moreover, just as comparability for innovators' products pre- and post- any manufacturing change has presumed interchangeability to their final product, so the potential for interchangeability of a product from a subsequent

March 6, 2007                                                                      4 of 9 pages

sponsor, who has demonstrated comparability to an existing product, must be a legitimate consideration if not a foregone conclusion.

The industry and FDA accept that batch-to-batch variation is inevitable for biologics, and, as long as manufacturers ensure that subsequent batches stay within the same "goal posts" of that accepted variation, then the product is made available to patients. Comparability principles ensure that, for biologics, the same rules apply for after-approval manufacturing changes, and they can likewise be imposed on follow-on biologics. In none of these cases is "sameness" a useful or scientifically-valid concept, any more than it has been at any time for any biologic. To argue otherwise (for example insisting on "sameness" requirements that are not the current regulatory standard) creates hurdles to follow-on biologics that are greater than those required for innovator products and counter-intuitive. Similarly, an unintended consequence of such protectionism disguised as "sameness" raises the hurdles for innovator products, and makes products for unmet medical needs increasingly unavailable to patients. What we need are consistent and appropriate regulatory standards applied to all biologics independent of their sponsor.

In addition, a regulatory pathway that allows any sponsor to further innovate and develop a new second-generation product that is expressly different from but related to the first-generation product, and that represents an improvement in the medical options for patients, can be enabled by a pathway based on principles of comparability. This element encourages second-generation biologics but is precluded in the European approach and yet may represent an significant opportunities in the "Access to Life-Saving Medicines Act".

*Biotechnology Medicines Have The Confidence Of The Public*

It is essential that the high standards for safety and efficacy that patients expect and that the biopharmaceutical industry has provided in collaboration with FDA are maintained through appropriate and consistent regulatory requirements for *all* biologics. These standards have been achieved through the application of rigorous, science-based regulatory requirements by experts for over a century under the PHS Act. The current statute reinforces the requirements for safety,

March 6, 2007    5 of 9 pages

purity and potency. However, just as we trust the FDA to assess the unknown (new) biologic about which we necessarily have the least experience, (namely the innovator products), using these criteria, so too we can entrust the Agency to evaluate follow-on biologics which refer to products for which we now have decades of experience. We believe Congress should confer on FDA the flexibility to accommodate progress in science, and help enable the regulatory requirements to evolve appropriately as well. As such, FDA can, through public notice-and-comment rulemaking, and guidance as appropriate, implement a comparability-based pathway for follow-on biologics without requiring arbitrary, unnecessary or unethical duplication of pre-approval studies or clinical trials, and by allowing appropriate extrapolation between indications based on mechanism of action. We can also allow FDA to use their experience with comparability to evaluate a follow-on biologic sponsor's data, and judge the appropriateness of the products being designated as interchangeable -- all while recognizing that FDA does not regulate the practice of medicine. The EU may have chosen to defer to member states on interchangeability (the EMEA has not rejected interchangeability for biosimilars as some have misrepresented), but the history of generic drugs in the US makes it much more fitting that FDA recommend the designation – they have the skill and the public health responsibility that make this appropriate. It should also be noted that, throughout this process, no access to the innovator's data is required – the approval of the follow-on biologic can rest solely and surely on the shoulders of the subsequent sponsor's comparative data which it obtains by running side-by-studies of the innovator reference product and its own follow-on biologic.

*Protection of Intellectual Property Is The Lifeblood Of Innovation*

Strong intellectual property protection, including patents, trade secrets, and confidential information, is essential to promoting innovation that results in new therapies to meet patient needs. However, Novartis believes that, by having a regulatory pathway that allows more rapid and efficient realization of this innovation through greater use of comparability and prior knowledge for second-generation products as well, these IP rights are enhanced not undermined by a follow-on biologics pathway. Moreover, with each follow-on sponsor developing its own independent data package, and not relying on the innovator's data, we believe these property rights are respected even for those products on which the patents have expired and competition

appears imminent. Historically, the biotech industry has established robust patent estates. However, when these patents expire (including patents claiming those PHS Act products for which up to five years of patent-term restoration already has been granted under existing Hatch Waxman), increased competition and access to safe and effective medicines should proceed in the free market. Litigation over patents will still occur, but those litigation proceedings should, and in fact do not need to be coupled to the regulatory approval process. Nonetheless, Novartis is prepared to work with the Committee and its staff to develop appropriate legislative provisions that would apply at the conclusion of the FDA approval process. Such a process for follow-on biologics could include a 45-day notification of an issued approval, during which time the innovator would be alerted to an approval referencing its product, and the innovator could institute litigation if it believed that its patent or other intellectual property rights have been violated.

Novartis believes that, if follow-on biologics are to become available to patients in a timely manner, it is essential to "decouple" patent litigation from the approval of new products using a comparability-based regulatory pathway. The complexity of biotechnology product patent estates is such that we do not believe waiting for resolution of biotech patent litigation in the Courts will be other than a barrier to the timely availability of follow-on biologics. Consequently, we believe companies should be able to decide how best to approach the market if they believe there are not outstanding patents, or that any patents still in force are invalid or not infringed just as they can for any PHS Act biologic today.

In legislating this "decoupling", it may be appropriate for Congress to consider other mechanisms by which to make the exclusive marketing window more predictable for innovators. Novartis supports a non-patent research incentive such as may be achieved through modelling on EU data exclusivity provisions, more appropriately called market-exclusivity provisions, for innovator biologics approved after enactment of any new legislation, as a way to enhance regulatory certainty for all sponsors (which would be independent of the patent estates). Such an approach would prevent diversion of excess resources being used by either innovators or the sponsors of follow-on biologics on slow and expensive patent litigation, and enable those resources to be dedicated to the development and new and more efficient manufacturing of

March 6, 2007                                              7 of 9 pages

biologics. However, beyond harmonizing this one discrete component of the EU system, in general, the EU approaches on follow-on biologics *per se*, their so-called "biosimilars", suit an EU environment of 27 distinct countries with different legislative and regulatory histories as well as very different health care and reimbursement systems. The U.S. needs a solution that suits U.S. needs and statutory environment as it has been evolving here for over two hundred years following adoption of the U.S. Constitution.

*The Development Of New Regulatory Requirements Must Be Transparent And The Rules Fair*

For any new regulatory pathway, the FDA will need to go through a process of developing regulations. While promulgation of regulations need not be blocking applications in the meantime, their development can be expected to facilitate the choices for those sponsors and patients who can afford to wait a little longer. The FDA has a mission to enhance the public health, and follow-on biologics will be part of that as a result of enhanced patient access and competition. Novartis supports such an open process, while not accepting that it should ever serve to block follow-on biologics while the regulatory implementation process proceeds. Unlike the EU, the U.S. has a long established and very accessible public participatory process, in which submissions to dockets are available to the public. It will be through this notice-and-comment rule-making, as well as the development of guidance, to which the experienced innovator industry and others will be able to contribute and ensure that only safe and effective follow-on biologics are approved.

*In Conclusion*

Novartis envisions a win:win public health and public policy solution whereby a follow-on biologics industry is enabled, patients get greater access to high-quality and improved biotechnology products at competitive prices, and that provides innovators relief from outdated requirements and a less burdensome pathway to improve existing products. As recognized by the FDA leadership, it is not appropriate to use outdated regulatory requirements just because those parameters were considered historically useful. In this and other important regards, the opportunities to innovators through the creation of a new regulatory pathway based on comparability such as, for example, in the "Access to Life-Saving Medicines Act", should be at

March 6, 2007                                                        8 of 9 pages

least as great as any available to generics, especially with respect to second-generation products. We do not believe that this is a zero-sum game. PhRMA's own numbers say 418 biotechnology medicines are in development, and yet, only 4 recombinant PHS Act applications were approved in 2006. It is time for all of us to work with FDA to improve the review for all biologics such that every patient can get access to safe and effective medicines that will compete in the market place and be more affordable, while also encouraging the development of the new therapies which are so desperately needed.

March 6, 2007                                          9 of 9 pages

# EXHIBIT D

# SHAPIRO & CROLAND

COUNSELLORS AT LAW

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

BARRY I. CROLAND, P.C.*
ROBERT P. SHAPIRO, P.C.*
SUSAN W. SHAPIRO (1943-1990)
BARRY L. BAIME
KENNETH S. APFEL, P.C.*
BRUCE J. ACKERMAN, P.C.***
STUART REISER, P.C.*†
JOHN P. DI IORIO*
JAY RUBENSTEIN*
MERIDITH J. BRONSON◊
DAVID O. MARCUS*
ROBERT F. GREEN*
LIZABETH CROLAND SARAKIN
DAVID TORCHIN, P.C.**
N. ARI WEISBROT*
VICTORIA R. PEKERMAN**
TARA SCHILLARI RICH
ALEXANDER G. BENISATTO*
SETH M. GOLLIN*
BRIAN C. MARTEL*

CONTINENTAL PLAZA II
411 HACKENSACK AVENUE
HACKENSACK, N.J. 07601
(201) 488-3900
TELECOPIER (201) 488-9481
WEBSITE: WWW.SHAPIRO-CROLAND.COM

OF COUNSEL:

HARVEY R. SORKOW

DONALD R. SORKOW
(1936-1995)

KENNETH S. GOLDRICH
(1951-2004)

*CERTIFIED BY THE SUPREME
COURT OF NEW JERSEY AS A
CIVIL TRIAL ATTORNEY

◊CERTIFIED BY THE SUPREME
COURT OF NEW JERSEY AS A
MATRIMONIAL LAW ATTORNEY

*MEMBER OF N.J. & N.Y. BAR
**MEMBER OF N.J. & PA BAR
***MEMBER OF N.J, N.Y. & FL BAR

June 5, 2007

**VIA ELECTRONIC FILING AND HAND DELIVERY**
The Honorable Susan D. Wigenton
United States District Judge
United States District Court for
The District of New Jersey
Martin Luther King Jr. Federal Building
50 Walnut Street
Newark, NJ 07101

Re: *Celgene Corp. et al. v. Abrika Pharmaceuticals, Inc. et al.*
**Civil Action No. 06-CV-5818 (SDW)(MCA)**

Dear Judge Wigenton:

On June 1, 2007, Defendants filed their Answer and Counterclaim to the Complaint in the above-captioned matter. In ordinary course, the parties in this action would receive a notice from the Magistrate Judge for a Rule 16 scheduling conference. Under Local Rule 16.1(a)(1), however, the District "Judge [may] otherwise direct." In the unique circumstances surrounding this action, this case is one where the statutory, equitable, and constitutional dimensions of setting the scheduling order can only be adequately addressed if the scheduling conference is conducted, and the scheduling order issued, directly by Your Honor.

Importantly, Plaintiffs previously stipulated to a Scheduling Order in their identical action, co-pending in Delaware and now unreasonably refuse to agree to a stipulated filing of the same Scheduling Order in this case. The Delaware Scheduling Order was entered on April 4, 2007, and Defendants respectfully request, to the maximum extent possible, adoption of the same deadlines and dates, including the trial date, in this case. Plaintiffs' position, that this Court should adopt a different schedule, runs counter to representations made by Plaintiffs' counsel in Delaware and unfairly prejudices Defendants as well as patients in need of a generic version of

57452.1

the drug product at the heart of this action. Plaintiffs' position also contravenes 21 U.S.C. §355(j)(5)(B)(iii), which mandates that the parties "cooperate in expediting" this action.

<u>Background</u>

As the Court is aware, Plaintiffs filed two identical patent infringement actions – first, on December 4, 2006, the above-captioned action pending before Your Honor in New Jersey and second, on December 6, 2006, *Celgene Corp. et al. v. Abrika Pharmaceuticals, Inc. et al.*, Civil Action No. 1:06-CV-741-SLR pending before Judge Robinson in Delaware. The reasons for this double filing were discussed in the parties' papers concerning Defendants' Motion to Dismiss or Transfer.

As Plaintiffs anticipated, their Complaint in New Jersey prompted Defendants to file a motion to dismiss the case or to transfer it to Delaware. Perhaps unanticipated by plaintiffs was how quickly—and how far—the case progressed in Delaware. Defendants answered the Delaware complaint on December 8, 2006 and discovery is well underway there. The parties completed their Rule 26(f) conference, served initial disclosures, and served and answered interrogatories and document production requests. On March 28, 2007, Judge Robinson conducted a scheduling conference and adopted the stipulated Scheduling Order negotiated by the parties, including a September 2, 2008 trial date. (<u>See</u> Ex. 1; Hearing Tr.) During the scheduling conference, Plaintiffs' counsel represented that if the New Jersey Court ruled on Defendants' Motions within a month or two after the conference, Plaintiffs would "not renegotiate any of our proposed dates" in the schedule. (<u>Id.</u> at 7.) A copy of the Delaware Scheduling Order, which was formally entered on April 4, 2007, is attached hereto. (Ex. 2; Delaware Scheduling Order.) Motion practice is also underway in Delaware. Defendants filed a motion for judgment on the pleadings and a motion to amend their Answer and Counterclaims. Those motions are fully briefed and pending before Judge Robinson.

<u>Defendants' Request for Stipulated Scheduling Order in New Jersey</u>

After receiving this Court's ruling denying their motions to dismiss or transfer (ex. 3; Order), Defendants proposed a stipulated dismissal of the Delaware action on the conditions that (1) Plaintiffs agree to submit the Scheduling Order entered in Delaware to this Court and (2) this Court enter the same. (Ex. 4; L. Savit and J. Ongman emails.) Defendants explained that on the best information available to them, a trial date in the New Jersey action would, without the direct intervention of your Honor, be set in ordinary course a year or more after the September 2, 2008 trial date, which had been set by Judge Robinson in Delaware. (<u>Id.</u>) Defendants pointed out that "[o]ur responsibilities to patients in need of an affordable generic substitute for Ritalin and to our shareholders prohibit us from stipulating to such an extensive delay as to when a generic substitute may be made available to patients." (<u>Id.</u>)

Defendants crafted their proposal based on Plaintiffs' representation before Judge Robinson in the March 28, 2007 scheduling conference. Plaintiffs had no problem with the Scheduling Order in Delaware and, therefore, should have no problem with entry of the same Scheduling Order in this Court. Since this Court's order regarding Defendants' Motions issued within two months of the scheduling conference, Defendant suggested a joint motion directly to Your Honor for immediate entry of a schedule identical to that entered in Delaware.

On May 22, 2007, Plaintiffs unreasonably rejected Defendants proposal. (Ex. 5; email exchange between L. Savit and J. Ongman.) As a result, Defendants were compelled to address this matter directly with Your Honor.

<u>Unique Legal Attributes of this Action</u>

This is not just another patent infringement case. It instead is a Paragraph IV case under the Hatch-Waxman Act. The "purpose of the Hatch Waxman Amendments was, after all, 'to increase competition in the drug industry by facilitating the approval of generic copies of drugs.'" *Serono Laboratories, Inc. v. Shalala*, 158 F. 3d 1313, 1326 (D.C. Cir. 1998). "The public interest [is] in receiving generic competition to brand-name drugs as soon as possible." *Boehringer Ingelheim Corp. v. Shalala*, 993 F. Supp. 1 (D.D.C. 1997). Through the Hatch-Waxman legislation, "Congress sought to get generic drugs into the hands of patients at reasonable prices – fast." *In re Barr Laboratories*, 930 F. 2d 72, 76 (D.C. Cir. 1991).

Congress implemented this policy directly by compelling parties to expedite Paragraph IV patent infringement actions. "In such an action, each of the parties shall reasonably cooperate in expediting the action." 21 U.S.C. §355(j)(5)(B)(iii).

As the court in *In re Barr Laboratories*, 930 F. 2d at 75 explained, Paragraph IV patent infringement actions are not just about the branded or generic drug companies revenue streams. At their core, they raise profound issues of human health and welfare:

> "[The generic drug company's] interest, we may assume, is entirely commercial. But it makes money getting useful drugs into the hands of sick people. Of course the 'bioequivalents' of the drugs covered by these applications [the branded drugs] are, by definition, already available—but at a higher price, which makes the stake appear pecuniary. But for poorer people—the users for whom access to generic drugs is most important—a pecuniary saving on drugs may have important health benefits. The difference between sinking, say, 3% and 20% of one's income into pharmaceuticals spells a large difference in the range of economically accessible food and shelter.
>
> The prevalence of health insurance hardly disposes of these complications. Much of the American population is uncovered by medical insurance—predominantly, in all likelihood, people for whom access to generic drugs is especially important.
> . . .

These interests of patients are of the type which have been accorded protection as "liberty interests" under the Fifth Amendment to the United States Constitution.

<u>Consequences of these Legal Aspects on the Scheduling Process</u>

If this Court convenes a scheduling conference and enters a scheduling order that leads effectively and efficiently to a firm trial date no later than September 2, 2008, no prejudice will result. The parties could then jointly move to dismiss the Delaware action and the Paragraph IV litigation would proceed in New Jersey.

If the Court does not do so, matters become more complicated. Even in the context of ordinary patent litigation, the Delaware district court has held that "it is fundamentally unfair to stay litigation that has proceeded further than another previously filed action" even where the result is that the same action proceeds in two separate courts. *Tuff Toro Corp. v. Hydro-Gear Limited Partnership*, 882 F. Supp. 359, 365 (D. Del. 1994, Robinson J.). In the context of Paragraph IV patent infringement litigation, the statutory and equitable factors would bear even more strongly toward continuing the Delaware action. In fact, now that the Delaware court has set a firm trial date of September 2, 2008, it may be constitutionally impermissible for the Delaware action to be dismissed or stayed unless the scheduling order in New Jersey also leads effectively and efficiently to a trial date no later than September 2, 2008. Otherwise, the patients in need of a more affordable generic version of Ritalin may have their liberty interests unconstitutionally impaired.

<u>Conclusion</u>

For the foregoing reasons, Defendants respectfully request that the Court set a date for a scheduling conference as expeditiously as possible. Because of the uniquely important legal issues bound up in the determination of the scheduling order in this case, Defendants also respectfully request that the conference proceed before Your Honor, as permitted by Local Rule 16.1(a)(1).

Very truly yours,

Stuart Reiser
sreiser@shapiro-croland.com

cc: Counsel for Plaintiffs in New Jersey and Delaware
    Honorable Sue L. Robinson

# EXHIBIT E

# UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

CHAMBERS OF
**MADELINE COX ARLEO**
UNITED STATES MAGISTRATE JUDGE

MARTIN LUTHER KING COURTHOUSE
50 WALNUT ST.
ROOM 2060
NEWARK, NJ 07101
973-297-4903

June 15, 2007

Charles Michael Lizza, Esq.
Leboeuf, Lamb, Greene & Macrae, LLP
One Riverfront Plaza
Newark, NJ 07102-5490

Stuart Reiser, Esq.
Shapiro & Croland, PC
Continental Plaza II
411 Hackensack Avenue
Hackensack, NJ 07601

William J. O'Shaughnessy, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
PO Box 652
Newark, NJ 07101-0652

## LETTER ORDER PURSUANT TO RULE 16.1

RE:    **Celegne Corporation v. Abrika Pharmaceuticals, et al.**
       **Civil Action No. 06-5818 (SDW)**

Dear Counsel:

A scheduling conference shall be conducted before the undersigned at **3:00 pm** on **Tuesday, July 10, 2007**, in Courtroom 2A of the Martin Luther King, Jr. Courthouse Building, 50 Walnut Street, Newark, New Jersey. See Fed. R. Civ. P. 16.1 and L.Civ.R. 16.1(a).

Counsel are advised that the early disclosure requirements of Fed. R. Civ. P. 26 will be enforced. Therefore, counsel shall immediately exchange the following information without a formal discovery request:

-     identities of individuals likely to have knowledge of discoverable facts,

-     documents and things in the possession of counsel or the party,

-     identities of experts and their opinions,

-     insurance agreements in force, and

-     statement of the basis for any damages claimed.

At least fourteen (14) days prior to the conference scheduled herein, counsel shall personally meet and confer pursuant to Fed. R. Civ. P. 26(f), and shall submit a discovery plan to the undersigned not later than 72 hours prior to the conference with the Court. The discovery plan shall include (1) a brief summary of the claims and defenses; and (2) a proposed schedule for completing fact and expert discovery. The discovery plan may include a summary of the status of settlement negotiations.

At the conference, the Court will address scheduling of all motions. No motion shall be filed without prior leave of Court. If any motions have already been filed, please advise the Court immediately, in writing, regarding the nature of the motion and its present status.

The parties shall immediately serve interrogatories, limited to twenty-five (25) single questions, and requests for production of documents (no limit).

At the conference, all parties who are not appearing pro se must be represented by counsel who shall have full authority to bind their clients in all pre-trial matters. Counsel shall also be prepared to discuss the merits of the case and have settlement authority. Clients or persons with authority over the matter shall be available by telephone. See L.Civ.R. 16.1(a).

Counsel for plaintiff(s) shall notify any party who hereafter enters an appearance of the above conference and forward to that party a copy of this Order.

The parties must advise this Court immediately if this action has been settled or terminated so that the above conference may be canceled.

Failure to comply with the terms herein may result in the imposition of sanctions.

**SO ORDERED this day, June 15, 2007.**

_____ *s/Madeline Cox Arleo* _____
**MADELINE COX ARLEO**
**UNITED STATES MAGISTRATE JUDGE**

Orig:  Clerk
cc:    Courtroom Deputy
       File

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | Civil Action No. |
| Plaintiff(s), | : | Hon. |
| v. | : | JOINT DISCOVERY PLAN |
| | : | |
| Defendant(s). | : | |

1.     Set forth a factual description of the case. Include the causes of action and affirmative defenses asserted.

2.     Have settlement discussions taken place? Yes _____ No _____

    If so, when? _____

    (a)   What was plaintiff's last demand?

        (1)   Monetary demand: $ _____
        (2)   Non-monetary demand: _____

    (b)   What was defendant's last offer?

        (1)   Monetary offer: $ _____
        (2)   Non-monetary offer: _____

3.     The parties [have _____ -have not _____] exchanged the information required by Fed. R. Civ. P. 26(a)(1). If not, state the reason therefor.

4.     Describe any discovery conducted other than the above disclosures.

5.     Generally, dispositive Motions cannot be filed until the completion of discovery. Describe any Motions any party may seek to make prior to the completion of discovery. Include any jurisdictional Motions and Motions to Amend.

6.     The parties proposed the following:

    (a)   Discovery is needed on the following subjects:

    (b)   Should discovery be conducted in phases? If so, explain.

    (c)   Number of Interrogatories by each party to each other party: _____

(d)    Number of Depositions to be taken by each party: _____

(e)    Plaintiff's expert report due on _____.

(f)    Defendant's expert report due on _____.

(g)    Motions to Amend or to Add Parties to be filed by _____.

(h)    Dispositive motions to be served within _____days of completion of discovery.

(i)    Factual discovery to be completed by _____.

(j)    Expert discovery to be completed by _____.

(k)    Set forth any special discovery mechanism or procedure requested, including data preservation orders or protective orders:

(l)    A pretrial conference may take place on _____.

(m)    Trial by jury or non-jury Trial?

(n)    Trial date: _____.

7.    Do you anticipate any discovery problem(s)?  Yes _____  No _____
      If so, explain.

8.    Do you anticipate any special discovery needs (i.e., videotape/telephone depositions, problems with out-of state witnesses or documents, etc.)?  Yes _____  No _____
      If so, explain.

9.    State whether this case is appropriate for voluntary arbitration (pursuant to L. Civ. R. 201.1 or otherwise), mediation (pursuant to L. Civ. R. 301.1 or otherwise), appointment of a special master or other special procedure.  If not, explain why and state whether any such procedure may be appropriate at a later time (i.e., after exchange of pretrial disclosures, after completion of depositions, after disposition of dispositive motions, etc.).

10.    Is this case appropriate for bifurcation?  Yes _____  No _____

11.    We [do _____ do not _____] consent to the trial being conducted by a Magistrate Judge.

_____
Attorney(s) for Plaintiff(s)


_____
Attorney(s) for Defendant(s)

## ALTERNATIVE DISPUTE RESOLUTION
## IN THE
## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Mediation is the Alternative Dispute Resolution ( "ADR") program in this Court. Mediation is governed by Local Civil Rule 301.1. The mediation program under this rule is supervised by a judicial officer (at present United States Magistrate Judge Madeline Cox Arleo) who is available to answer any questions about the program.

Any district judge or magistrate judge may refer a civil action to mediation. This may be done without the consent of the parties. However, the Court encourages parties to confer among themselves and consent to mediation. Moreover, you are reminded that, when counsel confer pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and Local Civil Rule 26.1, one of the topics that must be addressed is the eligibility of a civil action for participation in ADR.

A civil action may be referred to mediation at any time. However, one of the advantages of mediation is that, if successful, it enables parties to avoid the time and expense of discovery and trial. Accordingly, the Court encourages parties to consent to mediation prior to or at the time that automatic disclosures are made pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.

If parties consent to mediation, they may choose a mediator either from the list of certified mediators maintained by the Court or by the selection of a private mediator. If a civil action is referred to mediation without consent of the parties, the judicial officer responsible for supervision of the program will select the mediator.

Mediation is non-judgmental. The role of the mediator is to assist the parties in reaching a resolution of their dispute. The parties may confer with the mediator on an ex parte basis. Anything said to the mediator will be deemed to be confidential and will not be revealed to another party or to others without the party's consent. The first six hours of a mediator's time is free. The mediator's hourly rate thereafter is $150.00, which is borne equally by the parties.

If you would like further information with regard to the mediation program please review the Guidelines for Mediation, which are available on the Court's Web Site "pacer.njd.uscourts.gov" and appear as Appendix Q to the Local Civil Rules. You may also make inquiries of the judicial officer responsible for supervision of the program.

**Civil actions in which there are *pro se* parties (incarcerated or not) are not eligible for mediation.**

DNJ-Med-001 Rev. (10/00)

# EXHIBIT F

**ORIGINAL ARTICLE**

# Prevalence, Severity, and Comorbidity of 12-Month *DSM-IV* Disorders in the National Comorbidity Survey Replication

*Ronald C. Kessler, PhD; Wai Tat Chiu, AM; Olga Demler, MA, MS; Ellen E. Walters, MS*

**Background:** Little is known about the general population prevalence or severity of *DSM-IV* mental disorders.

**Objective:** To estimate 12-month prevalence, severity, and comorbidity of *DSM-IV* anxiety, mood, impulse control, and substance disorders in the recently completed US National Comorbidity Survey Replication.

**Design and Setting:** Nationally representative face-to-face household survey conducted between February 2001 and April 2003 using a fully structured diagnostic interview, the World Health Organization World Mental Health Survey Initiative version of the Composite International Diagnostic Interview.

**Participants:** Nine thousand two hundred eighty-two English-speaking respondents 18 years and older.

**Main Outcome Measures:** Twelve-month *DSM-IV* disorders.

**Results:** Twelve-month prevalence estimates were anxiety, 18.1%; mood, 9.5%; impulse control, 8.9%; substance, 3.8%; and any disorder, 26.2%. Of 12-month cases, 22.3% were classified as serious; 37.3%, moderate; and 40.4%, mild. Fifty-five percent carried only a single diagnosis; 22%, 2 diagnoses; and 23%, 3 or more diagnoses. Latent class analysis detected 7 multivariate disorder classes, including 3 highly comorbid classes representing 7% of the population.

**Conclusion:** Although mental disorders are widespread, serious cases are concentrated among a relatively small proportion of cases with high comorbidity.

*Arch Gen Psychiatry. 2005;62:617-627*

**C**OMMUNITY EPIDEMIOLOGICAL surveys estimate that as many as 30% of the adult population in the United States meet criteria for a 12-month *DSM* mental disorder.[1,2] Clinical reappraisal studies confirm these estimates.[3] Although fewer than half these people receive treatment,[4,5] unmet need for treatment may not be a major problem, because a high proportion of untreated cases might be mild or self-limiting. However, no definitive epidemiological data exist on this possibility, because severity has not been a focus of previous psychiatric epidemiological surveys. Although secondary analysis of surveys in the United States[6] and other countries[7,8] suggests that many 12-month cases are mild, this conclusion is based on crude post hoc severity indicators.

Recognizing the importance of obtaining more refined disorder severity data as well as updating available data on the epidemiological features of mental disorders in a number of other ways, the World Health Organization recently expanded its Composite International Diagnostic Interview (CIDI),[9] the interview used in almost all major psychiatric epidemiological surveys in the world over the past decade, to include detailed questions about

### See also pages 590, 593, 603, and 629

severity.[10] This expanded CIDI was used in a coordinated series of epidemiological surveys carried out under World Health Organization auspices known as the World Mental Health (WMH) Survey Initiative.[8] The current report presents WMH-CIDI data on prevalence, comorbidity, and severity of 12-month *DSM-IV* disorders from the US National Comorbidity Survey Replication (NCS-R),[11,12] the WMH survey carried out in the United States.

**Author Affiliations:**
Department of Health Care Policy, Harvard Medical School, Boston, Mass.

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

## METHODS

### SAMPLE

As described in more detail elsewhere,[12,13] the NCS-R is a nationally representative household survey of English speakers 18 years and older in the coterminous United States. Respondents were confined to English speakers because 2 parallel surveys are currently under way in nationally representative samples of Hispanic (in Spanish or English, depending on the preference of the respondent) and Asian American individuals (in a number of Asian languages or English, again depending on the preference of the respondent). These surveys are using the same diagnostic instrument as the NCS-R and are covering the major groups of non-English speakers in the US population. The NCS-R respondents were selected from a multistage clustered area probability sample of households. Face-to-face interviews were carried out between February 2001 and April 2003 by professional interviewers from the Institute for Social Research at the University of Michigan, Ann Arbor. The response rate was 70.9%. The survey was administered in 2 parts. Part 1 included a core diagnostic assessment (n=9282). Part 2 included questions about risk factors, consequences, and other correlates along with assessments of additional disorders that were administered to all part 1 respondents who met lifetime criteria for any disorder plus a probability subsample of other respondents (n=5692). Interviewers explained the study and obtained verbal informed consent prior to beginning each interview. The NCS-R recruitment, consent, and field procedures were approved by the Human Subjects Committees of both Harvard Medical School (Boston, Mass) and the University of Michigan.

### MEASURES

#### Diagnostic Assessment

*DSM-IV* diagnoses were based on the WMH-CIDI,[10] a fully structured lay interview that generates diagnoses according to *International Classification of Diseases, 10th Revision*[14] and *DSM-IV*[15] criteria. *DSM-IV* criteria are used herein. Twelve-month disorders considered herein include anxiety disorders (panic disorder, generalized anxiety disorder, agoraphobia without panic disorder, specific phobia, social phobia, posttraumatic stress disorder, obsessive-compulsive disorder, separation anxiety disorder), mood disorders (major depressive disorder, dysthymia, bipolar disorder I or II), impulse control disorders (oppositional defiant disorder, conduct disorder, attention-deficit/hyperactivity disorder, intermittent explosive disorder), and substance use disorders (alcohol and drug abuse and dependence). Minor corrections to diagnostic algorithms were made subsequent to previously reported aggregate analyses, leading to small differences in aggregate prevalence estimates.[8] The disorders assessed in part 2 include the 4 childhood disorders (separation anxiety disorder, oppositional defiant disorder, conduct disorder, and attention-deficit/hyperactivity disorder), posttraumatic stress disorder, obsessive-compulsive disorder, and the substance use disorders. Assessment of the childhood disorders in part 2 was limited to respondents in the age range 18 to 44 years based on concerns about recall bias among older respondents. Because all but 1 of the impulse control disorders were assessed only among respondents in the age range 18 to 44 years, overall prevalence of any impulse control disorder was limited to that age range, leading to a much higher prevalence estimate than in a previously reported aggregate analysis (where prevalence was reported for the total sample).[8] *DSM-IV* organic exclusion rules were used in making diagnoses. Diagnostic hierarchy rules were also used in making all diagnoses other than substance use disorders, where abuse

was defined with or without dependence in recognition of abuse often being a stage in the progression to dependence. Hierarchy-free diagnoses were consistently used in analyses of comorbidity. As described elsewhere,[12] blind clinical reinterviews using the Structured Clinical Interview for *DSM-IV* (SCID)[16] with a probability subsample of NCS-R respondents found generally good concordance between WMH-CIDI diagnoses and SCID diagnoses.

### Severity

Twelve-month cases were classified as serious if they had any of the following: a 12-month suicide attempt with serious lethality intent; work disability or substantial limitation due to a mental or substance disorder; positive screen results for nonaffective psychosis; bipolar I or II disorder; substance dependence with serious role impairment (as defined by disorder-specific impairment questions); an impulse control disorder with repeated serious violence; or any disorder that resulted in 30 or more days out of role in the year. Cases not defined as serious were defined as moderate if they had any of the following: suicide gesture, plan, or ideation; substance dependence without serious role impairment; at least moderate work limitation due to a mental or substance disorder; or any disorder with at least moderate role impairment in 2 or more domains of the Sheehan Disability Scale.[17] (The Sheehan Disability Scale assessed disability in work role performance, household maintenance, social life, and intimate relationships on 0-10 visual analog scales with verbal descriptors and associated scale scores of none, 0; mild, 1-3; moderate, 4-6; severe, 7-9; and very severe, 10.) All other cases were classified as mild. This classification scheme is somewhat more refined than the one used in comparative analyses of all WMH surveys[8] owing to the NCS-R having more detailed information than the other WMH surveys. To assess the meaning of the severity ratings, we compared number of days in the past 12 months respondents were totally unable to carry out their normal daily activities because of mental or substance problems. The mean of this variable was significantly higher ($F_{2,3689}=17.7$; $P<.001$) among respondents classified as serious (88.3) than those classified as moderate (4.7) or mild (1.9).

### Sociodemographic Correlates

Sociodemographic correlates include cohort (defined by age at interview in categories 18-29 years, 30-44 years, 45-59 years, and ≥60 years), sex, race/ethnicity (non-Hispanic white, non-Hispanic black, Hispanic, and other), completed years of education (0-11 years, 12 years, 13-15 years, and ≥16 years), marital status (married or cohabitating, previously married, and never married), family income, and urbanicity. Family income was defined in relation to the federal poverty line.[18] Low income was less than or equal to 1.5 times the poverty line, low average was more than 1.5 to 3 times the poverty line, high average was more than 3 to 6 times the poverty line, and high was greater than 6 times the poverty line. Urbanicity was coded according to 2000 census definitions[19] and distinguished large (at least 2 million residents) vs smaller metropolitan statistical areas by central cities, suburbs, adjacent areas (areas outside the suburban belt but within 50 miles of the central business district of a central city), and rural areas (more than 50 miles from the central business district of a central city).

### ANALYSIS METHODS

Weights were used to adjust for differences in within-household probability of selection, nonresponse, and differ-

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

ences between the sample and the 2000 census on sociodemographic variables. As described in more detail elsewhere,[13] sociodemographic matching was based on the full 2000 census (which includes non-English speakers and nonhousehold residents, who were excluded from the NCS-R sample) because it was impractical to refine the 2000 census data to have the same restrictions as the NCS-R while still using tract-level census geocode data to adjust for geographic variation in nonresponse. This failure to make exclusions from the census data comparable with those in the NCS-R introduced a small bias into the last part of the weight adjustment.

Prevalence and severity were estimated by calculating means for dichotomous variables. Standard errors were obtained using the Taylor series linearization method[20] implemented in the SUDAAN software system to adjust for the effects of weighting and clustering on the precision of estimates.[21] Comorbidity was studied initially by calculating tetrachoric correlations of disorders among part 2 respondents aged 18 to 44 years. The restriction to part 2 was because some disorders were only assessed in part 2, and the restriction to ages 18 to 44 years was because childhood disorders were assessed only in that age range. Exploratory factor analysis, implemented in SAS version 8.2,[22] was used to reduce the dimensionality of the correlation matrix.

The additivity of associations among the 19 WMH-CIDI disorders was investigated by using log-linear analysis to evaluate the fit of a saturated 2-way marginal model to the $2^{19}$ logically possible multivariate profiles of disorders.[23] As described later, this analysis documented significant higher-order interactions among the disorders. Based on this result, latent class analysis (LCA),[24,25] a data reduction method that allows for nonadditive associations among comorbid conditions, was used to study multivariate comorbidity among the NCS-R disorders. Latent class analysis postulates a discrete latent variable defining class membership that explains covariance among observed disorders. When this model holds, the observed cell probabilities in the cross-classification among disorders will equal the product of the within-class marginal disorder probabilities multiplied by the class prevalence and summed across classes. This model contains 1 parameter for the probability of each disorder in each of k classes of the latent variable in addition to k parameters for class prevalence. The latent class model was fit for values of k between 1 and 8 using the iterative-fitting NAG FORTRAN library routine E04UCF[26] and the method of maximum likelihood.[27] The comparative fit of LCA models with successively higher values of k was assessed by evaluating the Bayes Information Criterion.[28]

Sociodemographic correlates were examined by transforming the 7 predicted probabilities of class membership from the LCA solution into logits, the natural logarithm of the odds $p_{ic}/(1-p_{ic})$, where $p_{ic}$ is the probability that respondent $i$ is in class $c$, that were then used as dependent variables in linear regression equations for effects of sociodemographic variables on the odds of class membership. The Taylor series linearization method was used to estimate standard errors. Regression coefficients were exponentiated and interpreted as odds ratios with design-based 95% confidence intervals. Multivariate significance was evaluated with Wald $\chi^2$ tests using Taylor series design-based coefficient variance–covariance matrices. Statistical significance was evaluated using 2-sided, design-based $P<.05$-level tests.

## RESULTS

### PREVALENCE AND SEVERITY

The more prevalent 12-month disorders (**Table 1**) were specific phobia (8.7%), social phobia (6.8%), and major depressive disorder (6.7%). Anxiety disorders were the most prevalent class (18.1%), followed by mood disorders (9.5%), impulse control disorders (8.9%), and substance disorders (3.8%). Twelve-month prevalence of any disorder was 26.2%, with more than half of cases (14.4% of the total sample) meeting criteria for only 1 disorder and smaller proportions, for 2 (5.8%) or more (6.0%) disorders.

Among respondents with a disorder, 22.3% were classified as serious, 37.3% as moderate, and 40.4% as mild. Severity was strongly related to comorbidity; 9.6% of respondents with 1 diagnosis, 25.5% with 2 diagnoses, and 49.9% with 3 or more diagnoses were classified as serious. The distribution of severity was quite different from the distribution of prevalence across classes of disorder; mood disorders had the highest percentage of serious classifications (45.0%) and anxiety disorders, the lowest (22.8%). The anxiety disorder with the highest percentage of serious classifications was obsessive-compulsive disorder (50.6%), while bipolar disorder had the highest percentage of serious classifications (82.9%) among mood disorders; oppositional defiant disorder, the highest (49.6%) among impulse control disorders; and drug dependence, the highest (56.5%) among substance disorders.

## BIVARIATE COMORBIDITY

Tetrachoric correlations between hierarchy-free 12-month disorders (**Table 2**) were almost all positive (98%) and statistically significant (72%). Of only 4 negative correlations, all involved either obsessive-compulsive disorder or separation anxiety disorder, both of which are very uncommon. The 12 highest correlations, each exceeding 0.60, represented well-known syndromes: bipolar disorder (major depressive episode with mania/hypomania), double depression (major depressive episode with dysthymia), anxious depression (major depressive episode with generalized anxiety disorder), comorbid mania/hypomania and attention-deficit/hyperactivity disorder, panic disorder with agoraphobia, comorbid social phobia with agoraphobia, and comorbid substance disorders (both alcohol abuse and dependence with drug abuse and dependence).

Exploratory factor analysis of the correlation matrix was carried out after excluding the disorders associated with negative correlations (obsessive-compulsive disorder and separation anxiety disorder). Two factors had eigenvalues greater than 1 (7.3 and 2.3), while the eigenvalue of the third factor (0.8) was substantially smaller. Both rigid and oblique rotations of the 2-factor solution yielded similar patterns, with high factor loadings on the first factor (Table 2) for internalizing disorders (anxiety disorders, major depressive episode) and on the second factor for externalizing disorders (conduct disorder, substance disorders). Five disorders had factor loadings of 0.30 or higher on both factors (dysthymia, mania/hypomania, oppositional defiant disorder, attention-deficit/hyperactivity disorder, and intermittent explosive disorder), although all 5 had higher loadings on the internalizing than externalizing factor.

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

**Table 1. Twelve-Month Prevalence and Severity of *DSM-IV* and WMH-CIDI Disorders in 9282 Respondents**

| | | Severity | | |
|---|---|---|---|---|
| | **Total** | **Serious** | **Moderate** | **Mild** |
| Anxiety disorders | | | | |
| Panic disorder | 2.7 (0.2) | 44.8 (3.2) | 29.5 (2.7) | 25.7 (2.5) |
| Agoraphobia without panic | 0.8 (0.1) | 40.6 (7.2) | 30.7 (6.4) | 28.7 (8.4) |
| Specific phobia | 8.7 (0.4) | 21.9 (2.0) | 30.0 (2.0) | 48.1 (2.1) |
| Social phobia | 6.8 (0.3) | 29.9 (2.0) | 38.8 (2.5) | 31.3 (2.4) |
| Generalized anxiety disorder | 3.1 (0.2) | 32.3 (2.9) | 44.6 (4.0) | 23.1 (2.9) |
| Posttraumatic stress disorder† | 3.5 (0.3) | 36.6 (3.5) | 33.1 (2.2) | 30.2 (3.4) |
| Obsessive-compulsive disorder‡ | 1.0 (0.3) | 50.6 (12.4) | 34.8 (14.1) | 14.6 (5.7) |
| Separation anxiety disorder§ | 0.9 (0.2) | 43.3 (9.2) | 24.8 (7.5) | 31.9 (12.2) |
| Any anxiety disorder∥ | 18.1 (0.7) | 22.8 (1.5) | 33.7 (1.4) | 43.5 (2.1) |
| Mood disorders | | | | |
| Major depressive disorder | 6.7 (0.3) | 30.4 (1.7) | 50.1 (2.1) | 19.5 (2.1) |
| Dysthymia | 1.5 (0.1) | 49.7 (3.9) | 32.1 (4.0) | 18.2 (3.4) |
| Bipolar I and II disorders | 2.6 (0.2) | 82.9 (3.2) | 17.1 (3.2) | 0 (0) |
| Any mood disorder | 9.5 (0.4) | 45.0 (1.9) | 40.0 (1.7) | 15.0 (1.6) |
| Impulse control disorders | | | | |
| Oppositional defiant disorder§ | 1.0 (0.2) | 49.6 (8.0) | 40.3 (8.7) | 10.1 (4.8) |
| Conduct disorder§ | 1.0 (0.2) | 40.5 (11.1) | 31.6 (7.5) | 28.0 (9.1) |
| Attention-deficit/hyperactivity disorder§ | 4.1 (0.3) | 41.3 (4.3) | 35.2 (3.5) | 23.5 (4.5) |
| Intermittent explosive disorder | 2.6 (0.2) | 23.8 (3.3) | 74.4 (3.5) | 1.7 (0.9) |
| Any impulse control disorder§¶ | 8.9 (0.5) | 32.9 (2.9) | 52.4 (3.0) | 14.7 (2.3) |
| Substance disorders | | | | |
| Alcohol abuse† | 3.1 (0.3) | 28.9 (2.6) | 39.7 (3.7) | 31.5 (3.3) |
| Alcohol dependence† | 1.3 (0.2) | 34.3 (4.5) | 65.7 (4.5) | 0 (0) |
| Drug abuse† | 1.4 (0.1) | 36.6 (5.0) | 30.4 (5.8) | 33.0 (6.8) |
| Drug dependence† | 0.4 (0.1) | 56.5 (8.2) | 43.5 (8.2) | 0 (0) |
| Any substance disorder† | 3.8 (0.3) | 29.6 (2.8) | 37.1 (3.5) | 33.4 (3.2) |
| Any disorder | | | | |
| Any∥ | 26.2 (0.8) | 22.3 (1.3) | 37.3 (1.3) | 40.4 (1.6) |
| 1 disorder∥ | 14.4 (0.6) | 9.6 (1.3) | 31.2 (1.9) | 59.2 (2.3) |
| 2 disorders∥ | 5.8 (0.3) | 25.5 (2.1) | 46.4 (2.6) | 28.2 (2.0) |
| ≥3 disorders∥ | 6.0 (0.3) | 49.9 (2.3) | 43.1 (2.1) | 7.0 (1.3) |

Abbreviation: WMH-CIDI, World Health Organization World Mental Health Survey Initiative version of the Composite International Diagnostic Interview.

*Values are expressed as percentage (standard error). Percentages in the 3 severity columns are repeated as proportions of all cases and sum to 100% across each row.

†Assessed in the part 2 sample (n = 5692).

‡Assessed in a random one third of the part 2 sample (n = 1808).

§Assessed in the part 2 sample among respondents in the age range 18 to 44 years (n = 3199).

∥Estimated in the part 2 sample. No adjustment is made for the fact that 1 or more disorders in the category were not assessed for all part 2 respondents.

¶The estimated prevalence of any impulse control disorder is larger than the sum of the individual disorders because the prevalence of intermittent explosive disorder, the only impulse control disorder that was assessed in the total sample, is reported herein for the total sample rather than for the subsample of respondents among whom the other impulse control disorders were assessed (part 2 respondents in the age range 18-44 years). The estimated prevalence of any impulse control disorder, in comparison, is estimated in the latter subsample. Intermittent explosive disorder had a considerably higher estimated prevalence in this subsample than in the total sample.

## MULTIVARIATE COMORBIDITY

Of the 524 288 ($2^{19}$) logically possible multivariate disorder profiles among the 19 NCS-R disorders, 433 were observed. Nearly 80% involved highly comorbid cases (3 or more disorders) (**Table 3**), accounting for 27% of all respondents with a disorder and 55.9% of all instances of these disorders. Importantly, the distribution of comorbidity was significantly different ($\chi^2_3$=110.2; *P*<.001) from the distribution we would expect to find if the multivariate structure among the disorders was due entirely to the 2-way associations that are the focus of factor analysis. This finding led us to reject the use of confirmatory factor analysis to carry out more in-depth exploration of comorbid profiles. Instead, LCA was used to study nonadditive comorbid profiles. Alcohol abuse

and dependence were collapsed into a single category for purposes of this analysis because their separation violates the LCA assumption of conditional independence within classes. The same was done for drug abuse and dependence. Major depressive episode and dysthymia were collapsed based on their extremely high tetrachoric correlation.

A 7-class LCA model provided the best fit for the data. The 7 classes differed greatly in prevalence (**Table 4**), from 68.5% in class 1 to 0.7% in class 7. Prevalence was inversely related both to number of disorders (Table 4) and severity (Table 4), although there were meaningful inversions between classes 4 and 5. Although subsets of the classes formed a general hierarchy (eg, classes 2, 4, and 6 represent profiles of increasingly comorbid internalizing disorders), some disorders

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

**Table 2. Tetrachoric Correlations Among Hierarchy-Free 12-Month *DSM-IV* and WMH-CIDI Disorders and Factor Loadings From a Principal Axis Factor Analysis of the Correlation Matrix (n = 3199)***

| | Panic Disorder | Agoraphobia | Specific Phobia | Social Phobia | GAD | PTSD | OCD | SAD | MDE | Dysthymia | MHE | ODD | Conduct Disorder | ADHD | IED | Alcohol Abuse | Alcohol Dependence | Drug Abuse | Drug Dependence |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Anxiety disorders** | | | | | | | | | | | | | | | | | | | |
| Panic disorder | 1.0 | | | | | | | | | | | | | | | | | | |
| Agoraphobia | 0.64† | 1.0 | | | | | | | | | | | | | | | | | |
| Specific phobia | 0.49† | 0.57† | 1.0 | | | | | | | | | | | | | | | | |
| Social phobia | 0.48† | 0.68† | 0.50† | 1.0 | | | | | | | | | | | | | | | |
| GAD | 0.46† | 0.45† | 0.35† | 0.47† | 1.0 | | | | | | | | | | | | | | |
| PTSD | 0.49† | 0.47† | 0.44† | 0.43† | 0.44† | 1.0 | | | | | | | | | | | | | |
| OCD‡ | 0.42 | 0.44 | 0.21 | 0.16 | 0.33 | 0.57† | 1.0 | | | | | | | | | | | | |
| SAD | 0.39† | 0.31 | 0.32† | 0.34† | 0.36† | 0.49† | −0.79 | 1.0 | | | | | | | | | | | |
| **Mood disorders** | | | | | | | | | | | | | | | | | | | |
| MDE | 0.48† | 0.52† | 0.43† | 0.52† | 0.62† | 0.50† | 0.42† | 0.37† | 1.0 | | | | | | | | | | |
| Dysthymia | 0.54† | 0.44† | 0.44† | 0.55† | 0.55† | 0.50† | 0.36 | 0.41† | 0.88† | 1.0 | | | | | | | | | |
| MHE | 0.51† | 0.52† | 0.39† | 0.46† | 0.49† | 0.44† | 0.40 | 0.40† | 0.63† | 0.56† | 1.0 | | | | | | | | |
| **Impulse control disorders** | | | | | | | | | | | | | | | | | | | |
| ODD | 0.40† | 0.48† | 0.45† | 0.47† | 0.27† | 0.53† | 0.52 | 0.46† | 0.48† | 0.48† | 0.55† | 1.0 | | | | | | | |
| Conduct disorder | 0.26 | 0.24 | 0.17 | 0.28† | 0.07 | 0.27 | −0.81 | −0.07 | 0.12 | 0.31 | 0.32† | 0.50† | 1.0 | | | | | | |
| ADHD | 0.38† | 0.42† | 0.34† | 0.51† | 0.46† | 0.43† | 0.26 | 0.37† | 0.50† | 0.51† | 0.60† | 0.58† | 0.39† | 1.0 | | | | | |
| IED | 0.32† | 0.35† | 0.27† | 0.30† | 0.31† | 0.21† | 0.25 | 0.29 | 0.39† | 0.36† | 0.43† | 0.37† | 0.42† | 0.38† | 1.0 | | | | |
| **Substance disorders** | | | | | | | | | | | | | | | | | | | |
| Alcohol abuse | 0.27† | 0.22 | 0.10 | 0.22† | 0.25† | 0.27† | 0.31† | 0.09 | 0.24† | 0.33† | 0.37† | 0.29 | 0.40† | 0.27† | 0.41† | 1.0 | | | |
| Alcohol dependence | 0.25 | 0.33 | 0.21† | 0.31† | 0.31† | 0.34† | 0.25 | 0.10 | 0.37† | 0.38† | 0.41† | 0.36 | 0.39 | 0.30 | 0.37† | 1.0† | 1.0 | | |
| Drug abuse | 0.16 | 0.08 | 0.07 | 0.22† | 0.24† | 0.14 | 0.32 | 0.06 | 0.25† | 0.42† | 0.43† | 0.40 | 0.41 | 0.36† | 0.30† | 0.67† | 0.63† | 1.0 | |
| Drug dependence | 0.27 | 0.29 | 0.26 | 0.44† | 0.35† | 0.25 | 0.36 | −0.81† | 0.40† | 0.56† | 0.38† | 0.43 | 0.44 | 0.55† | 0.38† | 0.63† | 0.71† | 1.0† | 1.0 |
| Prevalence | 3.4 | 1.6 | 10.1 | 8.8 | 4.4 | 3.7 | 1.3 | 0.9 | 10.3 | 2.4 | 3.8 | 1.1 | 1.0 | 4.1 | 6.6 | 5.0 | 2.2 | 2.4 | 0.7 |
| Percentage comorbid | 80 | 97 | 62 | 74 | 85 | 75 | 65 | 71 | 76 | 99 | 87 | 93 | 70 | 78 | 70 | 77 | 100 | 79 | 100 |
| Factor 1§ | 0.70 | 0.76 | 0.65 | 0.71 | 0.63 | 0.64 | . . . | . . . | 0.80 | 0.74 | 0.66 | 0.60 | 0.26 | 0.60 | 0.39 | 0.11 | 0.21 | 0.08 | 0.29 |
| Factor 2§ | 0.12 | 0.09 | 0.03 | 0.18 | 0.17 | 0.16 | . . . | . . . | 0.19 | 0.33 | 0.34 | 0.34 | 0.47 | 0.34 | 0.37 | 0.89 | 0.86 | 0.92 | 0.88 |

Abbreviations: ADHD, attention-deficit/hyperactivity disorder; GAD, generalized anxiety disorder; IED, intermittent explosive disorder; MDE, major depressive disorder; MHE, manic/hypomanic disorder; OCD, obsessive-compulsive disorder; ODD, oppositional defiant disorder; PTSD, posttraumatic stress disorder; SAD, separation anxiety disorder; WMH-CIDI, World Health Organization World Mental Health Survey Initiative version of the Composite International Diagnostic Interview.

*Part 2 respondents in the age range 18 to 44 years (n = 3199).

†Significant at the *P*<.05 level, 2-sided test.

‡Assessed in a random one third of the part 2 sample among respondents in the age range 18 to 44 years (n = 1025).

§Varimax rotation

Downloaded from www.archgenpsychiatry.com by Thomas Iedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

were more prevalent in the lower than higher classes (eg, oppositional defiant disorder and conduct disorder were more prevalent in class 2 than class 4, while panic disorder and all 3 types of phobia were more prevalent in class 4 than class 6). These inversions show that the classes are not merely points of density on the 2 factor analysis dimensions.

The 7 LCA classes can be interpreted by examining the mean number ($_d$) and content of within-class disorders. Class 1 represents unaffected respondents ($_d = 0.1$).

Class 2 represents pure ($_d = 1.2$) internalizing disorders. Class 3 represents pure ($_d = 1.2$) externalizing disorders. Class 4 represents comorbid ($_d = 2.9$) internalizing disorders. Class 5 represents comorbid ($_d = 2.0$) internalizing and/or externalizing disorders dominated by comorbid social phobia and attention-deficit/hyperactivity disorder. Class 6 represents highly comorbid ($_d = 4.9$) major depressive episodes. Class 7 represents highly comorbid ($_d = 7.5$) bipolar disorder. Although the classes with high comorbidity (classes 4, 6, and 7) included only about 7% of the sample, 43.6% of serious cases were in these classes.

### SOCIODEMOGRAPHIC CORRELATES

Using the predicted probabilities of LCA class membership as outcomes, correlates of being largely unaffected (class 1) included being male, non-Hispanic black or Hispanic, and married, having a high income, and residing in a rural area (**Table 5**). Correlates of pure internalizing disorders (class 2) include being female and married, having a high education, and residing in the suburbs of small metropolitan areas. Correlates of pure externalizing disorders (class 3) included being young, male, and Hispanic, not having low income, and residing in a rural area. Correlates of comorbid internalizing disorders (class 4) included being female and previously married and residing either in suburbia or in an outlying nonrural area. Correlates of comorbid internalizing and/or externalizing disorders (class 5) included being young, male, and married and resid-

**Table 3. The Distribution of Hierarchy-Free 12-Month DSM-IV and WMH-CIDI Disorders in 3199 Respondents***

| | Respondents | Cases | Diagnoses† | Profiles‡ |
|---|---|---|---|---|
| No. of disorders | | | | |
| 0 | 66.4 (0.9) | ... | ... | ... |
| 1 | 16.9 (0.7) | 50.3 (1.5) | 23.2 (1.4) | 3.9 |
| 2 | 7.6 (0.4) | 22.7 (1.2) | 20.9 (1.4) | 17.1 |
| ≥3 | 9.1 (0.6) | 27.0 (1.8) | 55.9 (2.4) | 79.0 |

Abbreviations: NCS-R, National Comorbidity Survey Replication; WMH-CIDI, World Health Organization World Mental Health Survey Initiative version of the Composite International Diagnostic Interview.
*Part 2 NCS-R respondents in the age range 18 to 44 years. Values are expressed as percentage (standard error).
†The proportion of respondents with more than 2 diagnoses ranged from 3.8% with exactly 3 to 0.03% with 15 and averaged 4.5 diagnoses per respondent with more than 2 diagnoses. When the diagnosis is taken as the unit of analysis, the numbers in this column show that more than half of all 12-month diagnoses occurred to respondents with 3 or more disorders.
‡The 19 disorders generate 2¹⁹ (524 288) logically possible multivariate disorder profiles, of which 433 are observed in the sample of part 2 respondents in the age range 18 to 44 years.

**Table 4. Conditional Probabilities and Distributions of Hierarchy-Free 12-Month DSM-IV and WMH-CIDI Disorders Based on a 7-Class Latent Class Analysis (n = 3199)***

| | Class 1 | Class 2 | Class 3 | Class 4 | Class 5 | Class 6 | Class 7 |
|---|---|---|---|---|---|---|---|
| Within-class disorder prevalences | | | | | | | |
| Panic disorder | 0.9 | 1.5 | 2.5 | 32.8 | 0 | 10.9 | 73.0 |
| Agoraphobia | 0 | 0 | 0 | 23.7 | 1.5 | 3.0 | 45.8 |
| Specific phobia | 4.8 | 15.6 | 2.0 | 53.0 | 25.4 | 36.0 | 83.9 |
| Social phobia | 2.1 | 15.9 | 3.6 | 51.3 | 40.2 | 41.0 | 88.4 |
| Generalized anxiety disorder | 0.1 | 13.2 | 3.5 | 23.2 | 0 | 38.6 | 50.5 |
| Posttraumatic stress disorder | 1.0 | 5.8 | 1.5 | 19.5 | 14.1 | 22.8 | 54.8 |
| Major depressive episode/dysthymia | 0 | 40.7 | 5.3 | 40.7 | 0 | 94.6 | 89.3 |
| Manic/hypomanic episode | 0 | 6.5 | 11.1 | 10.2 | 0 | 54.1 | 93.8 |
| Oppositional defiant disorder | 0 | 1.1 | 1.3 | 0.7 | 15.9 | 11.7 | 39.3 |
| Conduct disorder | 0.3 | 0.3 | 3.0 | 0 | 15.0 | 6.7 | 11.9 |
| Attention-deficit/hyperactivity disorder | 0.9 | 5.9 | 0 | 7.7 | 39.0 | 56.2 | 64.0 |
| Intermittent explosive disorder | 1.4 | 12.7 | 22.1 | 14.6 | 21.8 | 40.5 | 45.1 |
| Alcohol abuse or dependence | 0.2 | 0 | 43.6 | 13.2 | 14.4 | 42.5 | 5.6 |
| Drug abuse or dependence | 0 | 0 | 21.5 | 0 | 11.9 | 31.2 | 5.2 |
| Class prevalence | 68.5 | 14.5 | 7.4 | 5.0 | 2.3 | 1.6 | 0.5 |
| Within-class disorder distributions, No. | | | | | | | |
| 0 | 88.9 | 25.7 | 24.4 | 2.6 | 9.7 | 0 | 0.9 |
| 1 | 10.5 | 40.1 | 40.9 | 12.2 | 26.1 | 0.8 | 0.2 |
| 2 | 0.6 | 25.4 | 25.6 | 27.0 | 35.2 | 4.2 | 0 |
| ≥3 | 0 | 8.9 | 9.1 | 58.2 | 29.0 | 95.0 | 98.8 |
| Within-class severity distributions | | | | | | | |
| None | 86.8 | 25.1 | 23.8 | 2.6 | 9.5 | 0 | 0.9 |
| Mild | 7.6 | 22.7 | 28.5 | 23.2 | 30.7 | 1.3 | 0.2 |
| Moderate | 4.5 | 37.3 | 30.7 | 40.0 | 44.5 | 28.1 | 5.2 |
| Serious | 1.1 | 14.9 | 17.0 | 34.2 | 15.2 | 70.5 | 93.8 |

Abbreviation: WMH-CIDI, World Health Organization World Mental Health Survey Initiative version of the Composite International Diagnostic Interview.
*Part 2 respondents in the age range 18 to 44 years. Values are expressed as percentages.

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

**Table 5. Sociodemographic Correlates (Odds Ratios) of Latent Class Analysis Class Membership Probabilities (n = 3199)\***

| | Class 1 | Class 2 | Class 3 | Class 4 | Class 5 | Class 6 | Class 7 |
|---|---|---|---|---|---|---|---|
| **Age, y** | | | | | | | |
| 18-29 | 0.9 (0.7-1.1) | 0.9 (0.7-1.0) | 1.4 (1.2-1.6)† | 0.8 (0.7-1.0) | 1.4 (1.2-1.7)† | 1.1 (0.8-1.4) | 1.0 (0.9-1.1) |
| 30-44 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| $\chi_1^2$ | 1.9 | 2.4 | 15.5† | 3.1 | 14.2† | 0.3 | 0.4 |
| **Sex** | | | | | | | |
| Female | 0.7 (0.6-0.9)† | 1.6 (1.4-1.8)† | 0.6 (0.5-0.7)† | 1.9 (1.7-2.2)† | 0.6 (0.6-0.7)† | 1.4 (1.1-1.7)† | 1.1 (0.9-1.2) |
| Male | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| $\chi_1^2$ | 9.3† | 52.2† | 51.3† | 87.0† | 46.1† | 9.5† | 1.0 |
| **Race/ethnicity** | | | | | | | |
| Non-Hispanic white | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Non-Hispanic black | 2.1 (1.4-3.0)† | 1.2 (1.0-1.4) | 0.9 (0.8-1.1) | 0.9 (0.7-1.0) | 1.2 (1.0-1.4) | 0.5 (0.4-0.7)† | 1.1 (0.9-1.2) |
| Hispanic | 2.0 (1.3-3.0)† | 1.0 (0.8-1.2) | 1.3 (1.0-1.7)† | 0.9 (0.7-1.1) | 1.1 (0.9-1.3) | 0.5 (0.4-0.8)† | 0.9 (0.8-1.0) |
| Other | 0.9 (0.4-1.8) | 1.0 (0.7-1.3) | 0.8 (0.6-1.1) | 0.9 (0.7-1.3) | 1.4 (0.9-2.0) | 1.1 (0.6-2.1) | 1.2 (0.9-1.5) |
| $\chi_3^2$ | 23.4† | 4.4 | 7.8† | 3.3 | 6.2 | 32.7† | 5.9 |
| **Education, y** | | | | | | | |
| 0-11 | 0.3 (0.2-0.5)† | 0.7 (0.5-1.0)† | 1.0 (0.7-1.3) | 1.2 (1.0-1.6) | 1.0 (0.7-1.3) | 2.6 (1.7-4.0)† | 1.1 (0.9-1.4) |
| 12 | 0.5 (0.4-0.8)† | 0.8 (0.7-0.9)† | 1.0 (0.8-1.3) | 1.0 (0.8-1.3) | 1.0 (0.8-1.2) | 1.6 (1.2-2.2)† | 1.2 (1.0-1.3)† |
| 13-15 | 0.6 (0.4-0.9)† | 0.9 (0.8-1.1) | 1.0 (0.9-1.2) | 1.2 (1.0-1.5) | 1.0 (0.8-1.2) | 1.4 (1.1-1.9)† | 1.0 (0.9-1.1) |
| ≥16 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| $\chi_3^2$ | 25.2† | 18.5† | 0.4 | 5.9 | 0.6 | 21.2† | 7.8 |
| **Marital status** | | | | | | | |
| Married or cohabitating | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Previously married | 0.2 (0.1-0.4)† | 0.9 (0.7-1.1) | 0.8 (0.6-1.2) | 1.7 (1.2-2.3)† | 0.6 (0.5-0.9)† | 3.0 (1.9-4.8)† | 1.2 (0.9-1.6) |
| Never married | 0.6 (0.4-0.8)† | 0.8 (0.7-0.9)† | 1.2 (1.0-1.5) | 1.1 (0.9-1.3) | 0.7 (0.6-0.9)† | 1.5 (1.1-2.0)† | 1.0 (0.8-1.2) |
| $\chi_2^2$ | 32.5† | 9.1† | 6.1† | 8.8† | 13.3† | 28.0† | 1.7 |
| **Family income‡** | | | | | | | |
| Low | 0.7 (0.4-1.2) | 1.0 (0.7-1.3) | 0.7 (0.6-0.9)† | 1.2 (0.9-1.6) | 1.0 (0.8-1.2) | 1.4 (0.9-2.1) | 1.2 (1.0-1.5) |
| Low average | 0.6 (0.4-1.0)† | 1.0 (0.8-1.3) | 0.9 (0.7-1.1) | 1.2 (0.9-1.6) | 0.9 (0.7-1.2) | 1.4 (1.0-2.0) | 1.1 (0.9-1.3) |
| High average | 0.7 (0.5-1.0)† | 1.0 (0.8-1.2) | 1.0 (0.8-1.3) | 1.2 (0.9-1.5) | 1.0 (0.8-1.3) | 1.4 (1.0-1.8)† | 1.0 (0.9-1.1) |
| High | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| $\chi_3^2$ | 6.4 | 0.2 | 9.4† | 2.7 | 1.7 | 7.3 | 3.5 |
| **County urbanicity§** | | | | | | | |
| Central city ≥2 million residents | 0.6 (0.4-0.8)† | 1.0 (0.8-1.3) | 0.7 (0.6-0.9)† | 1.0 (0.8-1.3) | 1.6 (1.3-2.0)† | 2.0 (1.4-2.8)† | 1.2 (1.1-1.4)† |
| Central city <2 million residents | 0.6 (0.4-1.0)† | 1.1 (1.0-1.4) | 0.7 (0.6-0.9)† | 1.1 (0.9-1.3) | 1.6 (1.4-1.8)† | 1.6 (1.2-2.2)† | 1.3 (1.1-1.4)† |
| Suburbs of central city ≥2 million residents | 0.6 (0.4-0.8)† | 1.1 (0.8-1.5) | 0.7 (0.6-0.9)† | 1.3 (1.1-1.6)† | 1.6 (1.3-1.9)† | 1.7 (1.3-2.3)† | 1.2 (1.0-1.5)† |
| Suburbs of central city <2 million residents | 0.5 (0.3-0.8)† | 1.3 (1.1-1.6)† | 0.6 (0.5-0.8)† | 1.4 (1.1-1.7)† | 1.6 (1.4-1.9)† | 2.1 (1.5-2.9)† | 1.2 (1.0-1.4)† |
| Adjacent area | 0.6 (0.4-0.8)† | 1.1 (1.0-1.4) | 0.7 (0.6-0.8)† | 1.2 (1.0-1.5)† | 1.6 (1.2-2.0)† | 1.7 (1.3-2.1)† | 1.1 (1.0-1.3) |
| Rural area | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| $\chi_5^2$ | 19.6† | 9.0 | 40.2† | 12.6† | 74.4† | 41.6† | 23.0† |

\*Part 2 respondents in the age range 18 to 44 years. Values are expressed as odds ratio (95% confidence interval).
†Significant at the *P*<.05 level, 2-sided test.
‡Family income is defined in relation to the official federal poverty line for families of the size and composition of the respondent's family.[18] Low income is defined as less than or equal to 1.5 times the poverty line, low average as more than 1.5 to 3 times the poverty line, high average as more than 3 to 6 times the poverty line, and high as greater than 6 times the poverty line.
§Coded according to the 2000 census definitions.[19] Central cities and suburbs are defined by the Census Bureau for each consolidated metropolitan statistical area and metropolitan statistical area in the United States. Adjacent areas are defined as all areas beyond the outer boundary of the suburban belt but within 50 miles of the central business district of a central city. Rural areas include all territory more than 50 miles from the central business district of a central city.

ing in a nonrural area. Correlates of highly comorbid major depression (class 6) included being female, non-Hispanic white or other non-Hispanic/nonblack race/ethnicity, and unmarried, having low education and less than high income, and residing in a nonrural area. Correlates of highly comorbid bipolar disorder (class 7) included termination of schooling with the completion of high school and residing in cities or suburbs. Sociodemographic variation was strongest in predicting either being unaffected (class 1) or having highly comorbid major depression (class 6). Sociodemographic variation was weakest in predicting pure inter-

nalizing disorders (class 2) and highly comorbid bipolar disorder (class 7).

## COMMENT

Four limitations of the NCS-R are relevant to the analyses reported herein. First, the sample underrepresents several important population segments, including the homeless, those in institutions, and those who cannot speak English. The first 2 of these exclusions reduce prevalence estimates. In addition, those with mental illness

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

might be more reluctant than others to participate in a mental health survey. This is relevant because the 70.9% response rate means that nearly 30% of eligible respondents are not represented in the sample. Evidence for selection bias related to mental illness has been reported in other community surveys,[29-31] although no evidence for it was found in an NCS-R nonresponse survey.[13] To the extent that this bias exists, it will make NCS-R estimates conservative.

Second, participants might have underreported 12-month prevalence. This possibility is consistent with evidence in the methodological evidence that embarrassing behaviors are often underreported.[32] Experimental studies show that this underreporting bias can be reduced by using strategies aimed at decreasing embarrassment,[3,33] a number of which were used in the NCS-R.[10] To the extent that these strategies were unsuccessful, the NCS-R estimates are likely to be conservative.

Third, the WMH-CIDI is a lay-administered interview. However, as reported elsewhere,[13] a clinical reappraisal study using the SCID[36] found generally good individual-level concordance between the WMH-CIDI and SCID and conservative estimates of prevalence compared with the SCID.

Fourth, the NCS-R did not include all *DSM-IV* diagnoses. Schizophrenia and other nonaffective psychoses are notably missing. Nonaffective psychoses were excluded from the NCS-R core because previous studies have shown they are dramatically overestimated in lay-administered interviews.[34-38] These same studies showed that the vast majority of respondents with nonaffective psychoses met criteria for CIDI anxiety, mood, or substance disorders and were consequently captured as cases. However, if severity is underestimated in the WMH-CIDI, results will be conservative.

Within the context of these limitations, NCS-R results are generally consistent with the earlier Epidemiologic Catchment Area (ECA) Study and National Comorbidity Survey (NCS)[1] in finding 12-month mental disorders to be highly prevalent. The 26.2% estimate of any disorder in the NCS-R is very close to estimates of 28.1% in the ECA[2] Study and 29.5% in the NCS.[1] However, this great similarity should not be overinterpreted, because the 3 surveys differed greatly in sampling frames, age ranges, diagnostic systems used to define disorders, and measures and it is impossible to draw firm conclusions about time trends in prevalence from these comparisons. In light of these different design elements, the 3 most prevalent NCS-R disorders (specific phobia, social phobia, and major depressive disorder) are identical to the 3 most prevalent disorders in the NCS and to 2 of the 3 in the ECA Study. The exception is social phobia, which was not comprehensively assessed in the ECA Study.

The NCS-R findings that anxiety disorders are more prevalent than mood disorders and that mood disorders are more prevalent than substance disorders are also consistent with both ECA Study and NCS findings. The NCS-R prevalence estimates can also be directly compared with those in more than a dozen countries that participated in the World Health Organization WMH Survey Initiative.[8] The NCS-R prevalence estimates are consistently higher than in these other countries. However, as with the ECA

Study and NCS, within-country differences in disorder prevalence in the NCS-R are quite similar to those reported so far in other WMH countries.[39,40]

The externalizing disorders in NCS-R have been much less well studied than anxiety, mood, and substance disorders in previous adult surveys. The limited evidence on intermittent explosive disorder[41] is consistent with the NCS-R prevalence estimate of 2.6%, but we are aware of no comparable information on other impulse control disorders among adults. These disorders are routinely assessed in surveys of children.[42-44] The NCS-R 12-month prevalence estimates of all but 1 of the childhood-onset impulse disorders are much smaller than in surveys of youth. The exception is attention-deficit/hyperactivity disorder, with 12-month NCS-R prevalence approximately 50% as high as the estimates in surveys of youth. This is consistent with independent evidence that as many as half of children with attention-deficit/hyperactivity disorder continue to have symptoms as adults.[45]

The NCS-R results regarding severity support the secondary analyses in showing that many mental disorders are mild. Indeed, nearly twice as high a proportion of NCS-R cases were mild (40.4%) as opposed to serious (22.3%). Nonetheless, the 14.0% of respondents with serious or moderate disorder is substantial. The 5.7% with a serious disorder (22.3% of the 26.2% overall prevalence) is almost identical to the estimated prevalence of *serious mental illness*, using the Substance Abuse and Mental Health Services Administration definition of the term, in the baseline NCS.[46] The finding that mood disorders are more likely than anxiety disorders to be classified as serious is consistent with a cross-national comparative analysis of 5 earlier CIDI surveys that used a less precise measure of severity[7] as well as with the results of the more recent WMH surveys.[8]

Patterns of bivariate comorbidity are broadly consistent with the ECA Study and NCS in showing the vast majority of disorders positively correlated. Relative magnitudes of associations are also quite similar across the 3 surveys, with high rank-order correlations of odds ratios among comorbid pairs in the NCS vs published odds ratios[47] in both the NCS (0.79) and the ECA Study (0.57). Major internal patterns of comorbidity are also quite consistent across surveys, such as the stronger odds ratios within the mood disorders than the anxiety disorders, very high odds ratios between anxiety and mood disorders, and odds ratios between anxiety and mood disorders generally being higher than between pairs of anxiety disorders.

The factor analysis found a very similar 2-dimensional solution as in the NCS.[48] A similar structure was found in a study of comorbidity among primary care patients.[49] However, the log-linear analysis showed clearly that powerful interactions exist among NCS-R disorders that are not captured by the additive model on which factor analysis is based. Latent class analysis was used to study these profiles. This is a departure from the confirmatory factor analysis approach used in other recent studies of comorbidity.[48-50] The LCA results documented progression within and overlap between internalizing and externalizing disorders, with a clear divergence from a simple 2-dimensional progression due to panic and pho-

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

bia being considerably more prevalent in the comorbid internalizing class than in the highly comorbid internalizing and externalizing classes. This is an intriguing specification that was also found a decade ago in an LCA analysis of the NCS data.[51] It is conceivable that this pattern reflects a protective effect of comorbid panic and phobias against externalizing disorders, possibly through risk aversion.

The NCS-R LCA results share several other features with the earlier NCS LCA results. Both include separate classes of pure and comorbid internalizing disorders with low prevalence of bipolarity. Both have highly comorbid classes with a small proportion of the sample (4.9% in NCS and 7.3% in NCS-R) having a high concentration of severe cases. The implicit progression among these classes warrants a more fine-grained investigation of transitions in lifetime comorbidity. Such an investigation goes beyond the scope of the current report.

The results regarding sociodemographic correlates are broadly consistent with previous surveys in finding that mental disorders (ie, low probability of membership in latent class 1) are associated with a general pattern of disadvantaged social status, including being female, unmarried, and having low socioeconomic status.[8,52-59] The finding that non-Hispanic black and Hispanic individuals have significantly lower risk of disorders is inconsistent with this general pattern, but the same relationship was found in the baseline NCS.[1] It is not clear whether the associations of achieved social statuses (ie, marital status, socioeconomic status) with prevalence are due to effects of environmental experiences on mental disorders, effects of mental disorders on achieved social status, unmeasured common biological causes, or some combination. In the case of the ascribed social statuses (ie, sex and race/ethnicity), the causal effects clearly flow from the statuses and their correlates to the disorders, although the relative importance of environmental and biological mediators is unclear. The significant associations of race/ethnicity, marital status, education, and income with positive disorder classes are largely confined to predicting highly comorbid major depression (class 6). This means the associations of these important sociodemographic variables with 12-month *DSM-IV* disorders are due largely to effects on a comparatively rare (16% of the population) profile of high comorbidity.

---

## CONCLUSION

The NCS-R results show 12-month *DSM-IV* disorders to be highly prevalent in the United States. Although more than one third of cases were mild, the prevalence of moderate and serious cases was substantial (14.0% of the population). Although anxiety disorders were by far the most common mental disorders, the proportion of serious cases was lower than for other classes of disorder. Mood disorders were the next most common and had the highest proportion of serious cases. Impulse control disorders, which have been neglected in previous epidemiological studies of adult mental disorders, were found in more than one third of cases and had a higher proportion of serious cases than either anxiety or substance disorders.

More than 40% of 12-month cases were comorbid. Multivariate comorbidity profiles generally conformed to a 2-dimensional model of progression and overlapped between internalizing and externalizing disorders but with notable exceptions that were masked in conventional additive analysis. Severity was strongly related to comorbidity. Many of the most consistently documented sociodemographic correlates of disorder were related largely to a relatively small proportion of the population made up of people with highly comorbid major depression. Clarification of the implications of these results for public health interventions requires more dynamic analysis of the lifetime onset and cumulation of comorbid disorders.

**Submitted for Publication:** June 9, 2004; final revision received October 1, 2004; accepted November 9, 2004.
**Correspondence:** Ronald C. Kessler, PhD, Department of Health Care Policy, Harvard Medical School, 180 Longwood Ave, Boston, MA 02115 (ncs@hcp.med.harvard .edu).
**Funding/Support:** The National Comorbidity Survey Replication (NCS-R) is supported by grant U01-MH60220 from the National Institute of Mental Health (NIMH), Bethesda, Md, with supplemental support from the National Institute of Drug Abuse (NIDA), Bethesda; the Substance Abuse and Mental Health Services Administration, Bethesda; grant 044708 from The Robert Wood Johnson Foundation, Princeton, NJ; and the John W. Alden Trust, Boston.
**Disclaimer:** The views and opinions expressed in this report are those of the authors and should not be construed to represent the views of any of the sponsoring organizations, agencies, or US government.
**Additional Information:** Collaborating investigators include Ronald C. Kessler (principal investigator, Harvard Medical School), Kathleen Merikangas (coprincipal investigator, NIMH), Doreen Koretz (Harvard University, Cambridge, Mass), James Anthony (Michigan State University, East Lansing), William Eaton (The Johns Hopkins University, Baltimore, Md), Meyer Glantz (NIDA), Jane McLeod (Indiana University, Bloomington), Mark Olfson (New York State Psychiatric Institute, College of Physicians and Surgeons of Columbia University, NY), Harold Pincus (University of Pittsburgh, Pittsburgh, Pa), Greg Simon (Group Health Cooperative, Seattle, Wash), Michael Von Korff (Group Health Cooperative), Philip Wang (Harvard Medical School), Kenneth Wells (University of California, Los Angeles), Elaine Wethington (Cornell University, Ithaca, NY), and Hans-Ulrich Wittchen (Institute of Psychology, Technical University Dresden, Dresden, Germany, and Max Planck Institute of Psychiatry, Munich, Germany). A complete list of NCS publications and the full text of all NCS-R instruments can be found at http://www.hcp.med.harvard .edu/ncs. Send correspondence to ncs@hcp.med.harvard .edu. The NCS-R is carried out in conjunction with the World Mental Health (WMH) Survey Initiative. These activities were supported by grant R01 MH070884 from NIMH; the John D. and Catherine T. MacArthur Foundation, Chicago, Ill; the Pfizer Foundation, New York; grants R13-MH066849, R01-MH069864, and R01

---

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

DA016558 from the US Public Health Service, Washington, DC; grant FIRCA R01-TW006481 from the Fogarty International Center, Bethesda; the Pan American Health Organization, Washington, DC; Eli Lilly and Company, Indianapolis, Ind; Ortho-McNeil Pharmaceutical, Inc, Raritan, NJ; GlaxoSmithKline, Research Triangle Park, NC; and Bristol-Myers Squibb, New York. A complete list of WMH publications and instruments can be found at http://www.hcp.med.harvard.edu/wmh.

**Acknowledgment:** We thank Jerry Garcia, BA, Sara Belopavlovich, BA, Eric Bourke, BA, and Todd Strauss, MAT, for assistance with manuscript preparation and the staff of the WMH Data Collection and Data Analysis Coordination Centres for assistance with instrumentation, fieldwork, and consultation on data analysis. We appreciate the helpful comments of William Eaton, PhD, Kathleen Merikangas, PhD, Michael Von Korff, ScD, and Hans-Ulrich Wittchen, PhD, on earlier manuscript drafts.

## REFERENCES

1. Kessler RC, McGonagle KA, Zhao S, Nelson CB, Hughes M, Eshleman S, Wittchen HU, Kendler KS. Lifetime and 12-month prevalence of *DSM-III-R* psychiatric disorders in the United States: results from the National Comorbidity Survey. *Arch Gen Psychiatry.* 1994;51:8-19.

2. Regier DA, Kaelber CT, Rae DS, Farmer ME, Knauper B, Kessler RC, Norquist GS. Limitations of diagnostic criteria and assessment instruments for mental disorders: implications for research and policy. *Arch Gen Psychiatry.* 1998;55:109-115.

3. Kessler RC, Wittchen H-U, Abelson JM, McGonagle KA, Schwarz N, Kendler KS, Knäuper B, Zhao S. Methodological studies of the Composite International Diagnostic Interview (CIDI) in the US National Comorbidity Survey. *Int J Methods Psychiatr Res.* 1998;7:33-55.

4. Kessler RC, Berglund PA, Bruce ML, Koch JR, Laska EM, Leaf PJ, Manderscheid RW, Rosenheck RA, Walters EE, Wang PS. The prevalence and correlates of untreated serious mental illness. *Health Serv Res.* 2001;36:987-1007.

5. Kessler RC, Zhao S, Katz SJ, Kouzis AC, Frank RG, Edlund M, Leaf P. Past-year use of outpatient services for psychiatric problems in the National Comorbidity Survey. *Am J Psychiatry.* 1999;156:115-123.

6. Narrow WE, Rae DS, Robins LN, Regier DA. Revised prevalence estimates of mental disorders in the United States: using a clinical significance criterion to reconcile 2 surveys' estimates. *Arch Gen Psychiatry.* 2002;59:115-123.

7. Bijl RV, de Graaf R, Hiripi E, Kessler RC, Kohn R, Offord DR, Ustun TB, Vicente B, Vollebergh WA, Walters EE, Wittchen HU. The prevalence of treated and untreated mental disorders in five countries. *Health Aff (Millwood).* 2003;22:122-133.

8. Demyttenaere K, Bruffaerts R, Posada-Villa J, Gasquet I, Kovess V, Lepine JP, Angermeyer MC, Bernert S, de Girolamo G, Morosini P, Polidori G, Kikkawa T, Kawakami N, Ono Y, Takeshima T, Uda H, Karam EG, Fayyad JA, Karam AN, Mneimneh ZN, Medina-Mora ME, Borges G, Lara C, de Graaf R, Ormel J, Gureje O, Shen Y, Huang Y, Zhang M, Alonso J, Haro JM, Vilagut G, Bromet EJ, Gluzman S, Webb C, Kessler RC, Merikangas KR, Anthony JC, Von Korff MR, Wang PS, Brugha TS, Aguilar-Gaxiola S, Lee S, Heeringa S, Pennell BE, Zaslavsky AM, Ustun TB, Chatterji S; WHO World Mental Health Survey Consortium. Prevalence, severity and unmet need for treatment of mental disorders in the World Health Organization World Mental Health surveys. *JAMA.* 2004;291:2581-2590.

9. Robins LN, Wing J, Wittchen H-U, Helzer JE. An epidemiologic instrument suitable for use in conjunction with different diagnostic systems and in different cultures. *Arch Gen Psychiatry.* 1988;45:1069-1077.

10. Kessler RC, Ustun TB. The World Mental Health (WMH) survey initiative version of the World Health Organization (WHO) Composite International Diagnostic Interview (CIDI). *Int J Methods Psychiatr Res.* 2004;13:93-121.

11. Kessler RC, Merikangas KR. The National Comorbidity Survey Replication (NCS-R): background and aims. *Int J Methods Psychiatr Res.* 2004;13:60-68.

12. Kessler RC, Berglund P, Demler O, Jin R, Walters EE. Lifetime prevalence and age-of-onset distributions of *DSM-IV* disorders in the National Comorbidity Survey Replication. *Arch Gen Psychiatry.* 2005;62:593-602.

13. Kessler RC, Berglund P, Chiu W-T, Demler O, Heeringa S, Hiripi E, Jin R, Pennell BE, Walters EE, Zaslavsky A, Zheng H. The US National Comorbidity Survey Replication (NCS-R): design and field procedures. *Int J Methods Psychiatr Res.* 2004;13:69-92.

14. World Health Organization. *International Classification of Diseases, 10th Revision (ICD-10).* Geneva, Switzerland: World Health Organization; 1992.

15. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.* Washington, DC: American Psychiatric Association; 1994.

16. First MB, Spitzer RL, Gibbon M, Williams JBW. *Structured Clinical Interview for DSM-IV Axis I Disorders, Research Version, Non-Patient Edition (SCID-I/NP).* New York: Biometrics Research, New York State Psychiatric Institute; 2002.

17. Leon AC, Olfson M, Portera L, Farber L, Sheehan DV. Assessing psychiatric impairment in primary care with the Sheehan Disability Scale. *Int J Psychiatry Med.* 1997;27:93-105.

18. Proctor BD, Dalaker J. Current population reports. In: *Poverty in the United States: 2001.* Washington, DC: US Government Printing Office; 2002.

19. US Census Bureau. *County and City Databook, 2000.* Washington, DC: US Government Printing Office; 2000.

20. Wolter KM. *Introduction to Variance Estimation.* New York, NY: Springer-Verlag; 1985.

21. SUDAAN. *Professional Software for Survey Data Analysis. Version 8.0.1.* Research Triangle Park, NC: Research Triangle Institute; 2002.

22. SAS Institute Inc. *SAS/STAT Software: Changes and Enhancements, Release 8.2.* Cary, NC: SAS Publishing; 2001.

23. McCutcheon AL, Mills C. Categorical data analysis: log-linear and latent class models. In: Scarbrough E, Tanenbaum E, eds. *Research Strategies in the Social Sciences: a Guide to New Approaches.* New York, NY: Oxford University Press; 1998:71-94.

24. Lazarsfeld PR, Henry NW. *Latent Structure Analysis.* Boston, Mass: Houghton-Mifflin; 1968.

25. Hagenaars JA, McCutcheon AL. *Applied Latent Class Analysis.* New York, NY: Cambridge University Press; 2002.

26. Numerical Approximation Group. *Nag FORTRAN Library Introductory Guide.* Downers Grove, Ill: Nag Inc; 1990.

27. Eaves LJ, Silberg JL, Hewitt JK, Rutter M, Meyer JM, Neale MC, Pickles A. Analyzing twin resemblance in multisymptom data: genetic applications of a latent class model for symptoms of conduct disorder in juvenile boys. *Behav Genet.* 1993;23:5-19.

28. Lewis SM, Raftery AE. Estimating Bayes factors via posterior simulation with the LaPlace-Metropolis estimator. *J Am Stat Assoc.* 1997;92:648-655.

29. Eaton WW, Anthony JC, Tepper S, Dryman A. Psychopathology and attrition in the Epidemiologic Catchment Area Study. *Am J Epidemiol.* 1992;135:1051-1059.

30. Allgulander C. Psychoactive drug use in a general population sample, Sweden: correlates with perceived health, psychiatric diagnoses, and mortality in an automated record-linkage study. *Am J Public Health.* 1989;79:1006-1010.

31. Kessler RC, Little RJA, Groves RM. Advances in strategies for minimizing and adjusting for survey nonresponse. *Epidemiol Rev.* 1995;17:192-204.

32. Cannell CF, Marquis KH, Laurent A. A summary of studies of interviewing methodology: 1959-1970 [National Center for Health Statistics Web site]. March 1977. Available at: http://www.cdc.gov/nchs/products/pubs/pubd/series/sr02/100-1 /100-1.htm. Accessed April 15, 2005. Report 69.

33. Turner CF, Ku L, Rogers SM, Lindberg LD, Pleck JH, Sonenstein FL. Adolescent sexual behavior, drug use, and violence: increased reporting with computer survey technology. *Science.* 1998;280:867-873.

34. Bebbington PE, Nayani T. The psychosis screening questionnaire. *Int J Methods Psychiatr Res.* 1995;5:11-19.

35. Eaton WW, Romanoski A, Anthony JC, Nestadt G. Screening for psychosis in the general population with a self-report interview. *J Nerv Ment Dis.* 1991; 179:689-693.

36. Spengler PA, Wittchen H-U. Procedural validity of standardized symptom questions for the assessment of psychotic symptoms: a comparison of the DIS with two clinical methods. *Compr Psychiatry.* 1988;29:309-322.

37. Keith SJ, Regier DA, Rae DS. Schizophrenic disorders. In: *Psychiatric Disorders in America: The Epidemiologic Catchment Area Study.* New York, NY: Free Press; 1991:33-52.

38. Kendler KS, Gallagher TJ, Abelson JM, Kessler RC. Lifetime prevalence, demographic risk factors, and diagnostic validity of nonaffective psychosis as assessed in a US community sample: the National Comorbidity Survey. *Arch Gen Psychiatry.* 1996;53:1022-1031.

39. Alonso J, Angermeyer MC, Bernert S, Bruffaerts R, Brugha TS, Bryson H, Girolamo G. Graaf R, Demyttenaere K, Gasquet I, Haro JM, Katz SJ, Kessler RC, Kovess V, Lepine JP, Ormel J, Polidori G, Russo LJ, Vilagut G, Almansa J, Arbabzadeh-Bouchez S, Autonell J, Bernal M, Buist-Bouwman MA, Codony M, Domingo-Salvany A, Ferrer M, Joo SS, Martinez-Alonso M, Matschinger H, Mazzi F, Morgan J, Morosini P, Palacin C, Romera B, Taub N, Vollebergh WA; ESEMeD/MHEDEA 2000 Investigators, European Study of the Epidemiology of Mental Disorders (ESEMeD) Project. Prevalence of mental disorders in Europe: results

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

from the European Study of the Epidemiology of Mental Disorders (ESEMeD) project. *Acta Psychiatr Scand Suppl.* 2004;420:21-27.

40. Posada Villa JA, Aguilar-Gaxiola S, Magana C, Gomez LC. Prevalencia de trastornos mentales u uso de servicios: resultados preliminares del Estudio Nacional de Salud Mental, Colombia, 2003. *Revista Colombiana de Psiquiatria.* 2004; 33:241-262.

41. Olvera RL. Intermittent explosive disorder: epidemiology, diagnosis and management. *CNS Drugs.* 2002;16:517-526.

42. Costello EJ, Mustillo S, Erkanli A, Keeler G, Angold A. Prevalence and development of psychiatric disorders in childhood and adolescence. *Arch Gen Psychiatry.* 2003;60:837-844.

43. Lahey BB, Schwab-Stone M, Goodman SH, Waldman ID, Canino G, Rathouz PJ, Miller TL, Dennis KD, Bird H, Jensen PS. Age and gender differences in oppositional behavior and conduct problems: a cross-sectional household study of middle childhood and adolescence. *J Abnorm Psychol.* 2000;109:488-503.

44. Scahill L, Schwab-Stone M. Epidemiology of ADHD in school-age children. *Child Adolesc Psychiatr Clin N Am.* 2000;9:541-555.

45. Pary R, Lewis S, Matuschka PR, Rudzinskiy P, Safi M, Lippmann S. Attention deficit disorder in adults. *Ann Clin Psychiatry.* 2002;14:105-111.

46. Kessler RC, Berglund PA, Zhao S, Leaf PJ, Kouzis AC, Bruce ML, Friedman RM, Grosser RC, Kennedy C, Kuehnel TG, Laska EM, Manderscheid RW, Narrow WE, Rosenheck RA, Santoni TW, Schneier M. The 12-month prevalence and correlates of serious mental illness (SMI). In: Manderscheid RW, Sonnenschein MA, eds. *Mental Health, United States, 1996.* Washington, DC: US Government Printing Office; 1996:59-70.

47. Kessler RC. Epidemiology of psychiatric comorbidity. In: Tsuang MT, Tohen M, Zahner GEP, eds. *Textbook in Psychiatric Epidemiology.* New York, NY: John Wiley & Sons; 1995:179-197.

48. Krueger RF. The structure of common mental disorders. *Arch Gen Psychiatry.* 1999;56:921-926.

49. Krueger RF, Chentsova-Dutton YE, Markon KE, Goldberg D, Ormel J. A cross-cultural study of the structure of comorbidity among common psychopathologi-cal syndromes in the general health care setting. *J Abnorm Psychol.* 2003; 112:437-447.

50. Vollebergh WA, Iedema J, Bijl RV, de Graaf R, Smit F, Ormel J. The structure and stability of common mental disorders: the NEMESIS study. *Arch Gen Psychiatry.* 2001;58:597-603.

51. Kessler RC. The prevalence of psychiatric comorbidity. In: Wetzler S, Sanderson WC, eds. *Treatment Strategies for Patients With Psychiatric Comorbidity.* New York, NY: John Wiley & Sons; 1997.

52. Bland RC, Orn H, Newman SC. Lifetime prevalence of psychiatric disorders in Edmonton. *Acta Psychiatr Scand.* 1988;338:24-32.

53. Canino GJ, Bird HR, Shrout PE, Rubio-Stipec M, Bravo M, Martinez R, Sesman M, Guevara LM. The prevalence of specific psychiatric disorders in Puerto Rico. *Arch Gen Psychiatry.* 1987;44:727-735.

54. Hwu HG, Yeh EK, Cheng LY. Prevalence of psychiatric disorders in Taiwan defined by the Chinese diagnostic interview schedule. *Acta Psychiatr Scand.* 1989; 79:136-147.

55. Lee CK, Kwak YS, Yamamoto J, Rhee H, Kim YS, Han JH, Choi JO, Lee YH. Psychiatric epidemiology in Korea, part I: gender and age differences in Seoul. *J Nerv Ment Dis.* 1990;178:242-246.

56. Lépine JP, Lellouch J, Lovell A, Teherani M, Ha C, Verdier-Taillefer MH, Rambourg N, Lempérière T. Anxiety and depressive disorders in a French population: methodology and preliminary results. *Psychiatry Psychobiology.* 1989; 4:267-274.

57. Wittchen H-U, Essau CA, von Zerssen D, Krieg CJ, Zaudig M. Lifetime and six-month prevalence of mental disorders in the Munich Follow-up Study. *Eur Arch Psychiatry Clin Neurosci.* 1992;241:247-258.

58. Wells JE, Bushnell JA, Hornblow AR, Joyce PR, Oakley-Browne MA. Christchurch Psychiatric Epidemiology Study, part I: methodology and lifetime prevalence for specific psychiatric disorders. *Aust N Z J Psychiatry.* 1989;23:315-326.

59. Cross-national comparisons of the prevalences and correlates of mental disorders: WHO International Consortium in Psychiatric Epidemiology. *Bull World Health Organ.* 2000;78:413-426.

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

**B**irnbaumer et al (page 799) investigated neuronal, peripheral, and subjective correlates of fear conditioning in criminal psychopaths using an aversion differential pavlovian conditioning paradigm. The psychopaths were either criminal offenders on bail or were on parole. During emotional learning they failed to show differential activation in the limbic-prefrontal circuitry and showed no conditioned skin conductance responses despite intact processing of the stimulus contingency. Hence, deficient fear conditioning may underlie the emotional detachment and antisocial behaviors that characterize psychopathy.

---

### Correction

**Errors in Byline, Author Affiliations, and Acknowledgment.** In the Original Article titled "Prevalence, Severity, and Comorbidity of 12-Month *DSM-IV* Disorders in the National Comorbidity Survey Replication," published in the June issue of the ARCHIVES (2005;62:617-627), an author's name was inadvertently omitted from the byline on page 617. The byline should have appeared as follows: "Ronald C. Kessler, PhD; Wai Tat Chiu, AM; Olga Demler, MA, MS; Kathleen R. Merikangas, PhD; Ellen E. Walters, MS." Also on that page, the affiliations paragraph should have appeared as follows: Department of Health Care Policy, Harvard Medical School, Boston, Mass (Drs Kessler, Chiu, Demler, and Walters); Section on Developmental Genetic Epidemiology, National Institute of Mental Health, Bethesda, Md (Dr Merikangas). On page 626, the acknowledgment paragraph should have appeared as follows: We thank Jerry Garcia, BA, Sara Belopavlovich, BA, Eric Bourke, BA, and Todd Strauss, MAT, for assistance with manuscript preparation and the staff of the WMH Data Collection and Data Analysis Coordination Centres for assistance with instrumentation, fieldwork, and consultation on the data analysis. We appreciate the helpful comments of William Eaton, PhD, Michael Von Korff, ScD, and Hans-Ulrich Wittchen, PhD, on earlier manuscripts. Online versions of this article on the *Archives of General Psychiatry* Web site were corrected on June 10, 2005.

---

Downloaded from www.archgenpsychiatry.com by ThomasHedemann, on June 20, 2007
©2005 American Medical Association. All rights reserved.

EXHIBIT G

TESTIMONY OF

## BRUCE L. DOWNEY

CHAIRMAN AND CEO, BARR PHARMACEUTICALS, INC.

"ASSESSING THE IMPACT OF A SAFE AND EQUITABLE BIOSIMILAR
POLICY IN THE UNITED STATES"

Before the
HOUSE ENERGY AND COMMERCE
SUBCOMMITTEE ON HEALTH

U.S. HOUSE OF REPRESENTATIVES
MAY 2, 2007

Chairman Pallone, Ranking Member Deal and Members of the House Energy and Commerce Committee Subcommittee on Health. I am Bruce Downey, the Chairman and Chief Executive Officer of Barr Pharmaceuticals, a leading global generic pharmaceutical company.

I want to thank you for convening this hearing and for allowing me to express my company's views on issues so vital to the continued success of the generic pharmaceutical industry – an industry that saves consumers and taxpayers literally billions of dollars each year in prescription drugs costs. Indeed, no other industry has made, or continues to make, a greater contribution to affordable health care than the generic pharmaceutical industry.

While my testimony today is on behalf of Barr Pharmaceuticals, I also serve as Chairman of the Generic Pharmaceutical Association, which represents more than 100 generic manufacturers, distributors and suppliers of bulk active pharmaceutical chemicals worldwide. I mention my role in GPhA because it is important to note that the issue we address today – that of generic biological medicines – is at the top of the association's priority list of legislative and policy initiatives.

## INTRODUCTION

Mr. Chairman, this Congress holds the key that will open the door for generic and other manufacturers to provide affordable access to many of the life-saving biological medicines used in the treatment of diabetes, cancer, rheumatoid arthritis, HIV/AIDS and other diseases. Today, the cost of these treatments can put them out of reach of many consumers. The rheumatoid arthritis and psoriasis treatment Enbrel®, for instance, costs an average of $16,000 a year per patient. Biological drugs for multiple sclerosis range in price from $16,000 to $25,000 a year. Neulasta®, used to correct chemotherapy-induced white blood cell deficiency, costs an average $3,500 per chemotherapy cycle.

What becomes frightening from the cost perspective is that not only are the costs of biological treatments getting more expensive each year, but the utilization of these medicines is growing, as well. These two factors coupled together yields exponential growth in the amount we are spending on biologics every year.

According to the 2006 Drug Trend Report released in April by Express Scripts, biotech drug spending increased 21 percent last year, even as growth in traditional prescription drug expenditures slowed. The report showed that growth hormone deficiency spending rose nearly 23 percent in 2006 due to a 10.7 percent increase in utilization, coupled with the increase in product cost.

This dual impact of higher prices and greater utilization presents a recipe for disaster which will end in price controls. The alternative, as we are seeing in the chemical drug sector, is competition.

Thus, creating a pathway that allows for the introduction of safe and affordable generic alternatives to these medicines is vital. It not only will save consumers and taxpayers billions of dollars a year, but, again, will allow more patients access to these important medicines.

This committee is well aware of the role traditional chemical generic drugs play in helping consumers, insurers, and the government in achieving billions of dollars in savings each year. Generic drugs filled more than one-and-a-half billion prescriptions in the U.S. last year. That is nearly 55% of all prescriptions dispensed nationwide. Considering that the average cost of a generic prescription is less than $30, while the average cost of a brand prescription is close to $95, it is easy to see how the Congressional Budget Office estimates the savings generated by generic drug use to be between $8 billion and $10 billion each and every year.

As this Committee knows, Congress made these savings possible over twenty years ago with the 1984 enactment of the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act. Hatch-Waxman achieves a critical balance between access to less costly generics and innovation of new brand-name drugs. I, and many others, believe that it is time for Congress to take the next step

and let generic companies provide savings in the biological field. Doing so, however, will require brushing aside the current political maneuvering that threatens progress on this issue, and enacting appropriate legislation that would allow FDA to begin approving safe, effective, and affordable generic biologics.

## DISCUSSION

Today, I want to briefly discuss three points that I hope this committee will consider as you move forward on generic biologics legislation:

(1) legislation must provide a regulatory pathway for approving generic biologics that is free of artificial barriers and unnecessary roadblocks, as well as a mechanism for allowing expeditious resolution of patent disputes that would delay generic market entry;

(2) market competition generated by generic biologics would unleash incentives for further innovation of newer medicines, just as Hatch-Waxman did over twenty years ago; and

(3) generic biologics will provide a market-based mechanism to help manage private and federal expenditures and achieve significant savings.

## I.   Legislative Framework

Effective generic biologics legislation must include two parts: a regulatory pathway that allows FDA to expeditiously approve safe and affordable generic biologics and a mechanism for allowing generic companies to resolve certain

1282208.1

patent disputes without delaying FDA approval. I will discuss some important aspect about both of these issues.

## A.    Approval Pathway

Effective biologics legislation must include a regulatory approval pathway that does not impose unnecessary barriers to prompt market entry. Hatch-Waxman was largely successful in achieving this goal for generic drugs regulated under the Federal Food, Drug and Cosmetic Act, and this legislation should do the same for biologics regulated under the Public Health Service Act. An adequate abbreviated pathway must include, for example:

- clearly defined comparability criteria;

- provisions giving FDA discretion to require the needed tests – and only the needed tests – to make safety and effectiveness determinations;

- provisions setting forth the circumstances under which FDA can deny approval;

- provisions setting forth the contents of an abbreviated biological application;

- the ability to obtain an interchangeability rating that is immediately operative;

- no unique names for generic biologics, which is fully consistent with FDA's position that unique biologic names should not be used to differentiate products with the same active ingredient(s) when credible scientific data demonstrate that no pharmacologically relevant differences exist;

5

1282208.1

- a timely review process that allows a company to discuss with the FDA research and testing and to know when action on the application can be anticipated; and

- an approval process that gives FDA flexibility as to what should be required on the label.

Equally as important, effective biologics legislation must not include provisions like those advocated by groups such as BIO – provisions that would unnecessarily delay approval and/or prevent consumers from receiving the biggest benefit from generic biological products. For example, legislation should *not* include:

- a requirement that all generic applications include full clinical and human trials, or any clinical trials other than those that FDA deems necessary to the relevant scientific issues;

- further legislation, or Congressional authorization/oversight or FDA regulations or guidances before the agency can give an interchangeability rating to a generic product;

- unique names for generic biologics, which would impede interchangeability findings and thus prevent the substitution of generic for brand that is essential for cost savings;

- provisions requiring agency-issued guidance or notice and comment rulemaking, which can take years and years to complete, before FDA can accept or approve a generic biologic application; and/or

1282208.1

- provisions requiring the generic company to have an identical label to the reference product, particularly where the brand has patented certain labeling information.

There is no justification for provisions like these, which will delay generic market entry and the interchangeability rating needed for consumers to benefit most from generic competition. They are entirely unnecessary to ensuring approval of safe and affordable generic biologics.

For example, while today clinical data may be needed for most biological products, Congress should not impose rigid requirements for such testing in all circumstances. Rather, Congress should give FDA the ability to draw on its decades of experience with these compounds by granting the agency the discretion to require such tests only when it determines that such clinical studies are needed.

It is significant that FDA agrees. FDA Deputy Commissioner Janet Woodcock addressed this during Congressman Waxman's Oversight & Government Reform Committee hearings last month, testifying that the "use of human subjects for trials that are not needed but are simply to check a box on a regulatory requirement is not desirable." Dr. Woodcock added that the ability to physically characterize protein molecules and other complex substances "has evolved and is continuing to evolve" and that "flexibility in enabling FDA to incorporate the new science into the regulatory process . . . is in the best interest of the public as well as the agency and the industry." Congress has entrusted FDA to

7

make scientific judgments regarding drugs and biologics.  This scientific advice from the agency should be headed.

Barr urges Congress to pass a regulatory framework for approving generic biologics that is free of unnecessary barriers and roadblocks in the form of artificial requirements, such as clinical studies and agency guidances.  Such a framework will give FDA the flexibility it needs to approve safe and interchangeable generic biological products as quickly as possible.

**B.    Patent Provisions and Other "IP" Provisions**

A key part of effective generic biologics legislation is a mechanism that allows the generic company to resolve certain patent disputes without that litigation impacting FDA approval.  This was also a goal of Hatch-Waxman, although the brand industry has found ways around the law's intent, which was that patent disputes be resolved early, so that the generics can enter the market at the earliest time after valid and applicable patents have expired.  Barr submits that any bill providing a pathway for generic biological products should take into account what we have learned from our 20-plus years of experience with the Hatch-Waxman patent provisions and improve upon that system in order to ensure that affordable biological products reach the public as quickly as possible.  Thus, an effective generic biologic bill must, at the very least, contain patent provisions like the following:

1282208.1

- First, companies need patent certainty prior to marketing. Without it, companies will not invest in bringing affordable, comparable products to market prior to patent expiration because doing so could subject them to enormous patent infringement damages. Thus, effective legislation must include provisions that allow a generic company to obtain the required certainty – through litigation if necessary – while FDA is reviewing the application.

- Second, equally as important, however, is the fact that generic companies not be forced to litigate every patent relating to the brand product in order to obtain the patent certainty needed to launch. Thus, a biological patent system should provide a mechanism for litigating only those patent disputes that the generic company believes would delay its launch. There will be other patents – for example patents applicable to manufacturing processes that the generic company is not using – for which the only effect of early litigation would be unnecessary delay. I am not suggesting that the brand company should forever be foreclosed from asserting its patents. The brand company should have that opportunity, just not before the generic company markets its product. Accordingly, the system that will allow for the most expeditious generic market entry is one that permits the generic company to select the patents that will be litigated pre-product launch. This system also protects the brand company's intellectual property by allowing for suit on any patent that can reasonably be asserted after the generic company begins marketing.

- Third, generic companies need to be able to resolve patent disputes without those disputes delaying the FDA approval process, as we now experience with small molecule drugs under Hatch-Waxman.

- Fourth, generic companies must be able to litigate patent disputes quickly and efficiently. This will only happen if the generic company is permitted to designate a forum that would allow for more efficient litigation resolution. Right now, the brand company has the ability to bring suit against an ANDA applicant in virtually any district court in the country. Brand companies increasingly have brought suit in districts

9

with the longest time to trial.  In some courts, its takes from three to five years just to get to trial.  Where certainty is essential, this means more delayed market entry.

- Fifth, if a brand company refuses to participate in the patent process, as increasingly happens with small molecule applications, the generic company must be allowed to enter the market without risking potentially massive damages.  Under proposals such as those found in H.R. 1038, generic companies have some protection in the event that the brand company refuses to participate in the patent process.  Brand companies have complained that this takes away substantive patent rights and forces them to give what amounts to a compulsory patent license.  Not true. These provisions only apply if the brand company violates its statutory obligation to participate in the patent process.  If the brand company follows the law, all of its patent rights would remain in tact.

Finally, part of the so-called "IP" discussion surrounding generic biologics is the idea of exclusivity.  On the generic side, the issue is clear:  consumers and taxpayers, without question, will see the most significant savings from interchangeable products.  Thus, it is essential that any generic biologics bill incentivize generic companies to do the work necessary to achieve an interchangeability rating from FDA.  At present, no such incentive currently exists and, therefore, will need to be included in the legislation.

On the brand side, the issue also seems clear:  lengthy, new exclusivity periods for brand companies are not necessary because the law currently provides more than enough incentive to continue innovating.   For example, brand companies already get significant incentives, including multiple provisions

10

1282208.1

allowing for patent term restorations, orphan drug exclusivity, and various tax credits. If the brand companies disagree, they are free to come forward and present data to support their argument. Indeed, Representative Waxman has invited discussion on this issue. However, the brands have not yet come forward with any concrete data that would suggest that additional incentives are necessary. It is my view that only if they do come forward with such evidence should Congress consider enacting new exclusivity periods.

## II.    Generic Competition Will Spur Innovation

There is a misconception that market competition from generic biologics would diminish the incentive for originators to innovate new biologics. Generic competition will *not* slow innovation. In fact, just the opposite would be true. Market competition generated by generic biologics would accelerate further innovation of new biological products, while at the same time lowering the cost of treatment with existing medicines.

For example, Dr. Scott Gottlieb, recently the FDA Director of Medical Policy Development and Deputy Commissioner for Medical and Scientific Affairs, has explained: "Legislation to expose today's biologics to easier competition, after legitimate patents have expired, is going to accelerate development of improved products, not just lower-cost. Those making static assumptions . . . about how much savings this legislation is likely to bring are <u>losing sight of the competition</u>

11

and progress it will have unleashed." [Forbes 4/17/07 edition (emphasis added)]. Similarly, the January 2007 study released by the Pharmaceutical Care Management Association concluded that increased competition from generic biologics would not only create pressure to reduce the cost of these products, but also produce added incentives for further innovation. Thus, generic biologics legislation would provide the dual benefit of increased savings and advancements in medical treatments.

## III.    Savings

No one can legitimately dispute that generic biologics will provide a market-based mechanism to help manage private and federal expenditures and achieve significant savings. And no one can dispute that the American health care system has ever needed those savings more than it does today.

As the use of life-saving biological drugs continues to increase, so does the amount consumers and taxpayers spend. Indeed, spending on biotech drugs increased 21% in 2006, to approximately $40 billion, according to the 2006 Drug Trend Report. Spending in this sector is expected to grow to $100 billion over just the next four years. By 2010, biological medicines will account for 26% of total drug spending in the U.S. It is particularly important to note that Medicare spending for biological drugs continues to escalate disproportionately to Medicare funding. To put things in perspective, Medicare and Medicaid will spend $2.5

1282208.1

billion this year on just one biological drug – the anemia treatment Epogen® – which is a half-billion dollars greater than the entire FY 2007 budget of the Food and Drug Administration.

The solution to managing this spending is, of course, the use of safe and effective, lower-cost generic biologics. Just as generic chemical drugs have saved billions of dollars so, too, will generic biological drug products. A study released by Express Scripts in February 2007 showed that generic biologics would save payors $71 billion over 10 years. An Engel & Novitt study in January 2007, as well as other independent economic analyses we have seen, show that generic biologics would generate significant savings for Medicare Part B reimbursed medicines. Now, the brand companies take issue with some of these studies. Significantly, though, they do not take issue with the fact that generic biologics will save billions of dollars. They only take issue with how many billions will be saved. But in the end, whether the number is $71 billion or $7.1 billion, we simply cannot afford to lose the savings that, without question, would be achieved through use of generic biological medicines.

Congress should act now and pass legislation giving FDA authority to review abbreviated applications for generic biologics. The agency would be able to begin reviewing those applications as soon as they were submitted and the public would be assured that when the FDA approves a generic version of a

1282208.1

biological product, just as has been the case with traditional drugs over the past 30 years, it will be safe, effective and have the same performance as the innovator product.

## CONCLUSION

Chairman Palone and Members of the Committee, Barr always has been deeply committed to providing the public with affordable, safe generic drug products, and to do so as expeditiously as possible under the circumstances. That is why Barr has joined with consumer groups like AARP, Consumers Union, Families USA; employee unions life AFL-CIO and AFSCME; major corporations like Caterpillar, Ford, GM, and Kodak; healthcare providers Aetna, Blue Cross Blue Shield and Kaiser Permanente; pharmacy leaders like CVS/Caremark and the National Association of Chain Drug Stores; and no less than 18 of the nation's governors in calling on Congress to pass legislation creating the framework for the approval of safe, effective and lower-cost generic biological drugs.

Congress has the opportunity this year to create a huge win for patients, for taxpayers and for employers alike. Indeed, effective generic biologics legislation very well could be the most important piece of consumer legislation enacted this year. We urge Congress to move forward in this effort.

Thank you, Mr. Chairman. I am happy to respond to any questions you and the Committee may have.

1282208.1

# EXHIBIT H

I

110TH CONGRESS
1ST SESSION

# H. R. 1038

To amend the Public Health Service Act to provide for the licensing of
comparable and interchangeable biological products, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

FEBRUARY 14, 2007

Mr. WAXMAN (for himself, Mrs. EMERSON, Mr. PALLONE, Mr. EMANUEL, and
Ms. HIRONO) introduced the following bill; which was referred to the
Committee on Energy and Commerce, and in addition to the Committee
on the Judiciary, for a period to be subsequently determined by the
Speaker, in each case for consideration of such provisions as fall within
the jurisdiction of the committee concerned

---

# A BILL

To amend the Public Health Service Act to provide for
the licensing of comparable and interchangeable biologi-
cal products, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the "Access to Life-Saving

5   Medicine Act".

6   **SEC. 2. DEFINITIONS.**

7        (a) AMENDMENTS.—Section 351(i) of the Public

8   Health Service Act (42 U.S.C. 262(i)) is amended—

2

1    (1) by striking "In this section, the term 'bio-

2    logical product' means" and inserting the following:

3    "In this section:

4    "(1) The term 'biological product' means"; and

5    (2) by adding at the end the following:

6    "(2) The term 'abbreviated biological product

7    application' means an abbreviated application for a

8    license of a biological product containing the same,

9    or similar, active ingredient as a reference product.

10    "(3) The term 'reference product' means the

11    single licensed biological product, approved under

12    subsection (a) or subsection (k), against which a bio-

13    logical product is evaluated for demonstration of

14    safety, potency, or purity.

15    "(4) The term 'comparable' or 'comparability'

16    in reference to a biological product means the ab-

17    sence of clinically meaningful differences between

18    the biological product and the reference product in

19    terms of the safety, purity, and potency of the prod-

20    uct based upon—

21    "(A) data derived from chemical, physical,

22    and biological assays, and other non-clinical

23    laboratory studies; and

24    "(B) data from any necessary clinical

25    study or studies sufficient to confirm safety,

3

| | |
|---|---|
| 1 | purity, and potency in one or more appropriate |
| 2 | conditions of use for which the reference prod- |
| 3 | uct is licensed and intended to be used. |
| 4 | Any studies under subparagraph (B) shall be de- |
| 5 | signed to avoid duplicative and unethical clinical |
| 6 | testing. |
| 7 | "(5) The terms 'interchangeable' and 'inter- |
| 8 | changeability' mean, with respect to the condition of |
| 9 | use involved, that the biological product— |
| 10 | "(A) is comparable to the reference prod- |
| 11 | uct; and |
| 12 | "(B) can be expected to produce the same |
| 13 | clinical result as the reference product in any |
| 14 | given patient. |
| 15 | "(6) The term 'thorough characterization' |
| 16 | means an analysis of structural features based upon |
| 17 | appropriate analytical and functional testing suffi- |
| 18 | cient to identify differences between a biological |
| 19 | product and reference product relevant to safety, pu- |
| 20 | rity or potency. |
| 21 | "(7) The term 'final action' means, with respect |
| 22 | to an abbreviated biological product application, the |
| 23 | Secretary's issuance of a final action letter to the |
| 24 | sponsor of an abbreviated biological product applica- |
| 25 | tion which— |

4

1         "(A) approves the application; or

2         "(B) disapproves the application and sets

3         forth in detail an enumeration of the specific

4         deficiencies in the particular application and of

5         the specific, enumerated actions the sponsor

6         would be required to take in order for the spon-

7         sor to receive a final action letter that approves

8         such application.

9     "(8) The term 'final action date' means, with

10    respect to an abbreviated biological product applica-

11    tion, the date by which the Secretary must take a

12    final action on the application pursuant to sub-

13    section (k)(11).

14    "(9) The term 'reviewing division' means the

15    division responsible for the review of an application

16    for approval of a biological product (including all sci-

17    entific and medical matters, chemistry, manufac-

18    turing, and controls).".

19    (b) RULE OF CONSTRUCTION.—Nothing in this Act

20    or the amendments made by this Act shall be construed

21    to exclude an application for licensure of a biological prod-

22    uct under section 351(k) from the definition of a human

23    drug application in section 735(1)(C) of the Federal Food,

24    Drug, and Cosmetic Act (21 U.S.C. 379g(1)(C)).

5

1 SEC. 3. REGULATION OF COMPARABLE AND INTERCHANGE-

2        ABLE BIOLOGICAL PRODUCTS.

3     (a) IN GENERAL.—Section 351 of the Public Health

4 Service Act (42 U.S.C. 262) is amended—

5        (1) in subsection (a)(1)(A), by inserting "under

6     this subsection or subsection (k)" after "biologics li-

7     cense"; and

8        (2) by adding at the end the following sub-

9     section:

10 "(k) REGULATION OF COMPARABLE AND INTER-

11 CHANGEABLE BIOLOGICAL PRODUCTS.—

12        "(1) SUBMISSION OF AN ABBREVIATED BIO-

13     LOGICAL PRODUCT APPLICATION.—Any person may

14     file with the Secretary an abbreviated biological

15     product application. Any such application shall in-

16     clude the following:

17        "(A) Data demonstrating that the biologi-

18     cal product is comparable to or interchangeable

19     with the reference product.

20        "(B) Data demonstrating that the biologi-

21     cal product and reference product contain high-

22     ly similar principal molecular structural fea-

23     tures, notwithstanding minor differences in het-

24     erogeneity profile, impurities, or degradation

25     patterns. The Secretary shall find the following

6

1    types of products to contain highly similar prin-
2    cipal molecular structural features:

3        "(i) Two protein biological products
4        with differences in structure between them
5        solely due to post-translational events, infi-
6        delity of translation or transcription, or
7        minor differences in amino acid sequence.

8        "(ii) Two polysaccharide biological
9        products with similar saccharide repeating
10       units, even if the number of units differ
11       and even if there are differences in post-
12       polymerization modifications.

13       "(iii) Two glycosylated protein prod-
14       ucts with differences in structure between
15       them solely due to post-translational
16       events, infidelity of translation or tran-
17       scription, or minor differences in amino
18       acid sequence, and if they had similar sac-
19       charide repeating units, even if the number
20       of units differ and even if there were dif-
21       ferences in post-polymerization modifica-
22       tions.

23       "(iv) Two polynucleotide biological
24       products with identical sequence of purine
25       and pyrimidine bases (or their derivatives)

7

1                bound to an identical sugar backbone (ri-

2                bose, deoxyribose, or modifications of these

3                sugars).

4                      "(v) Closely related, complex partly

5                   definable biological products with similar

6                   therapeutic intent, such as two live viral

7                   products for the same indication.

8                Two biological products not enumerated in the

9                foregoing clauses may be demonstrated to con-

10               tain highly similar principal molecular struc-

11               tural features based upon such data and other

12               information characterizing the two products as

13               the Secretary determines to be necessary.

14                    "(C) Data demonstrating that the biologi-

15               cal product and reference product utilize the

16               same mechanism or mechanisms of action for

17               the condition or conditions of use prescribed,

18               recommended, or suggested in the proposed la-

19               beling, but only to the extent the mechanism or

20               mechanisms of action are known for the ref-

21               erence product.

22                    "(D) Information to show that the condi-

23               tion or conditions of use prescribed, rec-

24               ommended, or suggested in the labeling pro-

8

1    posed for the biological product have been pre-

2    viously approved for the reference product.

3        "(E) Information to show that the route of

4    administration, the dosage form, and the

5    strength of the biological product are the same

6    as those of the reference product.

7        "(F) Data demonstrating that the facility

8    in which the biological product is manufactured,

9    processed, packed, or held meets standards de-

10    signed to assure that the biological product con-

11    tinues to be safe, pure, and potent.

12        "(G) At the applicant's option, publicly-

13    available information regarding the Secretary's

14    previous determination that the reference prod-

15    uct is safe, pure, and potent.

16        "(H) Any additional data and information

17    in support of the application, including publicly-

18    available information with respect to the ref-

19    erence product or another biological product.

20    "(2) OTHER APPLICATIONS.—Any person, in-

21    cluding a person who has not conducted and does

22    not have a right of reference to the studies in the

23    application for a reference product, may submit an

24    application under this paragraph for a biological

25    product that differs from, or incorporates a change

9

1   to, the reference product with respect to one or more

2   characteristics described in subparagraphs (A)

3   through (E) of paragraph (1), including a difference

4   in safety, purity, or potency, so long as the applica-

5   tion contains sufficient information to establish the

6   safety, purity, and potency of the biological product

7   relative to the reference product for its proposed

8   condition or conditions of use.

9   "(3) FDA REVIEW OF ABBREVIATED BIOLOGI-

10  CAL PRODUCT APPLICATIONS.—

11      "(A) GUIDANCE REGARDING REVIEW OF

12      APPLICATIONS.—The Secretary shall issue guid-

13      ance for the individuals who review applications

14      submitted under paragraph (1) or (2), which

15      shall relate to promptness in conducting the re-

16      view, technical excellence, lack of bias and con-

17      flict of interest, and knowledge of regulatory

18      and scientific standards, and which shall apply

19      equally to all individuals who review such appli-

20      cations.

21      "(B) MEETINGS WITH SPONSORS AND AP-

22      PLICANTS.—The Secretary shall meet with a

23      sponsor of an investigation or an applicant for

24      approval of a comparable or interchangeable bi-

25      ological product under this subsection if the

10

1   sponsor or applicant makes a reasonable writ-
2   ten request for a meeting for the purpose of
3   reaching agreement on the design and size of
4   studies needed for approval of the application.
5   The sponsor or applicant shall provide informa-
6   tion necessary for discussion and agreement on
7   the design and size of such studies. Minutes of
8   any such meeting shall be prepared by the Sec-
9   retary and made available to the sponsor or ap-
10  plicant.

11      ''(C) AGREEMENTS.—Any agreement re-
12  garding the parameters of design and size of
13  the studies of a biological product under this
14  paragraph that is reached between the Sec-
15  retary and a sponsor or applicant shall be re-
16  duced to writing and made part of the adminis-
17  trative record by the Secretary. Such agreement
18  shall not be changed after the testing begins,
19  except—

20          ''(i) with the written agreement of the
21      sponsor or applicant; or

22          ''(ii) pursuant to a decision, made in
23      accordance with subparagraph (D) by the
24      director of the reviewing division, that a
25      substantial scientific issue essential to de-

11

1               termining the safety, purity, and potency

2               of the biological product has been identi-

3               fied after the testing has begun.

4           "(D) PROCEDURE REGARDING CERTAIN

5        DECISIONS.—A decision under subparagraph

6        (C)(ii) by the director shall be in writing and

7        the Secretary shall provide to the sponsor or

8        applicant an opportunity for a meeting at which

9        the director and the sponsor or applicant will be

10      present and at which the director will document

11      the scientific issue involved.

12         "(E) EFFECT OF DECISIONS.—The written

13      decisions of the reviewing division shall be bind-

14      ing upon, and may not directly or indirectly be

15      changed by, the field or compliance office per-

16      sonnel unless such field or compliance office

17      personnel demonstrate to the reviewing division

18      why such decision should be modified.

19         "(F) DELAYS BY REVIEWING DIVISIONS.—

20      No action by the reviewing division may be de-

21      layed because of the unavailability of informa-

22      tion from or action by field personnel unless the

23      reviewing division determines that a delay is

24      necessary to assure the marketing of a safe,

25      pure, and potent biological product.

12

1            "(4) APPROVAL OF COMPARABLE OR INTER-

2   CHANGEABLE BIOLOGICAL PRODUCTS.—

3                "(A) DETERMINATION OF COM-

4            PARABILITY.—Upon review of an application

5            submitted under paragraph (1) or (2) for a bio-

6            logical product, the Secretary shall issue a com-

7            parable biological product license for all condi-

8            tions of use of the reference product sharing

9            the same mechanism or mechanisms of action

10            for which the applicant has demonstrated com-

11            parability for a single condition of use, or, if the

12            mechanism or mechanisms of action are un-

13            known, for the condition or conditions of use

14            for which the data submitted establishes com-

15            parability, unless the Secretary finds and in-

16            forms the applicant that—

17                "(i) information submitted in the ap-

18                plication or any other information available

19                to the Secretary is insufficient to show

20                that the biological product is comparable

21                to the reference product for the condition

22                or conditions of use prescribed, rec-

23                ommended, or suggested in the labeling

24                proposed in the application;

13

1          "(ii) information submitted in the ap-

2     plication or any other information available

3     to the Secretary is insufficient to show

4     that the biological product and the ref-

5     erence product contain highly similar prin-

6     cipal molecular structural features, not-

7     withstanding minor differences in hetero-

8     geneity profile, impurities, or degradation

9     patterns;

10         "(iii) information submitted in the ap-

11     plication or any other information available

12     to the Secretary is insufficient to show

13     that the biological product and reference

14     product utilize the same mechanism or

15     mechanisms of action for the conditions of

16     use prescribed, recommended, or suggested

17     in the labeling proposed for the biological

18     product, unless the mechanism or mecha-

19     nisms of action are not known for the ref-

20     erence product for such condition or condi-

21     tions;

22         "(iv) information submitted in the ap-

23     plication or any other information available

24     to the Secretary is insufficient to show

25     that the route of administration, the dos-

14

1    age form, and the strength of the biological

2    product are the same as those of the ref-

3    erence product;

4        "(v) information submitted in the ap-

5    plication or any other information available

6    to the Secretary is insufficient to show

7    that the condition or conditions of use pre-

8    scribed, recommended, or suggested in the

9    labeling proposed for the biological product

10   are limited to one or more of the same use

11   or uses as have been previously approved

12   for the reference product;

13       "(vi) information submitted in the ap-

14   plication or any other information available

15   to the Secretary shows (I) the inactive in-

16   gredients of the biological product are un-

17   safe for use under the conditions pre-

18   scribed, recommended, or suggested in the

19   labeling proposed for the biological prod-

20   uct, or (II) the composition of the biologi-

21   cal product is unsafe under such conditions

22   because of the type or quantity of inactive

23   ingredients included or the manner in

24   which the inactive ingredients are included;

15

1          ''(vii) information submitted in the
2          application or any other information avail-
3          able to the Secretary fails to demonstrate
4          that the facility in which the biological
5          product is manufactured, processed,
6          packed, or held meets standards designed
7          to assure that the biological product con-
8          tinues to be safe, pure, and potent;

9          ''(viii) the Secretary has withdrawn or
10         suspended the license of the reference
11         product, for safety or effectiveness reasons,
12         or has published a notice of opportunity
13         for hearing to withdraw such license for
14         safety or effectiveness reasons, or the Sec-
15         retary has determined that the reference
16         product has been withdrawn from sale for
17         safety or effectiveness reasons; or

18         ''(ix) the application contains an un-
19         true statement of material fact; and
20     provides the applicant with a detailed expla-
21     nation for the decision.

22     ''(B) DETERMINATIONS ON INTERCHANGE-
23     ABILITY.—Subject to subparagraph (C) and
24     paragraph (10), upon issuing a product license
25     for a biological product under subparagraph

16

1    (A), the Secretary shall make and publish one

2    of the following determinations:

3            "(i) Such product is interchangeable

4        with the reference product for one or more

5        specified conditions of use prescribed, rec-

6        ommended, or suggested in the labeling of

7        the biological product.

8            "(ii) Interchangeability has not been

9        established.

10    "(C) DETERMINATION OF INTERCHANGE-

11    ABILITY OF SUBSEQUENT BIOLOGICAL PROD-

12    UCT.—If the Secretary determines that an ap-

13    plication meets the approval requirements of

14    subparagraph (A), and, prior to the issuance of

15    a product license, the Secretary has made a de-

16    termination of interchangeability of another bio-

17    logical product and the reference product for

18    which the exclusivity period under paragraph

19    (10) has not expired, the Secretary shall—

20            "(i) issue the product license for the

21        subsequent biological product; and

22            "(ii) defer issuing any determination

23        of interchangeability as to the subsequent

24        biological product and the reference prod-

17

1     uct until the exclusivity period under para-

2     graph (10) has expired.

3     "(5) POSTMARKETING STUDIES FOR APPLICA-

4     TIONS SUBMITTED UNDER PARAGRAPH (1).—If the

5     Secretary has agreed with the sponsor of the ref-

6     erence product, at the time of approval or any time

7     thereafter, that the sponsor shall conduct one or

8     more postmarketing safety studies, a person submit-

9     ting an application for a biological product under

10    paragraph (1) may agree with the Secretary to con-

11    duct a similar postmarketing safety study or studies

12    upon a reasonable showing that such study or stud-

13    ies would provide relevant information not available

14    from the studies on the reference product. The Sec-

15    retary shall not, as a condition of approval, propose

16    any additional postmarketing studies for such bio-

17    logical product.

18    "(6) DESIGNATION OF OFFICIAL NAME.—If,

19    pursuant to section 508 of the Federal Food, Drug,

20    and Cosmetic Act, the Secretary determines that

21    designation of an official name for a comparable bio-

22    logical product is necessary or desirable in the inter-

23    ests of usefulness or simplicity, the Secretary shall

24    designate the same official name for the comparable

25    biological product as the Secretary designated for

18

1   the reference product. This paragraph shall not
2   apply to products approved under paragraph (7).

3       "(7) OTHER APPROVAL PROVISIONS.—The Sec-
4   retary shall approve, under the provisions of para-
5   graph (4)(A), an application for a license submitted
6   under paragraph (2), except that the Secretary shall
7   approve such an application that would otherwise be
8   disapproved by reason of one or more of subpara-
9   graphs (A) through (E) of paragraph (4)(A), if the
10  application and any other information available to
11  the Secretary are sufficient to establish the safety,
12  purity, and potency of the comparable biological
13  product relative to the reference product for the pro-
14  posed condition or conditions of use for such prod-
15  uct.

16      "(8) ESTABLISHING INTERCHANGEABILITY FOR
17  COMPARABLE BIOLOGICAL PRODUCTS.—

18          "(A) IN GENERAL.—In an original applica-
19      tion or a supplement to an application under
20      this subsection, an applicant may submit infor-
21      mation to the Secretary to demonstrate the
22      interchangeability of a comparable biological
23      product and the reference product. An applicant
24      may withdraw an interchangeability submission
25      at any time. A request for an interchangeability

19

1        determination submitted after the filing of an

2        application shall be considered a major amend-

3        ment to the application. Nothing in this sub-

4        section shall be construed to prohibit the Sec-

5        retary from making a determination of inter-

6        changeability at any time after approval.

7            "(B) GUIDANCE.—Within one year after

8        enactment of the Access to Life-Saving Medi-

9        cine Act, the Secretary shall issue guidance re-

10       garding standards and requirements for inter-

11       changeability. The Secretary may make deter-

12       minations of interchangeability under para-

13       graph (4)(B) prior to issuing guidance under

14       this subparagraph.

15          "(9) INTERCHANGEABILITY LABELING FOR

16     COMPARABLE BIOLOGICAL PRODUCTS.—Upon a de-

17     termination of interchangeability, the Secretary, if

18     requested by the applicant, shall provide for the

19     label of the comparable biological product to include

20     a statement that the biological product is inter-

21     changeable with the reference product for the condi-

22     tions of use prescribed, recommended, or suggested

23     in the labeling for which interchangeability has been

24     established.

25         "(10) EXCLUSIVITY.—

20

1        "(A) IN GENERAL.—Upon review of an ab-
2    breviated biological product application relying
3    on the same reference product for which a prior
4    biological product has received a determination
5    of interchangeability for any condition of use,
6    the Secretary shall not make a determination
7    under paragraph (4)(B) that the second or sub-
8    sequent biological product is interchangeable for
9    any condition of use, and no holder of a biologi-
10   cal product license approved under subsection
11   (a) shall manufacture, market, sell, or dis-
12   tribute a rebranded interchangeable biological
13   product, directly or indirectly, or authorize any
14   other person to manufacture, market, sell, or
15   distribute a rebranded interchangeable biologi-
16   cal product, for any condition of use, until the
17   earlier of—

18        "(i) 180 days after the first commer-
19        cial marketing of the first interchangeable
20        comparable biological product to be ap-
21        proved as interchangeable for that ref-
22        erence product;
23        "(ii) one year after—
24            "(I) a final court decision on all
25            patents in suit in an action instituted

21

1          under paragraph (17)(C) against the
2          applicant that submitted the applica-
3          tion for the first approved inter-
4          changeable comparable biological
5          product; or
6               "(II) the dismissal with or with-
7          out prejudice of an action instituted
8          under paragraph (17)(C) against the
9          applicant that submitted the applica-
10         tion for the first approved inter-
11         changeable comparable biological
12         product; or
13              "(iii)(I) 36 months after approval of
14         the first interchangeable comparable bio-
15         logical product if the applicant has been
16         sued under paragraph (17)(C) and such
17         litigation is still ongoing within such 36-
18         month period; or
19              "(II) one year after approval in the
20         event that the first approved interchange-
21         able comparable applicant has not been
22         sued under paragraph (17)(C).
23    For purposes of this subparagraph, the term
24    'final court decision' means a final decision of
25    a court from which no appeal (other than a pe-

22

1   tition to the United States Supreme Court for

2   a writ of certiorari) has been or can be taken.

3       "(B) REBRANDED INTERCHANGEABLE BI-

4   OLOGICAL PRODUCT.—For purposes of this sub-

5   section, the term 'rebranded interchangeable bi-

6   ological product'—

7           "(i) means any rebranded inter-

8       changeable version of the reference product

9       involved that the holder of the biological

10      product license approved under subsection

11      (a) for that reference product seeks to

12      commence marketing, selling, or distrib-

13      uting, directly or indirectly; and

14          "(ii) does not include any product to

15      be marketed, sold, or distributed—

16              "(I) by an entity eligible for ex-

17          clusivity with respect to such product

18          under this paragraph; or

19              "(II) after expiration of any ex-

20          clusivity with respect to such product

21          under this paragraph.

22      "(11) HEARING.—If the Secretary decides to

23  disapprove an abbreviated biological product applica-

24  tion, the Secretary shall give the applicant notice of

25  an opportunity for a hearing before the Secretary on

23

1 the question of whether such application is approv-
2 able. If the applicant elects to accept the opportunity
3 for hearing by written request within thirty days
4 after such notice, such hearing shall commence not
5 more than ninety days after the expiration of such
6 thirty days unless the Secretary and the applicant
7 otherwise agree. Any such hearing shall thereafter
8 be conducted on an expedited basis, and the Sec-
9 retary's order thereon shall be issued within ninety
10 days after the date fixed by the Secretary for filing
11 final briefs.

12 "(12) FINAL ACTION DATE.—

13 "(A) IN GENERAL.—The Secretary shall
14 take a final action on an abbreviated biological
15 product application by the date that is 8 cal-
16 endar months following the sponsor's submis-
17 sion of such application, or 180 days following
18 the Secretary's notification to the applicant that
19 its application has been accepted for filing,
20 whichever is earlier.

21 "(B) EXTENSION.—The final action date
22 provided by subparagraph (A) with respect to
23 an application may be extended for such period
24 of time as is agreed to by the Secretary and the
25 applicant in a jointly executed written agree-

24

1 ment that is counter-signed by the Secretary

2 and the applicant no later than 30 days prior

3 to such date.

4 "(13) REQUEST FOR DELAY OF FINAL AC-

5 TION.—Notwithstanding paragraph (18) or any

6 other provision of law, the Secretary shall not fail or

7 refuse to take a final action on an abbreviated bio-

8 logical product application by the final action date

9 on the basis that a person, other than the com-

10 parable biological product applicant, has requested

11 (in a petition or otherwise) that the Secretary refuse

12 to take or otherwise defer such final action, and no

13 court shall enjoin the Secretary from taking final ac-

14 tion or stay the effect of final action previously

15 taken by the Secretary, except by issuance of a per-

16 manent injunction based upon an express finding of

17 clear and convincing evidence that the person seek-

18 ing to have the Secretary refuse to take or otherwise

19 to defer final action by the final action date—

20  "(A) has prevailed on the merits of the

21  person's complaint against the Secretary;

22  "(B) will suffer imminent and actual irrep-

23  arable injury, constituting more than irrecover-

24  able economic loss, and that also will threaten

25

1      imminent destruction of such person's business;
2      and

3           "(C) has an interest that outweighs the
4      overwhelming interest that the public has in ob-
5      taining prompt access to a comparable biologi-
6      cal product.

7           "(14) REPORT ON EXTENSIONS OF FINAL AC-
8      TION DATE.—The Secretary shall prepare and sub-
9      mit to the President, the Committee on Energy and
10     Commerce of the House of Representatives, and the
11     Committee on Health, Education, Labor, and Pen-
12     sions of the Senate a report regarding any jointly
13     executed written agreement to extend the final ac-
14     tion date under this Act within 15 calendar days
15     after the joint execution of any such written agree-
16     ment.

17          "(15) REPORT ON FAILURE TO TAKE FINAL AC-
18     TION.—The Secretary shall prepare and submit an-
19     nually to the President, the Committee on Energy
20     and Commerce of the House of Representatives, and
21     the Committee on Health, Education, Labor, and
22     Pensions of the Senate a report detailing the specific
23     and particularized reasons enumerated by the re-
24     viewing division for each instance of the Secretary's

26

1 failure to take final action by the final action date

2 in the previous year.

3  "(16) REGULATIONS.—The Secretary shall es-

4 tablish, by regulation within 2 years after the date

5 of the enactment of this subsection, requirements for

6 the efficient review, approval, suspension, and rev-

7 ocation of abbreviated biological product applications

8 under this subsection.

9  "(17) PATENTS.—

10   "(A) REQUEST FOR PATENT INFORMA-

11   TION.—

12    "(i) IN GENERAL.—At any time, in-

13    cluding at the initial stages of develop-

14    ment, an applicant or a prospective appli-

15    cant under this subsection may send a

16    written request for patent information to

17    the holder of the approved application for

18    the reference product. The holder of the

19    approved application for the reference

20    product shall, not later than 60 days after

21    the date on which the holder receives the

22    request, provide to the applicant or pro-

23    spective applicant a list of all those patents

24    owned by, or licensed to, the holder of the

25    approved application that the holder be-

27

1　　lieves in good faith relate to the reference

2　　product, including patents that claim the

3　　approved biological product, any method of

4　　using such product, any component of such

5　　product, or any method or process of man-

6　　ufacturing such product or component.

7　　　　"(ii) COSTS OF COMPLYING WITH RE-

8　　QUEST.—The application holder may de-

9　　mand payment of not more than $1,000 to

10　　offset the cost of responding to the request

11　　for information.

12　　　　"(iii) UPDATES.—For a period of two

13　　years beginning on the date on which the

14　　holder of the approved application for the

15　　reference product receives the request for

16　　information, the holder shall send to the

17　　applicant or prospective applicant updates

18　　of its response to the request for informa-

19　　tion by identifying all relevant patents

20　　issued or licensed to the holder after the

21　　initial response under clause (i). Any such

22　　update must be provided, in the case of a

23　　new patent, not later than 30 days after

24　　the date on which the patent is issued and,

25　　in the case of a license, not later than 30

28

1 days after the date on which the holder ob-

2 tains the license.

3  "(iv) ADDITIONAL REQUESTS.—The

4  applicant may submit additional requests

5  for patent information, subject to the re-

6  quirements of this paragraph, at any time.

7  "(B) PATENT NOTIFICATIONS.—At any

8 time after submitting an application under this

9 subsection, the applicant may provide a notice

10 of the application with respect to any one or

11 more patents identified by the holder of the ref-

12 erence product pursuant to subparagraph (A).

13 An applicant may submit additional notices at

14 any time, and each notice shall be subject to

15 the provisions of this subparagraph. Each no-

16 tice shall—

17  "(i) be sent to the holder of the ap-

18  proved application for the reference prod-

19  uct and to the owner of any patent identi-

20  fied by the holder pursuant to subpara-

21  graph (A);

22  "(ii) include a detailed statement of

23  the factual and legal bases for the appli-

24  cant's belief that the patents included in

25  the notice are invalid, are unenforceable, or

29

1    will not be infringed by the commercial

2    sale of the product for which approval is

3    being sought under this subsection; and

4        "(iii) identify 1 or more judicial dis-

5        tricts in which the applicant consents to

6        such suit being brought.

7        "(C) ACTION FOR INFRINGEMENT.—With-

8    in 45 days after the date on which the holder

9    of the approved application for the reference

10   product, or the owner of a patent, receives a no-

11   tice under subparagraph (B), the holder or pat-

12   ent owner may bring an action for infringement

13   only with respect to the patent or patents in-

14   cluded in the notice, and only in a judicial dis-

15   trict identified pursuant to subparagraph

16   (B)(iii).

17       "(D) LIMITATION ON DECLARATORY JUDG-

18   MENT ACTIONS.—With respect to any patent re-

19   lating to a product that is the subject of an ap-

20   plication under this subsection, the recipient of

21   a notice under subparagraph (B) with respect

22   to that application may not, prior to the com-

23   mercial marketing of the product, bring any ac-

24   tion under section 2201 of title 28, United

25   States Code, for a declaration of infringement,

30

1    validity, or enforceability of any such patent

2    that was not identified in the notice. With re-

3    spect to any such patent identified in the no-

4    tice, any such action may, notwithstanding

5    chapter 87 of title 28, United States Code, be

6    brought only in a judicial district identified in

7    the notice.

8    "(E) DISCRETION OF APPLICANTS.—An

9    applicant or prospective applicant for a com-

10   parable biological product under this subsection

11   may not be compelled, by court order or other-

12   wise, to initiate the procedures set forth in this

13   paragraph. Nothing in this paragraph requires

14   an applicant or a prospective applicant to in-

15   voke the procedures set forth in this paragraph.

16   "(18) PETITIONS AND CIVIL ACTIONS REGARD-

17   ING APPROVAL OF CERTAIN APPLICATIONS.—

18   "(A) IN GENERAL.—With respect to a

19   pending application submitted under paragraph

20   (1) or (2), if a petition is submitted to the Sec-

21   retary that seeks to have the Secretary take, or

22   refrain from taking, any form of action relating

23   to the approval of the application, including a

24   delay in the effective date of the application,

31

1    the following applies, subject to subparagraph

2    (E):

3    "(i)(I) The Secretary may not, on the

4    basis of the petition, delay approval of the

5    application unless the Secretary deter-

6    mines, within 30 days after receiving the

7    petition, that a delay is necessary to pro-

8    tect the public health. Consideration of a

9    petition shall be separate and apart from

10    the review and approval of the application.

11    "(II) With respect to a determination

12    by the Secretary under subclause (I) that

13    a delay is necessary to protect the public

14    health:

15    "(aa) The Secretary shall publish

16    on the Internet site of the Food and

17    Drug Administration a statement pro-

18    viding the reasons underlying the de-

19    termination.

20    "(bb) Not later than 10 days

21    after making the determination, the

22    Secretary shall provide notice to the

23    sponsor of the application and an op-

24    portunity for a meeting with the Com-

32

1      missioner to discuss the determina-
2      tion.
3          "(ii) The Secretary shall take final
4      agency action on the petition not later
5      than 180 days after the date on which the
6      petition is submitted. The Secretary shall
7      not extend such period, even with the con-
8      sent of the petitioner, for any reason, in-
9      cluding based upon the submission of com-
10     ments relating to the petition or supple-
11     mental information supplied by the peti-
12     tioner.
13         "(iii) The Secretary may not consider
14     the petition for review unless it is signed
15     and contains the following verification: 'I
16     certify that, to my best knowledge and be-
17     lief: (a) this petition includes all informa-
18     tion and views upon which the petition re-
19     lies; (b) this petition includes representa-
20     tive data and/or information known to the
21     petitioner which are unfavorable to the pe-
22     tition; and (c) I have taken reasonable
23     steps to ensure that any representative
24     data and/or information which are unfavor-
25     able to the petition were disclosed to me.

33

1     I further certify that the information upon

2     which I have based the action requested

3     herein first became known to the party on

4     whose behalf this petition is submitted on

5     or      about      the      following      date:

6     _____. I received or expect to

7     receive payments, including cash and other

8     forms of consideration, from the following

9     persons or organizations to file this peti-

10    tion: _____. I verify under

11    penalty of perjury that the foregoing is

12    true and correct.'.

13    "(B) EXHAUSTION OF ADMINISTRATIVE

14    REMEDIES.—

15         "(i) FINAL AGENCY ACTION WITHIN

16    180 DAYS.—The Secretary shall be consid-

17    ered to have taken final agency action on

18    a petition referred to in subparagraph (A)

19    if—

20         "(I) during the 180-day period

21    referred to in clause (ii) of such sub-

22    paragraph, the Secretary makes a

23    final decision within the meaning of

24    section 10.45(d) of title 21, Code of

34

| | |
|---|---|
| 1 | Federal Regulations (or any successor |
| 2 | regulations); or |
| 3 | "(II) such period expires without |
| 4 | the Secretary having made such a |
| 5 | final decision. |
| 6 | "(ii) DISMISSAL OF CERTAIN CIVIL |
| 7 | ACTIONS.—If a civil action is filed with re- |
| 8 | spect to a petition referred to in subpara- |
| 9 | graph (A) before final agency action within |
| 10 | the meaning of clause (i) has occurred, the |
| 11 | court shall dismiss the action for failure to |
| 12 | exhaust administrative remedies. |
| 13 | "(C) APPLICABILITY OF CERTAIN REGULA- |
| 14 | TIONS.—The provisions of this section are in |
| 15 | addition to the requirements for the submission |
| 16 | of a petition to the Secretary that apply under |
| 17 | section 10.30 or 10.35 of title 21, Code of Fed- |
| 18 | eral Regulations (or any successor regulations). |
| 19 | "(D) ANNUAL REPORT ON DELAYS IN AP- |
| 20 | PROVALS PER PETITIONS.—The Secretary shall |
| 21 | annually submit to the Congress a report that |
| 22 | specifies— |
| 23 | "(i) the number of applications under |
| 24 | this subsection that were approved during |
| 25 | the preceding 12-month period; |

35

1                 "(ii) the number of such applications

2                 whose effective dates were delayed by peti-

3                 tions referred to in subparagraph (A) dur-

4                 ing such period; and

5                    "(iii) the number of days by which the

6                 applications were so delayed.

7            "(E) EXCEPTION.—This paragraph does

8         not apply to a petition that is made by the

9         sponsor of an application under this subsection

10        and that seeks only to have the Secretary take

11        or refrain from taking any form of action with

12        respect to that application.

13            "(F) DEFINITION.—For purposes of this

14        paragraph, the term 'petition' includes any re-

15        quest to the Secretary, without regard to

16        whether the request is characterized as a peti-

17        tion.".

18    (b) ADDITIONAL AMENDMENTS.—

19        (1) PATENTS.—Section 271(e) of title 35,

20   United States Code, is amended—

21        (A) in paragraph (2)—

22            (i) by striking "or" at the end of sub-

23        paragraph (A);

24            (ii) by adding "or" at the end of sub-

25        paragraph (B);

36

1          (iii) by inserting after subparagraph

2          (B) the following:

3      "(C)    a    notice    described    in    section

4  351(k)(17)(B) of the Public Health Service Act, but

5  only with respect to a patent identified in such no-

6  tice,"; and

7              (iv) in the matter following subpara-

8              graph (C) (as inserted by clause (iii) of

9              this subparagraph), by inserting before the

10             period the following: ", or if the notice de-

11             scribed in subparagraph (C) is provided in

12             connection with an application to obtain a

13             license to engage in the commercial manu-

14             facture, use, or sale of a biological product

15             claimed in a patent or the use of which is

16             claimed in a patent before the expiration of

17             such patent"; and

18         (B) by adding at the end the following

19     paragraph:

20     "(6) (A) This paragraph applies, in lieu of paragraph

21  (4), in the case of a patent—

22             "(i) which is disclosed in a response to a

23             request for patent information pursuant to sub-

24             paragraph (A) of section 351(k)(17) of the

25             Public Health Service Act;

37

1               "(ii) with respect to which a notice was

2             provided pursuant to subparagraph (B) of such

3             section; and

4               "(iii) for which an action for infringement

5             of the patent—

6                   "(I) was brought after the expiration

7                 of the 45-day period described in subpara-

8                 graph (C) of such section; or

9                   "(II) was brought before the expira-

10               tion of the 45-day period described in sub-

11               clause (I), but which was dismissed with-

12               out prejudice or was not prosecuted to

13               judgment in good faith.

14         "(B) In an action for infringement of a patent

15 described in subparagraph (A), the sole and exclu-

16 sive remedy that may be granted by a court, upon

17 a finding that the person who submitted the notice

18 described in subparagraph (A)(ii) infringed the pat-

19 ent, or that any person induced or contributed to in-

20 fringement of the patent, shall be a reasonable roy-

21 alty.

22         "(C) The owner of a patent that should have

23 been disclosed in response to a request for patent in-

24 formation made by an applicant pursuant to sub-

25 paragraph (A)(i) of section 351(k)(17) of the Public

38

1    Health Service Act, but that was not timely dis-

2    closed under that subparagraph, may not bring an

3    action under this section for infringement of that

4    patent.".

5    (2) CONFORMING AMENDMENTS.—

6    (A) TITLE 28.—Section 2201(b) of title

7    28, United States Code, is amended by insert-

8    ing before the period the following: ", or section

9    351 of the Public Health Service Act".

10    (B) PUBLIC HEALTH SERVICE ACT.—Sub-

11    jection (j) of section 351 of the Public Health

12    Service Act (42 U.S.C. 262) is amended by in-

13    serting "or subsection (k)" after "subsection

14    (a)".

○

# EXHIBIT I

II

110TH CONGRESS
1ST SESSION

# S. 623

To amend the Public Health Service Act to provide for the licensing of comparable and interchangeable biological products, and for other purposes.

---

## IN THE SENATE OF THE UNITED STATES

FEBRUARY 15, 2007

Mr. SCHUMER (for himself, Mrs. CLINTON, Mr. VITTER, Ms. COLLINS, Mr. LEAHY, and Ms. STABENOW) introduced the following bill; which was read twice and referred to the Committee on Homeland Security and Governmental Affairs

---

# A BILL

To amend the Public Health Service Act to provide for the licensing of comparable and interchangeable biological products, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Access to Life-Saving

5 Medicine Act".

6 **SEC. 2. DEFINITIONS.**

7    (a) AMENDMENTS.—Section 351(i) of the Public

8 Health Service Act (42 U.S.C. 262(i)) is amended—

2

1        (1) by striking "In this section, the term 'bio-

2    logical product' means" and inserting the following:

3    "In this section:

4        "(1) The term 'biological product' means"; and

5        (2) by adding at the end the following:

6        "(2) The term 'abbreviated biological product

7    application' means an abbreviated application for a

8    license of a biological product containing the same,

9    or similar, active ingredient as a reference product.

10        "(3) The term 'reference product' means the

11    single licensed biological product, approved under

12    subsection (a) or subsection (k), against which a bio-

13    logical product is evaluated for demonstration of

14    safety, potency, or purity.

15        "(4) The term 'comparable' or 'comparability'

16    in reference to a biological product means the ab-

17    sence of clinically meaningful differences between

18    the biological product and the reference product in

19    terms of the safety, purity, and potency of the prod-

20    uct based upon—

21        "(A) data derived from chemical, physical,

22        and biological assays, and other non-clinical

23        laboratory studies; and

24        "(B) data from any necessary clinical

25        study or studies sufficient to confirm safety,

3

1        purity, and potency in one or more appropriate

2        conditions of use for which the reference prod-

3        uct is licensed and intended to be used.

4    Any studies under subparagraph (B) shall be de-

5    signed to avoid duplicative and unethical clinical

6    testing.

7        "(5) The terms 'interchangeable' and 'inter-

8    changeability' mean, with respect to the condition of

9    use involved, that the biological product—

10        "(A) is comparable to the reference prod-

11        uct; and

12        "(B) can be expected to produce the same

13        clinical result as the reference product in any

14        given patient.

15        "(6) The term 'thorough characterization'

16    means an analysis of structural features based upon

17    appropriate analytical and functional testing suffi-

18    cient to identify differences between a biological

19    product and reference product relevant to safety, pu-

20    rity or potency.

21        "(7) The term 'final action' means, with respect

22    to an abbreviated biological product application, the

23    Secretary's issuance of a final action letter to the

24    sponsor of an abbreviated biological product applica-

25    tion which—

4

1          "(A) approves the application; or

2          "(B) disapproves the application and sets

3      forth in detail an enumeration of the specific

4      deficiencies in the particular application and of

5      the specific, enumerated actions the sponsor

6      would be required to take in order for the spon-

7      sor to receive a final action letter that approves

8      such application.

9      "(8) The term 'final action date' means, with

10  respect to an abbreviated biological product applica-

11  tion, the date by which the Secretary must take a

12  final action on the application pursuant to sub-

13  section (k)(11).

14     "(9) The term 'reviewing division' means the

15  division responsible for the review of an application

16  for approval of a biological product (including all sci-

17  entific and medical matters, chemistry, manufac-

18  turing, and controls).".

19     (b) RULE OF CONSTRUCTION.—Nothing in this Act

20  or the amendments made by this Act shall be construed

21  to exclude an application for licensure of a biological prod-

22  uct under section 351(k) from the definition of a human

23  drug application in section 735(1)(C) of the Federal Food,

24  Drug, and Cosmetic Act (21 U.S.C. 379g(1)(C)).

5

1 **SEC. 3. REGULATION OF COMPARABLE AND INTERCHANGE-**

2 **ABLE BIOLOGICAL PRODUCTS.**

3    (a) IN GENERAL.—Section 351 of the Public Health

4 Service Act (42 U.S.C. 262) is amended—

5        (1) in subsection (a)(1)(A), by inserting "under

6    this subsection or subsection (k)" after "biologics li-

7    cense"; and

8        (2) by adding at the end the following sub-

9    section:

10 "(k) REGULATION OF COMPARABLE AND INTER-

11 CHANGEABLE BIOLOGICAL PRODUCTS.—

12        "(1) SUBMISSION OF AN ABBREVIATED BIO-

13    LOGICAL PRODUCT APPLICATION.—Any person may

14    file with the Secretary an abbreviated biological

15    product application. Any such application shall in-

16    clude the following:

17            "(A) Data demonstrating that the biologi-

18        cal product is comparable to or interchangeable

19        with the reference product.

20            "(B) Data demonstrating that the biologi-

21        cal product and reference product contain high-

22        ly similar principal molecular structural fea-

23        tures, notwithstanding minor differences in het-

24        erogeneity profile, impurities, or degradation

25        patterns. The Secretary shall find the following

6

1       types of products to contain highly similar prin-

2       cipal molecular structural features:

3               "(i) Two protein biological products

4               with differences in structure between them

5               solely due to post-translational events, infi-

6               delity of translation or transcription, or

7               minor differences in amino acid sequence.

8               "(ii) Two polysaccharide biological

9               products with similar saccharide repeating

10              units, even if the number of units differ

11              and even if there are differences in post-

12              polymerization modifications.

13              "(iii) Two glycosylated protein prod-

14              ucts with differences in structure between

15              them solely due to post-translational

16              events, infidelity of translation or tran-

17              scription, or minor differences in amino

18              acid sequence, and if they had similar sac-

19              charide repeating units, even if the number

20              of units differ and even if there were dif-

21              ferences in post-polymerization modifica-

22              tions.

23              "(iv) Two polynucleotide biological

24              products with identical sequence of purine

25              and pyrimidine bases (or their derivatives)

7

1         bound to an identical sugar backbone (ri-

2         bose, deoxyribose, or modifications of these

3         sugars).

4              "(v) Closely related, complex partly

5            definable biological products with similar

6            therapeutic intent, such as two live viral

7            products for the same indication.

8         Two biological products not enumerated in the

9         foregoing clauses may be demonstrated to con-

10        tain highly similar principal molecular struc-

11        tural features based upon such data and other

12        information characterizing the two products as

13        the Secretary determines to be necessary.

14              "(C) Data demonstrating that the biologi-

15        cal product and reference product utilize the

16        same mechanism or mechanisms of action for

17        the condition or conditions of use prescribed,

18        recommended, or suggested in the proposed la-

19        beling, but only to the extent the mechanism or

20        mechanisms of action are known for the ref-

21        erence product.

22              "(D) Information to show that the condi-

23        tion or conditions of use prescribed, rec-

24        ommended, or suggested in the labeling pro-

8

1    posed for the biological product have been pre-
2    viously approved for the reference product.

3        "(E) Information to show that the route of
4    administration, the dosage form, and the
5    strength of the biological product are the same
6    as those of the reference product.

7        "(F) Data demonstrating that the facility
8    in which the biological product is manufactured,
9    processed, packed, or held meets standards de-
10   signed to assure that the biological product con-
11   tinues to be safe, pure, and potent.

12       "(G) At the applicant's option, publicly-
13   available information regarding the Secretary's
14   previous determination that the reference prod-
15   uct is safe, pure, and potent.

16       "(H) Any additional data and information
17   in support of the application, including publicly-
18   available information with respect to the ref-
19   erence product or another biological product.

20       "(2) OTHER APPLICATIONS.—Any person, in-
21   cluding a person who has not conducted and does
22   not have a right of reference to the studies in the
23   application for a reference product, may submit an
24   application under this paragraph for a biological
25   product that differs from, or incorporates a change

9

1    to, the reference product with respect to one or more
2    characteristics described in subparagraphs (A)
3    through (E) of paragraph (1), including a difference
4    in safety, purity, or potency, so long as the applica-
5    tion contains sufficient information to establish the
6    safety, purity, and potency of the biological product
7    relative to the reference product for its proposed
8    condition or conditions of use.

9        "(3) FDA REVIEW OF ABBREVIATED BIOLOGI-
10    CAL PRODUCT APPLICATIONS.—

11            "(A) GUIDANCE REGARDING REVIEW OF
12        APPLICATIONS.—The Secretary shall issue guid-
13        ance for the individuals who review applications
14        submitted under paragraph (1) or (2), which
15        shall relate to promptness in conducting the re-
16        view, technical excellence, lack of bias and con-
17        flict of interest, and knowledge of regulatory
18        and scientific standards, and which shall apply
19        equally to all individuals who review such appli-
20        cations.

21            "(B) MEETINGS WITH SPONSORS AND AP-
22        PLICANTS.—The Secretary shall meet with a
23        sponsor of an investigation or an applicant for
24        approval of a comparable or interchangeable bi-
25        ological product under this subsection if the

10

1 sponsor or applicant makes a reasonable writ-
2 ten request for a meeting for the purpose of
3 reaching agreement on the design and size of
4 studies needed for approval of the application.
5 The sponsor or applicant shall provide informa-
6 tion necessary for discussion and agreement on
7 the design and size of such studies. Minutes of
8 any such meeting shall be prepared by the Sec-
9 retary and made available to the sponsor or ap-
10 plicant.

11 "(C) AGREEMENTS.—Any agreement re-
12 garding the parameters of design and size of
13 the studies of a biological product under this
14 paragraph that is reached between the Sec-
15 retary and a sponsor or applicant shall be re-
16 duced to writing and made part of the adminis-
17 trative record by the Secretary. Such agreement
18 shall not be changed after the testing begins,
19 except—

20 "(i) with the written agreement of the
21 sponsor or applicant; or

22 "(ii) pursuant to a decision, made in
23 accordance with subparagraph (D) by the
24 director of the reviewing division, that a
25 substantial scientific issue essential to de-

11

1        termining the safety, purity, and potency

2        of the biological product has been identi-

3        fied after the testing has begun.

4        "(D) PROCEDURE REGARDING CERTAIN

5    DECISIONS.—A decision under subparagraph

6    (C)(ii) by the director shall be in writing and

7    the Secretary shall provide to the sponsor or

8    applicant an opportunity for a meeting at which

9    the director and the sponsor or applicant will be

10   present and at which the director will document

11   the scientific issue involved.

12       "(E) EFFECT OF DECISIONS.—The written

13   decisions of the reviewing division shall be bind-

14   ing upon, and may not directly or indirectly be

15   changed by, the field or compliance office per-

16   sonnel unless such field or compliance office

17   personnel demonstrate to the reviewing division

18   why such decision should be modified.

19       "(F) DELAYS BY REVIEWING DIVISIONS.—

20   No action by the reviewing division may be de-

21   layed because of the unavailability of informa-

22   tion from or action by field personnel unless the

23   reviewing division determines that a delay is

24   necessary to assure the marketing of a safe,

25   pure, and potent biological product.

12

"(4) APPROVAL OF COMPARABLE OR INTER-
CHANGEABLE BIOLOGICAL PRODUCTS.—

"(A) DETERMINATION OF COM-
PARABILITY.—Upon review of an application
submitted under paragraph (1) or (2) for a bio-
logical product, the Secretary shall issue a com-
parable biological product license for all condi-
tions of use of the reference product sharing
the same mechanism or mechanisms of action
for which the applicant has demonstrated com-
parability for a single condition of use, or, if the
mechanism or mechanisms of action are un-
known, for the condition or conditions of use
for which the data submitted establishes com-
parability, unless the Secretary finds and in-
forms the applicant that—

"(i) information submitted in the ap-
plication or any other information available
to the Secretary is insufficient to show
that the biological product is comparable
to the reference product for the condition
or conditions of use prescribed, rec-
ommended, or suggested in the labeling
proposed in the application;

13

1          "(ii) information submitted in the ap-

2      plication or any other information available

3      to the Secretary is insufficient to show

4      that the biological product and the ref-

5      erence product contain highly similar prin-

6      cipal molecular structural features, not-

7      withstanding minor differences in hetero-

8      geneity profile, impurities, or degradation

9      patterns;

10         "(iii) information submitted in the ap-

11     plication or any other information available

12     to the Secretary is insufficient to show

13     that the biological product and reference

14     product utilize the same mechanism or

15     mechanisms of action for the conditions of

16     use prescribed, recommended, or suggested

17     in the labeling proposed for the biological

18     product, unless the mechanism or mecha-

19     nisms of action are not known for the ref-

20     erence product for such condition or condi-

21     tions;

22         "(iv) information submitted in the ap-

23     plication or any other information available

24     to the Secretary is insufficient to show

25     that the route of administration, the dos-

14

1    age form, and the strength of the biological

2    product are the same as those of the ref-

3    erence product;

4        "(v) information submitted in the ap-

5    plication or any other information available

6    to the Secretary is insufficient to show

7    that the condition or conditions of use pre-

8    scribed, recommended, or suggested in the

9    labeling proposed for the biological product

10   are limited to one or more of the same use

11   or uses as have been previously approved

12   for the reference product;

13       "(vi) information submitted in the ap-

14   plication or any other information available

15   to the Secretary shows (I) the inactive in-

16   gredients of the biological product are un-

17   safe for use under the conditions pre-

18   scribed, recommended, or suggested in the

19   labeling proposed for the biological prod-

20   uct, or (II) the composition of the biologi-

21   cal product is unsafe under such conditions

22   because of the type or quantity of inactive

23   ingredients included or the manner in

24   which the inactive ingredients are included;

15

1          "(vii) information submitted in the
2     application or any other information avail-
3     able to the Secretary fails to demonstrate
4     that the facility in which the biological
5     product is manufactured, processed,
6     packed, or held meets standards designed
7     to assure that the biological product con-
8     tinues to be safe, pure, and potent;

9          "(viii) the Secretary has withdrawn or
10    suspended the license of the reference
11    product, for safety or effectiveness reasons,
12    or has published a notice of opportunity
13    for hearing to withdraw such license for
14    safety or effectiveness reasons, or the Sec-
15    retary has determined that the reference
16    product has been withdrawn from sale for
17    safety or effectiveness reasons; or

18         "(ix) the application contains an un-
19    true statement of material fact; and
20    provides the applicant with a detailed expla-
21    nation for the decision.

22         "(B) DETERMINATIONS ON INTERCHANGE-
23    ABILITY.—Subject to subparagraph (C) and
24    paragraph (10), upon issuing a product license
25    for a biological product under subparagraph

16

1  (A), the Secretary shall make and publish one

2  of the following determinations:

3  "(i) Such product is interchangeable

4  with the reference product for one or more

5  specified conditions of use prescribed, rec-

6  ommended, or suggested in the labeling of

7  the biological product.

8  "(ii) Interchangeability has not been

9  established.

10  "(C) DETERMINATION OF INTERCHANGE-

11  ABILITY OF SUBSEQUENT BIOLOGICAL PROD-

12  UCT.—If the Secretary determines that an ap-

13  plication meets the approval requirements of

14  subparagraph (A), and, prior to the issuance of

15  a product license, the Secretary has made a de-

16  termination of interchangeability of another bio-

17  logical product and the reference product for

18  which the exclusivity period under paragraph

19  (10) has not expired, the Secretary shall—

20  "(i) issue the product license for the

21  subsequent biological product; and

22  "(ii) defer issuing any determination

23  of interchangeability as to the subsequent

24  biological product and the reference prod-

17

1          uct until the exclusivity period under para-

2          graph (10) has expired.

3     "(5) POSTMARKETING STUDIES FOR APPLICA-

4     TIONS SUBMITTED UNDER PARAGRAPH (1).—If the

5     Secretary has agreed with the sponsor of the ref-

6     erence product, at the time of approval or any time

7     thereafter, that the sponsor shall conduct one or

8     more postmarketing safety studies, a person submit-

9     ting an application for a biological product under

10    paragraph (1) may agree with the Secretary to con-

11    duct a similar postmarketing safety study or studies

12    upon a reasonable showing that such study or stud-

13    ies would provide relevant information not available

14    from the studies on the reference product. The Sec-

15    retary shall not, as a condition of approval, propose

16    any additional postmarketing studies for such bio-

17    logical product.

18    "(6) DESIGNATION OF OFFICIAL NAME.—If,

19    pursuant to section 508 of the Federal Food, Drug,

20    and Cosmetic Act, the Secretary determines that

21    designation of an official name for a comparable bio-

22    logical product is necessary or desirable in the inter-

23    ests of usefulness or simplicity, the Secretary shall

24    designate the same official name for the comparable

25    biological product as the Secretary designated for

18

1    the reference product. This paragraph shall not

2    apply to products approved under paragraph (7).

3        "(7) OTHER APPROVAL PROVISIONS.—The Sec-

4    retary shall approve, under the provisions of para-

5    graph (4)(A), an application for a license submitted

6    under paragraph (2), except that the Secretary shall

7    approve such an application that would otherwise be

8    disapproved by reason of one or more of subpara-

9    graphs (A) through (E) of paragraph (4)(A), if the

10    application and any other information available to

11    the Secretary are sufficient to establish the safety,

12    purity, and potency of the comparable biological

13    product relative to the reference product for the pro-

14    posed condition or conditions of use for such prod-

15    uct.

16        "(8) ESTABLISHING INTERCHANGEABILITY FOR

17    COMPARABLE BIOLOGICAL PRODUCTS.—

18            "(A) IN GENERAL.—In an original applica-

19        tion or a supplement to an application under

20        this subsection, an applicant may submit infor-

21        mation to the Secretary to demonstrate the

22        interchangeability of a comparable biological

23        product and the reference product. An applicant

24        may withdraw an interchangeability submission

25        at any time. A request for an interchangeability

19

1    determination submitted after the filing of an
2    application shall be considered a major amend-
3    ment to the application. Nothing in this sub-
4    section shall be construed to prohibit the Sec-
5    retary from making a determination of inter-
6    changeability at any time after approval.

7        "(B) GUIDANCE.—Within one year after
8    enactment of the Access to Life-Saving Medi-
9    cine Act, the Secretary shall issue guidance re-
10   garding standards and requirements for inter-
11   changeability. The Secretary may make deter-
12   minations of interchangeability under para-
13   graph (4)(B) prior to issuing guidance under
14   this subparagraph.

15       "(9) INTERCHANGEABILITY LABELING FOR
16   COMPARABLE BIOLOGICAL PRODUCTS.—Upon a de-
17   termination of interchangeability, the Secretary, if
18   requested by the applicant, shall provide for the
19   label of the comparable biological product to include
20   a statement that the biological product is inter-
21   changeable with the reference product for the condi-
22   tions of use prescribed, recommended, or suggested
23   in the labeling for which interchangeability has been
24   established.

25       "(10) EXCLUSIVITY.—

20

1          "(A) IN GENERAL.—Upon review of an ab-

2     breviated biological product application relying

3     on the same reference product for which a prior

4     biological product has received a determination

5     of interchangeability for any condition of use,

6     the Secretary shall not make a determination

7     under paragraph (4)(B) that the second or sub-

8     sequent biological product is interchangeable for

9     any condition of use, and no holder of a biologi-

10    cal product license approved under subsection

11    (a) shall manufacture, market, sell, or dis-

12    tribute a rebranded interchangeable biological

13    product, directly or indirectly, or authorize any

14    other person to manufacture, market, sell, or

15    distribute a rebranded interchangeable biologi-

16    cal product, for any condition of use, until the

17    earlier of—

18              "(i) 180 days after the first commer-

19         cial marketing of the first interchangeable

20         comparable biological product to be ap-

21         proved as interchangeable for that ref-

22         erence product;

23              "(ii) one year after—

24                   "(I) a final court decision on all

25              patents in suit in an action instituted

21

1                under paragraph (17)(C) against the

2                applicant that submitted the applica-

3                tion for the first approved inter-

4                changeable comparable biological

5                product; or

6                    "(II) the dismissal with or with-

7                out prejudice of an action instituted

8                under paragraph (17)(C) against the

9                applicant that submitted the applica-

10               tion for the first approved inter-

11               changeable comparable biological

12               product; or

13                   "(iii)(I) 36 months after approval of

14               the first interchangeable comparable bio-

15               logical product if the applicant has been

16               sued under paragraph (17)(C) and such

17               litigation is still ongoing within such 36-

18               month period; or

19                   "(II) one year after approval in the

20               event that the first approved interchange-

21               able comparable applicant has not been

22               sued under paragraph (17)(C).

23          For purposes of this subparagraph, the term

24          'final court decision' means a final decision of

25          a court from which no appeal (other than a pe-

22

1    tition to the United States Supreme Court for

2    a writ of certiorari) has been or can be taken.

3    "(B) REBRANDED INTERCHANGEABLE BI-

4    OLOGICAL PRODUCT.—For purposes of this sub-

5    section, the term 'rebranded interchangeable bi-

6    ological product'—

7        "(i)  means  any  rebranded  inter-

8        changeable version of the reference product

9        involved that the holder of the biological

10       product license approved under subsection

11       (a)  for  that  reference  product  seeks  to

12       commence  marketing,  selling,  or  distrib-

13       uting, directly or indirectly; and

14           "(ii) does not include any product to

15       be marketed, sold, or distributed—

16           "(I) by an entity eligible for ex-

17           clusivity with respect to such product

18           under this paragraph; or

19           "(II) after expiration of any ex-

20           clusivity with respect to such product

21           under this paragraph.

22   "(11) HEARING.—If the Secretary decides to

23   disapprove an abbreviated biological product applica-

24   tion, the Secretary shall give the applicant notice of

25   an opportunity for a hearing before the Secretary on

23

1    the question of whether such application is approv-

2    able. If the applicant elects to accept the opportunity

3    for hearing by written request within thirty days

4    after such notice, such hearing shall commence not

5    more than ninety days after the expiration of such

6    thirty days unless the Secretary and the applicant

7    otherwise agree. Any such hearing shall thereafter

8    be conducted on an expedited basis, and the Sec-

9    retary's order thereon shall be issued within ninety

10    days after the date fixed by the Secretary for filing

11    final briefs.

12    "(12) FINAL ACTION DATE.—

13    "(A) IN GENERAL.—The Secretary shall

14    take a final action on an abbreviated biological

15    product application by the date that is 8 cal-

16    endar months following the sponsor's submis-

17    sion of such application, or 180 days following

18    the Secretary's notification to the applicant that

19    its application has been accepted for filing,

20    whichever is earlier.

21    "(B) EXTENSION.—The final action date

22    provided by subparagraph (A) with respect to

23    an application may be extended for such period

24    of time as is agreed to by the Secretary and the

25    applicant in a jointly executed written agree-

24

1    ment that is counter-signed by the Secretary
2    and the applicant no later than 30 days prior
3    to such date.

4    "(13) REQUEST FOR DELAY OF FINAL AC-
5    TION.—Notwithstanding paragraph (18) or any
6    other provision of law, the Secretary shall not fail or
7    refuse to take a final action on an abbreviated bio-
8    logical product application by the final action date
9    on the basis that a person, other than the com-
10   parable biological product applicant, has requested
11   (in a petition or otherwise) that the Secretary refuse
12   to take or otherwise defer such final action, and no
13   court shall enjoin the Secretary from taking final ac-
14   tion or stay the effect of final action previously
15   taken by the Secretary, except by issuance of a per-
16   manent injunction based upon an express finding of
17   clear and convincing evidence that the person seek-
18   ing to have the Secretary refuse to take or otherwise
19   to defer final action by the final action date—

20        "(A) has prevailed on the merits of the
21        person's complaint against the Secretary;

22        "(B) will suffer imminent and actual irrep-
23        arable injury, constituting more than irrecover-
24        able economic loss, and that also will threaten

25

1           imminent destruction of such person's business;

2           and

3                "(C) has an interest that outweighs the

4           overwhelming interest that the public has in ob-

5           taining prompt access to a comparable biologi-

6           cal product.

7           "(14) REPORT ON EXTENSIONS OF FINAL AC-

8      TION DATE.—The Secretary shall prepare and sub-

9      mit to the President, the Committee on Energy and

10     Commerce of the House of Representatives, and the

11     Committee on Health, Education, Labor, and Pen-

12     sions of the Senate a report regarding any jointly

13     executed written agreement to extend the final ac-

14     tion date under this Act within 15 calendar days

15     after the joint execution of any such written agree-

16     ment.

17          "(15) REPORT ON FAILURE TO TAKE FINAL AC-

18     TION.—The Secretary shall prepare and submit an-

19     nually to the President, the Committee on Energy

20     and Commerce of the House of Representatives, and

21     the Committee on Health, Education, Labor, and

22     Pensions of the Senate a report detailing the specific

23     and particularized reasons enumerated by the re-

24     viewing division for each instance of the Secretary's

26

1   failure to take final action by the final action date

2   in the previous year.

3       "(16) REGULATIONS.—The Secretary shall es-

4   tablish, by regulation within 2 years after the date

5   of the enactment of this subsection, requirements for

6   the efficient review, approval, suspension, and rev-

7   ocation of abbreviated biological product applications

8   under this subsection.

9       "(17) PATENTS.—

10          "(A) REQUEST FOR PATENT INFORMA-

11          TION.—

12              "(i) IN GENERAL.—At any time, in-

13              cluding at the initial stages of develop-

14              ment, an applicant or a prospective appli-

15              cant under this subsection may send a

16              written request for patent information to

17              the holder of the approved application for

18              the reference product. The holder of the

19              approved application for the reference

20              product shall, not later than 60 days after

21              the date on which the holder receives the

22              request, provide to the applicant or pro-

23              spective applicant a list of all those patents

24              owned by, or licensed to, the holder of the

25              approved application that the holder be-

27

1 lieves in good faith relate to the reference

2 product, including patents that claim the

3 approved biological product, any method of

4 using such product, any component of such

5 product, or any method or process of man-

6 ufacturing such product or component.

7 "(ii) COSTS OF COMPLYING WITH RE-

8 QUEST.—The application holder may de-

9 mand payment of not more than $1,000 to

10 offset the cost of responding to the request

11 for information.

12 "(iii) UPDATES.—For a period of two

13 years beginning on the date on which the

14 holder of the approved application for the

15 reference product receives the request for

16 information, the holder shall send to the

17 applicant or prospective applicant updates

18 of its response to the request for informa-

19 tion by identifying all relevant patents

20 issued or licensed to the holder after the

21 initial response under clause (i). Any such

22 update must be provided, in the case of a

23 new patent, not later than 30 days after

24 the date on which the patent is issued and,

25 in the case of a license, not later than 30

28

1    days after the date on which the holder ob-
2    tains the license.

3        "(iv) ADDITIONAL REQUESTS.—The
4        applicant may submit additional requests
5        for patent information, subject to the re-
6        quirements of this paragraph, at any time.

7        "(B) PATENT NOTIFICATIONS.—At any
8    time after submitting an application under this
9    subsection, the applicant may provide a notice
10    of the application with respect to any one or
11    more patents identified by the holder of the ref-
12    erence product pursuant to subparagraph (A).
13    An applicant may submit additional notices at
14    any time, and each notice shall be subject to
15    the provisions of this subparagraph. Each no-
16    tice shall—

17        "(i) be sent to the holder of the ap-
18        proved application for the reference prod-
19        uct and to the owner of any patent identi-
20        fied by the holder pursuant to subpara-
21        graph (A);

22        "(ii) include a detailed statement of
23        the factual and legal bases for the appli-
24        cant's belief that the patents included in
25        the notice are invalid, are unenforceable, or

29

1           will not be infringed by the commercial

2           sale of the product for which approval is

3           being sought under this subsection; and

4                 "(iii) identify 1 or more judicial dis-

5           tricts in which the applicant consents to

6           such suit being brought.

7               "(C) ACTION FOR INFRINGEMENT.—With-

8           in 45 days after the date on which the holder

9           of the approved application for the reference

10          product, or the owner of a patent, receives a no-

11          tice under subparagraph (B), the holder or pat-

12          ent owner may bring an action for infringement

13          only with respect to the patent or patents in-

14          cluded in the notice, and only in a judicial dis-

15          trict identified pursuant to subparagraph

16          (B)(iii).

17               "(D) LIMITATION ON DECLARATORY JUDG-

18          MENT ACTIONS.—With respect to any patent re-

19          lating to a product that is the subject of an ap-

20          plication under this subsection, the recipient of

21          a notice under subparagraph (B) with respect

22          to that application may not, prior to the com-

23          mercial marketing of the product, bring any ac-

24          tion under section 2201 of title 28, United

25          States Code, for a declaration of infringement,

30

1  validity, or enforceability of any such patent

2  that was not identified in the notice. With re-

3  spect to any such patent identified in the no-

4  tice, any such action may, notwithstanding

5  chapter 87 of title 28, United States Code, be

6  brought only in a judicial district identified in

7  the notice.

8  "(E) DISCRETION OF APPLICANTS.—An

9  applicant or prospective applicant for a com-

10  parable biological product under this subsection

11  may not be compelled, by court order or other-

12  wise, to initiate the procedures set forth in this

13  paragraph. Nothing in this paragraph requires

14  an applicant or a prospective applicant to in-

15  voke the procedures set forth in this paragraph.

16  "(18) PETITIONS AND CIVIL ACTIONS REGARD-

17  ING APPROVAL OF CERTAIN APPLICATIONS.—

18  "(A) IN GENERAL.—With respect to a

19  pending application submitted under paragraph

20  (1) or (2), if a petition is submitted to the Sec-

21  retary that seeks to have the Secretary take, or

22  refrain from taking, any form of action relating

23  to the approval of the application, including a

24  delay in the effective date of the application,

31

1  the following applies, subject to subparagraph

2  (E):

3  "(i)(I) The Secretary may not, on the

4  basis of the petition, delay approval of the

5  application unless the Secretary deter-

6  mines, within 30 days after receiving the

7  petition, that a delay is necessary to pro-

8  tect the public health. Consideration of a

9  petition shall be separate and apart from

10  the review and approval of the application.

11  "(II) With respect to a determination

12  by the Secretary under subclause (I) that

13  a delay is necessary to protect the public

14  health:

15  "(aa) The Secretary shall publish

16  on the Internet site of the Food and

17  Drug Administration a statement pro-

18  viding the reasons underlying the de-

19  termination.

20  "(bb) Not later than 10 days

21  after making the determination, the

22  Secretary shall provide notice to the

23  sponsor of the application and an op-

24  portunity for a meeting with the Com-

32

1    missioner to discuss the determina-

2    tion.

3    "(ii) The Secretary shall take final

4    agency action on the petition not later

5    than 180 days after the date on which the

6    petition is submitted. The Secretary shall

7    not extend such period, even with the con-

8    sent of the petitioner, for any reason, in-

9    cluding based upon the submission of com-

10   ments relating to the petition or supple-

11   mental information supplied by the peti-

12   tioner.

13   "(iii) The Secretary may not consider

14   the petition for review unless it is signed

15   and contains the following verification: 'I

16   certify that, to my best knowledge and be-

17   lief: (a) this petition includes all informa-

18   tion and views upon which the petition re-

19   lies; (b) this petition includes representa-

20   tive data and/or information known to the

21   petitioner which are unfavorable to the pe-

22   tition; and (c) I have taken reasonable

23   steps to ensure that any representative

24   data and/or information which are unfavor-

25   able to the petition were disclosed to me.

33

1      I further certify that the information upon

2      which I have based the action requested

3      herein first became known to the party on

4      whose behalf this petition is submitted on

5      or about the following date:

6      _____. I received or expect to

7      receive payments, including cash and other

8      forms of consideration, from the following

9      persons or organizations to file this peti-

10     tion: _____. I verify under

11     penalty of perjury that the foregoing is

12     true and correct.'.

13     "(B) EXHAUSTION OF ADMINISTRATIVE

14     REMEDIES.—

15          "(i) FINAL AGENCY ACTION WITHIN

16          180 DAYS.—The Secretary shall be consid-

17          ered to have taken final agency action on

18          a petition referred to in subparagraph (A)

19          if—

20               "(I) during the 180-day period

21               referred to in clause (ii) of such sub-

22               paragraph, the Secretary makes a

23               final decision within the meaning of

24               section 10.45(d) of title 21, Code of

34

1          Federal Regulations (or any successor
2          regulations); or
3                    "(II) such period expires without
4               the Secretary having made such a
5               final decision.
6               "(ii) DISMISSAL OF CERTAIN CIVIL
7          ACTIONS.—If a civil action is filed with re-
8          spect to a petition referred to in subpara-
9          graph (A) before final agency action within
10         the meaning of clause (i) has occurred, the
11         court shall dismiss the action for failure to
12         exhaust administrative remedies.
13              "(C) APPLICABILITY OF CERTAIN REGULA-
14         TIONS.—The provisions of this section are in
15         addition to the requirements for the submission
16         of a petition to the Secretary that apply under
17         section 10.30 or 10.35 of title 21, Code of Fed-
18         eral Regulations (or any successor regulations).
19              "(D) ANNUAL REPORT ON DELAYS IN AP-
20         PROVALS PER PETITIONS.—The Secretary shall
21         annually submit to the Congress a report that
22         specifies—
23                    "(i) the number of applications under
24               this subsection that were approved during
25               the preceding 12-month period;

35

1        "(ii) the number of such applications

2     whose effective dates were delayed by peti-

3     tions referred to in subparagraph (A) dur-

4     ing such period; and

5        "(iii) the number of days by which the

6     applications were so delayed.

7     "(E) EXCEPTION.—This paragraph does

8  not apply to a petition that is made by the

9  sponsor of an application under this subsection

10  and that seeks only to have the Secretary take

11  or refrain from taking any form of action with

12  respect to that application.

13     "(F) DEFINITION.—For purposes of this

14  paragraph, the term 'petition' includes any re-

15  quest to the Secretary, without regard to

16  whether the request is characterized as a peti-

17  tion.".

18  (b) ADDITIONAL AMENDMENTS.—

19     (1) PATENTS.—Section 271(e) of title 35,

20  United States Code, is amended—

21        (A) in paragraph (2)—

22           (i) by striking "or" at the end of sub-

23        paragraph (A);

24           (ii) by adding "or" at the end of sub-

25        paragraph (B);

36

1          (iii) by inserting after subparagraph

2          (B) the following:

3     "(C)     a     notice     described     in     section

4     351(k)(17)(B) of the Public Health Service Act, but

5     only with respect to a patent identified in such no-

6     tice,"; and

7                    (iv) in the matter following subpara-

8                    graph (C) (as inserted by clause (iii) of

9                    this subparagraph), by inserting before the

10                   period the following: ", or if the notice de-

11                   scribed in subparagraph (C) is provided in

12                   connection with an application to obtain a

13                   license to engage in the commercial manu-

14                   facture, use, or sale of a biological product

15                   claimed in a patent or the use of which is

16                   claimed in a patent before the expiration of

17                   such patent"; and

18          (B) by adding at the end the following

19     paragraph:

20     "(6) (A) This paragraph applies, in lieu of paragraph

21     (4), in the case of a patent—

22                   "(i) which is disclosed in a response to a

23                   request for patent information pursuant to sub-

24                   paragraph (A) of section 351(k)(17) of the

25                   Public Health Service Act;

37

1          "(ii) with respect to which a notice was

2     provided pursuant to subparagraph (B) of such

3     section; and

4          "(iii) for which an action for infringement

5     of the patent—

6               "(I) was brought after the expiration

7          of the 45-day period described in subpara-

8          graph (C) of such section; or

9               "(II) was brought before the expira-

10          tion of the 45-day period described in sub-

11          clause (I), but which was dismissed with-

12          out prejudice or was not prosecuted to

13          judgment in good faith.

14     "(B) In an action for infringement of a patent

15     described in subparagraph (A), the sole and exclu-

16     sive remedy that may be granted by a court, upon

17     a finding that the person who submitted the notice

18     described in subparagraph (A)(ii) infringed the pat-

19     ent, or that any person induced or contributed to in-

20     fringement of the patent, shall be a reasonable roy-

21     alty.

22     "(C) The owner of a patent that should have

23     been disclosed in response to a request for patent in-

24     formation made by an applicant pursuant to sub-

25     paragraph (A)(i) of section 351(k)(17) of the Public

38

1     Health Service Act, but that was not timely dis-

2     closed under that subparagraph, may not bring an

3     action under this section for infringement of that

4     patent.".

5         (2) CONFORMING AMENDMENTS.—

6             (A) TITLE 28.—Section 2201(b) of title

7         28, United States Code, is amended by insert-

8         ing before the period the following: ", or section

9         351 of the Public Health Service Act".

10            (B) PUBLIC HEALTH SERVICE ACT.—Sub-

11         jection (j) of section 351 of the Public Health

12         Service Act (42 U.S.C. 262) is amended by in-

13         serting "or subsection (k)" after "subsection

14         (a)".

○

EXHIBIT J



**A**
**CBO**
**STUDY**

**HOW INCREASED COMPETITION FROM**
**GENERIC DRUGS HAS AFFECTED PRICES**
**AND RETURNS IN THE PHARMACEUTICAL INDUSTRY**

**JULY 1998**

The Congress of the United States
Congressional Budget Office



---

## NOTES

The numbers in the text and tables of this study may not add up to totals because of rounding.

Cover photo ©The Stock Market/Dennis Meyler.

---

# Preface

In 1984, the Drug Price Competition and Patent Term Restoration Act (also known as the Hatch-Waxman Act) created an abbreviated approval process for generic prescription drugs and at the same time extended patent terms for innovator drugs. This Congressional Budget Office (CBO) study examines the extent to which competition from generic drugs has increased since the act. It also analyzes how that competition has affected the returns from developing a drug. The analysis was conducted at the request of the Chairman of the Senate Committee on the Budget.

Anna Cook of CBO's Natural Resources and Commerce Division wrote the study under the supervision of Jan Paul Acton and Elliot Schwartz. The analysis would not have been possible without data and information provided by the Food and Drug Administration (FDA), the Patent and Trademark Office (PTO), the Health Care Financing Administration, and Henry Grabowski of Duke University. A variety of industry experts provided information and insights, including Philip Chao and Donald Hare of the FDA, Karin Tyson of the PTO, Joel Hamilton of the General Accounting Office, David Reiffen of the Federal Trade Commission, Paul Wilson of IMS America, and Gary Persinger of the Pharmaceutical Research and Manufacturers of America (now of the National Pharmaceutical Council). Other outside reviewers included the following economics professors: Ernst Berndt and Scott Stern of MIT, Fiona Scott Morton of Stanford, David Salkever of Johns Hopkins, and F.M. Scherer of Harvard. Within CBO, John Peterson, Linda Bilheimer, Judith Wagner. Patrice Gordon, and Anne Cappabianca (now at Hoffman-La Roche) made extensive and valuable comments. Aaron Zeisler and Carl Muehlmann provided research assistance.

Christian Spoor edited the manuscript, and Melissa Burman proofread it. Angela McCollough typed the many drafts. Kathryn Quattrone prepared the study for publication, and Laurie Brown prepared the electronic version for CBO's World Wide Web site.

June E. O'Neill
Director

July 1998

This study and other CBO publications
are available at CBO's Web site:
http://www.cbo.gov/

# Contents

SUMMARY ix

ONE        INTRODUCTION 1

The Basis for Competition Among Drug Companies    *2*
Changes Made by the Hatch-Waxman Act    *3*
Data Used in This Analysis    *4*

TWO        THE EFFECT OF MANAGED CARE ON
           THE PHARMACEUTICAL MARKET 5

The Rise of Managed Care    *5*
How PBMs Help Hold Down Drug Expenditures    *6*
How Managed Care Affects the Demand
    for Prescription Drugs    *10*
Conclusions    *11*

THREE      PRICING AND COMPETITION IN THE
           PHARMACEUTICAL MARKET 13

Competition Among Brand-Name Drugs    *14*
Factors That Determine Discounts on Brand-
    Name Drugs    *23*
Competition Between Brand-Name and
    Generic Drugs    *27*
Competition Among Generic Drugs    *32*
Conclusions    *34*

FOUR       THE EFFECTS OF THE HATCH-WAXMAN ACT
           ON THE RETURNS FROM INNOVATION 37

Changes to the Length of Patents for Brand-
    Name Drugs    *38*
Changes to the Approval Process for Generic
    Drugs    *43*
Effects on the Returns from Marketing a Drug    *45*
Effects of Proposed Changes to the Hatch-
    Waxman Act    *49*
Conclusions    *50*

APPENDIXES

A           Data Used for the Empirical Estimates   *53*

B           Regression Results on Discounting   *59*

C           Assumptions Behind the Calculation of Returns
              from Marketing a New Drug   *65*

D           The Replacement Effect   *73*

TABLES

| 1. | Market Share and Average Retail Prescription Price, by Type of Drug, 1994 | 15 |
| 2. | Average Time from Clinical Testing to Final Approval for an Innovator Drug | 17 |
| 3. | Percentage of New Drugs Acquired Rather Than Self-Originated by U.S.-Owned Drug Companies | 22 |
| 4. | Average Price Differences for Various Types of Purchasers in the Pharmaceutical Market | 25 |
| 5. | Price Comparison of Generic and Innovator Drugs, by Number of Manufacturers, 1994 | 33 |
| 6. | Generic Subsidiaries or Divisions of Brand-Name Manufacturers | 34 |
| 7. | Changes in Patent Protection for U.S. Pharmaceuticals | 39 |
| 8. | Average Length of Hatch-Waxman Extensions for Drugs Approved Between 1992 and 1995 | 40 |
| 9. | Limits on Hatch-Waxman Extensions for Drugs Approved Between 1992 and 1995 | 41 |
| 10. | Reasons That Some Drugs Approved Between 1992 and 1995 Did Not Receive a Hatch-Waxman Extension | 41 |
| A-1. | Data and Methods Behind CBO's Estimates | 54 |
| B-1. | Variables Used in the Regression Analysis of Discounting | 61 |
| B-2. | Regression Results on Price Dispersion in 1994 | 63 |
| B-3. | The Effects of Generic and Brand-Name Competition on Price Dispersion | 64 |
| C-1. | Assumptions Used to Calculate the Change in Returns from Marketing a Drug | 67 |
| C-2. | Formulas for Calculating Generic Market Share | 69 |
| C-3. | How Sensitive Is the Calculation of Returns to Changes in the Base-Case Assumptions? | 71 |

FIGURES

| | | |
|---|---|---|
| 1. | How PBMs Fit Into the Payment System for Prescription Drugs | 8 |
| 2. | Channels of Distribution for Prescription Drugs | 14 |
| 3. | Change in the Profit Stream for a Typical Innovator Drug | 16 |
| 4. | Choosing a Profit-Maximizing Price for a Drug | 19 |
| 5. | Market Share of the Top Three Innovator Drugs in 66 Therapeutic Classes, 1994 | 23 |
| 6. | Growth in the Market Share of Generic Drugs Since 1984 | 27 |
| 7. | The Average Profit Stream for a Brand-Name Drug Before and After the Hatch-Waxman Act | 46 |

BOXES

| | | |
|---|---|---|
| 1. | Types of Prescription Drugs | 2 |
| 2. | The Role of Changes in State Drug-Product Substitution Laws | 7 |
| 3. | Defining Therapeutic Classes of Drugs | 23 |
| 4. | Studies of How Generic Entry Affects Brand-Name Prices | 30 |
| C-1. | Calculating the Probability of Generic Entry | 68 |
| D-1. | Calculating the Impact of the Replacement Effect and Generic Competition on the Returns from Innovation | 74 |

# Summary

The pharmaceutical market has become increasingly competitive since the early 1980s, in part because of the dramatic growth of the generic drug industry. In 1996, 43 percent of the prescription drugs sold in the United States (as measured in total countable units, such as tablets and capsules) were generic. Twelve years earlier, the figure was just 19 percent. Generic drugs cost less than their brand-name, or "innovator," counterparts. Thus, they have played an important role in holding down national spending on prescription drugs from what it would otherwise have been. Considering only sales through pharmacies, the Congressional Budget Office (CBO) estimates that by substituting generic for brand-name drugs, purchasers saved roughly $8 billion to $10 billion in 1994 (at retail prices).

Three factors are behind the dramatic rise in sales of generic drugs that has made those savings possible. First, the Drug Price Competition and Patent Term Restoration Act of 1984—commonly known as the Hatch-Waxman Act—made it easier and less costly for manufacturers to enter the market for generic, nonantibiotic drugs. Second, by 1980, most states had passed drug-product substitution laws that allowed pharmacists to dispense a generic drug even when the prescription called for a brand-name drug. And third, some government health programs, such as Medicaid, and many private health insurance plans have actively promoted such generic substitution.

Greater sales of generic drugs reduce the returns that pharmaceutical companies earn from developing brand-name drugs. The Hatch-Waxman Act aimed to limit that effect by extending the length of time that a new drug is under patent—and thus protected from generic competitors. Those extensions compensate for the fact that part of the time a drug is under patent it is being reviewed by the Food and Drug Administration (FDA) rather than being sold. The act tried to balance two competing objectives: encouraging competition from generic drugs while maintaining the incentive to invest in developing innovative drugs. It fell somewhat short of achieving that balance, however, in part because the act shortened the average time between the expiration of a brand-name drug's patent and the arrival of generic copies on the market (so-called generic entry) from more than three years to less than three months. More important, it also greatly increased the number of drugs that experience generic competition and, thus, contributed to an increase in the supply of generic drugs. In the end, the cost to producers of brand-name drugs from faster generic entry has roughly offset the benefit they receive from extended patent terms. Meanwhile, the greater competition from generic drugs has somewhat eroded their expected returns from research and development.

CBO estimates that those factors have lowered the average returns from marketing a new drug by roughly 12 percent (or $27 million in 1990 dollars). In this study, "returns from marketing a new drug" refers to the present discounted value of the total stream of future profits expected from an average brand-name drug. Previous studies estimate that those profits had an average present discounted value of $210 million to $230 million (in 1990 dollars) for drugs introduced in the early 1980s. Those returns are

valued at the date of market introduction, after subtracting production costs but not the costs of research and development. Also, because the drugs in those studies were not eligible for the patent-term extensions provided by the Hatch-Waxman Act, those estimates do not account for the benefits of the extensions now available under the act. Thus, those figures can be considered a minimum estimate of the returns from marketing. Only part of the estimated decline in returns can be attributed to the Hatch-Waxman Act; the other factors that have boosted sales of generic drugs have played a role as well.

This study relies on a variety of data to produce its estimates, including a data set that represents about 70 percent of prescription drug sales through retail pharmacies in the United States. The various sets of data all have strengths and weaknesses, which are discussed along with the estimates they generate. In general, the empirical estimates in this study are rough rather than precise measures. They help characterize the increase in competition in the pharmaceutical market and its effects on the profits of drug manufacturers and the prices paid for prescription drugs.

# The Effects of Managed Care on the Pharmaceutical Market

At the same time that the Hatch-Waxman Act has helped increase the supply of generic drugs, changes in the demand for pharmaceuticals have affected the frequency with which generic and brand-name drugs are prescribed and the prices paid for them. Those changes in demand were brought on by newer forms of health care delivery and financing. In particular, because of competitive pressure in the health insurance market, more private-sector health plans have adopted managed care techniques in an effort to hold down overall health spending. The net effect of those techniques on spending for prescription drugs, however, is unclear.

On the one hand, many health plans (including traditional fee-for-service plans) hold down drug costs by "managing" their outpatient prescription drug benefits—either themselves or through organizations called pharmaceutical benefit management companies

(PBMs). Those plans and PBMs use computer networks at pharmacies and electronic card systems for enrollees that allow pharmacists, before filling an enrollee's prescription, to consult a list (or formulary) of the plan's suggested drugs. Formularies typically encourage substituting brand-name drugs with generic versions, or sometimes with other, less expensive brand-name drugs. Savings result not only because of that substitution but also because many manufacturers of brand-name drugs offer discounts to health plans or PBMs in exchange for being included on their formulary. In addition, because they represent a large pool of customers, PBMs can negotiate with pharmacies over the retail prices charged for prescriptions. Since the late 1980s, those various techniques have been putting downward pressure on the prices that PBMs and health plans pay for prescription drugs sold through pharmacies.

On the other hand, health maintenance organizations (HMOs) and some other managed care plans frequently charge lower copayments for health care services—including physician visits and prescription drugs—than traditional fee-for-service plans do. Those lower copayments may lead to greater use of prescription drugs by beneficiaries. The treatment practices of HMOs may also favor more intensive use of prescription drugs, perhaps as an alternative to costlier forms of treatment. As a result, the increasing prevalence of managed care plans may have helped boost the quantity of prescription drugs sold in the United States.

For brand-name drugs still under patent (which do not yet have generic competitors), managed care techniques may have only a small effect on profits, assuming that greater use offsets the downward pressure on prices. For brand-name drugs whose patents have expired, however, profits are probably lower than they would have been without the generic substitution promoted in part by managed care plans and PBMs; that substitution has cut dramatically into the market share of those drugs. (CBO's calculation of the change in returns accounts for the full increase in generic market share since 1984, part of which is attributable to the rise in managed care techniques, but it does not measure managed care's effect on profitability through other variables, such as increases in prescription drug use and changes in pricing.)

# Pricing and Competition in the Pharmaceutical Market

Competition in the pharmaceutical market takes three forms: among brand-name drugs that are therapeutically similar, between brand-name drugs and generic substitutes, and among generic versions of the same drug. Manufacturers of brand-name drugs compete for market share primarily through advertising and the quality of their products (including efficacy and side effects), as well as through pricing. Manufacturers of generic drugs increase their market share mainly by lowering prices. (In general, companies produce either generic or brand-name drugs, not both, although some generic manufacturers are subsidiaries of brand-name manufacturers.)

## Competition Among Brand-Name Drugs

Patents do not grant complete monopoly power in the pharmaceutical industry. The reason is that companies can frequently discover and patent several different drugs that use the same basic mechanism to treat an illness. The first drug using the new mechanism to treat that illness—the breakthrough drug—usually has between one and six years on the market before a therapeutically similar patented drug (sometimes called a "me-too" drug) is introduced. Economic theory and various studies suggest that the presence of several therapeutically similar drugs limits manufacturers' ability to raise prices as much as would otherwise be the case. In addition, brand-name manufacturers are more likely to agree to give purchasers a discount if those purchasers have the option of switching to a generic or me-too competitor.

The factors that limit the number of similar but slightly differentiated brand-name drugs on the market are unclear. In some cases, perhaps, only a limited number of slightly different chemicals that target a given enzyme can be developed into drugs. Or, as one economist has suggested, the high cost of developing a drug may limit the number of similar brand-name drugs that are eventually brought to market. Companies will undertake such investment only if they be-

lieve the market is not already saturated or their drug has some quality advantage that could enable it to compete effectively and earn an adequate return. For that reason, competition among patented brand-name drugs probably results in companies' earning roughly a normal rate of return on their investment in research and development (R&D), on average.

Overall, the pharmaceutical market is not highly concentrated, but when that market is divided into narrowly defined therapeutic classes, it becomes quite concentrated. The top manufacturers of brand-name drugs, ranked by pharmaceutical sales, each account for no more than 7 percent of the entire market for prescription drugs (which totaled $60.7 billion in 1995 at manufacturer prices). Within each therapeutic class, however, higher levels of concentration appear. In 35 of the 66 therapeutic classes that CBO examined in this study, the top three innovator drugs together constituted at least 80 percent of retail pharmacy sales in their class.

Studies of the average prices paid by pharmacies and hospitals have shown that manufacturers of brand-name drugs do compete with each other through pricing. The markups they charge over the marginal cost of producing a drug are consistent with economic models of price competition in which entry by manufacturers is limited (such as by patents). Offering discounts to some buyers may also be an important dimension of price competition for brand-name drugs. But its extent is difficult to measure because of lack of data.

## Discounts on Brand-Name Drugs

Different buyers pay different prices for brand-name prescription drugs. In theory, when companies are permitted to charge different types of purchasers different prices, those purchasers least sensitive to price will pay the most. In today's market for outpatient drugs, purchasers that have no insurance coverage for drugs, or third-party payers that do not use a formulary to manage their outpatient drug benefits, pay the highest prices for brand-name drugs.

Manufacturers offer discounts on brand-name drugs based not only on the volume purchased but also

on the buyer's ability to affect the drug's market share by using a formulary to systematically favor one brand-name drug over another for a large number of patients. Pharmacies themselves do not generally promote substitution between brand-name drugs, so they do not generally receive large discounts or rebates from manufacturers. Rather, it is the PBMs and insurers who manage benefits for drugs sold through pharmacies that promote brand-name substitution and receive discounts.

Such price discrimination, or discounting, may be an important mechanism for facilitating price competition in the pharmaceutical market. It rewards institutional purchasers that organize their patient base through formularies so as to encourage the use of less costly drugs. Prohibiting discounts, as some policymakers have called for, could decrease price competition.

Drug companies usually do not make their discounts public, but CBO was able to obtain limited information on the prices paid by different types of purchasers for prescription drugs. The prices that pharmacies pay can be seen as a proxy for the final price paid by customers who do not have a managed drug benefit or PBM to negotiate rebates from manufacturers. Based on the average invoice prices for top-selling drugs sold primarily to retail pharmacies, hospitals and clinics pay 9 percent less than retail pharmacies, on average, and HMOs pay 18 percent less. Federal facilities, such as veterans' hospitals, get an even more substantial discount—over 40 percent, on average, compared with the price paid by retail pharmacies. (Those comparisons are based only on invoice prices, so they do not account for rebates and other types of discounts that do not appear on invoices.)

Statistical analysis shows that manufacturers' discounts on brand-name drugs tend to be higher when more generic and me-too drugs are available. That analysis is based on the difference between the average price paid by pharmacies and the lowest price paid by any private purchaser in the United States (the best-price discount), as reported under the Medicaid drug rebate program. CBO found that the best-price discount for a brand-name drug was 10 to 14 percentage points greater when a generic version was available from four or more manufacturers. That analysis also showed that as the number of brand-name manufacturers in a therapeutic class increases from one to five, the best-price discount grows by 10 percentage points. Those statistical results imply that discounts are at least partly a response to competitive market conditions and may be a sign of greater price competition in some segments of the pharmaceutical market.

## Competition Between Brand-Name and Generic Drugs

The Hatch-Waxman Act eliminated the duplicative tests that had been required for a generic drug to obtain approval from the FDA. (That change applied only to nonantibiotic drugs, since antibiotics already had an abbreviated approval process.) Before 1984, manufacturers of generic drugs were required to independently prove the safety and efficacy of their products. They were prohibited from using the unpublished test results of the original innovator drug, which were considered trade secrets of its manufacturer.[1] The Hatch-Waxman Act streamlined the process for approving generic drugs by requiring only that manufacturers demonstrate "bioequivalence" to an already-approved innovator drug. (Bioequivalence means that the active ingredient is absorbed at the same rate and to the same extent for the generic drug as for the innovator drug.) The tests necessary to prove bioequivalence are much less costly than those required to prove safety and efficacy.

By accelerating the approval process for a generic drug and also allowing its producer to begin clinical tests before the patent on the innovator drug had expired, the Hatch-Waxman Act reduced the average delay between patent expiration and generic entry from more than three years to less than three months for top-selling drugs. Even more important, the act increased the proportion of brand-name drugs that face generic competition once their patents expire. In 1983, only 35 percent of the top-selling drugs with expired patents (excluding antibiotics and drugs approved before 1962) had generic versions available. Today, nearly all do.

---

1. This study uses the terms "brand-name" and "innovator" interchangeably.

After a drug's patent expires, generic copies quickly gain a large share of its market. CBO examined 21 brand-name prescription drugs in its retail pharmacy data set that first saw generic competition between 1991 and 1993. Within their first full calendar year after patent expiration, those drugs lost an average of 44 percent of their market (as measured by the quantity of prescriptions sold through pharmacies) to generic drugs. And the generic versions cost an average of 25 percent less than the original brand-name drugs at retail prices. That rapid growth in generic market share after patent expiration is a substantial change from the situation before the 1984 Hatch-Waxman Act. In 1983, for example, generic market share averaged just 13 percent for nonantibiotic drugs.

Various studies have found that generic entry has little effect on the prices of brand-name drugs, which continue to increase faster than inflation. CBO's analysis of the average prices that manufacturers charge for drugs distributed to retail pharmacies is consistent with that result. However, CBO's analysis of discounting shows that certain purchasers other than retail pharmacies receive steeper discounts on brand-name drugs once generic alternatives are available. Taken together, those results imply that the impact of generic entry on brand-name prices may vary considerably among different types of purchasers.

Even if brand-name prices frequently do not respond to generic competition, such competition can effectively save money because price-sensitive buyers may switch to lower-priced generic drugs. CBO estimates that in 1994, purchasers saved a total of $8 billion to $10 billion on prescriptions at retail pharmacies by substituting generic drugs for their brand-name counterparts. (That estimate assumes that all of the generic prescriptions dispensed in 1994 would have been filled with a higher-priced brand-name drug if a generic drug was not available.)

## Competition Among Generic Drugs

By making generic entry easier and less costly, the Hatch-Waxman Act helped increase the number of generic manufacturers producing the same drug. As the number of manufacturers rises, the average prescription price of a generic drug falls. CBO's analysis

shows that when one to 10 firms are manufacturing and distributing generic forms of a particular drug, the generic retail price of that drug averages about 60 percent of the brand-name price. When more than 10 manufacturers have entered the market, the average generic prescription price falls to less than half of the brand-name price.

# The Effects of the Hatch-Waxman Act on the Returns from Innovation

The patent provisions in the Hatch-Waxman Act have not completely protected drug companies' profits from the dramatic rise in generic competition since 1984. Manufacturers of brand-name drugs invest an average of about $200 million (in 1990 dollars) to bring a new drug to market, when the cost of capital and the cost of failures (investment in drugs that never make it to market) are included. Patent protection enables manufacturers to earn an adequate return on that investment. By itself, generic entry increases the rate at which sales erode after patent expiration, thus reducing the returns from marketing a new drug. Two studies have estimated that drugs introduced in the early 1980s earned returns that exceeded their capitalized costs of development by $22 million to $36 million, on average. (Those figures represent the present discounted value in 1990 dollars.) CBO concludes that since 1984, the expected returns from marketing a new drug have declined by about 12 percent, or $27 million in 1990 dollars. That decline has probably not made drug development unprofitable on average, but it may have made some specific projects unprofitable.

## Changes to the Length of Patents for Brand-Name Drugs

Under the Hatch-Waxman Act, drugs that contain a new chemical entity never before approved by the FDA can qualify for an extension of their patent term. Those extensions, granted after the drug is approved, equal half of the time the drug spent in clinical testing (usually a total of six to eight years) plus all of the

time it spent having the FDA review its new drug application (usually about two years). Two key limitations apply. First, the extension cannot be longer than five years, and second, it cannot grant a total period of patent protection that exceeds 14 years after the drug is approved.

The 14-year limit is the main reason that Hatch-Waxman extensions now average about three years in length. Fifty-one drugs approved between 1992 and 1995 received an extension. Excluding the eight drugs that were subject to a transitional two-year cap (which applied to products already in testing when the act took effect), half of the drugs had their extensions limited by the 14-year cap.

Not all of the new drugs that are approved obtain an extension. Out of 101 drugs approved between 1992 and 1995, 38 did not apply for a Hatch-Waxman extension. Nineteen of those drugs had no patent to extend, and 15 others already had 14 years of patent protection left after obtaining FDA approval.

Besides patent-term extensions, the Hatch-Waxman Act contains other provisions that postpone generic competition. One key provision is the requirement that manufacturers wait five years after an innovator drug is approved before filing an application to sell a generic copy. That requirement benefits drugs that have no patent, or that have very little time left under patent, when they are approved. That exclusivity provision, together with the patent-term extensions, postpones generic entry by an average of 2.8 years for all drugs approved that contain a new chemical entity. Another exclusivity provision delays generic entry for three years when a new application is approved that requires clinical tests (such as for a new dosage form or over-the-counter version of an already-approved drug).

Ten years after the Hatch-Waxman Act, another piece of federal legislation—the Uruguay Round Agreements Act of 1994 (URAA)—further changed the patent terms of prescription drugs. That act altered the length of a patent for all types of inventions to 20 years from the date the application is filed rather than 17 years from the date the patent is granted. That change should have little effect on the average amount of time between market introduction and patent expiration for brand-name drugs patented after

June 8, 1995 (most of which have yet to be introduced on the market). However, many products that were already under patent by that date have benefited from the URAA, since their manufacturers can choose between the 17-year and 20-year patent terms and still be eligible for a Hatch-Waxman extension.

## The Change in Returns from Innovation

As noted earlier, the Hatch-Waxman Act greatly increased the probability that a generic copy would become available once the patent on a brand-name drug expired. It also contributed to a dramatic rise in generic market share. In addition, the act reduced the delay between patent expiration and generic entry, but that acceleration was roughly offset by patent-term extensions and exclusivity provisions that postpone generic entry.

CBO estimates that the increase in the size of the generic market since 1984—part of which is attributable to the act—has reduced the expected level of returns from marketing a brand-name drug by an average of $27 million in 1990 dollars. That amount is roughly 12 percent of the total discounted returns from selling a brand-name drug, which previous studies have estimated at $210 million to $230 million in 1990 dollars for drugs introduced in the early 1980s. (Those figures represent the present discounted value of the total stream of profits from those drugs discounted to the date of market introduction, deducting manufacturing costs but not R&D costs.) That 12 percent decline does not change significantly under reasonable variations in CBO's underlying assumptions.

Other factors besides the Hatch-Waxman Act have played a role in increasing the frequency of generic competition and the average size of generic market share. For example, changes in state laws have given pharmacists more leeway to substitute generic drugs for brand-name ones. And for reasons of cost, many purchasers have put increasing emphasis on generic substitution.

Total returns from selling a brand-name prescription drug vary significantly among different drugs. As noted above, the average cost of developing

such drugs, including failures, is around $200 million in 1990 dollars. But on average only three in 10 drugs earn that much in discounted returns (after deducting manufacturing, advertising, distribution, and other non-R&D-related costs). For most drugs, the returns from marketing do not exceed the average capitalized costs of development. As a result, for a company's average returns to exceed its average development costs, the company must discover and market a highly profitable drug from time to time.

For all drugs, on average, the increase in generic sales since 1984 has probably not reduced expected returns below the average capitalized costs of R&D. On the margin, however, it is possible that a few drugs that were barely profitable to develop before may no longer be so now.

CBO's calculation of the change in average returns since 1984 considers only increased generic entry and longer patent terms. It does not include many other changes that could either increase or decrease those returns—such as any rise in the volume of prescription drugs sold that might result as HMOs substitute drugs for more expensive forms of treatment and frequently charge lower copayments for prescription drugs and physicians' services. In addition, managed care plans and PBMs are putting downward pressure on the prices of brand-name drugs, which would tend to reduce the returns from selling them.

On the other side, returns could increase because drug companies' development projects may be improving as breakthroughs in the basic science of genetics are converted into ideas for new drugs. Moreover, foreign markets for prescription drugs should keep growing as the drug-approval process becomes streamlined in Europe, and many other countries continue to strengthen patent-protection rights.

Between 1983 and 1995, investment in R&D as a percentage of pharmaceutical sales by brand-name drug companies increased from 14.7 percent to 19.4 percent. Over the same period, U.S. pharmaceutical sales by those companies rose from $17 billion to $57 billion (in current dollars). Overall, then, the changes that have occurred since 1984 appear to be favoring investment in drug development.

## Effects of Changing the Hatch-Waxman Act

Some representatives of the pharmaceutical industry have called for amending the Hatch-Waxman Act to lengthen patent-term extensions. However, doing that would not encourage innovation as much as accelerating the FDA approval process by the same amount would. The reason is that lengthening patent terms increases profits today for drugs whose patents are about to expire, but it does not have as great an impact on the incentive to invest in R&D—that is, on the expected average value of the profits from marketing a drug. CBO calculates that increasing the average patent term by one year would raise the expected value of those profits by about $12 million in 1990 dollars. Accelerating the FDA review period by one year would boost returns by much more—about $22 million in 1990 dollars. Thus, policies that speed up the FDA approval process without sacrificing the safety and efficacy of drugs are much more beneficial to both the pharmaceutical industry and consumers than is lengthening the patent-protection period.

Chapter One

# Introduction

Competition in the pharmaceutical market has changed significantly. During the past decade, many health insurance companies have contracted out the management of their prescription drug benefits to specialized pharmaceutical benefit management companies (PBMs), and enrollment in managed care health plans has increased. In the previous decade, many states repealed antisubstitution laws that had prohibited pharmacists from dispensing generic drugs in place of brand-name ones, and changes in federal law sped up the approval process for generic drugs. All of those factors have contributed to a dramatic rise in sales of generic prescription drugs. Generic drugs contain the same active ingredient as a brand-name drug and enter the market after the patent on the brand-name drug has expired. Higher sales of generic drugs in turn have led to lower average prices for prescription drugs in general and a decline in returns from marketing new drugs.

The prices of brand-name prescription drugs are also facing downward pressure as many more purchasers try to negotiate discounts from manufacturers. In particular, PBMs and health maintenance organizations (HMOs) compile lists of suggested drugs (known as formularies) for their enrollees that encourage the use of generic drugs and less expensive brand-name drugs. The lure of being included on a large health plan's formulary allows those plans to leverage discounts on some brand-name drugs. According to the statistical analysis in this study, the discounts and rebates that some purchasers receive on brand-name drugs tend to be larger when more therapeutically similar brand-name drugs are available from different manufacturers and when generic copies are available. Such discounting may be an important source of price competition among brand-name drugs. However, assessing the amount of drugs sold at a significant discount is difficult, because sufficient data do not exist.

Market competition and federal policies have affected not only drug prices but also the incentives for companies to research and develop new drugs (in other words, to innovate). This study assesses the extent to which longer patents for innovative drugs—the result of 1984 legislation—have offset the effects of increased generic competition on the returns from marketing new drugs. The Drug Price Competition and Patent Term Restoration Act of 1984 (commonly known as the Hatch-Waxman Act) established provisions for extending patent terms for innovative drugs. At the same time, it reduced the testing requirements for approval of generic drugs, allowing them to enter the market—and thus cut into the sales of brand-name drugs—more quickly.

Many other changes have occurred on both the demand and supply side of the pharmaceutical market that affect the returns from innovation. This study examines many of those changes, but it does not attempt to explicitly measure their impact. On the supply side, recent breakthroughs in genetics and biomedical research have increased the technological opportunities for developing new drugs. On the demand side, the increase in HMO enrollment and the spread of managed care techniques to all forms of health insurance have made many purchasers more sensitive to drug prices and helped hold down those prices. At the

same time, under some forms of managed care, the demand for prescription drugs may grow. Because of those diverging trends of lower prices and higher demand, it is difficult to assess the net impact of the rise in managed care on profits in the pharmaceutical industry.

## The Basis for Competition Among Drug Companies

Prescription drugs can be divided into two categories: innovator drugs and generic drugs. (See Box 1 for a glossary of various terms for prescription drugs.) Innovator drugs (which this study also refers to as brand-name drugs) generally have a patent on their chemical formulation or on their process of manufacture.[1] They have been approved by the Food and Drug Administration (FDA), after extensive clinical testing, under an original "new drug application" (NDA). Patented brand-name drugs that are therapeutically similar may exist, but each has a different chemical formulation. While they are still under patent protection, innovator drugs are called single-source drugs, because only the company that holds the patent produces them. After the patent has expired, generic copies of the exact chemical formulation usually become available. Then such drugs are referred to as multiple-source drugs.

Generic drugs obtain FDA approval under a shorter process than innovator drugs. They are required only to demonstrate "bioequivalence" to an innovator drug—in other words, to show that the active ingredient is released and absorbed at the same rate for the generic drug as for the corresponding innovator drug. Because they are copies rather than original formulations, generic drugs are not patentable.

Manufacturers of prescription drugs can be divided along similar lines: companies that primarily produce innovator drugs, and companies that focus on

---

Box 1.
Types of Prescription Drugs

**innovator drug**: a drug that receives a patent on its chemical formulation or manufacturing process, obtains approval from the Food and Drug Administration (FDA) after extensive testing, and is sold under a brand name.

**brand-name drug**: as used in this study, an innovator drug.

**generic drug**: a copy of an innovator drug, containing the same active ingredients, that the FDA judges to be comparable in terms of such factors as strength, quality, and therapeutic effectiveness. Generic copies may be sold after the patent on a brand-name drug has expired. Generic drugs are generally sold under their chemical name rather than under a brand name.

**breakthrough drug**: the first brand-name drug to use a particular therapeutic mechanism—that is, to use a particular method of treating a given disease.

**me-too drug**: a brand-name drug that uses the same therapeutic mechanism as a breakthrough drug and therefore competes with it directly.

**single-source drug**: a brand-name drug that is still under patent and thus is usually available from only one manufacturer.

**multiple-source drug**: a drug available in both brand-name and generic versions from a variety of manufacturers.

---

generic drugs. The two types of manufacturers compete very differently in the market. Producers of innovator drugs invest heavily in research and development (R&D), hoping to recoup that investment in profits from future sales while a drug is under patent and they have a monopoly on its manufacture. Producers of generic drugs do not need to duplicate the research effort of the innovator firm or invest nearly as much in getting FDA approval for their drugs. However, since those producers have neither patents nor a costly approval process to deter potential competitors, they quickly face competition from other companies pro-

---

1.  In a very small number of cases, generic drugs go by a brand name rather than the drug's chemical name. Those types of drugs are an exception and represent less than 2 percent of total retail pharmacy sales (based on tabulations of the Congressional Budget Office's data set on retail pharmacy sales). In this study, "brand-name drug" means an innovator drug.

ducing identical drugs. That intense competition forces generic manufacturers to charge much lower prices than the innovator firm—which, even after its patent expires, typically enjoys a market advantage based on its reputation for producing a high-quality product.

Although companies invest in research and development because they expect high returns from the future sales of their discoveries, those returns are considerably skewed. Some drugs have billion-dollar sales, whereas others bring in less than $25 million a year. For drug manufacturers to be successful, the present value of their future profits from the sale of new products (discounted to the date the products were introduced) must exceed the capitalized cost of their original R&D investment (capitalized to the date of market introduction), including investment in drugs that never make it to the market. Patents increase the rewards for innovation by giving companies a temporary monopoly over marketing their discoveries. Although that monopoly status rewards the company with high profits, consumers pay a higher price and get less output than would be the case under competition. But that temporary monopoly status is often necessary to provide sufficient incentives for drug companies to invent the new products that benefit consumers. Without patents, many new drugs could be easily and quickly duplicated by other manufacturers, preventing the innovator firm from obtaining enough reward to justify its investment.

Patents do not grant total monopoly power to companies in the pharmaceutical industry. In many cases, several chemicals can be developed that use the same basic mechanisms to treat a disease. Since a patent applies to a specific chemical or production process, different firms can end up patenting similar, competing drugs based on the same innovative principle. In addition, drug therapies often compete with nondrug therapies. Rather than having a pure monopoly, frequently drug companies produce slightly different products—leading to a form of imperfect competition that allows an innovator firm to earn higher profits than it could in a perfectly competitive market but less than it would with a pure monopoly.

# Changes Made by the Hatch-Waxman Act

In passing the 1984 Hatch-Waxman Act, the Congress attempted to balance the interests of the generic drug industry against those of manufacturers of innovator drugs. That act contained two sets of changes. First, it eliminated the duplicative testing requirements necessary to obtain approval for a generic copy of a previously approved innovator drug. Specifically:

o    It created an abbreviated approval process for generic copies of innovator drugs. A similar abbreviated process already existed under FDA regulations for generic copies of antibiotics and of innovator drugs approved before 1962.

o    It allowed manufacturers of generic drugs to file an abbreviated new drug application and conduct clinical tests demonstrating bioequivalence with a brand-name drug before that drug's patent expires. As a result, the FDA can approve many of those applications immediately after patent expiration. That provision overturned a 1984 decision by the Court of Appeals for the Federal Circuit that clinical tests conducted by generic manufacturers before patent expiration constitute patent infringement.[2]

o    It also established a process to handle patent disputes between generic manufacturers and innovator firms.

Those provisions helped to increase the availability of generic drugs following patent expiration.

Second, the act established patent-term extensions for innovator drugs. Because such drugs receive patents from the Patent and Trademark Office before they receive approval from the FDA, part of their time under patent is spent in the clinical trials necessary for

---

2.    The case was *Roche Products, Inc. v. Bolar Pharmaceutical Company, Inc* (733 F. 2d 858 Federal Circuit 1984). See also Alan D. Lourie, "Patent Term Restoration," *Journal of the Patent Office Society*, vol. 66, no. 10 (October 1984), pp. 526-550; and Donald O. Beers, *Generic and Innovator Drugs: A Guide to FDA Approval Requirements*, 11th ed. (Englewood Cliffs, N.J.: Aspen Publishers, 1995), pp. 4-75 to 4-77.

FDA approval. The patent extensions were intended to offset part of the patent term used up during the approval process.[3] Under the new procedures:

o    Manufacturers of a newly approved innovator drug that contains an active ingredient never before approved by the FDA can apply for a patent-term extension that equals the sum of all the time spent in the NDA review process plus half of the time spent in the clinical testing phase. Two limitations exist. A patent-term extension cannot exceed five years, nor can it allow the period between product approval and patent expiration to exceed 14 years. The average length of patent-term extensions granted under this provision is three years.

o    If an innovator drug is not protected by a patent, it may still benefit from certain exclusivity provisions that delay the approval or filing of an abbreviated new drug application in some cases.

By extending patents on brand-name drugs while making it easier for generic drugs to enter the market after patents expire, the Hatch-Waxman Act aimed to benefit consumers by increasing the supply of generic drugs while preserving drug companies' incentive to invest in research and development.[4]

Since the act took effect, pharmaceutical sales in the United States have risen dramatically. Between 1985 and 1995, sales of all prescription drugs by manufacturers grew faster than total health care spending. Valued at manufacturer prices, those sales increased from $21.6 billion to $60.7 billion—or from 5.7 percent to 6.9 percent of total health care expenditures in the United States.[5] Over the same period, spending on

drug research and development rose even faster, growing from 15.1 percent to 19.4 percent of brand-name drug sales.[6] Although increased competition from generic drugs by itself reduces the returns from innovation, the rise in R&D spending indicates that, all factors taken together, a strong environment still exists for investing in drug development.

# Data Used in This Analysis

This study contains a variety of empirical estimates that help to characterize competition in the pharmaceutical market and its impact on consumers and the returns from marketing new drugs. To produce those estimates, the study draws on several data sets. The largest is a set of data on retail sales by pharmacies; it represents about 70 percent of all sales of prescription drugs through pharmacies at retail prices and covers 66 therapeutic classes of drugs. Most of the estimates in Chapter 3—which include market shares and prices of brand-name and generic drugs and an attempt to approximate the savings obtained from generic substitution—rely on that data set. The statistical analysis of discounting in the pharmaceutical industry discussed in Chapter 3 also relies on that data set, as well as on price information made available through Medicaid's drug rebate program.

The calculation in Chapter 4 of changes in the returns from marketing innovator drugs relies on another set of data: figures on the U.S. sales of 67 drugs (introduced between 1980 and 1984) during their first eight to 12 years on the market. That calculation also uses the retail pharmacy data set to estimate the market share of generic drugs immediately after the patent expiration of a brand-name drug.

Each of those data sets has its own strengths and weaknesses, which are discussed along with the empirical results. A summary of the estimates made in this study, together with the methods and data sets that were used, appears in Appendix A.

---

3.    See 35 U.S.C. 156(c), 98 Stat. 1598.

4.    See, for example, the opening statement by Senator Orrin Hatch before the Senate Committee on Labor and Human Resources, June 28, 1984.

5.    Data on total sales of prescription drugs, net of discounts and rebates and valued at the prices obtained by manufacturers, were provided by the Pharmaceutical Research and Manufacturers of America on April 28, 1997. If prescription drug sales had been valued at retail prices the prices used for measuring national health expenditures—they would represent a higher percentage of such expenditures. Health care expenditures in the United States totaled $376.4 billion in 1985 and $878.8 billion in 1995; see Katherine R. Levit and others, "National Health Expenditures, 1995," *Health Care Financing Review*, vol. 18, no. 1 (Fall 1996), p. 179.

6.    Pharmaceutical Research and Manufacturers of America, *1997 Industry Profile* (Washington, D.C.: PhRMA, March 1997), p. 57.

_____ Chapter Two _____

# The Effect of Managed Care
# on the Pharmaceutical Market

At the same time that the provisions of the Hatch-Waxman Act have affected the supply of generic drugs, changes in the demand for drugs—brought on by newer forms of health care delivery and financing—have influenced both the frequency with which generic and brand-name drugs are prescribed and the prices paid for them. Under competitive pressures, more health plans have adopted managed care techniques that help hold down overall health spending. The net effect of those techniques on prescription drug spending, however, is unclear.

The wider use of formularies has put downward pressure on the prices paid for brand-name drugs and has increased generic substitution. But use of prescription drugs may be higher in health maintenance organizations and some other types of managed care plans, because they tend to have more extensive coverage of physicians' services and sometimes of prescription drugs. In addition, managed care plans may sometimes favor the use of prescription drugs over other, more expensive, forms of medical treatment. As a result, the downward pressure on prices from the spread of managed care techniques may be offset by the more frequent use of prescription drugs.

## The Rise of Managed Care

The shift of many people in the United States from conventional to managed care plans has been associ-

ated with an increasingly competitive market for health insurance, in which plans compete largely on the basis of price to maintain their market share. Managed care plans enjoy an advantage because they can generally charge lower prices than conventional insurance plans by negotiating better rates from doctors, hospitals, and other health care providers and by reducing the use of high-cost services. Because of that cost advantage, a large number of people have moved to managed care plans. According to the Bureau of Labor Statistics, the proportion of full-time workers with health insurance who were enrolled in such plans increased from around 26 percent in 1988 to 61 percent by 1995.[1] As a result, the cost of health care benefits for the private sector has grown more slowly in recent years (although it may now be on the rise again, with some health plans anticipating significant increases in 1999).[2]

In conventional health insurance plans—also known as indemnity, or fee-for-service, plans—enrollees can receive care from any physician or hospital they choose. Generally, they must pay for some initial

---

1.  Those figures are for employees of medium to large firms; see Department of Labor, Bureau of Labor Statistics, "BLS Reports on Employee Benefits in Medium and Large Private Establishments, 1995" (press release, July 25, 1997, available at http://stats.bls.gov/special.requests/ocwc/oclt/ebs/ebnr0003.txt).

2.  See Congressional Budget Office, *Trends in Health Care Spending by the Private Sector*, CBO Paper (April 1997); and Mercer/Foster Higgins, *National Survey of Employer-Sponsored Health Plans* (New York: Mercer/Foster Higgins, 1997).

amount of health care spending themselves (the deductible) and pay an additional amount (a copayment) of any costs beyond that. Conventional plans pay health care providers on a fee-for-service basis.

In managed care plans, by contrast, beneficiaries are encouraged to use a limited network of health care providers. The extent of that limitation, or the conditions under which a patient may choose a doctor or hospital outside the plan's network, can be used to broadly categorize the various types of managed care plans.[3]

o  *Health Maintenance Organizations.* Enrollees in an HMO must generally receive all of their care from the HMO's physicians and from hospitals with which the HMO contracts; otherwise, the expense is not covered. The services they receive from those physicians are typically covered in full, apart from a flat dollar copayment for an office visit. (Copayments may also be required for such items as prescription drugs.) The plan's health care providers often bear some financial risk for the costs of the services they furnish or order on behalf of their patients.

o  *Preferred Provider Organizations.* Enrollees in a PPO can receive services from any provider they choose, but typically they incur significantly lower deductibles and copayments if they use physicians and hospitals that are part of the PPO's network. The PPO pays providers in the network on a fee-for-service basis. Unlike in conventional insurance plans, however, those fees are subject to negotiation between providers and the plan.

o  *Point-of-Service Plans.* POS plans are also known as HMO/PPO hybrids or open-ended HMOs. As in a PPO, enrollees can choose to receive services from providers who are not

members of the plan's network as well as from those who are members. When enrollees use network providers, a POS plan functions much like an HMO. When they use other providers, by contrast, those providers are typically paid on a fee-for-service basis and enrollees are responsible for deductibles and copayments.

Many managed care plans transfer financial risk to physicians and other health care providers through the various financial arrangements they use to reimburse those providers. For example, some managed care plans use a form of capitation to reimburse physicians. In such cases, the physician (or group of physicians) is paid a fixed monthly amount per enrollee and is responsible for providing all primary care services —and in some instances, for paying for all medical services, including the use of specialists. When providers are at financial risk for the services they furnish or order for patients, they have a powerful incentive to provide less costly care. The net effect of that incentive on prescription drug use is not certain. But it could encourage providers to prescribe drugs in more cases rather than immediately selecting relatively expensive, procedure-oriented approaches.

An important trend in the spread of managed care techniques is that most types of health care plans —including conventional fee-for-service plans—have increasingly been "managing" their outpatient prescription drug benefits, frequently through pharmaceutical benefit management companies. Since 60 percent of prescription drugs are sold through pharmacies and other retail outlets, PBMs have become an important intermediary that helps limit costs for those drugs.

## How PBMs Help Hold Down Drug Expenditures

Pharmaceutical benefit management companies exert downward pressure on the prices paid to both manufacturers and pharmacies. In return for channeling their patient base to particular pharmacies, they arrange to pay lower retail prices for drugs at those pharmacies. Similarly, PBMs are able to negotiate rebates from manufacturers of brand-name drugs based on their ability to steer their members toward a

---

3.  The definitions below come from Congressional Budget Office, *Trends in Health Care Spending by the Private Sector.* That paper relied in part on a survey on employer benefits by KPMG Peat Marwick to develop those definitions; see KPMG Peat Marwick, *Health Benefits in 1995* (August 1995), p. 10. Many health insurance providers refer to their different insurance arrangements as products ("indemnity product," "point-of-service product," and the like). More than one product may be available from a particular provider to a company or individual enrollee. To be consistent with the earlier CBO paper, this study uses the term "plan" to refer to those products.

particular drug by using a formulary.[4] Those cost-saving methods are not limited to PBMs; some health insurers have set up similar operations to manage their own drug benefits. HMOs that have on-site pharmacies also apply formularies to promote the use of specific drugs and to negotiate rebates from drug manufacturers.

## How Formularies and PBMs Operate

Typically, in a retail setting, formularies work as follows: a customer gives a prescription to a pharmacist to be filled and presents a membership card in a health insurance plan or PBM. The pharmacist then uses a computer network to check the plan's or PBM's list of preferred drugs as a guide in filling the prescription. Such lists frequently specify substituting a generic drug for a brand-name drug (something that has only been legal in most states since the late 1970s; see Box 2). In some cases, formularies also suggest substituting a less expensive brand-name drug for the one on the prescription. Promoting substitution between brand-name drugs is more difficult, however, since it requires the doctor's permission.

Using the same computer network, a PBM can track all prescription drug purchases by its members from pharmacies—providing it with a wealth of market data. PCS Health Systems, the largest PBM in the United States, in 1987 established the first electronic links with pharmacies that allowed two-way transmission of information and claims data.[5] PBMs never physically handle prescription drugs. Rather, they act as middlemen in a variety of transactions with health plans, pharmacies, and drug companies and thus insert themselves into the payment system (see Figure 1).

PBMs have found their niche as health insurance plans have expanded outpatient drug benefits. In 1972, just 20 percent of total retail drug spending was

---

**Box 2.**
**The Role of Changes in State Drug-Product Substitution Laws**

The growth of generic substitution that has been fostered by the use of formularies would not have been possible without changes in state law. Through the early 1970s, it was illegal in many states for a pharmacist to dispense a generic drug when a prescription specified a brand-name one. By 1980, however, all but three states had drug-product substitution laws in effect that gave pharmacists more discretion. (By 1984, all states had such laws.)[1] Under those new laws, a pharmacist could dispense a generic drug even when a brand-name drug was specified, as long as the physician had not indicated otherwise on the prescription. By 1989, the dispensing of generic drugs on "brand-written" prescriptions rather than generically written prescriptions had become the chief source of generic drug sales through pharmacies.[2]

---

1. Alison Masson and Robert L. Steiner, *Generic Substitution and Prescription Drug Prices: Economic Effects of State Drug Product Selection Laws* (Federal Trade Commission, 1985), pp. 232-233, Table A4-1.

2. Richard E. Caves, Michael D. Whinston, and Mark A. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers on Economic Activity: Microeconomics* (1991), pp. 1-66.

---

paid for by third parties (such as private-sector health plans or Medicaid). By 1995, that figure had tripled to 60 percent.[6] What share of those drug benefits is being managed by PBMs or health plans themselves is unclear, but it appears to be significant. According to IMS America, a company that supplies sales data on the pharmaceutical industry, 58.5 percent of retail pharmacies' revenues from drug sales in 1996 came from prescriptions that were at least partly paid for by

---

4. See, for example, "PCS Rebates from Pfizer on Seven Products Totaled over $10 Million in First 21 Months of 1994-1998 Contract," *The Pink Sheet*, F-D-C Reports, June 10, 1996, p. 16.

5. Wilbur B. Pittinger, Senior Vice President for Health Management Services, "Placing PBMs in Context" (keynote address given at the roundtable conference of the Tufts Center for the Study of Drug Development, "PBMs: Reshaping the Pharmaceutical Distribution Network," October 24, 1996, available at http://www.pcshs.com/news/speeches/102496.html).

6. James S. Genuardi, Jean M. Stiller, and Gordon R. Trapnell, "Changing Prescription Drug Sector: New Expenditure Methodologies," *Health Care Financing Review* (Spring 1996), p. 192; and Katherine R. Levit and others, "National Health Expenditures, 1995," *Health Care Financing Review*, vol. 18, no. 1 (Fall 1996), p. 185.

**Figure 1.**
**How PBMs Fit Into the Payment System for Prescription Drugs**



SOURCE: Congressional Budget Office based in part on General Accounting Office, *Pharmacy Benefit Managers: Early Results on Ventures with Drug Manufacturers*, GAO/HEHS-96-45 (November 1995).

NOTE: PBMs = pharmaceutical benefit management companies.

third-party managed care drug coverage.[7]  (That figure does not include cases in which patients paid for the entire prescription because they had not yet met their plan's deductible or the prescription price was less than their copayment, although in such cases the drug benefit may also be managed.)  IMS America's definition of managed care third-party payment requires that customers presented an electronic card to the pharmacist indicating their membership in a health plan.[8]

## Manufacturer Rebates and Pharmacy Prices

Much of the savings that PBMs achieve appear to come from the lower prices paid to pharmacies rather than from the rebates offered by drug manufacturers. The General Accounting Office studied three large health plans for federal employees that used both PBMs and mail-order pharmacies.  The study found that 50 percent to 70 percent of the drop in the plans' spending on prescription drugs resulted from lower retail prescription prices (lower than what the plans would have paid at the pharmacy's usual and customary charge).  Two percent to 21 percent of the savings resulted from manufacturer rebates that the PBMs shared with the health insurance plans.[9]

## Generic Substitution

Another important way that PBMs lower drug costs is by promoting generic substitution, not just through formularies but also through their pricing contracts with pharmacies.  In general, dispensing a generic drug is already slightly more profitable for a pharmacist than dispensing a brand-name drug.[10]  PBMs' contracts sometimes provide financial incentives that make generic substitution even more profitable for pharmacists.

PBMs can also encourage generic substitution at the consumer level.  In a conventional health plan, pre-

---

7. IMS America, "IMS Reports Major Regional Differences in Managed Care Growth" (press release, April 14, 1997, available at http://www.ims-america.com/communications/pr_regional.html).

8. Personal communication by Paul Wilson, Vice President of Statistical Services, IMS America, on March 1, 1998.  If a customer had health insurance but applied for reimbursement later rather than presenting a card at the pharmacy, the transaction was considered a cash payment.  Cash payments totaled 29.3 percent of pharmacies' drug revenues. Medicaid payments made up the remainder.

9. General Accounting Office, *Pharmacy Benefit Managers: FEHBP Plans Satisfied with Savings and Services, but Retail Pharmacies Have Concerns*, GAO/HEHS-97-47 (February 1997).  In addition, Blue Cross found that in partnership with PCS Health Systems, it saved more on prescription drug expenditures through pharmacy discounts than through rebates from manufacturers (presentation by Alan Spielman, Vice President for Business Services, Blue Cross and Blue Shield Association, at the National Health Policy Forum "Purchasing as a Cost-Containment Tool: A Look at Pharmacy Benefit Management," Washington, D.C., May 17, 1995).

10. For most multiple-source drugs, the markup over the wholesale cost is higher (on an absolute dollar basis) for generic drugs than for brand-name drugs.  In addition, because their wholesale cost is lower, the cost of having money tied up in stocks of generic drugs is lower.  According to a recent study, for a prescription of 100 pills, the average retail markup on a generic prescription was about $13, compared with $10 on a brand-name prescription; see Henry Grabowski and John Vernon, "Longer Patents for Increased Generic Competition in the U.S.: The Hatch-Waxman Act After One Decade," *PharmacoEconomics* (1996), p. 116, Table IV.

scription drug coverage reduces the gap between the prices of brand-name and generic drugs as seen by the consumer. For example, if an innovator drug costs $40, its generic equivalent costs $20, and a health plan has a 20 percent copayment, then the consumer's price comparison is between $8 for the brand-name drug and $4 for the generic drug (after any deductible has been met). Because that price difference is small, the consumer may believe that the brand-name drug is worth an extra $4 and may prefer to have it dispensed. Many PBMs and health plans that manage their own drug benefits try to widen that price gap by charging a higher copayment for nonformulary drugs, such as brand-name drugs chosen over generic substitutes.[11]

Some researchers have found that even a small difference in the copayment can encourage generic substitution. One study determined that HMOs with a copayment difference of at least $2 between brand-name and generic drugs had as high a rate of generic substitution as HMOs that explicitly required such substitution.[12]

## Industry Changes

Some analysts question whether the savings that PBMs produce will be adversely affected by recent changes in the industry. Several of the largest PBMs have been acquired by pharmaceutical manufacturers. PCS was bought by Eli Lilly in 1994 for $4 billion; Medco (both a PBM and a mail-order pharmacy) was acquired by Merck in 1993 for $6.6 billion; and Diversified Pharmaceutical Services was purchased by

SmithKline Beecham in 1994 for $2.3 billion.[13] With acquisition, will those PBMs continue to represent the interests of insurance plans and patients effectively? Or will they have an incentive to favor their parent company's drugs over others?[14] The FDA has begun to regulate the advertising and marketing practices of PBMs owned by pharmaceutical manufacturers.[15] The Federal Trade Commission is also looking into those issues.

Another change in the industry involves the growing proportion of drugs distributed through mail-order pharmacies. Many insurance plans now include an option to purchase drugs by mail. According to IMS America, between 1991 and 1996 the share of prescription drugs channeled through mail-order pharmacies grew from 6 percent to 10 percent of manufacturers' total sales revenues.[16] Mail-order pharmacies are able to obtain substantial discounts on brand-name drugs from manufacturers in part because, in a mail-order setting, pharmacists have more time (about two days) to contact doctors and obtain permission to switch a prescription to a less expensive brand-name drug.[17] In addition, mail-order pharmacies appear to be more effective in promoting generic substitution than retail pharmacies.[18] Also, drugs ordered through a mail-order setting are frequently for chronic conditions, so the savings from switching the prescription

11. See General Accounting Office, *Pharmacy Benefit Managers: Early Results on Ventures with Drug Manufacturers*, GAO/HEHS-96-45 (November 1995), p. 7. That report refers to formularies that charge a higher copayment for nonformulary drugs as "incentive based" formularies. Other insurers, including many HMOs, have a very small copayment difference between brand-name and generic drugs and therefore rely more on their doctors and pharmacists (rather than price) to promote generic substitution; see Levit and others, "National Health Expenditures, 1995," p. 185.

12. Jonathan P. Weiner and others, "Impact of Managed Care on Prescription Drug Use," *Health Affairs* (Spring 1991), p. 145.

13. See Milt Freudenheim, "Pharmaceutical Giant Is Buying Operator of Drug-Benefit Plans," *New York Times*, July 12, 1994, p. A1. For a ranking of PBMs by size in 1994, see Milt Freudenheim, "A Shift of Power in Pharmaceuticals," *New York Times*, May 9, 1994, p. D1.

14. See General Accounting Office, *Pharmacy Benefit Managers: Early Results on Ventures with Drug Manufacturers*.

15. See Bruce Ingersoll, "FDA to Watch Drug Switching, Sales Practices," *Wall Street Journal*, January 16, 1998, p. B1.

16. For the 1991 figures, see "Mail Order Grew 37 Percent to $2.9 Billion in 1991 IMS Survey; Growth May Slow Soon," *The Pink Sheet*, F-D-C Reports, March 16, 1992, p. 11. For the 1996 figures, see Pharmaceutical Research and Manufacturers of America, *1997 Industry Profile* (Washington, D.C.: PhRMA, March 1997), p. 31.

17. For a discussion of how Medco obtains discounts from manufacturers, see Brian O'Reilly, "Medco Containment Services," *Fortune*, February 24, 1992, p. 10. See also Thomas M. Burton, "Eli Lilly's Lack of Success with PCS May Soon Lead to a Major Write-Off," *Wall Street Journal*, June 5, 1997, p. A3.

18. In 1992, Medco dispensed a generic drug on 72 percent of prescriptions for a multiple-source drug; statement of Judith L. Wagner, Office of Technology Assessment, before the Senate Special Committee on Aging, November 16, 1993.

are greater since the drug will be taken for a long period of time.

In addition, links have developed between PBMs and mail-order pharmacies. In 1996, PCS Health Systems, the largest PBM, opened a mail-order pharmacy; and the largest mail-order pharmacy, Medco, also has a PBM business.

In sum, the increasing management of outpatient drug benefits has put downward pressure on prescription drug costs by lowering the average prices that both manufacturers and pharmacists receive for those drugs. The promotion of generic substitution has also been a key factor in holding down the average price of prescription drugs (and is something that is more easily accomplished in a pharmacy setting than favoring one brand-name drug over another).

## How Managed Care Affects the Demand for Prescription Drugs

To encourage people to enroll in managed care plans and accept a limited network of providers, such plans typically charge lower copayments for physician visits and other medical services (when the limited network is used) than traditional fee-for-service plans do. Those lower copayments tend to increase the use of physicians' services, which in turn increases the demand for prescription drugs.[19] HMOs generally also have more extensive prescription drug coverage than most fee-for-service plans. According to a 1993 survey by the Bureau of Labor Statistics, HMOs typically charged $3 to $5 for a prescription drug purchase, with no deductible, compared with a 20 percent copayment and a deductible (covering all medical services) in most fee-for-service plans.[20] Those lower

prescription costs to the patient may increase the proportion of prescriptions that are actually filled. Indeed, some drug manufacturers believe that HMOs have contributed to the increase in the volume of prescription drug sales.[21]

A study by researchers at RAND suggests that a lower copayment structure for both physician visits and prescription drugs boosts the use of such drugs. The study randomly enrolled people in various fee-for-service plans that differed primarily in their coinsurance rates and deductibles. After adjusting for differences in population characteristics, the authors concluded that annual prescription drug spending per person was one-quarter less in plans with a 25 percent coinsurance rate, no deductible, and a $1,000 cap on out-of-pocket expenditures than in plans in which all medical services were free. When the coinsurance rate was increased to 95 percent, drug spending per person was 43 percent lower than when all services were free.[22] Those results suggest that the smaller copayments and absence of deductibles for prescription drugs and physicians' services that are typical of many managed care plans lead to greater use of prescription drugs.[23]

Moreover, a later study found that more prescriptions were bought per person in several HMOs than in a fee-for-service plan that offered comprehensive prescription drug coverage.[24] The fee-for-service plan, like the HMOs, required only a small copayment for prescription drugs and no deductible. In the three cases in which age adjustment was possible, the

---

19.   See Congressional Budget Office, *Updated Estimates of Medicare's Catastrophic Drug Insurance Program* (October 1989), p. 47, for a discussion of the relationship between physicians' services and prescription drug expenditures.

20.   Department of Labor, Bureau of Labor Statistics, *Employee Benefits in Medium and Large Private Establishments, 1993*, Bulletin 2456 (November 1994), p. 44 and Tables 64, 66, 85, and 86. The full results from the bureau's 1995 survey have not yet been published.

21.   See Levit and others, "National Health Expenditures, 1995"; and IMS America, "IMS Says Managed Care Drove Unprecedented Growth in Pharmaceuticals in 1996" (press release, April 14, 1997, available at http://www.ims-america.com/communications/pr_growth.html).

22.   Arleen Leibowitz, Willard G. Manning, and Joseph P. Newhouse, "The Demand for Prescription Drugs as a Function of Cost-Sharing," *Social Science Medicine*, vol. 21, no. 10 (1985), pp. 1063-1069, Table 4. See also Willard G. Manning and others, "Health Insurance and the Demand for Medical Care: Evidence from a Randomized Experiment," *American Economic Review* (June 1987), pp. 251-277.

23.   The results of the RAND study do not indicate whether physician coverage or drug coverage has a greater effect on the quantity of prescriptions sold.

24.   Weiner and others, "Impact of Managed Care on Prescription Drug Use," pp. 141-153. The HMO plans in the study did not employ their own doctors, but instead contracted with doctors that also had their own private practice.

HMOs nevertheless had 5 percent to 20 percent more prescriptions dispensed per beneficiary than the fee-for-service plan. That result suggests that the treatment practices of HMOs may favor more intensive use of prescription drugs than the procedures of fee-for-service plans do, perhaps as an alternative to costlier forms of treatment. (However, the study did not mention the copayment structure for physicians' services in the HMOs and fee-for-service plan. If the HMOs had lower copayments for physicians' services, that could partly explain their higher volume of prescription drug use.)

The same study also found that the HMOs used newly approved drugs as much as the fee-for-service plan. They showed no tendency toward a slower diffusion of new innovative drugs. The percentage of prescriptions that were dispensed for a newly approved brand-name drug was the same for the two types of plans. Since the overall quantity dispensed was higher in the HMOs, that implies a slightly higher use of all drugs, including new brand-name ones.

## Conclusions

Although some managed care techniques put downward pressure on drug spending by lowering the prices paid for brand-name drugs and promoting generic substitution, other techniques, such as lower copayments for health care services, tend to increase prescription drug use and total drug spending. It is not clear how the increased use of those techniques has affected the net returns from marketing a new drug. PBMs appear to have greater success at negotiating discounts from retail pharmacies than from drug manufacturers (in the form of rebates). Thus, the management of outpatient drug benefits may not have hurt drug companies' returns very much. And the movement of beneficiaries into managed care plans may have had a positive effect on prescription drug use. If managed care has helped increase the use of prescription drugs, which are often less costly than other forms of treatment, then the somewhat lower prices may be at least partially offset by a rise in the quantity of prescription drugs sold.

Those opposing trends (lower prices but higher demand) make it difficult to determine whether total spending on brand-name prescription drugs has increased or decreased because of the rise of managed care techniques—and as important, whether the total profits of those drugs' manufacturers have risen or fallen as a result.

For brand-name drugs still under patent, the effect of managed care on spending could be negligible if the discounts that purchasers obtain are offset by a higher quantity sold. However, since managed care techniques promote generic substitution, their effect on spending and profits is probably negative for brand-name drugs whose patents have expired.

Chapter Three

# Pricing and Competition in the Pharmaceutical Market

The federal government has competing policy objectives with respect to the pricing of prescription drugs. On the one hand, it wants to ensure that companies have enough incentive to invest in researching and developing innovative drugs. On the other hand, it wants to discourage them from charging excessively high prices. In general, the government achieves the first goal through a patent system that grants market exclusivity for a limited period of time, allowing companies to recoup their investment in R&D. For the second goal, it relies on competition between similar drugs to hold prices down.

This chapter examines price competition among manufacturers in the pharmaceutical market, including the impact of the dramatic growth in the generic drug industry since 1984. Such competition comes in three main forms: between brand-name drugs in the same therapeutic class, between brand-name drugs and their generic counterparts, and between different generic versions of the same drug. The pharmaceutical industry is also affected by other types of competition, such as the substitution that sometimes occurs between prescription drugs and other forms of medical treatment. However, the conditions under which prescription drugs can be substituted for other medical procedures are outside the scope of this study.

The patent system provides a period of protection during which manufacturers of innovator drugs can charge relatively high prices, earning profits that enable them to compensate for the costs of a drug's discovery and development. Although patents prevent other manufacturers from producing the same drug, they do not prevent manufacturers with a similar but slightly different drug from also obtaining a patent and entering the market. Limited empirical evidence suggests that the availability of several similar brand-name drugs tends to slow the rate of price growth, even before generic copies become available.

The dramatic rise in generic sales since 1984 has held down average prices for drugs that are no longer protected by a patent. However, those lower prices tend not to result from reductions in the price of the original brand-name drug when it begins facing competition from generic drugs. Rather, average prices fall primarily because consumers switch from the higher-priced innovator drug to the lower-priced generics. To be on the receiving end of that switch, generic manufacturers compete with each other intensely in the area of price, partly because they sell identical products.

The increased use of generic drugs has kept total spending on prescription drugs below what it might otherwise have been. Considering only drugs sold through retail pharmacies, the Congressional Budget Office (CBO) estimates that the purchase of generic drugs reduced the cost of prescriptions (at retail prices) by roughly $8 billion to $10 billion in 1994. That estimate assumes that all generic prescriptions dispensed would have been filled with a higher-priced brand-name drug if the generic was not available.

**Figure 2.**
**Channels of Distribution for Prescription Drugs**



SOURCE:  Congressional Budget Office based on Micky Smith, *Pharmaceutical Marketing Strategy and Cases* (New York: Pharmaceutical Products Press, 1991), Chapter 3; Boston Consulting Group, *The Changing Environment for U.S. Pharmaceuticals* (Boston: Boston Consulting Group, April 1993); and Pharmaceutical Research and Manufacturers of America, *1997 Industry Profile* (Washington, D.C.: PhRMA, March 1997), p. 31.

NOTES:  Figures in parentheses represent shares of the prescription drug market in 1996, calculated as a percentage of total U.S. sales at manufacturer prices.

   HMOs = health maintenance organizations.

a.  Some chain-store pharmacies buy directly from the manufacturer.

b.  Some mail-order pharmacies go through a wholesaler.

Much of the analysis in this chapter relies on a set of data that represents 70 percent of prescription drug sales at retail pharmacies in the United States in 1993 and 1994. Roughly half of all prescription drugs are channeled through retail pharmacies (see Figure 2). Thus, the data set represents about 35 percent of all drug sales in the United States in those years. The data include total dollars spent on each dosage form (tablet, capsule, liquid, and so forth) of 454 brand-name drugs, as well as total spending on generic versions of the brand-name drugs whose patents have expired. (For more information about the data, see Appendix A.)

The unit used to measure quantity in the retail pharmacy data is the prescription. That unit can lead to measurement errors, however, since different prescriptions for the same drug come in different sizes.

(For example, one prescription may be filled with 30 pills and another with 100 pills.) A statistical bias would occur if more pills were dispensed per prescription, on average, for a generic drug than for its brand-name counterpart. That bias would lead to underestimating the price difference between brand-name and generic drugs. But the bias could run in either direction. Without a better measure of quantity, part of the analysis in this chapter relies on the number of prescriptions to estimate sales volume and to calculate average unit prices. Implicitly, those estimates assume that, in general, prescriptions for a brand-name drug and for its generic equivalent have roughly the same average number of dosage units (such as tablets). All estimates that rely on average prescription prices are based only on tablet and capsule formulations, which constitute 87 percent of sales in the retail pharmacy data set. Those dosage forms yield more reliable average prescription prices.

# Competition Among Brand-Name Drugs

In 1994, 83 percent of retail pharmacies' total revenues from selling prescription drugs came from innovator drugs (see Table 1). Those brand-name drugs also accounted for 64 percent of all prescriptions dispensed. Single-source innovator drugs—which, by definition, do not yet face generic competition—made up half of retail pharmacies' revenues from the sale of prescription drugs. Because innovator drugs constitute such a large share of pharmacy sales, the extent to which their manufacturers compete on the basis of price has important implications for consumers.

In general, the higher prices charged for brand-name drugs allow firms to recoup their investment in a drug's discovery and development. Studies have found that, on average, discovering and developing a drug takes 11 to 12 years and costs about $200 million per successful product (in 1990 dollars).[1] That $200 mil-

---

1.  That figure represents the after-tax cost of R&D and was calculated as follows: for drugs developed between 1970 and 1982, manufacturers' out-of-pocket costs were about $100 million per drug, after averaging in the costs of clinical failures. Accounting for the opportunity cost of capital (or the time value of money) nearly triples those costs. But

**Table 1.**
**Market Share and Average Retail Prescription Price, by Type of Drug, 1994**

| | Market Share | | Average |
| | Percentage of Retail Pharmacy Sales[a] | Percentage of Prescriptions Dispensed | Retail Prescription Price (Dollars) |
|---|---|---|---|
| Innovator Drugs | | | |
| Single source | 55.5 | 37.5 | 53.80 |
| Multiple source[b] | 27.2 | 26.5 | 37.40 |
| Generic Drugs | 17.3 | 36.0 | 17.40 |

SOURCE:   Congressional Budget Office based on tabulations of retail pharmacy sales data from Scott-Levin.

a.   Calculated at retail prices.

b.   If generic versions of an innovator drug were available in any dosage form, then all sales of all dosage forms of the innovator drug were classified as multiple source.  Hence, an extended-release dosage form that had no generic versions available was classified as a multiple-source drug if generic versions of the original formulation were available.

lion figure includes the cost of drugs that never make it to market; it also accounts for the cost of capital—that is, the cost of waiting for a return until the drug is introduced.  Actual drug development costs may be higher today if, for example, the cost of conducting clinical trials has increased.  Conversely, costs may be lower if the failure rate of drugs that go into clinical trials has declined.[2]

The stream of after-tax profits over the life of a typical innovator drug follows an up-and-down pattern (see Figure 3).  The first 11 to 12 years show a negative cash flow while the drug is being developed, undergoing testing, and awaiting approval.  Over the next 20 years, as the drug is marketed, it earns back a

return on the investment in its research and development.  According to two studies, that profit stream has an average present value of $220 million to $230 million (in 1990 dollars, after deducting manufacturing, advertising, distribution, and other non-R&D-related costs, discounted to the date of market introduction)—which more than compensates for the $200 million in average capitalized costs of drug development.[3]  Those studies estimate that for innovator drugs introduced in the early 1980s, after-tax profits exceeded development costs by $22 million to $36 million, on average (in 1990 dollars, where returns are discounted and costs are capitalized to the date of market introduction).  Since the returns from selling new drugs are highly skewed—a few drugs earn very large profits, whereas others may only cover the cost of their own development—that average encompasses both a few big winners and some marginally profitable drugs.

## The FDA Approval Process

Much of the capitalized cost of drug development can be attributed to the length of the discovery, develop-

---

since R&D investments are expensed for tax purposes (because a dollar invested in R&D is a dollar on which corporate profit taxes are not paid), the after-tax cost comes to about $200 million at a marginal tax rate of 35 percent.  See Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards* (February 1993); and Henry G. Grabowski and John M. Vernon, "Returns to R&D on New Drug Introductions in the 1980s," *Journal of Health Economics*, vol. 13, no. 4 (December 1994), pp. 383-406.  Both of those studies rely on Joseph A. DiMasi and others, "Cost of Innovation in the Pharmaceutical Industry," *Journal of Health Economics*, vol. 10, no. 2 (July 1991), pp. 107-142.

2.   For a discussion about how changes in technology have affected the R&D process, see Geoffrey Carr, "A Survey of the Pharmaceutical Industry," *Economist*, February 21, 1998.  As one example, computer programs are being developed that can help predict whether a clinical trial is likely to work before it is undertaken.

3.   See Grabowski and Vernon, "Returns to R&D"; and Office of Technology Assessment, *Pharmaceutical R&D*.  Those measures account for the cost of capital, so the returns are beyond the amount necessary to adequately compensate investors for their investment in drug development.

## Figure 3.
## Change in the Profit Stream for a Typical Innovator Drug



SOURCE:    Congressional Budget Office based in part on Henry G. Grabowski and John M. Vernon, "Returns to R&D on New Drug Introductions in the 1980s," *Journal of Health Economics*, vol. 13, no. 4 (December 1994).

NOTE:    R&D = research and development.

ment, and approval process. That process includes five distinct phases, the first of which is screening and discovery. Recent advances in biomedical research appear to have increased productivity in the discovery phase by yielding new "targets" (such as enzymes) against which a chemical can be tested for interactions. A process called high-throughput screening allows hundreds of chemicals to be tested quickly against a single target. After finding a drug candidate that interacts with the target, the manufacturer checks the drug for toxicity and tests it in animals. If the drug still looks promising, the company files an investigational new drug application with the Food and Drug Administration in order to begin testing the compound in humans. (Testing can begin 30 days after the application is filed.) Between 1980 and 1992, that screening and discovery phase (including preclinical testing) took an average of two to four years.[4]

The clinical trials that follow are divided into three phases. Phase I tests the new compound on

fewer than 100 volunteers (usually healthy people) to determine safe dosage levels and toxicity. Phase II tests the drug on 50 to 200 people who have the disease the drug is designed to combat in order to determine both safety and efficacy. Phase III tests the drug on thousands of people to see whether the benefits are statistically significant.[5] The FDA usually requires two controlled clinical trials in humans (Phase III studies) before approving a new drug.[6] Those trials establish effectiveness, optimal dosage forms, and possible side effects. They can also detect adverse reactions at that stage. Companies often consult with the FDA when designing their clinical tests. After a company believes it has gathered sufficient evidence in Phase III testing, it files a new drug application with the Food and Drug Administration.

Making the drug-approval process as quick and efficient as possible without sacrificing standards of safety and efficacy benefits both the public and pharmaceutical manufacturers. Those were the goals of the 1992 Prescription Drug User Fee Act (PDUFA). Meeting those goals is not a simple task, however, since "inevitably there is a trade-off between speed and certainty" about a drug's safety and effectiveness.[7] The PDUFA imposed fees on pharmaceutical manufacturers when they submit a new drug application for FDA approval. In 1997, those fees totaled $205,000 for a full NDA requiring clinical data for approval. Other types of fees paid by firms that filed NDAs include an annual fee on their manufacturing establishments and an annual fee for the drugs they currently have on the market.[8]

---

4.    Joseph A. DiMasi, Mark A. Seibring, and Louis Lasagna, "New Drug Development in the United States from 1963 to 1992," *Clinical Pharmacology and Therapeutics*, vol. 55, no. 6 (June 1994), pp. 609-622.

5.    See DiMasi and others, "Cost of Innovation in the Pharmaceutical Industry"; and Blanchard Randall, *Drug Regulation: Historical Overview and Current Reform Proposals*, CRS Report for Congress 95-962 SPR (Congressional Research Service, September 11, 1995), pp. 7-8.

6.    David A. Kessler and Karyn I. Feiden, "Faster Evaluation of Vital Drugs," *Scientific American* (March 1995).

7.    Ibid., p. 50. For an explanation of the need for a large clinical trial to demonstrate that a drug is as safe as, and more effective than, existing treatments, see F.M. Scherer, *Industry Structure, Strategy, and Public Policy* (New York: Harper Collins College Publishers, 1996), pp. 353-355.

8.    Section 736 of the Federal Food, Drug, and Cosmetic Act of 1938, as amended. 21 U.S.C. 379(h).

**Table 2.**
**Average Time from Clinical Testing to Final Approval for an Innovator Drug**

| Year of FDA Approval | Number of Drugs in Sample | Average Length (Years) | | |
|---|---|---|---|---|
| | | Clinical Testing Phase | NDA Approval Phase | Total FDA Approval Time |
| 1984 | 8 | 6.6 | 3.3 | 9.9 |
| 1985 | 23 | 5.0 | 2.8 | 7.9 |
| 1986 | 13 | 6.7 | 2.5 | 9.2 |
| 1987 | 14 | 4.5 | 3.2 | 7.7 |
| 1988 | 15 | 4.9 | 3.1 | 8.0 |
| 1989 | 17 | 5.5 | 3.1 | 8.7 |
| 1990 | 17 | 5.3 | 2.7 | 8.0 |
| 1991 | 26 | 5.2 | 2.7 | 7.9 |
| 1992 | 18 | 4.6 | 3.2 | 7.8 |
| 1993 | 14 | 5.2 | 3.2 | 8.4 |
| 1994 | 11 | 6.6 | 1.9 | 8.5 |
| 1995 | 10 | 6.2 | 2.5 | 8.7 |
| Total | 186 | 5.4 | 2.9 | 8.2 |

SOURCE:   Congressional Budget Office based on data from the Food and Drug Administration and the Patent and Trademark Office.

NOTES:  These figures are for drugs that obtained patent extensions under the Hatch-Waxman Act.

FDA = Food and Drug Administration; NDA = new drug application.

The FDA has used those fees to hire more reviewers and accelerate the approval process. The agency reports that it has eliminated the backlog of applications that were awaiting approval and has sped up approval for applications filed since 1992. According to the FDA, drug applications approved between 1991 and 1992 (that included a chemical never before approved) had a median review time of about 22 months. For applications approved in 1994 and 1995, the median review time was down to about 15 months, falling to 12 months in 1996.[9]

By law, however, the FDA is required to approve all new drug applications within 180 days (or a longer period if agreed on with the applicant).[10] In complying with the PDUFA, the FDA has set a target date of one year for all such applications. It reports that at least 95 percent of the 106 new drug applications filed in fiscal year 1995 met that goal.[11]

The total time a drug spends in development, however, does not appear to have changed much. Steering a new drug through clinical testing in humans to final FDA approval took eight to nine years for drugs approved between 1980 and 1992, according to one study.[12] CBO found similar results for 186 drugs approved between 1984 and 1995 that obtained patent extensions under the Hatch-Waxman Act. Those drugs spent an average of 5.4 years in the clinical testing phase (see Table 2). The NDA approval phase took another 2.9 years, on average, bringing the total development time after clinical testing began to 8.2 years. For drugs approved in 1994 and 1995, the

9.    See Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research, *Center for Drug Evaluation and Research Fact Book, 1997* (May 1997), available at http://www.fda.gov/cder/about.htm.  Note that less than half of all new drug applications include a chemical entity never before approved.

10.   Federal Food, Drug, and Cosmetic Act of 1938, as amended, 21 U.S.C. 355(c)(1).

11.   See Department of Health and Human Services, Food and Drug Administration, *Fourth Annual Performance Report, Prescription Drug User Fee Act of 1992* (December 1, 1996), available at http://www.fda.gov/ope/96pdufa.htm.

12.   See DiMasi, Seibring, and Lasagna, "New Drug Development in the United States from 1963 to 1992."

NDA approval phase was shorter than that average but the clinical testing phase was longer. That suggests that faster NDA review times in recent years may have been partially offset by longer clinical testing periods. However, more data are required to assess whether that is indeed the case.

Last year, the Congress passed the Food and Drug Administration Modernization Act of 1997, which made a variety of changes affecting how the FDA regulates food, medical devices, and prescription drugs. Some of those changes could speed up the approval process for innovator drugs. Under the act, the FDA must formulate a plan to reach compliance with the 180-day limit on NDA approvals and other existing time limits.[13] That plan could further reduce the average approval time for a new drug application if the FDA received enough funding to carry it out. (For example, the agency would probably need to hire more staff.)

The 1997 act also attempts to decrease the time needed for conducting clinical tests by encouraging cooperation between the FDA and pharmaceutical companies. For example, once the FDA has approved an investigational new drug application, its officials are required to meet with the applicant (on written request) to agree on the size and design of the clinical studies necessary for final FDA approval.[14]

Faster approval of new drugs increases the returns that those drugs earn. For example, speeding up the FDA approval phase by one year would boost the average profits from marketing a new drug by about $22 million (at a present discounted value in 1990 dollars).[15] That estimate assumes that the approval is accelerated entirely because the FDA reviews applications and test results more quickly, so the timing of outlays in the R&D process does not change. The estimated benefits arise because firms begin earning a profit on their new drug one year earlier. Such a change would nearly double the estimated $22 million to $36 million by which after-tax profits from selling a brand-name drug exceed drug development costs, on average.[16] As a point of comparison, extending the patent on a prescription drug by one year would increase the present discounted value of its returns by substantially less—about $12 million, on average. An additional effect of faster approvals would be increased competition in the pharmaceutical market as new brand-name drugs were introduced more quickly, providing more competition for existing ones.

## "Me-Too" Drugs

Although patents prevent other companies from producing exactly the same drug claimed in the patent, they usually do not prevent the introduction of similar but slightly differentiated drugs. In many cases, several different chemical entities can be found that use the same basic mechanism to treat an illness. Since patents are frequently obtained on a specific chemical formulation, not on a therapeutic mechanism, many patented products are "functionally similar."[17] Thus, a breakthrough drug—the first innovator drug to use a particular therapeutic mechanism—may have only one to six years, at most, of pure market exclusivity before a similar patented drug (sometimes called a "me-too" drug) is approved by the FDA. Of 13 therapeutic categories that CBO examined for this study, the first me-too drug entered the market within one year in six cases and within two to six years in another six cases.[18]

---

13.  Food and Drug Administration Modernization Act of 1997, 21 U.S.C. 393.

14.  Food and Drug Administration Modernization Act of 1997, 21 U.S.C. 355(b).

15.  According to Office of Technology Assessment, *Pharmaceutical R&D*, and Grabowski and Vernon, "Returns to R&D," the average present discounted value of the profit stream from marketing a new drug over its product life is $210 million to $230 million in 1990 dollars. Thus, at an interest rate of 10 percent, adding a year to that product life by speeding up market introduction could raise returns by $21 million to $23 million.

16.  Ibid.  Those number are also at a present discounted value in 1990 dollars.

17.  Z. John Lu and William S. Comanor, *Strategic Pricing of New Pharmaceuticals*, Working Paper 96-1 (Los Angeles: University of California School of Public Health, Research Program in Pharmaceutical Economics and Policy, October 9, 1996), p. 1.

18.  The 13 therapeutic classes were H2 antagonists, beta-blockers, ace inhibitors, cholesterol reducers, serotonin reuptake inhibitors (antidepressants), 5-HT3 receptor antagonists (antinauseants), cephalosporins (1st, 2nd, and 3rd generations), growth hormones, calcium channel blockers, loop diuretics, and benzodiazepines (tranquilizers). Those classes were defined by a mechanism of action clearly distinguished in Facts and Comparisons, *Drug Facts and Comparisons* (St. Louis, Mo.: Facts and Comparisons, 1995).

Consider the example of Tagamet, a breakthrough drug in antiulcer therapies that was introduced in 1977. Tagamet was the first drug to relieve ulcers by blocking the histamine 2 (H2) receptors in the lining of the stomach from stimulating acid production by the parietal cells. Such treatment is generally superior to antacids, which only neutralize stomach acid, as well as to anticholinergic drugs, which block acid production but often have more severe side effects.[19] Six years after Tagamet became available, a second H2 antagonist, Zantac, was approved; it eventually became the largest-selling drug in both the United States and the world. By 1989, two additional H2 antagonists, Pepcid and Axid, were available. Thus, four slightly different drugs using the same therapeutic mechanism (blocking the H2 receptor) were all patentable, and the breakthrough drug had only six years of market exclusivity before being challenged by a competitor using a similar compound.

## The Economics Behind the Pricing of Innovator Drugs

Although me-too drugs do not offer a novel treatment, they may have fewer side effects and may treat some patients more effectively than the original breakthrough drug. In addition, me-too drugs create more competition in the market by ending the breakthrough drug's monopoly on its method of treatment. That added competition generally keeps the manufacturer of the breakthrough drug from raising its price as quickly as would otherwise be the case.

According to economic theory, both demand and production costs play a role in determining the price of a drug. The line that illustrates demand for a manufacturer's output (known as a demand curve) slopes downward because people will buy more as the price declines (see Figure 4). For example, if the manufacturer's price decreases from $p_1$ to $p_2$, then the quantity that the company can sell increases from $q_1$ to $q_2$. It is profitable for the manufacturer to lower the price from $p_1$ to $p_2$ only if the increase in profits from the larger

**Figure 4.**
**Choosing a Profit-Maximizing Price for a Drug**



SOURCE:  Congressional Budget Office.

NOTE:  According to this hypothetical demand curve, when the price of a drug declines from $p_1$ to $p_2$, the quantity sold increases from $q_1$ to $q_2$. Area A represents the loss in profits when the price falls from $p_1$ to $p_2$, and area B represents the increase in profits because a greater quantity is sold. Drug companies can increase their profits by lowering price so long as area B is larger than area A. At price $p_2$, total profits equal area B plus C.

quantity sold (represented by shaded area B) more than compensates for the loss in profits from the lower price charged on the first $q_1$ units sold (represented by shaded area A). In this example, the manufacturer would continue to lower the price until it could no longer profit from doing so.[20] The profit-maximizing, or equilibrium, price will exceed the cost of producing another unit of the drug, and the profits earned from selling at that price (represented by areas B plus C, if $p_2$ is the equilibrium price) provide the incentive for companies to invest in drug development.

When a breakthrough drug is introduced, by definition it has no close substitutes on the market. Demand for the drug is therefore fairly insensitive to

19.  See Ernst Berndt and others, *The Roles of Marketing, Product Quality and Price Competition in the Growth and Composition of the U.S. Anti-Ulcer Drug Industry,* Working Paper No. 4904 (Cambridge, Mass.: National Bureau of Economic Research, October 1994).

20.  Economists refer to this as the point at which incremental, or marginal, revenue from selling another unit of the drug is equal to the cost of producing another unit. To keep Figure 4 simple, the cost of producing another unit is assumed to be the same no matter how much is produced (therefore, unit production costs are represented by a horizontal line).

price, since no alternative treatment of equal quality and effectiveness exists. (In other words, the drug has a much steeper demand curve, and a given percentage change in its price is associated with a smaller percentage change in the quantity sold.)

Over time, advertising, "detailing" (visits by representatives of the manufacturer to health care professionals), and articles in medical journals disseminate information to doctors about the new treatment. As the breakthrough drug becomes more widely known, demand for it increases. (Graphically speaking, the demand curve shifts to the right, meaning that at any given price, the manufacturer can sell more of the drug.) At that point, the quantity of the drug sold increases, and its equilibrium price usually rises.

Later, when me-too drugs enter the market, demand for the breakthrough drug becomes more sensitive to price, since close substitutes are now available. At that point, an increase in the price of the breakthrough drug will prompt some purchasers to switch to the substitutes. Advertising and detailing of the new me-too drugs may also cause some customers to switch. Publicity for me-too drugs can also boost demand for the treatment in general. But although the overall market for the treatment may grow, such growth may not offset the sales that the breakthrough drug loses to its new competitors. As the market becomes split among several drugs, demand for the breakthrough drug could shrink and become more sensitive to price. As a result, the price of the breakthrough drug could theoretically decline.

## Empirical Evidence About the Pricing of Innovator Drugs

Studies of competition among similar brand-name drugs show that manufacturers compete through prices as well as through advertising and product quality. Most of the empirical studies that look at prices of brand-name drugs are based either on list prices or on average prices paid on invoices to pharmacies and hospitals. Neither of those prices represents an actual transaction price, however. No purchaser pays the list price, although it serves as an important signal since it is a published price observed by

all buyers.[21] The average invoice price is much closer to an actual transaction price, but it does not include rebates or discounts that do not appear on the invoice. Since neither price captures the full impact of discounting, studies that rely on those prices underestimate to some extent the level of price competition among brand-name drugs. Those are the only prices widely available to researchers, however, so they are the ones generally used for analyses.

CBO examined the list prices of breakthrough and me-too drugs over time for five therapeutic classes.[22] In four of the five, the list price of the breakthrough product continued to increase in real terms—that is, by more than just the effects of inflation—after the entry of one or more me-too products.[23] In only one case (that of fluoroquinolone antiinfectives) did the breakthrough drug lower its list price in real terms after the first me-too drug entered the market.

A study by John Lu and William Comanor also found that the average list price of brand-name drugs continues to rise faster than inflation after the introduction of a me-too competitor.[24] For 13 drugs that received an A rating from the FDA (as most innovative), the average inflation-adjusted list price after eight years on the market was 7 percent above the launch price. For 48 B-rated drugs (slightly less innovative), the inflation-adjusted list price was 32 percent higher, on average, eight years after launch.

That same study also found that although prices continued to increase, the rate of increase was slower for those drugs that had more brand-name competitors

---

21.  The list price, called the average wholesale price, or AWP, is published annually in Medical Economics Company, *Red Book* (Montvale, N.J.: Medical Economics Company).

22.  Prices were obtained from the 1980 to 1994 editions of the *Red Book*. The five therapeutic classes were H2 antagonists, cholesterol reducers (specifically HMG-CoA reductase inhibitors), antidepressants (specifically serotonin reuptake inhibitors), fluoroquinolone anti-infectives, and alpha-blockers, as listed in Facts and Comparisons, *Drug Facts and Comparisons*.

23.  In one of those four cases, the entry price of the me-too drug exceeded that of the breakthrough drug. In the other three, the breakthrough drug's price was not reduced even though the me-too drugs with which it competed were available at a lower price.

24.  Lu and Comanor, *Strategic Pricing of New Pharmaceuticals*.

on the market.  The introductory price also tended to be lower when more similar brand-name drugs were already on the market.  Those findings suggest that the rate of price increase is slowed by competition between brand-name drugs.

A breakthrough drug has an advantage over its me-too competitors in that doctors become experienced with it first and are usually hesitant to try a new drug unless it is seen to be more effective or have fewer side effects.  New me-too drugs that offer small advantages over competitors may be sold at a lower price initially; then, as they become more widely accepted, their price rises more quickly.[25]  That may partially explain why the list prices of C-rated drugs (least innovative) tend to increase much more rapidly over time than the list prices of their more innovative competitors.  Lu and Comanor found that for a sample of 69 C-rated drugs, the average inflation-adjusted list price after eight years on the market was 62 percent above the launch price.  That high price increase occurred although those drugs were launched at roughly the same price as their closest competitors, on average.

Price competition among similar innovator drugs is softened because products are differentiated.  It is also softened because entry in the pharmaceutical industry is limited by patent protection and the FDA approval process.  Still, companies have an incentive to continue to enter the market with similar brand-name drugs until profits are driven down to a normal (competitive) rate of return that adequately compensates for the risk of investing in drug development.  One economist has asserted, based on discussions with industry executives, that more me-too drugs are not developed because they would not be profitable given the high development costs.[26]  Companies will choose to develop a brand-name drug similar to others on the market only if they believe that the market is not already saturated, or that their drug may have some quality advantage (such as fewer side effects or greater efficacy) that could enable it to compete effectively and earn profits that more than cover the devel-

opment costs.  Competition should result in firms' earning close to a normal rate of return to their R&D investment, on average.

Using average invoice prices, economist Scott Stern found that cross-price elasticities (a measure of buyers' sensitivity to price differences between similar brand-name drugs) in four therapeutic classes were consistent with the assertion that brand-name drugs compete in price.[27]  His estimates of price sensitivity were not consistent with the assertion that firms collude to maintain prices as high as what would be charged if a single company produced all of the products.  Several other studies have also found that the price differences between patented pharmaceutical products can largely be accounted for by differences in quality, such as side effects and therapeutic effectiveness.[28]

## Barriers to Entry and Market Concentration

Competition between brand-name drugs may be limited not only by patent protection but also by the advantages that large drug companies have in marketing and in the FDA approval process.  One of the key ways in which firms compete for market share (other than through price) is by advertising.  Promotional spending for a brand-name drug can run as high as 20 percent of total sales.  In 1989, three-quarters of promotional outlays went toward detailing—financing a large sales force that promoted the firm's entire product line directly to health care professionals.[29]  The

---

25.  Economists have analyzed this phenomenon using an "experience goods" or "switching costs" model.  See F.M. Scherer and David Ross, *Industrial Market Structure and Economic Performance* (Boston: Houghton Mifflin, 1990), pp. 588-589.

26.  Scherer, *Industry Structure, Strategy, and Public Policy*, p. 351.

27.  The four classes were gout therapies, nonbarbiturate sedatives, oral diabetic therapies, and minor tranquilizers.  See Scott Stern, "Product Demand in Pharmaceutical Markets" (draft, Stanford University, Department of Economics, November 21, 1994; the draft was updated in 1996 at MIT's Sloan School of Management).

28.  See, for example, W. Duncan Reekie, "Price and Quality Competition in Drug Markets: Evidence from the United States and the Netherlands," in Robert B. Helms, ed., *Drugs and Health: Economic Issues and Policy Objectives* (Washington, D.C.: American Enterprise Institute, 1981).

29.  Richard E. Caves, Michael D. Whinston, and Mark A. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers on Economic Activity: Microeconomics* (1991), pp. 11-12; and Mark A. Hurwitz and Richard E. Caves, "Persuasion or Information?  Promotion and the Share of Brand-Name and Generic Pharmaceuticals," *Journal of Law and Economics*, vol. 31 (October 1988), p. 302.

**Table 3.**
**Percentage of New Drugs Acquired Rather Than Self-Originated by U.S.-Owned Drug Companies**

| | Investigational New Drug Applications | | Approved New Drug Applications (For new chemical entities) | |
|---|---|---|---|---|
| | Number of Applications Filed | Percentage of Drugs Acquired[a] | Number of Applications Approved | Percentage of Drugs Acquired[a] |
| 1963-1966 | 326 | 19 | b | b |
| 1967-1970 | 240 | 20 | b | b |
| 1971-1974 | 206 | 19 | b | b |
| 1975-1978 | 160 | 21 | 38 | 29 |
| 1979-1982 | 185 | 31 | 47 | 40 |
| 1983-1986 | 223 | 26 | 40 | 40 |

SOURCE:    Congressional Budget Office based on Joseph DiMasi, Natalie Bryant, and Louis Lasagna, "New Drug Development in the United States from 1963 to 1990," *Clinical Pharmacology and Therapeutics* (November 1991), p. 475.

a.    Cases in which the company submitting the application had acquired rather than discovered the drug.

b.    Not available.

ability to spread those promotional costs across a large product line is beneficial in that type of marketing, giving big firms an advantage.[30] They also appear to enjoy an advantage in the drug-approval process: the General Accounting Office found that NDAs from the most experienced sponsors were three times more likely to be approved than those from the least experienced sponsors.[31]

Perhaps because of the advantages enjoyed by large firms, many new drugs are marketed by a company that did not discover them.[32] Of all chemical entities that began clinical testing between 1979 and 1986, around 29 percent were acquired by another company rather than self-originated (see Table 3). And of the new chemical entities that were approved

for marketing during those years, 40 percent were acquired rather than self-originated.

At first glance, the pharmaceutical industry does not appear to be highly concentrated. The four largest manufacturers of innovative drugs each accounted for only 6 percent to 7 percent of total U.S. pharmaceutical sales in 1994. And the top 10 companies together shared just 56 percent of the market.[33]

When pharmaceutical sales are divided into narrower submarkets, in which products are grouped only with their immediate competitors, much higher concentration becomes apparent. CBO's retail pharmacy data set divides drugs into narrowly defined therapeutic classes. (For more information about how those classes are defined, see Box 3.) The data cover 66 therapeutic classes that together represent about 70 percent of the total retail pharmacy sales revenues in the United States from 1991 to 1994. In just over half of those classes, the top three innovator drugs accounted for 80 percent or more of retail pharmacy sales in their class (see Figure 5).[34] In only nine of the

---

30.    Economists would also say that economies of scope are important. Economies of scope occur when the production or advertising of more than one product lowers the average cost of those expenditures for all products.

31.    General Accounting Office, *FDA Drug Approval Review Time Has Decreased in Recent Years*, GAO/PEMD-96-1 (October 1995), p. 5. "Experienced sponsors" submitted nine or more NDAs between 1987 and 1992, whereas "inexperienced sponsors" submitted four or fewer NDAs and had no affiliation with more experienced sponsors.

32.    Large firms may also have advantages in financial markets, overcoming problems of adverse selection and moral hazard to obtain funding more easily. And they can more easily fund a drug's development out of their profits from sales.

33.    Based on U.S. sales reported by *Med Ad News* (September 1995), p. 34.

34.    Thirteen of the therapeutic classes contained just one to three innovator drugs. In five of those 13 classes, the top three innovator drugs had less than 63 percent of the market because of generic competition.

classes did the top three innovator drugs make up less than 50 percent of their pharmacy market.

The level of market concentration varies widely among therapeutic classes, however, with concentration reduced by the availability of several different brand-name drugs and by generic entry. Generally, the most concentrated classes in the retail pharmacy

---

**Box 3.**
**Defining Therapeutic Classes of Drugs**

Drugs are generally assigned to a therapeutic class according to the Uniform Standard of Classification—a system used by many pharmaceutical data companies.[1] Under that system, drugs are grouped by their indication (the type of illness they treat) and their mechanism of action. Each class is assigned a five-digit number. The first two digits represent very broad indications, such as anesthetics, anti-infectives, and cardiovascular therapies. As the number gets larger, the indication becomes more specific—for example, ace inhibitors and beta-blockers are five-digit classes within cardiovascular therapies, and amoxicillin and penicillin fall within anti-infectives.

The degree to which drugs in the same therapeutic class can be substituted for one another varies by class and by drug within each class. In some five-digit classes, the drugs share the same indication but differ in their mechanism of action. For example, all of the drugs in one five-digit class treat ulcers, but some coat the stomach whereas others block acid secretion. In other five-digit classes, each drug has the same mechanism of action (examples are ace inhibitors, beta-blockers, and B-lactamase inhibitors). Prescription drugs that share a five-digit therapeutic class are closer substitutes for one another than drugs in other classes.

---

1.  Both Scott-Levin and IMS America use that system to classify drug sales. The system was developed by IMS America to provide a logical grouping of pharmaceutical products that are considered to compete in the same or similar markets (according to Paul Wilson, Vice President of Statistical Services at IMS America).

---

**Figure 5.**
**Market Share of the Top Three Innovator Drugs in 66 Therapeutic Classes, 1994**



SOURCE:  Congressional Budget Office based on tabulations of retail pharmacy sales data from Scott-Levin.

NOTE:  Market share is calculated as the total sales (valued at retail prices) of the top three innovator drugs in a therapeutic class divided by the total sales of all drugs (both brand-name and generic) in that class.

---

data set had four or fewer innovator drugs, none of which were available in generic form. In the 18 least concentrated therapeutic classes, at least one of the three top-selling innovator drugs had a generic version available. And 14 of those 18 least concentrated classes had nine or more innovator drugs.

# Factors That Determine Discounts on Brand-Name Drugs

Different purchasers pay different prices for brand-name prescription drugs. Such discounting, which economists refer to as price discrimination, may be an important mechanism for aiding price competition in the pharmaceutical market.[35]  It rewards institutional

---

35.  For a general discussion of price discrimination, see Jean Tirole, *The Theory of Industrial Organization* (Cambridge: MIT Press, 1989), Chapter 3. For a discussion of the legal and economic issues surrounding pricing practices in the pharmaceutical industry, see "Symposium on the Brand Name Prescription Drug Antitrust Litigation," *International Journal of the Economics of Business*, vol. 4, no. 3 (November 1997).

purchasers that organize their patient base through formularies so as to encourage the use of less costly drugs, when possible. Prohibiting or limiting discounts, as some people have called for, could decrease price competition.

A statistical analysis of pharmaceutical prices shows that purchasers tend to obtain higher discounts from manufacturers on brand-name drugs when generic substitutes are available and when a greater number of therapeutically similar brand-name drugs are available. That finding suggests that manufacturers' discounts are a response to competitive market conditions. When a variety of similar drugs are available, the purchaser has more opportunities to switch, which can be used as leverage in negotiating discounts.

## The Economic Theory Behind Discounting

If companies practice price discrimination, those purchasers least sensitive to price pay the most. In today's market for outpatient prescription drugs, that means people who have no insurance coverage for drugs, or third-party payers that do not use a formulary to manage their outpatient drug benefits, pay the highest prices for brand-name drugs. Differences in price result because manufacturers apply typical profit-maximizing strategies based on the price sensitivity of buyers. According to economic theory, no purchaser pays a higher price to make up for the discounts offered to somebody else. Instead, each pays the price dictated by his or her price sensitivity.[36]

Manufacturers offer discounts on brand-name drugs based both on the volume bought and on the purchaser's ability to influence market share by systematically favoring one brand-name drug over another. For that reason, one would expect retail pharmacies to pay higher average prices than other purchasers (such as hospitals, long-term care facilities, and health maintenance organizations) because they have less ability to promote such brand-name substitution. (As noted earlier, substituting one therapeuti-

cally similar brand-name drug for another requires getting the doctor's consent—something that pharmacists in a hurry do not always have time to do.) If pharmacies do pay higher prices, that may be evidence that some managed care techniques, such as the use of formularies, help other types of purchasers obtain discounts from manufacturers.[37] Pharmaceutical benefit management companies, for example, receive rebates from manufacturers precisely because they apply a formulary to a broad patient base, which a retail pharmacy itself generally cannot do.

## Types of Discounts

Manufacturers' discounts on brand-name drugs take a variety of forms. Purchasers that buy directly from manufacturers can simply negotiate a lower purchase price. Three-quarters of prescription drugs are bought indirectly, however, through wholesalers. But that does not prevent the purchaser from obtaining a lower price. Manufacturers frequently pay rebates directly to such purchasers based on the volume of drugs they use over a period of time. A demonstrated ability to switch patients to a particular company's drug, evidenced by an increase in the volume used by a purchaser's patient base, may be rewarded with a higher rebate. Some contracts between PBMs and drug companies have been designed in that manner.[38]

Another important form of discounting involves the wholesaler. Together, manufacturers and wholesalers have developed a computerized system whereby the wholesaler learns of the discounted price negotiated between a manufacturer and a particular purchaser. The wholesaler delivers the drug at the discounted price, informs the manufacturer of the discounted delivery, and then is reimbursed by the manufacturer electronically.[39] Such discounts handled

---

36. See Tirole, *The Theory of Industrial Organization*, pp. 137-139.

37. For a further discussion of this issue, see Kenneth G. Elzinga and David E. Mills, "The Distribution and Pricing of Prescription Drugs," *International Journal of the Economics of Business*, vol. 4, no. 3 (November 1997), pp. 289-292.

38. See, for example, "PCS Rebates from Pfizer on Seven Products Totaled over $10 Million in First 21 Months of 1994-1998 Contract," *The Pink Sheet*, F-D-C Reports, June 10, 1996, p. 16.

39. For a discussion of that system, see F.M. Scherer, "How U.S. Antitrust Can Go Astray: The Brand Name Prescription Drug Litigation," *International Journal of the Economics of Business*, vol. 4, no. 3 (November 1997), p. 248.

**Table 4.**
**Average Price Differences for Various Types of Purchasers in the Pharmaceutical Market (In percent)**

| Type of Purchaser | Average Invoice Price Paid for 100 Brand-Name Drugs (As a percentage of the average invoice price to pharmacies) | | Market Share by Type of Purchaser in 1994[a] |
|---|---|---|---|
| | 1993 | 1994 | |
| Retail Pharmacies | 100 | 100 | 85.6 |
| Hospitals | 91 | 91 | 4.2 |
| Long-Term Care Facilities | 96 | 95 | 3.4 |
| Health Maintenance Organizations | 80 | 82 | 2.7 |
| Federal Facilities | 65 | 58 | 2.6 |
| Clinics | 95 | 91 | 1.6 |

SOURCE:   IMS America.

NOTE:   These figures are based on the average prices of 100 top-selling brand-name drugs sold primarily through retail pharmacies. The prices do not include manufacturer rebates or other discounts not appearing on the invoice.

a.   Calculated as a percentage of total sales revenues for the 100 drugs (valued at invoice prices) after excluding sales to mail-order pharmacies.

through a wholesaler are generally known as charge-backs (although that term is sometimes used to encompass other types of discounts as well).[40]

## Empirical Evidence on Discounting

Most discounts are negotiated privately between manufacturers and purchasers and do not become public information. CBO was able to obtain limited information from IMS America about the different prices that different types of purchasers paid for some prescription drugs in 1993 and 1994 (see Table 4). The prices paid by pharmacies can be viewed as a proxy for the final price paid by customers who do not have a managed drug benefit or PBM to negotiate rebates from manufacturers. That limited pricing information suggests that customers of retail pharmacies who do not have such a plan are paying the most for brand-name drugs.

The price comparison is based on the average invoice prices paid by various kinds of purchasers for 100 top-selling drugs sold largely through pharmacies. (Top-selling drugs that were dispensed primarily in an inpatient setting, such as a hospital, were excluded.) About 85 percent of the revenues from sales of those drugs (excluding sales to mail-order pharmacies) came from retail pharmacies; the other 15 percent came from sales to other types of purchasers.

Those other purchasers paid less, on average, than retail pharmacies for the drugs in question. That finding is consistent with the notion that purchasers are rewarded for their ability to influence the prescription choice of a large patient base. For example, hospitals and clinics paid 9 percent less than retail pharmacies in 1994, and HMOs paid 18 percent less. Federal facilities got the biggest discount, over 40 percent, off the average invoice price paid by retail pharmacies.[41]

---

40.   For example, hospitals and hospital buying groups sometimes refer to the rebates paid directly to them by manufacturers for drugs bought through wholesalers as charge-backs, even though the wholesalers have no knowledge of them. See Caves, Whinston, and Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," p. 32.

41.   Note that the prices paid by federal agencies—such as the Department of Veterans Affairs, the Defense Department, the Indian Health Service, and the Public Health Service, as well as state pharmaceutical assistance programs—are not affected by the best-price provision in the Medicaid rebate program, which discourages discounting. That exclusion was made permanent by the Veterans Health Care Act of 1992. For more information, see Congressional Budget Office, *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry*, CBO Paper (January 1996); and General Accounting Office, *Drug Prices: Effects of Opening Federal Supply Schedule for Pharmaceuticals Are Uncertain*, GAO/HEHS-97-60 (June 1997).

That comparison is based on invoice prices only, which do not capture rebates and other types of discounts that do not appear on an invoice.[42] The size of the average price differences between types of purchasers, and perhaps also the relative ranking of the nonpharmacy purchasers, would change if rebates and all forms of discounts were included. But as long as the excluded rebates and discounts were not larger for retail pharmacies than for the other types of purchasers, on average, then the conclusion drawn from Table 4—that customers of pharmacies without a managed drug benefit pay the highest prices for brand-name drugs—would remain correct. Unfortunately, more complete pricing data are not available.

Rebates to PBMs and Medicaid are also not included in Table 4. Such rebates are an important mechanism for lowering the average prices that manufacturers are paid for prescription drugs bought through retail pharmacies. Since the invoice prices paid by pharmacies do not include the rebates that PBMs and Medicaid receive, Table 4 probably overstates the difference between the average prices that manufacturers earn for drugs channeled through retail pharmacies and the average prices they earn for drugs channeled through other types of purchasers.

## Statistical Analysis of Discounts

For another perspective on pricing in the pharmaceutical industry, CBO analyzed data on the "best-price discounts" offered by manufacturers of brand-name drugs in 1994. (Manufacturers reported that information to the federal Health Care Financing Administration as part of the Medicaid rebate program.) The best-price discount equals the percentage difference between a manufacturer's best price (the lowest price it offers any private purchaser in the United States) and the average price it charges for drugs distributed to retail pharmacies. The best price encompasses all forms of discounting, whereas the average price to retail pharmacies generally does not include rebates paid to PBMs or Medicaid (although it does include

all forms of discounts that manufacturers give directly to pharmacies).[43]

The best-price discount alone is not a perfect measure of discounting, because it is not representative of all discounts. It would be preferable from an analytic standpoint to know more about the distribution of different prices paid for a particular brand-name drug and the quantity sold at each price. Such extensive pricing data are not publicly available, however.

Manufacturers are very careful about giving large best-price discounts (more than 15.1 percent of their average price to pharmacies) because, by law, they must give that same discount on all drugs distributed through retail pharmacies that are purchased by Medicaid beneficiaries.[44] Since Medicaid usually constitutes a larger share of a drug's market than any single private purchaser—13 percent of retail pharmacy sales, on average—such a discount can represent a significant reduction in revenues. The Medicaid rebate program makes it less likely that manufacturers would offer a large best-price discount (over 15.1 percent) to just one private purchaser.[45]

CBO's statistical analysis in fact shows that the Medicaid rebate program, which began in 1991, has discouraged discounting on brand-name drugs. For every increase of 3 percentage points in Medicaid's market share for a particular brand-name drug, the best-price discount falls by 1.3 percentage points. (That result does not apply to prescription drugs used exclusively in an inpatient setting, which are generally not included in Medicaid's rebate program.)

---

42.  Invoice prices generally incorporate discounts granted through a charge-back system with wholesalers.

43.  For more detailed information on the calculation of those prices, see the Medicaid rebate agreement signed by manufacturers (available at http://www.hcfa.gov/medicaid/drug8.htm). The calculation of the average price that manufacturers charge for drugs distributed to retail pharmacies includes sales and discounts to mail-order pharmacies.

44.  Manufacturers pay at least a flat rebate of 15.1 percent of the average manufacturer price for drugs they distribute through retail pharmacies that are purchased by Medicaid beneficiaries. The rebate percentage is equal to the best-price discount only when that discount exceeds 15.1 percent.

45.  See Congressional Budget Office, *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry*, pp. 22-25.

The statistical analysis examines the size of discounts offered on brand-name drugs after adjusting for the effects of the number of brand-name and generic competitors, the therapeutic class of the drug, and its Medicaid market share. (For more details of the analysis, see Appendix B.) The results show that the best-price discount on a brand-name drug is 10 to 14 percentage points greater when therapeutically similar brand-name drugs are available from three or more manufacturers. As more producers of brand-name drugs enter a particular therapeutic class, the size of the best-price discount increases. Similar increases occur when generic competitors enter a market. Those results confirm the theory that the steep discounts on brand-name drugs available to some purchasers are a response to competitive market conditions.[46]

# Competition Between Brand-Name and Generic Drugs

One of the primary goals of the Hatch-Waxman Act was to increase the availability of lower-cost generic drugs. Since the act became law in 1984, the market share of generic drugs has indeed been rising steadily —although not all of that increase stems from the act. For drugs that come in easily countable units, such as tablets and capsules, the share of generic units sold more than doubled between 1984 and 1996—from 18.6 percent of all drug units sold to 42.6 percent (see Figure 6).[47]

Those numbers are probably the best publicly available estimate documenting the rise in generic

## Figure 6.
## Growth in the Market Share of Generic Drugs Since 1984



SOURCE:  Pharmaceutical Research and Manufacturers of America, *1997 Industry Profile* (Washington, D.C.: PhRMA, March 1997), p. 40, based on data from IMS America.

NOTE:  Generic market share is calculated as a percentage of all prescription drugs sold, not just off-patent drugs. These figures are based on countable units, such as tablets or capsules; prescription drugs that come in injectible form are not included.

market share since 1984. However, since countable units do not include injectable drugs and many types of prescription drugs dispensed in liquid form, they are not a perfect measure of average generic market share. Many injectable drugs are dispensed primarily in hospitals and other inpatient settings, so the estimate may underrepresent those channels of distribution. Countable units appear to yield an estimate of generic market share similar to that measured by the number of prescriptions dispensed through retail pharmacies.[48]

The Hatch-Waxman Act encouraged the entry of generic drugs by establishing an abbreviated approval process for generic versions of all nonantibiotic drugs (antibiotics already had such a process). In addition, the act reversed a 1984 court ruling and allowed generic manufacturers to begin the tests required for

---

46.  CBO's 1996 paper on the Medicaid rebate program also found that the largest discounts were significantly higher for multiple-source drugs than for single-source drugs. In 1991, the largest discounts offered on multiple-source innovator drugs averaged 50 percent off the price to pharmacies, compared with 35 percent off for single-source drugs; see Congressional Budget Office, *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry*. See also Fiona Scott Morton, "The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored-Customer Rules," *RAND Journal of Economics*, vol. 28, no. 2 (Summer 1997), pp. 269-290.

47.  Those figures come from IMS America and are published in Pharmaceutical Research and Manufacturers of America, *1997 Industry Profile*, p. 40. The publication gave the generic market share in 1996 as 41.6 percent. The corrected 1996 figure came from a personal communication from Paul Wilson, Vice President of Statistical Services, IMS America, on February 27, 1998.

48.  "Approximately 57 percent of all prescriptions paid for by managed care are still filled with branded products-- a virtually identical ratio to the overall market," implying a generic market share of about 43 percent for the retail pharmacy market; see IMS America, "IMS Says Managed Care Drove Unprecedented Growth in Pharmaceuticals in 1996" (press release, April 14, 1997, available at http://www.ims-america.com/communications/pr_growth.html).

FDA approval before the patent on the innovator drug they were copying had expired. Those changes both increased the probability that a generic copy would become available after patent expiration and reduced the average delay between patent expiration and generic entry from more than three years to less than three months.

As generic drugs are substituted for their more expensive brand-name counterparts, the average price of a prescription falls. In CBO's retail pharmacy data set, the average retail prescription price for a brand-name drug with generic substitutes was $37 in 1994. However, including prescriptions that were filled with a generic drug, the average prescription price for a multiple-source drug was only $26. Thus, generic substitution lowered the average cost for a multiple-source prescription by $11. That result is only a rough estimate, however, since prescriptions may somewhat misrepresent the relative quantities of brand-name and generic drugs sold. For example, if generic drugs tend to have more pills dispensed per prescription than their brand-name counterparts, that estimate would understate the degree to which generic substitution reduces the average cost of a prescription. If generic drugs tend to have fewer pills dispensed, the reverse would be true.

## Effect of Generic Entry on Sales

For many innovator drugs whose patents have recently expired, generic copies quickly gain a large share of the market. CBO's retail pharmacy data set includes 21 innovator drugs whose first generic competitors entered the market between 1991 and 1993. During the first full calendar year in which those 21 drugs faced generic competition, generics already accounted for an average of 44 percent of prescriptions dispensed through pharmacies.[49] Generics also cost one-fourth less than the brand-name drugs, on average, at retail prices. For seven of those drugs (Anaprox, Feldene, Lopid, Naprosyn, Pamelor, Tavist, and Xanax), generics had gained 65 percent or more of the innovator's market by 1994. For all but two of the 21

drugs, generic entry occurred within one year of patent expiration, and in many cases within three months.[50]

Other studies examining the size of the generic market after patent expiration have yielded slightly different results. Those appear to be attributable to differences in the sample of drugs studied as well as to small differences in method. A study by Grabowski and Vernon found that 11 drugs whose patents expired between 1989 and 1992 had an average generic market share (measured by quantity sold) of 50 percent in the first year after generic entry, and eight drugs whose patents expired in the 1986-1987 period had an average generic market share of 38 percent.[51] The study also found that the wholesale price of generic drugs was about half that of brand-name drugs in the first year after generic entry.

Grabowski and Vernon's average generic market share for the 1989-1992 period is higher than that measured by CBO for the 1991-1993 period in part because CBO included the quantity sold of all dosage forms of the brand-name drug, even those for which generic entry had not occurred, when calculating the percentage of total prescriptions filled with a generic drug. That method takes account of the option that brand-name manufacturers have to introduce a new dosage form (such as an extended-release capsule) just as a drug's patent is about to expire, so as to benefit from a three-year exclusivity period on that dosage form. Occasionally, manufacturers can even get a separate patent on a new dosage form. Of the 21 brand-name drugs that CBO analyzed, four had an advanced dosage form (Sinemet CR, Cardizem CD, Toprol XL, and Procardia XL) that was not yet available from generic manufacturers.

The Congress's former Office of Technology Assessment (OTA) also studied the erosion of brand-name drug sales after patent expiration.[52] In OTA's study of 35 brand-name drugs that lost patent protec-

---

49.    The 44 percent average is weighted by sales revenues of the innovator drugs. The unweighted average is 42.8 percent.

50.    The two drugs for which generic entry took more than a year after patent expiration had retail pharmacy sales of about $130 million in 1991.

51.    Henry Grabowski and John Vernon, "Longer Patents for Increased Generic Competition in the U.S.: The Hatch-Waxman Act After One Decade," *PharmacoEconomics* (1996).

52.    Office of Technology Assessment, *Pharmaceutical R&D*, Table F-3, p. 297.

tion between 1984 and 1987, sales volume for those drugs was 43 percent lower three years after patent expiration. Part of the reason it took that long for brand-name sales to erode by so much was a longer delay between patent expiration and generic entry during the period that OTA examined. For more than half of the 1984-1987 period, generic manufacturers could not have begun the abbreviated drug-approval process far enough in advance to enter the market soon after patent expiration. Also, that study differed from CBO's analysis because it focused on the decline in brand-name sales following patent expiration rather than explicitly on generic market share. Actual generic market share measured in volume may have been greater than 43 percent if the total quantity of the drugs demanded rose because generic drugs were cheaper. Or generic market share may have been smaller if competition from similar brand-name drugs was also eroding innovators' sales. OTA's estimates also differed from CBO's in that its measurements were based on the date of patent expiration rather than the date of generic entry.

Before 1984 and the Hatch-Waxman Act, competition from generic drugs in terms of price and market share was limited primarily to antibiotics.[53] In 29 cases other than antibiotics in which top-selling brand-name drugs had generic copies available, generic market share averaged just 12.7 percent of prescriptions dispensed through retail pharmacies in 1980.[54] The probability of generic entry was also much lower before 1984. Excluding antibiotics and drugs approved before 1962 (for which an abbreviated generic-drug-approval process existed), only 18 out of 52 top-selling drugs with expired patents had generic versions available.[55] Clearly, the lengthy FDA approval process at that time hampered the generic drug industry.

## Effect of Generic Entry on Brand-Name Prices

Those consumers who are more sensitive to price, or who are covered by health plans that encourage generic substitution, are more likely to buy a generic drug when it becomes available. As the more price-sensitive consumers switch to the generic version, demand for the original brand-name drug declines and may become less sensitive to price. If that happens, the price of the brand-name drug could theoretically rise more quickly over time than it would have without generic competition.[56]

A number of empirical studies have found that the prices of brand-name drugs continue to rise faster than inflation after generic entry (see Box 4 for details). One study also found that brand-name prices increase by about 1 percent with each new generic competitor. At the same time, CBO's analysis shows that discounts on brand-name drugs tend to increase after generic entry, something not fully captured in the invoice prices on which the other empirical studies are based. CBO found that the best-price discount is 10 to 17 percentage points greater when two or more generic manufacturers produce copies of the brand-name drug (see Appendix B). Taken together, the implication of those results is that prices of brand-name drugs do rise faster than inflation for many final purchasers after generic entry, but some purchasers pay less for those drugs after generic entry.

CBO examined the prices that manufacturers charged for 34 brand-name drugs distributed to retail pharmacies that first saw generic competition after 1991. It found that those brand-name prices continued to increase faster than inflation after generic entry, perhaps as much as they would have otherwise.[57]

---

53.  See Federal Trade Commission, Bureau of Consumer Protection, *Drug Product Selection* (1979), p. 46.

54.  See Appendix C for details.

55.  Those drugs were all in the top 200 drugs in the United States, rated by sales. Henry Grabowski and John Vernon, "Longer Patents for Lower Imitation Barriers: The 1984 Drug Act," *American Economic Review*, vol. 76, no. 2 (May 1986), pp. 195-198.

56.  Frank and Salkever have developed a theoretical model that formally captures this phenomenon, showing that it may be profitable for the manufacturer of the innovator drug to raise its price after generic entry; see Richard G. Frank and David S. Salkever, "Pricing, Patent Loss and the Market for Pharmaceuticals," *Southern Economic Journal* (October 1992), pp. 165-179.

57.  The analysis was based on the average price that manufacturers charged for brand-name drugs sold to the retail pharmacy class of trade, as reported by manufacturers to the Health Care Financing Administration as part of the Medicaid rebate program. Those prices, which include all discounts and rebates to retail pharmacies, were matched to the drugs in the retail pharmacy data set to determine whether a generic substitute existed. (For more details on the pricing data, see Appendix A.)

That result affects primarily third-party payers that do not manage their outpatient drug benefits and consumers who have no insurance (but who still purchased the brand-name drug). Other types of purchasers, such as Medicaid and PBMs, get rebates from manu-

facturers that are not captured in the prices charged to pharmacies.

For 34 drugs that experienced generic competition for the first time after 1991, the average price in-

---

**Box 4.**
**Studies of How Generic Entry Affects Brand-Name Prices**

Several economists have studied what happens to the prices of innovator drugs when generic copies enter the market. All of the studies agree that the effect on innovators' prices is very small, although there is some dispute about the direction of that effect. (Those studies looked at average invoice prices paid by hospitals and pharmacies, which do not include some types of discounts and rebates offered by drug manufacturers.)

For 18 innovator drugs whose patents expired between 1983 and 1987, Grabowski and Vernon found that prices continued to rise faster than inflation after generic entry.[1] Another empirical study, by Caves, Whinston, and Hurwitz, examined 30 brand-name drugs that went off patent between 1976 and 1987. The authors attempted to control for the rate of price increase that would have occurred without generic entry. They concluded that although the prices of many brand-name drugs continued to rise after generic entry, those prices were still lower than they would have been otherwise. The study's results showed that the brand-name price actually increased slightly just after patent expiration and then declined by only 2 percent with the entry of the first generic manufacturer.[2] After five generic manufacturers had entered the market, the brand-name price was 8.5 percent lower than it would have been without generic entry, and after 10 generic manufacturers had entered the market, that price was 15 percent lower.

Wiggins and Maness showed that generic entry has been effective in lowering the brand-name price for anti-infective drugs.[3] And a recent study by Ellison and colleagues found that in one antibiotic market (cephalosporins), demand for a brand-name drug is more sensitive to changes in the price of its generic substitute(s) than to changes in the price of a competing brand-name drug.[4] (Price competition between brand-name and generic drugs in the anti-infective class is thought to be unusually strong, however.)[5]

One study by Frank and Salkever of 32 drugs that went off patent between 1984 and 1987 found that brand-name prices increased more quickly than if generic entry had not occurred—by approximately one extra percentage point for each generic entrant.[6]

Overall, brand-name prices frequently continue to rise after generic entry. Whether they rise more quickly or more slowly than would be the case without competition from generic drugs, however, is unclear based on these studies.

---

1. Henry Grabowski and John Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act," *Journal of Law and Economics* (October 1992), p. 339.

2. Generic entry occurs much sooner after patent expiration now than during most of the period studied by the authors, because of changes made by the Hatch-Waxman Act. Richard E. Caves, Michael D. Whinston, and Mark A. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers on Economic Activity: Microeconomics* (1991), pp. 1-66.

3. Steven Wiggins and Robert Maness, "Price Competition in Pharmaceuticals: The Case of Antiinfectives" (draft, Texas A&M University, Department of Economics, 1995).

4. Sara Fisher Ellison and others, "Characteristics of Demand for Pharmaceutical Products: An Examination of Four Cephalosporins," *RAND Journal of Economics*, vol. 28, no. 3 (Autumn 1997), pp. 426-446.

5. Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards* (February 1993); and Grabowski and Vernon, "Brand Loyalty, Entry, and Price Competition," p. 333. Antibiotics are also known as a class for which physicians are more likely to write the prescription in generic form (specifying a chemical name) than with a brand name.

6. Richard G. Frank and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *Journal of Economics and Management Strategy*, vol. 6 (Spring 1997), pp. 75-90.

crease between 1991 and 1994 was 22 percent. By comparison, average prices for brand-name drugs that faced no generic competition rose by 24.5 percent over that period. And the prices of brand-name drugs that had already faced generic competition by 1991 grew by 22.4 percent during the same period. (Apart from any effect of generic competition, that price increase for multiple-source drugs could be lower because many of the drugs are older ones that have been surpassed by newer treatments.) The differences in the rate of price increase among those three groups of brand-name drugs are small and consistent with the notion that generic competition does not have a large effect on brand-name prices for many purchasers.

## Effect of Generic Competition on Total Costs for Prescription Drugs

Because generic drugs are priced much lower than their brand-name counterparts, they are a source of substantial savings. According to CBO's data on retail pharmacy sales, the average retail price of a prescription for a generic drug in 1994 was $17.40 (see Table 1 on page 15). Multiple-source brand-name drugs were twice as expensive—averaging $37.40 per prescription.

CBO estimates that if each generic prescription had been dispensed at the corresponding brand-name price, purchasers of prescription drugs through retail pharmacies would have spent roughly $8 billion to $10 billion more in 1994. Those figures were calculated as follows: CBO assumed that all of the generic prescriptions dispensed in 1994 would have been filled with a higher-priced brand-name drug if the generic drug was not available.[58] Then the price difference between the innovator and generic formulations of a given drug was multiplied by the number of generic prescriptions dispensed for that drug. Adding together

the results of those calculations for all of the multiple-source drugs in the retail pharmacy data set yielded an estimate of $7 billion in direct savings from retail purchases of generic drugs in the data set.[59]

The sales data cover only 70 percent of the retail pharmacy market, however, although they may cover more than 70 percent of generic drug sales through retail pharmacies since they include nearly all of the 200 top-selling drugs that are dispensed primarily through pharmacies. Assuming that the data set encompasses 70 percent to 90 percent of total generic sales, then savings from all retail purchases of generic drugs through pharmacies would total approximately $8 billion to $10 billion in 1994. Of course, retail pharmacies are not the only sellers of prescription drugs. Since other channels (including hospitals, clinics, and mail-order pharmacies) distribute around 40 percent of prescription drugs, the total savings from generic substitution through all channels were most likely even greater than that amount.

That calculation entails a variety of assumptions and caveats. First, it assumes that the quantity of prescriptions filled for a particular multiple-source drug does not increase because a lower-priced generic has become available. If the number of prescriptions did increase, the calculation would overstate the savings from generic entry. However, limited statistical evidence supports the assumption that the quantity sold does not change. A study by Caves, Whinston, and Hurwitz found that the total amount sold of a drug in both generic and brand-name forms did not increase after generic entry.[60]

Second, the calculation is a rough one because the price per prescription, from which it is derived, does not account for possible systematic differences between the size of brand-name and generic prescriptions. The calculation would be more accurate—though much more cumbersome—if the unit of measure was the cost of an average daily dose. But even

---

58. Technically, the calculation assumed that demand is perfectly price inelastic—that is, the lower price of generic drugs does not induce more prescriptions to be filled than if the cheaper generic version did not exist. To the extent that people fill prescriptions they would have left unfilled if a cheap generic version was not available, the estimate somewhat overstates the savings from generic substitution. And to the extent that some consumers substitute the generic for a therapeutically similar (but chemically different) brand-name drug that is still under patent, savings from generic substitution exist but the calculation estimates them based on the wrong brand-name price. That may or may not lead to a small overstatement of the total savings.

59. Those savings were calculated only for tablet and capsule dosage forms, which constitute 91 percent of the value of generic sales in the retail pharmacy data set. Those dosage forms yield a more reliable average price per prescription, which forms the basis of the calculation.

60. Caves, Whinston, and Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry."

that measure contains problems, because the average daily dose can vary among people and among the different medical conditions that a drug is used for. Without the ability to use a better measure, the calculation relies on prescriptions as the unit of quantity to obtain a rough estimate of the savings from generic substitution.

Finally, the calculation does not include any rebates that manufacturers pay to PBMs or other purchasers of prescription drugs through retail pharmacies. Excluding those rebates leads to an overestimation of the savings from generic substitution at retail pharmacies. That overestimate could be as much as roughly $500 million, assuming that manufacturers give rebates on multiple-source brand-name drugs (to PBMs and other third-party payers that manage their outpatient drug benefits) to the same extent that they do on brand-name drugs still under patent.[61]

# Competition Among Generic Drugs

The expiration of an innovator drug's patent frequently prompts more than one generic copy to enter the market. Since most generic competitors sell their copy under the same chemical name, there is little apparent difference between their products. Economic theory suggests that differences between products dampen price competition, so when products are roughly identical, price competition can be intense. Hence, as more generic manufacturers enter the market, they should face increased pressure to lower prices in order to maintain market share.

Tabulations of average retail prescription prices in 1994 show that the average price of a generic drug does decline as the number of manufacturers and distributors of that drug increases (see Table 5). For example, the average prescription price of a generic drug with one to five manufacturers ($23.40) is more than that of a drug with 16 to 20 manufacturers ($19.90). CBO's retail pharmacy data set covers 112 innovator drugs that in 1994 were also available in generic forms sold under their chemical name. Comparing the average generic prescription price with the average innovator price for the same drug also shows prices falling as the number of generic manufacturers rises. When one to 10 generic manufacturers are in the market, the generic retail prescription price averages 61 percent of the brand-name price. When 11 to 24 generic manufacturers are in the market, the generic retail price averages less than half of the brand-name price.

Other studies have also concluded that prices of generic drugs decline in response to increased generic competition. Economist Richard Caves and colleagues found that as the number of generic manufacturers increased from one to 10, the average generic price fell from 60 percent to just 34 percent of the brand-name price. With 20 manufacturers, the generic price was only 20 percent of the brand-name price.[62] Since generic prices tend to fall as the number of producers rises, generic manufacturers are most profitable when they are one of the first to enter a market.

## Market Concentration in the Generic Drug Industry

Overall, the generic drug market is not particularly concentrated. Mylan and Geneva, the largest generic firms in 1994, accounted for 16 percent and 12 percent, respectively, of all generic sales in the retail pharmacy data set. Most generic firms had just 1 percent to 5 percent of total generic sales.

---

61.  Discounts and rebates to private purchasers in 1994 totaled $3,456 million (not including Medicaid rebates), according to information that the Pharmaceutical Research and Manufacturers of America provided to CBO on April 28, 1997. Pharmacies distribute 60 percent of prescription drugs, but only rebates to third-party payers, not the discounts to pharmacies themselves, should be counted. Assuming that 40 percent of the discounts and rebates went to PBMs and other purchasers that manage their outpatient drug benefits (a very generous amount), that leaves $1,382 million. Since multiple-source brand-name drugs represent about 33 percent of the value of all brand-name drugs sold through retail pharmacies, taking 33 percent of that leaves $455 million.

62.  Caves, Whinston, and Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," p. 36, Table 9. Their study actually counted the number of approved abbreviated new drug applications, which a generic manufacturer is required to obtain from the FDA, rather than the number of manufacturers and distributors.

**Table 5.**
**Price Comparison of Generic and Innovator Drugs, by Number of Manufacturers, 1994**

| Number of Manufacturers Selling Generic Copies of a Given Innovator Drug[a] | Number of Innovator Drugs in Category | Average Prescription Price of All Generic Drugs in Category (Dollars) | Average Prescription Price of All Innovator Drugs in Category (Dollars) | Average Ratio of the Generic Price to the Innovator Price for the Same Drug[b] |
|---|---|---|---|---|
| 1 to 5 | 34 | 23.40 | 37.20 | 0.61 |
| 6 to 10 | 26 | 26.40 | 42.60 | 0.61 |
| 11 to 15 | 29 | 20.90 | 50.20 | 0.42 |
| 16 to 20 | 19 | 19.90 | 45.00 | 0.46 |
| 21 to 24 | 4 | 11.50 | 33.90 | 0.39 |
| Average | n.a. | 22.40 | 43.00 | 0.53 |

SOURCE:   Congressional Budget Office based on tabulations of retail pharmacy sales data from Scott-Levin.

NOTES:   The retail pharmacy data covered 177 multiple-source drugs, but only 112 had both brand-name and generic versions and came in tablet or capsule form. Only tablet and capsule formulations were used for calculating average prescription prices. The average number of generic manufacturers and distributors for a given drug was 10. Only manufacturers with sales above $100,000 for at least one dosage form were counted in the groupings, although all generic sales were used to calculate the average generic price.

　　　　　n.a. = not applicable.

a.   Includes manufacturers and distributors of dosage forms with annual sales above $100,000.

b.   An unweighted average of the ratios of generic to brand-name retail pharmacy prices for the drugs in each category. The ratio for a multiple-source drug is equal to: (total generic sales/number of generic prescriptions) ÷ (total brand-name sales/number of brand-name prescriptions).

　　　The markets for individual multiple-source drugs, by contrast, are much more concentrated. For 94 of 110 multiple-source drugs in the retail pharmacy data set, the top two generic firms were responsible for more than half of generic sales. And for 57 of those drugs, the single top generic firm accounted for more than half of generic sales.

　　　Leading generic firms may lower their price when new competitors enter the market so as to maintain their dominant position. That would explain how the average generic price falls as the number of manufacturers rises, but sales of many generic drugs remain dominated by one or two companies. Still, Grabowski and Vernon found that in only half of the 18 markets they examined, the lowest-priced generic manufacturer had the largest market share.[63] Factors other than

price, such as being the first to enter a market, probably also play a role in determining a generic manufacturer's market share. And one recent study found that generic manufacturers are more likely to enter markets where they have some experience with a drug's dosage form, therapy, or active ingredient.[64]

## Links Between Generic and Brand-Name Manufacturers

Although the same company rarely produces both a brand-name drug and its generic copy, some generic manufacturers are subsidiaries of brand-name firms. In 1994, eight of the 15 largest generic companies in

---

63.   Henry Grabowski and John Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act," *Journal of Law and Economics* (October 1992), p. 345. CBO's retail pharmacy

data are in retail prices, so they cannot be used to compare the prices charged by different generic manufacturers.

64.   Fiona Scott Morton, *Entry Decisions in the Generic Pharmaceutical Industry*, Working Paper No. 6190 (Cambridge, Mass.: National Bureau of Economic Research, September 1997).

the retail pharmacy data set were owned by innovator firms.[65] Those generic subsidiaries were responsible for 46 percent of total generic sales in the data set.

Today, the proportion of generic drugs produced by subsidiaries of innovator firms is probably somewhat smaller than in 1994 because several brand-name manufacturers have left the generic drug business. For example, three of the eight larger generic firms owned by a brand-name company (Rugby, Hamilton, and Warner-Chilcott) have been sold or disbanded in recent years.[66] Some of those brand-name companies experimented with producing generic copies of their own drugs in the early 1990s and found that it was not very profitable. For example, generic manufacturer Hamilton offered copies of the brand-name drugs Anaprox and Naprosyn produced by its parent company, Syntex. During the first calendar year after patent expiration, the average generic price quickly dropped, and Syntex lost 70 percent of its market for those two drugs to generic competition.[67] A few of the brand-name companies that tried to get further into the generic business in the early 1990s, including Hoechst Marion Roussel and Merck, have recently sold generic subsidiaries.[68]

Nevertheless, brand-name companies that have long held generic subsidiaries remain committed to their generic business. Today, at least 13 manufacturers of innovator drugs have a generic subsidiary or division (see Table 6). One of the largest generic firms, Geneva Pharmaceuticals, is a subsidiary of Novartis (a company formed by the merger of Ciba-Geigy and Sandoz).

Most generic subsidiaries do not produce copies of their parent company's drugs. Out of 112 multiple-

**Table 6.**
**Generic Subsidiaries or Divisions of Brand-Name Manufacturers**

| Generic Manufacturer | Owned By |
| --- | --- |
| Apothecon | Bristol-Myers Squibb Co. |
| Arcola Laboratories | Rhone-Poulenc Rorer |
| Blue Ridge Laboratories | Marion Merrell Dow Inc. |
| Copley Pharmaceutical Inc. | Hoechst Marion Roussel |
| Dista Products Co. | Eli Lilly and Co. |
| Elkins-Sinn Inc. | American Home Products Corp. |
| ESI-Lederle | American Home Products Corp. |
| Geneva Pharmaceuticals | Novartis Corp. |
| Greenstone Ltd. | Pharmacia & Upjohn Inc. |
| IPR Pharmaceuticals Inc. | Zeneca Pharmaceuticals |
| Kanetta Pharmacal | Sanofi Winthrop Inc. |
| Lederle Laboratories | Lederle Standard Products |
| Penn Labs Inc. | SmithKline Beecham |
| Schein Pharmaceutical Inc. | Bayer Corp. |

SOURCES: "Generics Are Gaining Respect," *Med Ad News* (November 1993), p. 10; and "The Meltdown: A Special Report on the Generic Drug Industry," *Med Ad News* (November 1997), p. 31.

source drugs in the retail pharmacy data set, only 13 had a generic subsidiary of the brand-name manufacturer selling more than 10 percent of the prescriptions dispensed through retail pharmacies. In general, the incentives to lower price in order to gain market share are the same for all generic manufacturers, whether or not they are the subsidiary of an innovator firm. But an important exception occurs when the generic subsidiary produces a copy of the parent company's innovator drug. Though infrequent, in such cases the subsidiary may have less incentive to lower price than other generic producers because it does not want to take more sales away from the parent company's drug. And when the generic subsidiary does lower price dramatically, the innovator firm suffers.

# Conclusions

Changes to the approval process for generic drugs made by the Hatch-Waxman Act, combined with the changes in demand for generic drugs discussed in

---

65.  All 15 companies had annual sales of over $100 million for the drugs in the retail pharmacy data set in 1994.

66.  Rugby, which was owned by Hoechst Marion Roussel, was sold to Watson, a generic drug company. Hamilton, a subsidiary of Syntex, was disbanded when Syntex was acquired by Roche in 1995. And Warner-Chilcott was sold by Warner-Lambert to Nalé Laboratories.

67.  Based on CBO's retail pharmacy data set. Also see Catherine Yang, "The Drugmakers vs. the Trustbusters," *Business Week*, September 5, 1994, p. 67.

68.  Milt Freudenheim, "Cleaning Out the Medicine Cabinet," *New York Times*, September 11, 1997, p. D1. Hoechst Marion Roussel sold Rugby in 1997 but still owns two smaller generic subsidiaries.

Chapter 2, have prompted a dramatic rise in generic competition since 1984. That increased competition has helped hold down the average price of a multiple-source prescription drug by encouraging the substitution of lower-priced generic drugs for brand-name ones. In 1994, such substitution saved final purchasers of prescription drugs through retail pharmacies roughly $8 billion to $10 billion (at retail prices).

Manufacturers of generic drugs, who sell nearly identical versions of the same product, compete more intensely on the basis of price than do manufacturers of innovator drugs, who compete more on the basis of quality and other differences between products. Average list and invoice prices of brand-name drugs do not typically fall after generic competitors enter the market. On a selective basis, however, manufacturers of brand-name drugs do offer discounts and rebates to some purchasers, and those discounts tend to be larger when generic versions of the drug are available. The data necessary to determine what volume of purchases is sold at a substantial discount do not exist. The industry group Pharmaceutical Research and Manufacturers of America estimates that discounts saved purchasers $5.3 billion in 1994, $3.5 billion of which went to non-Medicaid purchasers.[69] (That $3.5 billion

represented over 5 percent of the value of non-Medicaid prescription drug sales.)

The extent to which brand-name drugs compete through price is difficult to assess. Limited empirical evidence suggests that competition between similar brand-name drugs causes their prices to rise more slowly over time than would otherwise be the case. However, evidence also suggests that the prices of me-too drugs increase much more rapidly over time than the price of the breakthrough drug. Much of that analysis is based on list prices or average invoice prices, which do not include many charge-backs and rebates.

Clearly, some price competition is occurring, particularly in the segment of the market that can negotiate discounts when several similar brand-name drugs are available. As Chapter 2 noted, that segment of the market is growing with the emergence of PBMs and the proliferation of other managed care techniques. Still, since the size of discounts and the quantity of drugs sold at a discount are not known, it is difficult to assess the extent of competition brought about through discounting.

---

69. The group's $5.3 billion estimate is based on reporting from its member companies. In 1994, manufacturers paid states $1.8 billion under the Medicaid rebate program, leaving a net value of $3.5 billion in discounts to non-Medicaid purchasers.

_____Chapter Four_____

# The Effects of the Hatch-Waxman Act
# on the Returns from Innovation

The Hatch-Waxman Act helped increase the supply of generic drugs by lowering the cost of getting them approved by the Food and Drug Administration. As a result of that act and structural changes in the demand for prescription drugs, more innovator drugs now face generic competition shortly after their patents expire. They then quickly lose over 40 percent of their market, on average, to generic drugs.

By themselves, the increase in generic market share and the acceleration of generic entry after patent expiration would have substantially reduced the returns from marketing an innovator drug. However, the Hatch-Waxman Act countered part of that effect by providing patent extensions for such drugs, which now average about three years. Those patent extensions offset part of the potential loss. But they do not completely protect the returns of brand-name manufacturers from the dramatic rise in market share for generic drugs.

The analysis in this chapter focuses on changes in patent protection for brand-name drugs as well as on supply-side factors that have boosted generic market share. As noted in Chapter 2, however, demand-side factors, such as the rise of managed care techniques, have also played a role. The Congressional Budget Office's estimate of changes in the returns from marketing a new drug takes those demand-side factors into account only through their contribution to the dramatic growth of generic market share since 1984.

The Hatch-Waxman Act has increased the likelihood that generic copies will become available once the patent on a brand-name drug expires. Before the act (in 1983), only 35 percent of the top-selling drugs no longer under patent had generic copies available.[1] Today, nearly all do.[2] At the same time, the share of their market that those drugs lose to generic competitors has also expanded dramatically. In 1980, generic drugs accounted for only around 13 percent of the total quantity of prescriptions sold for multiple-source drugs (excluding antibiotics).[3] Fourteen years later, they constituted 58 percent of the total quantity of multiple-source prescriptions dispensed (according to CBO's retail pharmacy data set). Pinpointing how much of that increase resulted solely from the Hatch-Waxman Act, however, is impossible.

For the minority of brand-name drugs that would have experienced generic competition even without the

---

1.   That figure is based on the top 200 off-patent drugs that year, excluding antibiotics and drugs that were approved before 1962; see Henry Grabowski and John Vernon, "Longer Patents for Lower Imitation Barriers: The 1984 Drug Act," *American Economic Review*, vol. 76, no. 2 (May 1986), pp. 195-198.

2.   For example, in 1994, 95 percent of the off-patent drugs with sales revenues of $40 million or more in CBO's retail pharmacy data set had generic copies available. In that case, off-patent drugs were ones that were not protected by a patent or an exclusivity provision.

3.   CBO calculated that average based on 29 nonantibiotic multiple-source drugs that were among the top 100 in U.S. sales, using data from Alison Masson and Robert Steiner, *Generic Substitution and Prescription Drug Prices: Economic Effects of State Drug Product Selection Laws* (Federal Trade Commission, October 1985), pp. 251-269. See Appendix C of this study for details.

act, the average number of years they are on the market before facing generic competition did not change much. Before 1984, an average of three years elapsed between patent expiration and generic entry. By accelerating the approval process for generic drugs and explicitly permitting them to undergo clinical tests while the innovator drug is still under patent, the Hatch-Waxman Act now enables generic manufacturers to enter a market almost immediately after patent expiration. However, that decline of roughly three years in the average time before generic entry is almost exactly offset by the average increase in patent terms from Hatch-Waxman extensions.

CBO's analysis finds that despite the patent-term extensions and various exclusivity provisions of the Hatch-Waxman Act, the increase in generic market share since 1984 has decreased the total returns from marketing a new drug by about $27 million, on average. (That estimate does not apply to antibiotic drugs, which were not affected by the act.) In this study, the phrase "returns from marketing a new drug" refers to the expected average present discounted value of the total profit stream generated by introducing a new drug onto the market. Previous studies estimated that profit stream at an average of $210 million to $230 million (in 1990 dollars) for drugs introduced in the early 1980s.[4] Those returns account for production costs but not the cost of research and development, which averaged about $200 million per drug (in 1990 dollars) when capitalized to the date of market introduction. Expressed as a percentage, the $27 million decline in returns equals roughly 12 percent of the total average returns from marketing a new drug. Despite that decline, those expected returns probably continue to cover the costs of developing a drug, on average, including the cost of capital.[5]

# Changes to the Length of Patents for Brand-Name Drugs

Over the past 14 years, federal legislation—particularly the Hatch-Waxman Act of 1984 and the Uruguay Round Agreements Act of 1994—has altered the patent protection available to pharmaceutical products in the United States (see Table 7). The average length of time between when a brand-name drug enters the market and when its patent expires rose by more than two years—from an average of about nine years before 1984 to 11 to 12 years.[6] By contrast, the period after that, between when the innovator drug's patent expires and when the first generic copy enters the market, declined from about three years to a few months. After patent expiration, sales of an innovator drug can decline significantly. Between 1984 and 1994, the average market share of generic drugs increased from around 13 percent to 58 percent of prescriptions dispensed for multiple-source drugs (except antibiotics).[7]

Determining the extent to which average patent terms have changed under the Hatch-Waxman Act is crucial to assessing whether the returns from marketing a new drug have largely been preserved despite the dramatic rise in generic competition. To that end, CBO analyzed data from the Patent and Trademark Office to evaluate the effect of Hatch-Waxman extensions on the average patent term of an innovator drug.

---

4.   See Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards* (February 1993); and Henry G. Grabowksi and John M. Vernon, "Returns to R&D on New Drug Introductions in the 1980s," *Journal of Health Economics*, vol. 13, no. 4 (December 1994), pp. 383-406.

5.   Ibid. Those two studies found that the present discounted value of the returns from marketing a drug exceeded the capitalized costs of drug development by an average of $22 million to $36 million for drugs introduced in the early 1980s.

6.   According to data that CBO obtained from the Patent and Trademark Office, the average patent term remaining after FDA approval was 11.5 years for the 51 drugs approved between 1992 and 1995 that received a Hatch-Waxman extension. For drugs approved between 1978 and 1982, the average patent term remaining was just over nine years, according to Office of Technology Assessment, *Pharmaceutical R&D*, p. 83.

7.   According to CBO's retail pharmacy data set, generic drugs accounted for 36 percent of all retail prescriptions dispensed in 1994 and 58 percent of prescriptions dispensed for multiple-source drugs. Excluding the few multiple-source antibiotic drugs from the data does not particularly affect that average.

**Table 7.**
**Changes in Patent Protection for U.S. Pharmaceuticals**

|  | Before the Hatch-Waxman Act of 1984 | After the Hatch-Waxman Act and the Uruguay Round Agreements Act of 1994 |
|---|---|---|
| Patent Term | 17 years from patent grant | 20 years from application filing (the earliest relevant filing date)[a] |
| Average Period of Marketing Under Patent Protection[b] | About 9 years | About 11.5 years |
| Usual Period Between Patent Expiration and Generic Entry[c] | 3 to 4 years | Frequently 1 to 3 months |
| Average Generic Market Share for Multiple-Source Drugs (Percent)[d] | 12.7 | 57.6 |

SOURCE:   Congressional Budget Office based in part on the sources in the footnotes below.

NOTE:  These figures exclude antibiotics, which were not affected by the Hatch-Waxman Act.

a.   See 35 U.S.C. 154(c)(1). For drugs patented before June 8, 1995, companies can choose between the 17-years-from-patent term and the 20-years-from-filing term (if the drug was not yet into its Hatch-Waxman extension on that date).

b.   The average "effective" patent term (the period between approval by the Food and Drug Administration and patent expiration). These averages differ from the sales-weighted averages used in calculating the returns from marketing a new drug. Top-selling drugs tend to have more years of marketing under patent protection, making the sales-weighted averages larger. The figure for the pre-Hatch-Waxman period is based on Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards* (February 1993); and Henry Grabowski and John Vernon, "Longer Patents for Lower Imitation Barriers: The 1984 Drug Act," *American Economic Review*, vol. 76, no. 2 (May 1986). The figure for the post-Hatch-Waxman period is based on the average effective patent term for the 51 drugs approved between 1992 and 1995 that received a Hatch-Waxman extension.

c.   The pre-Hatch-Waxman figure is based on CBO's analysis of generic entry for 11 nonantibiotic drugs approved after 1962. The post-Hatch-Waxman figure is based in part on Henry Grabowski and John Vernon, "Longer Patents for Increased Generic Competition in the U.S.: The Hatch-Waxman Act After One Decade," *PharmacoEconomics* (1996).

d.   The increase resulted from various changes in the demand for brand-name and generic drugs as well as from changes in the Hatch-Waxman Act. The pre-Hatch-Waxman figure is based on sales data for 29 multiple-source drugs (excluding antibiotics) in Table A5-1 of Alison Masson and Robert Steiner, *Generic Substitution and Prescription Drug Prices: Economic Effects of State Drug Product Selection Laws* (Federal Trade Commission, October 1985).

## Patent Extensions Under the Hatch-Waxman Act

The Hatch-Waxman Act allows for patent extensions based on the amount of time a drug spends in the FDA review process. Those extensions now average about three years for new drugs.[8] Technically, the length of a patent extension equals half of the time spent in clinical testing after the patent is granted, plus all of the time that the FDA spends reviewing the new drug application. (The clinical testing phase starts when the manufacturer files an investigational new drug application, which allows clinical testing in humans to take place.) Those extensions are subject to two limits.

8.   The average extension for drugs approved before 1992 was less than that because a transitional two-year cap applied to drugs that were in clinical testing when the Hatch-Waxman Act became law. Drugs whose clinical testing began before September 24, 1984, were limited to two years of patent extension, and drugs that were already on the market by that date were not eligible for any patent extensions. However, drugs approved between January 1, 1982, and September 23, 1984, were eligible for 10 years of market exclusivity before an abbreviated new drug application could be submitted to the FDA by a generic manufacturer.

**Table 8.**
**Average Length of Hatch-Waxman Extensions for Drugs Approved Between 1992 and 1995**

| Year of FDA Approval | Number of New Drugs Receiving Extensions | Average Extension (Years) | |
|---|---|---|---|
| | | For All Drugs | Excluding Drugs Subject to Two-Year Cap |
| 1992 | 16 | 2.4 | 2.5 |
| 1993 | 14 | 3.2 | 3.4 |
| 1994 | 10 | 2.5 | 2.7 |
| 1995 | 11 | 3.6 | 3.6 |
| Average | n.a. | 2.9 | 3.0 |

SOURCE:   Congressional Budget Office calculations based on data from the Patent and Trademark Office and the Food and Drug Administration.

NOTE:    FDA = Food and Drug Administration; n.a. = not applicable.

First, they cannot exceed five years. And second, they cannot allow the period between product approval and patent expiration to exceed 14 years.

Only one patent for each newly approved chemical entity is eligible for a Hatch-Waxman extension. If a drug has more than one patent, the manufacturer must choose which will receive the extension. Extensions are usually applied to the patent on a drug's chemical compound (a product patent) or occasionally to a patent on the use of the drug.[9] Manufacturers must apply for an extension no more than 60 days after the FDA approves a drug for marketing.

For the 51 drugs approved between 1992 and 1995 that have received an extension, the average extension lasted 2.9 years. However, eight of those drugs were subject to a transitional two-year cap because they were undergoing clinical testing when the Hatch-Waxman Act became law. For the 43 drugs not subject to that cap, the average extension lasted 3.0 years (see Table 8).[10] In all, the average patent

term remaining after FDA approval for the 51 drugs that received extensions was 11.5 years.

Given the length of the clinical testing and NDA approval phases, those extensions would have averaged more than three years were it not for the 14-year cap. A study of the first 65 drugs to receive Hatch-Waxman extensions found that the total extension available under the act's formula, before applying the caps and other restrictions, averaged 4.5 years.[11] Almost half of those drugs would have been subject to the 14-year cap had the transitional two-year cap not applied. Similarly, about half of the 43 drugs introduced between 1992 and 1995 that received Hatch-Waxman extensions and were not limited by the transitional cap had their extensions limited by the 14-year cap (see Table 9). Only 10 drugs had their extensions limited by the five-year cap.

9.   A third type of patent, called a process patent, also exists. Since it may not be difficult to formulate a similar compound using a slightly different chemical process, those types of patents do not necessarily prevent generic entry; personal communication by Peter Richardson, chief patent attorney, Pfizer, May 1997.

10.   A study by Henry Grabowski and John Vernon found that for about 70 innovator drug products whose patents expired between 1991 and 1993, Hatch-Waxman extensions averaged 2.4 years. Some of those drugs

were subject to the transitional two-year cap. See Grabowski and Vernon, "Longer Patents for Increased Generic Competition in the U.S.: The Hatch-Waxman Act After One Decade," *PharmacoEconomics* (1996).

11.   The average clinical testing period for those drugs lasted 5.1 years. After subtracting the time between the beginning of clinical tests and the issuing of the patent, that period came to 3.8 years, half of which is counted when calculating the extension. The average NDA approval phase for those 65 drugs was 2.6 years, for a total average potential extension of 4.5 years. See Alan D. Lourie, "A Review of Recent Patent Term Data," *Journal of the Patent and Trademark Office Society* (February 1989), pp. 171-176.

Not all drugs obtain a Hatch-Waxman extension. The FDA approved a total of 101 drugs containing new chemical compounds between 1992 and 1995, but only half (51) have received a Hatch-Waxman extension so far. Another 12 have an application pending (see Table 10). Of the remaining 38 drugs, 19 had no patent to extend. Fifteen others already had 14 years left under patent when they were approved by the FDA. And four drugs did not apply for an extension, for reasons that could not be determined.

## Nonpatent Exclusivity Periods Under the Hatch-Waxman Act

In addition to extending patent terms, the act grants special periods of exclusivity in two circumstances (not including some of its transitional features). First, when the FDA approves a new chemical entity, no application for a generic copy is accepted for a minimum of five years. That provision benefits drugs that have no patent, or have a very short remaining patent life when they are approved, because it means that generic manufacturers must wait five years before filing an abbreviated new drug application. Since the approval process for such applications takes more than 30 months, on average, many of those brand-name drugs should actually have six to seven years of exclusivity before they must face generic competi-

**Table 9.**
**Limits on Hatch-Waxman Extensions for Drugs Approved Between 1992 and 1995**

| Type of Limit | Number of Drugs Affected |
|---|---|
| 14-Year Cap | 21 |
| Five-Year Cap | 10 |
| Two-Year Cap | 8 |
| No Cap | 12 |
| Total | 51 |

SOURCE:    Congressional Budget Office based on data from the Patent and Trademark Office.

**Table 10.**
**Reasons That Some Drugs Approved Between 1992 and 1995 Did Not Receive a Hatch-Waxman Extension**

| Reason | Number of New Drugs |
|---|---|
| No Patent to Extend[a] | 19 |
| Already Had 14 Years of Exclusivity | 15 |
| Extension Application Pending | 12 |
| Eligible but Did Not Apply | 4 |
| Total | 50 |

SOURCE:    Congressional Budget Office calculations based on data from the Patent and Trademark Office and from Department of Health and Human Services, Food and Drug Administration, "Prescription and OTC Drug Product Patent and Exclusivity Data," in *Approved Drug Products with Therapeutic Equivalence Evaluations* (1996).

NOTE:    The Food and Drug Administration approved a total of 101 new drugs during this period.

a.    These drugs received five years of exclusivity under the Hatch-Waxman Act or seven years of exclusivity under the Orphan Drug Act.

tion.[12] In most cases, however, that period is probably too short to fully recover the average costs of drug development.

Second, the act allows the FDA to grant three years of market exclusivity for an NDA (including a supplemental one) if that application requires new clinical investigations. Manufacturers can use NDAs or supplemental NDAs to obtain approval for new dosage forms of an already-approved drug, for a new use, or for marketing the drug over the counter. Those provisions give manufacturers an incentive to continue improving brand-name drugs, and the knowledge about those drugs, after they are on the market.

Manufacturers can also use those provisions to slow generic competition. By introducing a new dos-

---

12.    In 1995 and 1996, an average of 33 to 34 months elapsed between the submission and final approval of abbreviated NDAs; see Department of Health and Human Services, Food and Drug Administration, *Justification of Estimates for Appropriations Committees* (1997 and 1998).

age form just before patent expiration, a manufacturer obtains three years of market exclusivity for the new product under the Hatch-Waxman Act (although generic manufacturers can still copy the original form of the drug). Likewise, if a drug starts being sold over the counter, it enjoys three years of exclusivity before the FDA can accept abbreviated applications for generic over-the-counter versions. The over-the-counter versions of Zantac and Tagamet, for example, have benefitted from that provision. Sometimes, a manufacturer can obtain a separate patent on a new dosage form—particularly an extended-release form. For example, the patent for the active ingredient in Procardia expired in 1991, but the patents for the extended-release version, Procardia XL, do not expire until 2000 or later.[13]

## The Effect of Those Changes on the Average Drug

To assess the change in returns from marketing a new drug, analysts need to know the average effect of the Hatch-Waxman Act on all brand-name drugs approved, not just on those that obtain an extension. When the benefits of the act's patent extensions and five-year exclusivity period are averaged over all drugs approved between 1992 and 1995, the average effect is to postpone generic entry by 2.8 years.

CBO calculated that effect as follows. As Table 8 shows, extensions averaged three years for the 43 drugs receiving a Hatch-Waxman extension during that period that were not subject to the transitional two-year cap. Since the transitional cap applies only to drugs in clinical testing in 1984, it will eventually disappear. Therefore, the calculation attributes three years of patent exclusivity to all 51 drugs that received a Hatch-Waxman extension. It also assumes that the 12 drugs with extension applications pending will receive an average extension of three years.

Of the 19 drugs that had no patent to extend, nine were excluded from the calculation because they

were "orphan" drugs (those with a potentially small market because of the medical condition they treat), which received seven years of exclusivity under the Orphan Drug Act. The other 10 unpatented drugs were entitled under the Hatch-Waxman Act to five years of exclusivity, during which no generic manufacturer could file an abbreviated application with the FDA. Since it takes at least one year for a generic manufacturer to obtain FDA approval, that exclusivity provision effectively postpones generic entry by at least six years. Thus, the calculation attributes six years of delay in generic entry for those drugs under the act.

The average was taken over the number of new drugs approved between 1992 and 1995, after subtracting the nine orphan drugs and the four drugs that did not apply for an extension but were eligible. Mathematically, the formula is:

$$\frac{(\text{number of drugs obtaining an extension x 3 years}) + (\text{unpatented drugs x 6 years})}{(\text{all new drugs approved}) - (\text{orphan drugs}) - (\text{drugs that were eligible for an extension but did not apply})}$$

$$= [(51 + 12) \times 3 + (10 \times 6)]/(101 - 9 - 4) = 2.8.$$

That average does not take into account the exclusivity periods for new dosage forms. As explained below, CBO accounted for those exclusivity periods in its calculation of returns from marketing by including dosage forms that have no generic versions available in its estimate of average generic market share following patent expiration.

## The Effect of the Uruguay Round Agreements Act

Ten years after the Hatch-Waxman Act, another piece of legislation, the Uruguay Round Agreements Act of 1994 (URAA), affected patent terms for brand-name drugs. That act changed the length of U.S. patents on all types of inventions to 20 years from the date of application rather than 17 years from the date the patent is granted. That change has had only a very small effect on the average "effective" patent term—the time between FDA approval and patent expiration—for drugs patented after June 8, 1995 (most of which have

13. Department of Health and Human Services, Food and Drug Administration. "Approved Drug Products with Therapeutic Equivalence Evaluations," January 31, 1998 (available at http://www.fda.gov/cder/da/patex.17.htm).

yet to be introduced on the market). Drugs already patented by June 8, 1995, may benefit from the change as their manufacturers can choose between the 17-year and 20-year terms and still obtain a Hatch-Waxman extension.[14]

So-called patent pendency periods (the time between applying for a patent and receiving it) vary considerably among drugs. Of the 100 top-selling drugs in 1996, 45 were granted patent-term extensions under the Hatch-Waxman Act. CBO found that the patent pendency period for those 45 drugs averaged 3.3 years.[15] That implies that the new 20-years-from-filing term should have a slightly negative effect for drugs patented after June 8, 1995. The URAA's effect on patent terms interacts with the rules in the Hatch-Waxman Act used to calculate extensions. On net, CBO estimates, those 45 drugs would have lost an average of almost four months of patent life if the 20-years-from-filing term was applied universally.[16]

Companies can file a provisional patent application that establishes priority for their invention but does not start the patent-term clock. They must then file a full application within one year.[17] If companies take advantage of that provisional application, the negative effect of the 20-years-from-filing term could be slightly offset. Firms may also change their behavior in other ways that could speed up the time between patent application and patent grant. For those reasons, CBO assumed in calculating the change in returns from marketing that the URAA had no net impact on effective patent terms.

Some patents that were about to expire under the 17-year term had their expiration dates postponed under the 20-year term established by the URAA. For those patents, a transitional feature in the act allows generic manufacturers to enter a market after the 17-year term expires if the generic manufacturer had already undertaken a substantial investment.[18] However, because of complications in the way the URAA interacts with the Hatch-Waxman Act, that transitional feature does not apply to pharmaceutical products.[19] Some Members tried during the 104th Congress to pass legislation allowing earlier generic entry in the pharmaceutical market in cases in which substantial investment had already been made, but that effort was unsuccessful.

# Changes to the Approval Process for Generic Drugs

The Hatch-Waxman Act made two key changes that allow generic manufacturers to obtain FDA approval more quickly once the patent on an innovator drug has expired. First, it established an abbreviated approval process for generic copies of innovator drugs that were approved after 1962. Second, it allowed generic manufacturers to conduct the tests required for FDA approval before the innovator drug's patent expired. Those changes shortened the average time between patent expiration and generic entry for top-selling drugs from three or four years to less than three months. That acceleration of generic entry helps consumers by making lower-cost drugs available more quickly. It also roughly offsets the average 2.8-year delay in generic entry provided by the patent-term extensions and exclusivity provisions in the Hatch-Waxman Act.

Before the act took effect, the FDA had two types of application processes for approving generic copies of innovator drugs. When copying an innova-

---

14.  According to a 1996 ruling by the U.S. Circuit Court, products patented before June 8, 1995, that were already into their Hatch-Waxman extension period on that date are not eligible for the new 20-year patent term under the URAA.

15.  Based on data on patent pendency periods provided by Pfizer and data on regulatory review periods and patent-term extensions from the Patent and Trademark Office.

16.  Henry Grabowski and John Vernon found that the average patent pendency period for 105 drugs approved between 1990 and 1995 that received Hatch-Waxman extensions was 3.8 years. The overall effect of the URAA, when interacted with the Hatch-Waxman extensions, was a loss of 0.34 years. See Grabowski and Vernon, "Effective Patent Life in Pharmaceuticals," *International Journal of Technology Management* (forthcoming).

17.  Title V, section 532(b)(1) of the URAA pertains to provisional applications and the right of priority (see 35 U.S.C. 119(e)(1), 108 Stat. 4985). Section 532(a)(1) defines the new 20-year patent term (see 35 U.S.C. 154(a)(2), 108 Stat. 4984).

18.  The generic manufacturer must pay an equitable remuneration to the patent holder (see 35 U.S.C. 154(c)(2) and (3), 108 Stat. 4985).

19.  It also does not apply to other products reviewed by the FDA that are eligible for Hatch-Waxman extensions— namely, biological products, food and color additives, and medical devices.

tor drug that had been approved before October 1962, the generic manufacturer had only to demonstrate bioequivalence through clinical tests. When copying an innovator drug approved after 1962, the generic manufacturer also had to demonstrate safety and efficacy. The tests necessary to demonstrate a drug's bioequivalence are much less costly than those required to prove its safety and efficacy.[20] In some instances, the FDA accepted a literature review of published reports in lieu of safety and efficacy tests; such applications were called "paper NDAs."[21] However, in many cases, sufficient evidence was not available in published reports.[22] After the first generic copy of a drug was approved, subsequent applications by generic manufacturers could more easily substitute a literature review for safety and efficacy tests.

In the case of antibiotics, the distinction between pre- and post-1962 drugs did not exist. An abbreviated process for approving generic antibiotics, which required clinical tests to show only bioequivalence, applied to all antibiotic drugs approved under section 507 of the Federal Food, Drug, and Cosmetic Act. Since an abbreviated approval process for generics already existed, such antibiotics were not included in the Hatch-Waxman provisions and were not eligible for patent-term extensions under the act. However, the Food and Drug Administration Modernization Act of 1997 made antibiotic drugs eligible for Hatch-Waxman extensions, thus increasing the returns from their development.

In essence, the Hatch-Waxman Act extended the abbreviated process for approving antibiotics (as well as generic copies of innovator drugs approved before 1962) to all generic drugs. Generic manufacturers now file an abbreviated new drug application, which requires that they perform clinical tests only to demonstrate that their drug is bioequivalent to a drug with an approved NDA that is already on the market. The

FDA relies on the safety and effectiveness determination for that original drug when approving the generic copy.

To further speed up the process, the Hatch-Waxman Act explicitly allows generic manufacturers to begin those clinical tests before the original drug's patent expires. In most cases, that change lets manufacturers obtain FDA approval and begin selling copies of an innovator drug soon after patent expiration. Prior to the Hatch-Waxman Act, generic testing occasionally occurred before patent expiration; it was subject to legal dispute until the Court of Appeals for the Federal Circuit ruled in 1984 that such tests infringed on the patent of the innovator drug.[23] The Hatch-Waxman Act effectively reversed that decision by stating that generic manufacturers can begin the FDA approval process before patent expiration. By including the patent expiration date in its application, the generic firm makes explicit its intention not to market the new product until after patent expiration. For its part, the FDA will not approve a new generic drug until the innovator's patent has expired (unless the generic applicant successfully challenges that patent in court).[24]

Before the Hatch-Waxman Act, an average of three to four years elapsed between patent expiration and generic entry. CBO identified 15 cases before 1984 in which one or more generic manufacturers had obtained FDA approval to produce a post-1962 drug by filing a new drug application. For the 11 cases in which a patent expiration date was identified, the average time between patent expiration and generic entry was 3.1 years. In six of those cases, the NDA was applied for before patent expiration. In the other five cases (in which the NDA was applied for after patent expiration), the average time between patent expiration and generic entry was 3.9 years.

20.   Grabowski and Vernon, "Longer Patents for Lower Imitation Barriers."

21.   See Donald O. Beers, *Generic and Innovator Drugs: A Guide to FDA Approval Requirements*, 4th ed. (Englewood Cliffs, N.J.: Aspen Publishers, 1995), pp. 3-59 to 3-71.

22.   House Committee on Energy and Commerce, *Report on the Drug Price Competition and Patent Term Restoration Act of 1984* (June 21, 1984), pp. 16-17. According to that report, the FDA estimated that sufficient published evidence was not available for 85 percent of all post-1962 drugs.

23.   The case was *Roche Products, Inc. v. Bolar Pharmaceutical Company, Inc.* (733 F. 2d 858 Federal Circuit 1984). See Alan D. Lourie, "Patent Term Restoration," *Journal of the Patent Office Society*, vol. 66, no. 10 (October 1984), pp. 526-550; and Beers, *Generic and Innovator Drugs*, pp. 4-75 to 4-77.

24.   The process for a generic applicant to challenge an innovator's patent is discussed in 21 U.S.C. 355(j)(2)(A)(vii), paragraph IV, and section 355(j)(5)(B)(iii) of the Federal Food, Drug, and Cosmetic Act of 1938, as amended.

For those 15 drugs, generic entry occurred, on average, 1.8 years after the filing of an application. The approval process for those drugs actually took longer than that because before filing an NDA, the generic manufacturers had to research the formulation, contact a chemical manufacturer who could produce the active ingredient, search the literature for preclinical and clinical data, conduct a bioequivalence study, and perhaps demonstrate safety and efficacy as well. Although some of those steps could be taken before patent expiration, the *Roche v. Bolar* decision required that no clinical tests be conducted until afterward.

As an indication of how much more quickly generic entry occurs since the Hatch-Waxman Act, CBO examined 17 brand-name drugs that lost their patent protection between 1990 and 1993, most of which had annual U.S. sales of $50 million or more. For most of those drugs, generic entry occurred within one or two months of patent expiration, although there were exceptions (see Appendix C for more details).[25]

# Effects on the Returns from Marketing a Drug

Makers of innovator drugs were slightly worse off after the Hatch-Waxman Act, largely because many more of their drugs experienced generic competition following patent expiration. The act's provision for extending patent terms merely compensated for the loss of the average three-year delay between patent expiration and generic entry that existed before the act (in cases where generic entry occurred).

Still, those extensions played an important role in protecting the returns from drug companies' research and development. Without them, the rise in generic market share since 1984 would have dramatically lowered the expected returns from marketing a drug and might have caused the pharmaceutical industry to reduce its investment in R&D. In that case, a successful

innovator drug would have been likely to lose over 40 percent of its market to generic competitors just after reaching its peak year in sales. If the pre-1984 level of R&D investment was desirable, then the patent extensions benefited society by preserving most of the returns from marketing a new drug.

This study uses as a benchmark the average returns from marketing a new drug in the early 1980s under the modest levels of generic entry that existed then. The analysis estimates how much returns have declined relative to that benchmark because innovator drugs (excluding antibiotics) are losing a larger share of their market to generic competitors after patent expiration. Whether the benchmark level of returns is the best one for society is a separate question, which this study does not address.

When a brand-name drug first comes on the market, its sales revenues are low because its benefits are not yet widely known. As the drug becomes better known through published articles, advertising in medical journals, and detailing, its sales rise and reach their peak by year nine or 10, on average. Both before and after 1984, the average innovator drug had a few years of sales at its peak level before generic manufacturers entered the market.

The Hatch-Waxman Act did not greatly change the average point in a drug's life at which generic entry occurs, because the act's patent-term extensions and five-year exclusivity provision together postponed generic entry by roughly the same amount that the act's streamlined approval process sped it up. Two things that did change after 1984 were the likelihood that generics would become available and the average market share captured by generic drugs. Thus, on net, one would expect returns from marketing a new drug to decline after the Hatch-Waxman Act, because although the timing of generic entry has not changed much, the probability of generic entry and the size of the generic market once entry occurs have grown.

## Calculating the Change in Returns

CBO estimated the effect of increased generic competition on the stream of profits generated from the sale of 67 innovator drugs that were introduced in the

---

25.    The date of generic entry came from Table 1 of Grabowski and Vernon, "Longer Patents for Increased Generic Competition in the U.S."

United States in the early 1980s.[26]  The data include U.S. sales revenues from 1980 to 1991, covering the first eight to 12 years that those drugs were on the market.  The average patent term for the drugs, weighted by sales revenues, was 11 years.

CBO's calculation assumes that the profit stream for an average brand-name drug (excluding antibiotics) would have been the same for the first 11 years with or without the Hatch-Waxman Act.  (For more details about the assumptions behind the calculation, see Appendix C.)  The total profit stream over the drug's product life is depicted in Figure 7 by the area under the solid curve between year 0 (market introduction) and year 20 (when the drug has become nearly obsolete).  The present discounted value of that profit stream, discounted to the date of market introduction, represents the returns from marketing the drug.  The negative cash flow before drug introduction represents the investments made in the drug's development.  Capitalizing those costs to the date of market introduction brings their total to about $200 million.

For years 12 to 20, CBO estimated two revenue paths, one before and one after the Hatch-Waxman Act.  The only difference between those two revenue paths is in the amount of sales revenues lost to competition from generic drugs.  Sales revenues also decline in later years because of competition from newer, improved brand-name drugs.  CBO assumed that decline to be the same before and after 1984.  The pre-1984 path assumes that the drug's patent expires at the end of year 11 but that it takes three years for generics to enter the market, consistent with the data for that period.  Therefore, profits do not begin to decline because of generic entry until after year 14.  But the decline after year 14 is gradual because generic market share was small for nonantibiotic drugs before 1984.

In the post-1984 path, the Hatch-Waxman Act extends patents by 2.8 years.  Generics are assumed to enter about a month later and begin taking a large share of the market.  For any specific drug, the size of the generic market and whether generic entry occurs at all will vary.  The rate at which profits are eroded de-

**Figure 7.**
**The Average Profit Stream for a Brand-Name Drug Before and After the Hatch-Waxman Act**



**Before Hatch-Waxman**



**After Hatch-Waxman**

SOURCE:   Congressional Budget Office.

NOTE:   This figure is intended to be illustrative and does not reflect the actual dollar amounts invested in research and development (R&D) or the actual value of profits from drug development.

a.   That increased generic competition did not result solely from changes in the Hatch-Waxman Act.  Other developments, such as the use of formularies by private-sector health plans to increase generic substitution, also affected the degree to which generic drugs have eroded the profits of off-patent brand-name drugs.

pends on whether generic entry occurs and, if so, on the size of the generic market.  For the average drug, however, profits erode much more rapidly in this case than before the Hatch-Waxman Act because of greater generic competition.  In either case, the effect of increased generic entry on the returns from marketing a

---

26.   Data on average annual U.S. sales of those drugs were provided by Henry Grabowski of Duke University.  The analytical approach is based in part on Grabowski and Vernon. "Longer Patents for Lower Imitation Barriers."

new drug is less than one might expect because generic entry occurs at the end of a drug's product life, when profits are more heavily discounted (in other words, worth less today because they occur farther in the future).

CBO used the actual stream of sales revenues through year 11 for the 67 innovator drugs it examined as the starting point for its calculation. For the pre-1984 profit stream, it applied a rate of sales erosion after generic entry that was based on a sample of 29 top-selling, multiple-source, nonantibiotic drugs in 1980.[27] The erosion rate for the post-1984 case was based on this study's analysis of generic market share in 1993 and 1994.

The total difference between the two profit streams has a present discounted value of $27 million (in 1990 dollars), CBO estimates. In other words, despite the patent extensions and exclusivity provisions in the Hatch-Waxman Act, the growth in generic market share since 1984 has reduced the present discounted value of the returns from marketing a new drug by about $27 million, on average. That figure should be compared with the present discounted value of the total profit stream from marketing an innovator drug throughout its product life, discounted to the date of market introduction, which previous studies have estimated to average $210 million to $230 million for drugs introduced in the 1980s. (Those returns account for production costs but not the capitalized costs of drug development. They include profits from sales abroad, which make up roughly half of total returns.) Expressed as a percentage of those returns, the present discounted value of the returns from marketing a new drug have declined by roughly 12 percent. That result holds true even with modest variations in the assumptions (see the sensitivity analysis in Appendix C).

Grabowski and Vernon and the Office of Technology Assessment estimated that the present discounted value of the returns from marketing a drug exceeded the capitalized costs of R&D by $22 million to $36 million.[28] That is, investment in R&D earned a return slightly higher than the cost of capital, on average. The drugs in those studies did not obtain patent-term extensions under the Hatch-Waxman Act because they were introduced before the act was passed. But they did face increased generic competition once their patents expired. On average, therefore, the returns from marketing a new drug would probably still fully cover the capitalized costs of R&D despite the increase in generic sales since 1984. On the margin, however, a few drugs that were barely profitable to develop would no longer be profitable.

## Caveats About CBO's Estimate

CBO's estimated change in returns from marketing a new drug accounts for the full impact of increased generic entry since 1984. But it does not account for many changes in the pharmaceutical market that could increase or decrease those returns, such as changes in R&D costs, in technology, or in the overall demand for prescription drugs. Thus, the estimate is only a partial one, which focuses on the effects of the Hatch-Waxman Act and increased generic sales.

Moreover, since the calculation is based on the U.S. sales of drugs during the 1980-1991 period, it does not include the effects of changes in the pharmaceutical market since then (other than increased generic entry). Some of those changes would raise the returns from marketing a new drug; others would lower them. The rise in managed care since 1991 and its impact on the returns from marketing a new drug are considered only through their effect on increased generic market share. The impact of managed care on the volume of drugs purchased or the prices charged by manufacturers has not been considered. In addition, manufacturers selectively offer discounts and rebates on innovator drugs, but those rebates and some of the discounts are not captured by the data on sales revenues, which are based on average invoice prices.

Other factors not included in the estimate could increase the returns from marketing a new drug. For

---

27.  Masson and Steiner, *Generic Substitution and Prescription Drug Prices*, Appendix A5.

28.  Grabowski and Vernon, "Returns to R&D on New Drug Introductions in the 1980s," pp. 383-406; and Office of Technology Assessment, *Pharmaceutical R&D*.

example, the over-65 population, which has a high use of prescription drugs, is growing more rapidly now than it was 10 years ago. In addition, some Medicare beneficiaries are moving into HMOs. Since traditional Medicare does not offer an outpatient drug benefit but many HMOs do, the effect of those moves is to increase prescription drug coverage for the over-65 population.[29] As noted in Chapter 2, managed care techniques may also boost the volume of prescription drugs used by people under 65.

In addition, foreign markets for pharmaceutical products will probably continue to grow as the drug-approval process becomes streamlined in Europe and as various countries strengthen their patent-protection rights.[30] The Agreement on Trade-Related Aspects of Intellectual Property Rights, which was negotiated in 1994 at the Uruguay Round of the General Agreement on Tariffs and Trade, included provisions to encourage developing countries to strengthen their intellectual property rights, particularly in the areas of agriculture and pharmaceuticals. That agreement provides patented pharmaceutical products with a minimum of five years of exclusivity in a participating developing country.[31]

The net effect of changes not accounted for in CBO's estimate may push the total returns from marketing a new drug in one direction or the other. Overall, however, spending on R&D by brand-name manufacturers has increased as a percentage of their sales revenues—from an average of 14.7 percent in 1983 to 19.4 percent in 1995 (despite the fact that such revenues more than tripled).[32] That increase would seem to indicate that, all factors taken together, the incentive to invest in developing new drugs has remained intact since the Hatch-Waxman Act.

No one knows whether that amount of investment in R&D is over or under the optimal level.[33] Some people might argue that companies are not investing enough in drug development and that society would be better off if returns from marketing were increased further. Clearly, the avoided surgery and improved quality of life that result from the use of prescription drugs create large benefits for many people. But it is also possible that too many firms invest in the same research projects, and less could be spent on pharmaceutical R&D without significant costs to society.

## Other Considerations

CBO's estimate of the average change in returns from marketing a new drug is small relative to the returns earned on highly successful drugs. The reason is that returns from marketing new drugs are highly skewed. The top six drugs in the set of 67 that CBO used in its calculation earned a return of around $1 billion (discounted to the date of market introduction). But only the top 20 earned a return from marketing that exceeded $200 million, roughly the average cost of drug development.[34] However, since the cost of developing drugs includes the cost of failures, a drug can be profitable in the sense of covering its own development costs but still not earn enough to cover average development costs (which include the cost of drugs that never made it to market). A company must discover a highly profitable drug from time to time for its average returns from marketing to exceed the average capitalized cost of drug development.

Another factor to consider, which can reduce the impact of lower returns, is the so-called replacement effect. When a manufacturer introduces a new brand-name drug, that drug may erode the sales of similar drugs the company already has on the market. CBO's

---

29.  In 1997, 4.5 million out of 38.2 million Medicare beneficiaries were enrolled in an HMO or risk-based health plan. CBO projects that the proportion of Medicare beneficiaries enrolled in such plans will continue to grow. See Congressional Budget Office, *The Economic and Budget Outlook: Fiscal Years 1999-2008* (January 1998), Appendix F.

30.  Standard & Poor's, *Healthcare: Pharmaceuticals*, Industry Surveys (New York: Standard & Poor's, August 29, 1996), p. 21.

31.  See Dorothy Schrader, *Intellectual Property Provisions of the GATT 1994 and the Uruguay Round Agreements Act*, CRS Report for Congress 94-302A (Congressional Research Service, September 23, 1996), pp. 36-37.

32.  Pharmaceutical Researchers and Manufacturers of America, *1997 Industry Profile* (Washington, D.C.: PhRMA, March 1997), p. 57. Those figures equal R&D spending in the United States divided by domestic sales plus exports.

33.  See F.M. Scherer, "Pricing, Profits and Technological Progress in the Pharmaceutical Industry," *Journal of Economic Perspectives*, vol. 7, no. 3 (Summer 1993), p. 111.

34.  Grabowski and Vernon, "Returns to R&D on New Drug Introductions in the 1980s," pp. 398-400.

estimate of the decline in the present discounted value of the returns from marketing a new drug does not consider the dynamic effect of such product replacement. The replacement effect derives from the reduced incentive that companies have to innovate when a new drug will replace a share of the market currently held by one of their other products. (For more details about that effect, see Appendix D.) The rise in generic market share, however, reduces the replacement effect. A firm has less to lose by replacing an older product with a new drug when the patent on the older product is about to expire, since generics will take away a large share of that product's market anyway.

An example is the allergy drug Allegra, introduced in 1996 by Hoechst Marion Roussel, which also sells a competing brand-name drug, Seldane. The two drugs are very similar antihistamines, but Allegra has fewer negative side effects. Because of the replacement effect, Hoechst Marion Roussel had less incentive to introduce Allegra when it would cut into the profits from the sale of Seldane significantly. However, anticipation of generic competition reduced that replacement effect—Allegra was introduced just three years before Seldane's patent was to expire.[35]

Although the growth of generic competition since 1984 has reduced the returns from innovation overall, the effect of those lower returns on the incentive to innovate will be offset somewhat by a commensurate reduction in the replacement effect. That is, the slightly reduced value of profits at the end of a drug's product life will give firms with existing products a greater incentive to replace them in the market more quickly—as close to patent expiration as possible.

That dynamic effect exists only when pharmaceutical firms continue to invest in developing drugs in therapeutic areas where they are already market leaders. Large firms usually conduct R&D in a variety of therapeutic areas, so the dynamic effect will be greater

for some projects and nonexistent for others.[36] The operation of the replacement effect reduces—but does not eliminate—the negative impact that the rise in generic market share has on the incentive to invest in developing brand-name drugs.

# Effects of Proposed Changes to the Hatch-Waxman Act

Some representatives of the pharmaceutical industry would like to modify the Hatch-Waxman Act in various ways to increase the average effective patent term for pharmaceutical products.[37] Although lengthening patents would increase profits today for drugs whose patents are expiring, it would not have as large an impact on the incentive to invest in R&D—that is, on the present discounted value of the returns from marketing a new drug. Extending the average effective patent term by one year would increase the present discounted value of those returns by about $12 million.

In contrast, accelerating the FDA review period by one year would have a much greater effect on the present discounted value of the returns from marketing a new drug—a net benefit of about $22 million, on average. Thus, reducing FDA approval times—if it could be done without sacrificing safety concerns—would be much more effective in helping both the drug industry and consumers than would lengthening the patent-protection period.

Some drugs do not benefit from patent-term extensions because they have no patent to extend, or because their patent has already expired (perhaps because the drug lingered in the clinical testing phase). Lengthening the five-year exclusivity period for a new drug (that contains a chemical entity never before approved) would have a sizable impact on the incentive to develop those drugs, because the benefits would be

---

35. Department of Health and Human Services, Food and Drug Administration, *Approved Drug Products with Therapeutic Equivalence Evaluations* (1997). The section that contains patent expiration dates and exclusivity periods is available at http://www.fda.gov/cder/da/patex17.htm. Seldane's patent expires in April 1999; Allegra was introduced in July 1996.

36. For a discussion of the diversity of R&D projects within a single firm and the benefits of such diversification, see Rebecca Henderson and Ian Cockburn, "Scale, Scope and Spillovers: The Determinants of Research Productivity in Drug Discovery," *RAND Journal of Economics*, vol. 27, no. 1 (Spring 1996).

37. See testimony at the Senate Judiciary Committee's hearing on the Hatch-Waxman Act on March 5, 1996.

seen relatively early in the drug's product life. Furthermore, the current exclusivity period is probably too short to compensate for the average cost of developing those drugs. Out of the 101 drugs approved between 1992 and 1995, 10 would have benefited from a lengthening of the five-year exclusivity period.

## Conclusions

The Hatch-Waxman Act eliminated the duplicative testing requirements for manufacturers of generic drugs to obtain FDA approval. That regulatory relief has translated into greater availability of generic drugs and lower average prices to consumers for off-patent drugs. By itself, the doubling of generic market share between 1984 and 1994 would have substantially lowered the returns from marketing new innovator drugs. However, the act also provided patent extensions that postponed the time when an innovator drug would face generic competition.

CBO's analysis has found that the patent extensions available under the Hatch-Waxman Act were not sufficient to fully preserve the returns from marketing new brand-name drugs. The present discounted value of those returns has declined by about 12 percent because of the rise in generic competition. However, that rise has resulted from a variety of demand-side factors as well as from changes in the act itself.

The Hatch-Waxman Act helped increase the opportunity to substitute less expensive generic drugs for more expensive off-patent brand-name drugs. That substitution lowers the average cost of a multiple-source prescription drug. The point in the life of an average drug at which generic entry occurs did not change much under the act, because the average length of a patent extension roughly offsets the average delay between patent expiration and generic entry that existed before 1984. Of course, that specific timing varies significantly from one drug to another. Nevertheless, many purchasers are better off since the act, as most top-selling off-patent brand-name drugs now have generic versions available. And with the lower testing costs required for FDA approval, more generic manufacturers probably find it profitable to enter a given market. Empirical evidence suggests that that puts downward pressure on the average prescription price of generic drugs as well.

Many changes in the pharmaceutical market and in the technology of drug development have affected the returns from marketing a new drug. This study considered only two changes that affect those returns: the increase in generic market share since 1984 and the increase in patent terms under the Hatch-Waxman Act. Changes that were not considered may, taken together, either increase or decrease those returns. Overall, it appears that the incentives for drug companies to innovate have remained intact since the Hatch-Waxman Act; even as sales revenues from innovator drugs have more than tripled, the percentage of those revenues that manufacturers reinvest in R&D has risen from 14.7 percent to 19.4 percent between 1983 and 1995.

# Appendixes

_____Appendix A_____

# Data Used for the Empirical Estimates

This study draws on several different sets of data that cover sales revenues, prices, and quantities for prescription drugs sold in the United States (see Table A-1 for an overview). The data come from two private companies that collect and sell information about the pharmaceutical industry (Scott-Levin and IMS America), from three government agencies (the Food and Drug Administration, the Patent and Trademark Office, and the Health Care Financing Administration), and from Henry Grabowski, an economist at Duke University.

## Retail Pharmacy Data Set

Many of the estimates in Chapter 3 rely on a set of retail pharmacy data purchased from Scott-Levin. That data set covers the number of prescriptions dispensed at retail pharmacies in 1993 and 1994 for all formulations of all prescription drugs in 66 narrowly defined therapeutic classes, as well as the revenues from sales of those drugs, valued at retail prices. (Those retail prices are the average of the actual retail transaction prices charged by pharmacies.) The total value of sales revenues in the data set equals approximately 70 percent of the total sales revenues of retail pharmacies in the United States from prescription drugs. The data set is based on Scott-Levin's Source Prescription Audit, which covers more than 34,000 U.S. retail pharmacies. Scott-Levin projects the sales data upward to reflect sales through all pharmacies in

the United States (which numbered 67,939 in 1995).[1] Since retail pharmacies distribute roughly half of the value of prescription drugs, this data set represents approximately 35 percent of the value of all prescription drug sales in the nation.

The data are broken down by each dosage form of each drug in the 66 therapeutic classes. For example, if a multiple-source drug comes in both 50 milligram and 100 milligram tablets, the data set includes the sales revenues and number of prescriptions for each brand-name and generic manufacturer (if there are any) of both of those dosage forms. The set contains 454 different prescription drugs (or chemical entities), 177 of which are multiple source. Expanding that by the different dosage forms for each drug—many of which are produced by several manufacturers—brings the number of individual observations in the data set to 11,665. The Congressional Budget Office (CBO) added the chemical names of the brand-name drugs (using the reference book *Drug Facts and Comparisons*) and coded each observation so the generic drugs could be matched with their brand-name counterparts.[2]

_____

1.   National Association of Boards of Pharmacy, *Survey of Pharmacy Law: 1995-1996* (Park Ridge, Ill.: National Association of Boards of Pharmacy, 1995), p. 90.

2.   Facts and Comparisons, *Drug Facts and Comparisons* (St. Louis: Facts and Comparisons, 1995).

**Table A-1.**
**Data and Methods Behind CBO's Estimates**

| Empirical Estimate | Data Used | Method |
|---|---|---|
| Average prescription price and market share for brand-name and generic drugs (Chapter 3, Table 1) | Retail pharmacy sales data purchased from Scott-Levin. Includes the number of prescriptions dispensed through retail pharmacies for 11,665 dosage forms of 454 drugs. | The total retail pharmacy sales revenues for a given type of drug were divided by the number of prescriptions dispensed for it. The drug types are multiple-source and single-source brand-name drugs and generic drugs. Market share is the percentage of total prescriptions dispensed for that type of drug. |
| Market concentration by therapeutic class (Chapter 3, Figure 5) | Retail pharmacy data set | The percentage of sales held by the top three brand-name drugs was calculated for 66 therapeutic classes. |
| Price differences for various types of purchasers (Chapter 3, Table 4) | Computed by IMS America based on invoice prices to most intermediate purchasers, such as pharmacies (other than mail-order ones), clinics, hospitals, and HMOs. Prices are net of invoice discounts but do not include rebates. | For 100 top-selling outpatient drugs, the average prices paid by intermediate purchasers are expressed as a percentage of the average price paid by pharmacies. |
| Effect of competition on manufacturers' discounting of brand-name drugs sold to intermediate purchasers (Chapter 3) | Average manufacturer price to pharmacies and lowest price to any U.S. purchaser as reported to HCFA under the Medicaid rebate program.<br><br>The number of brand-name manufacturers in the therapeutic class and the existence of generic formulations were obtained from the retail pharmacy data set.<br><br>Total Medicaid sales were obtained from HCFA and total U.S. sales from IMS America. | Regression analysis (see Appendix B for more details). The dependent variable is the lowest price to any intermediate purchaser divided by the average price to pharmacies. Explanatory variables include the number of brand-name manufacturers in the drug's therapeutic class, a dummy variable taking the value of 1 when generic forms are available, and the drug's Medicaid market share. |
| Percentage change in brand-name drug prices between 1991 and 1994 (Chapter 3) | The average manufacturer price to pharmacies, reported by manufacturers to HCFA under the Medicaid rebate program. Price is reported per unit, such as tablet, and is equal to total sales divided by the number of units sold in a given quarter. Those prices include most discounts and rebates to pharmacies. Whether a given drug had generic competitors was determined from the retail pharmacy data set. | Calculated the average percentage change in price between 1991 and 1994 for 269 brand-name drugs. Compared those facing generic competition with those not facing generic competition. |

**Table A-1.**
**Continued**

| Empirical Estimate | Data Used | Method |
| --- | --- | --- |
| Total direct savings from generic substitution on retail pharmacy prescriptions (Chapter 3) | Retail pharmacy data set; 177 of the 454 drugs in the data set were multiple source in 1993 and 1994. CBO coded the data to link each brand-name drug with its generic competitors. | For each multiple-source drug, the difference between the brand-name and generic retail price for a prescription was multiplied by the number of generic prescriptions of the drug purchased through pharmacies in 1994. That difference was then summed for all multiple-source drugs. |
| Decline in average generic prescription price as the number of manufacturers rises (Chapter 3, Table 5) | Retail pharmacy data set | The average generic prescription price was calculated for cohorts of generic drugs, grouped by the number of generic manufacturers. The average ratio of generic to brand-name prescription price was also calculated by cohort. |
| Average length of patent-term extensions under the Hatch-Waxman Act (Chapter 4, Table 8) | Extension length was obtained from the PTO for the 51 drugs approved by the FDA between 1992 and 1995 that received an extension. | Averages were calculated for the 51 drugs approved between 1992 and 1995 that received an extension and for all new drugs approved during that period. |
| Effects of increased generic competition and longer patent terms on the returns from marketing a new drug (Chapter 4) | Average U.S. manufacturer sales of 67 brand-name drugs over their product life, obtained from Henry Grabowski. Those drugs were introduced between 1980 and 1984. The average is based on actual sales for the first eight to 12 years that a drug was on the market; remaining years were projected. | Calculated the change in the present discounted value of the profit stream for the average drug when the rise in generic market share and the Hatch-Waxman extensions are considered together (see Appendix C for more details). |
|  | Retail pharmacy data set | The rate of sales erosion from generic competition after the Hatch-Waxman Act is based on analysis of 21 drugs that lost patent protection between 1991 and 1993 (for the first year's rate) and all off-patent drugs in the data set (for the rate in subsequent years). |

SOURCE:   Congressional Budget Office.

NOTE:   HMOs = health maintenance organizations; HCFA = Health Care Financing Administration; PTO = Patent and Trademark Office; FDA = Food and Drug Administration.

CBO used that data set to estimate the total savings on prescriptions at retail pharmacies from generic substitution, to compare retail pharmacy sales of generic and brand-name drugs, and to analyze generic competition. Portions of the data set were also used to examine market concentration at the level of the therapeutic class for brand-name drugs and at the level of a single multiple-source drug for generics.

One drawback of the data set is that prescriptions are not the best measure of the quantity of sales. When comparing the prices of two drugs, the best comparison is one based on the price of an average daily dose, not the price of a prescription. Because prescriptions for a drug are typically dispensed in a variety of sizes (the quantity of dosage units, such as pills, varies), comparisons between them are potentially misleading. The variability in prescription sizes may be more of a problem for chronic drugs—which are taken over a long period of time—than for acute drugs. In the case of chronic drugs, whether a pharmacist dispenses a prescription that will last one month or four months may be arbitrary. However, since the data set covers such a large number of prescriptions, it seems reasonable to assume (where relevant) that the average quantity dispensed per prescription for one type of drug will be roughly equivalent to the average quantity dispensed for a close competitor. Moreover, such an assumption is necessary for carrying out any quantitative analysis because of the lack of better data.

CBO used prices per prescription to evaluate the reduction in prescription drug spending from generic substitution and the relative prices of brand-name and generic drugs. Those data were also used to evaluate the decline in the average prescription price as the number of generic manufacturers rises. The measurement error inherent in using a prescription as the unit of quantity could cause the estimated price difference between a brand-name drug and its generic counterpart to be either too high or too low—depending on whether generic prescriptions are smaller or larger, on average, than their brand-name counterparts. Consequently, the estimates of average prescription prices and of the savings to consumers from generic substitution should be viewed as rough figures, not exact ones.

All of the estimates based on average prescription prices cover only tablet and capsule dosage forms, which constitute 87 percent of all sales (or 91 percent of generic sales) in the data set. The average prescription price for those dosage forms appears more reliable than the average price when injectable and liquid dosage forms are included.

# Total U.S. Sales at Average Invoice Prices

CBO purchased data on the total U.S. sales of 350 prescription drugs from IMS America. That data set covers all channels of distribution except mail-order pharmacies. The sales revenues are valued at the average prices charged on invoices to hospitals, pharmacies, and other purchasers. IMS America also calculated the difference in average invoice prices paid by different channels of distribution for 100 top-selling drugs that were largely distributed through retail pharmacies.

As discussed in Chapter 3, the average invoice price does not include rebates and some discounts that manufacturers give purchasers. As a result, the average invoice price slightly overstates the final price paid. Pharmaceutical Research and Manufacturers of America estimates that discounts and rebates (not including Medicaid rebates) amounted to about $3.5 billion in 1994. Assuming that none of those discounts and rebates were included on an invoice, that figure would equal 5.5 percent of total pharmaceutical sales valued at invoice prices. Although the excluded discounts and rebates are small overall, they could substantially alter the price dispersion figures in Chapter 3 if they were disproportionately received by a particular type of purchaser.

The calculation of the change in returns from marketing a new drug was based on data provided by Henry Grabowski for the average annual U.S. sales revenues of 67 brand-name drugs (valued at invoice prices). Those drugs were introduced between 1980 and 1984. The sales data cover the 1980-1991 period

and thus capture the first eight to 12 years that those drugs were on the market. For drugs with only eight to 10 years of actual data, CBO relied on sales projections by Grabowski and John Vernon to determine average annual sales revenues through year 11 for all 67 drugs.

## Pricing Data from the Medicaid Rebate Program

CBO obtained data from the Health Care Financing Administration (HCFA) on the average price that manufacturers charge wholesalers for drugs that are then distributed through retail pharmacies, as well as on the lowest price charged to any private purchaser (known as the best price). Manufacturers are required by the Medicaid rebate program to report those prices to HCFA for all brand-name drugs that Medicaid beneficiaries buy at retail pharmacies. CBO also obtained data on total Medicaid sales by prescription drug (valued at the price at which states reimburse pharmacies for purchases through Medicaid). Those data were used to assess the differences in price increases between 1991 and 1994 for multiple-source and single-source brand-name drugs.

Those prices reported to HCFA are among the best available (although they are not publicly available) to assess price changes for drugs channeled through retail pharmacies. They represent actual transaction prices, since all discounts and rebates to wholesalers and retail pharmacies are included. Both the average price to pharmacies and the best price are reported by dosage units, such as price per 50 milligram tablet. The average price to pharmacies of a particular dosage form of a drug is calculated by dividing the value of its total sales to wholesalers or chain pharmacies by the number of dosage units sold.[3]

## Data from the Patent and Trademark Office and the FDA

The Patent and Trademark Office provided data on all drugs approved through 1995 that have received an extension under the Hatch-Waxman Act. The Food and Drug Administration (FDA) provided overlapping data on the average length of time those drugs spent in clinical testing and in having their new drug applications approved. Those data were used to calculate the average length of a Hatch-Waxman extension and the average time a drug spends in the FDA approval process.

---

3.  Details on how the best price and average manufacturer price are calculated can be found on HCFA's Web site at http://www.hcfa.gov/medicaid/drug8.htm.

# Regression Results on Discounting

The Congressional Budget Office (CBO) analyzed whether the discounts that manufacturers offer on brand-name prescription drugs tend to be greater when several therapeutically similar brand-name drugs or generic copies are available. The analysis is based on the difference between the average price that manufacturers charge for a particular brand-name drug distributed through retail pharmacies (the average manufacturer price to pharmacies) and the lowest price they charge to any private purchaser in the United States for that drug (the best price). The percentage difference between those two prices is called the best-price discount. CBO's analysis shows that best-price discounts are indeed greater when more competing brand-name or generic substitutes for a drug are available.

That result suggests that discounts are a response to competitive market forces. Discounting may in fact be an important component of price competition in the pharmaceutical market, but because of limited data, CBO cannot gauge its prevalence. This analysis is based on pricing data that only measure the size of the largest discounts offered to private purchasers on brand-name drugs. The quantity of brand-name drugs sold at those discounts, or any discount, is unknown. Therefore, these results are only suggestive.

## The Dependent Variable

In CBO's regression analysis of discounting, the dependent variable (that is, the value to be explained) is the ratio of the best price to the average manufacturer price for a given brand-name drug sold through retail pharmacies. (Frequently, such drugs are sold to wholesalers rather than directly to pharmacies.) If a brand-name drug is always sold at the same price, that ratio will equal 1; if it is ever sold at a discount, the ratio will be less than 1.

Manufacturers report best prices and average prices to pharmacies to the Health Care Financing Administration as part of the Medicaid rebate program.[1] The average manufacturer price to pharmacies includes all discounts and rebates given to retail pharmacies. That average is calculated by dividing all sales of a particular dosage form of a brand-name drug to retail pharmacies (after netting out all applicable discounts and rebates) by the number of units of that dosage form sold to retail pharmacies (including mail-order pharmacies). That price is therefore an average transaction price. The best price also includes all discounts and rebates given to any private purchaser. Under the Medicaid rebate program, Medicaid is entitled to receive a discount equal to the best-price discount or 15.1 percent of the average manufacturer price to pharmacies, whichever is greater.

---

1. The amount that manufacturers sell at the best price is not known. However, Medicaid's best-price provision helps ensure that a significant quantity is sold at that price. Offering a very low price on an extremely small quantity is usually unprofitable for a company because it increases the rebate on all outpatient sales to Medicaid. For more details on the pricing data set and the Medicaid rebate program, see Congressional Budget Office, *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry*, CBO Paper (January 1996).

To isolate the effects of competition on price dispersion, and to adjust for other factors that may affect prices, CBO selected a set of economic and therapeutically relevant variables for its regression. It used multivariate statistical analysis to analyze the effects of those variables on the ratio of the best price to the average price to pharmacies (BP/AP) for a particular brand-name drug. The explanatory variables for market competition—which include the number and types of substitutes that compete with a particular brand-name drug—are based on CBO's retail pharmacy data set, which covers sales through retail pharmacies of all drugs in 66 narrowly defined therapeutic classes in 1994. Those 66 therapeutic classes encompassed 70 percent of all retail pharmacy sales in 1994. The regression was run using pricing data for the fourth quarter of 1994 and the competitive market variables constructed from the retail pharmacy data set for calendar year 1994.

## The Explanatory Variables

The analysis used six explanatory variables (see Table B-1 for a description of them, along with their means and ranges). The variable explaining brand-name competition is defined at the level of a drug's five-digit therapeutic class, as established by the Uniform Standard of Classification codes (see Box 3 on page 23). That variable, INVNMBR, the inverse of the number of manufacturers, is equal to 1 divided by the number of manufacturers of brand-name drugs in a five-digit therapeutic class. That variable resembles imperfect competition based on a Cournot model, in which the equilibrium price is a function of $1/(N+1)$, N being the number of manufacturers. (In that model, firms choose the profit-maximizing quantity to produce, and the equilibrium price results. Note that the Cournot model does not apply when $N = 1$).

Another model of imperfect competition that could apply to the pharmaceutical industry is Bertrand competition with limited entry and differentiated products. In that model, firms compete by setting prices, with prices declining as the number of firms in a thera-

peutic class increases.[2] Specifically, the ratio BP/AP should decline as the market becomes more competitive if the difference in cross-price elasticities between pharmacies and other types of purchasers grows as more substitutes are introduced. Previous theoretical analyses and one empirical study have shown that the gap in prices paid by different types of purchasers widens with increased competition when the difference in price sensitivity among types of purchasers grows as more substitutes are introduced.[3]

Manufacturers are more likely to offer discounts when there are more similar brand-name drugs in the same therapeutic class. A manufacturer has less incentive to offer a discount on a breakthrough drug that has no close substitutes. With respect to the dependent variable, the best price should be closest to the average price to pharmacies when there is only one manufacturer of a brand-name drug in a given therapeutic class. Larger values of the BP/AP ratio should be associated with larger values of INVNMBR; thus, the expected sign of the coefficient on INVNMBR is positive.

Similarly, the difference between the average price to pharmacies and the best price should increase when generic manufacturers are producing copies of the brand-name drug. The variables explaining generic competition are GENDUM (a dummy variable) and INVNMG (the inverse of the number of generic

---

2. Four functional forms for competition were tried: the log of N, (N+N*N), N, and 1/N. Although the coefficients took the expected signs in all four cases, only 1/N yielded statistically significant results for both brand-name and generic competition. This functional form for competition was also used by Wiggins and Maness to explain price competition in antibiotic markets. See Steven Wiggins and Robert Maness, "Price Competition in Pharmaceutical Markets" (working paper, Texas A&M University, Department of Economics, June 1994). The empirical analysis does not distinguish whether Bertrand competition or Cournot competition is the more appropriate model for the pharmaceutical industry.

3. Thomas J. Holmes, "The Effects of Third-Degree Price Discrimination in Oligopoly," *American Economic Review*, vol. 79 (March 1989); Severin Borenstein, "Price Discrimination in Free Entry Markets," *Rand Journal of Economics*, vol. 16, no. 3 (Autumn 1985); and Severin Borenstein and Nancy L. Rose, "Competition and Price Dispersion in the U.S. Airline Industry," *Journal of Political Economy*, vol. 102, no. 4 (1994).

**Table B-1.**
**Variables Used in the Regression Analysis of Discounting**

| Variable | Description | Mean | Range |
|---|---|---|---|
| | **Dependent Variable** | | |
| BP/AP | The ratio of the best price (the lowest price to any private purchaser in the United States) for a brand-name drug relative to the average price to pharmacies.[a]  The prices for the top-selling dosage form of each brand-name drug were used. | .77 | .10 to 1 |
| | **Explanatory Variables** | | |
| INVNMBR | The inverse of (or 1 divided by) the number of manufacturers in a therapeutic class producing an innovator drug. | .23 | .08 to 1 |
| | Number of brand-name manufacturers per class: | 6.3 | 1 to 13 |
| GENDUM | Dummy variable that takes the value of 1 if generic entry has occurred and 0 otherwise.  A threshold of $1 million in total generic sales must exist for this variable to take a value of 1. | n.a. | 0 to 1 |
| INVNMG | The inverse of the number of generic manufacturers and distributors of a bioequivalent formulation of the brand-name drug.  This term is interacted with GENDUM so it takes a value of 0 if GENDUM is 0 and 1 divided by the number of generic manufacturers if GENDUM is 1. | .20[b] | .04 to 1[b] |
| | Number of generic manufacturers per brand-name drug: | 11.0[b] | 1 to 24[b] |
| MDSHARE | Medicaid's market share for a brand-name drug, defined as total Medicaid sales of the drug divided by its total U.S. sales. | .14 | .0005 to .79 |
| CLSDUM | A dummy variable for each therapeutic class defined at the broader two-digit level under the Uniform Standard of Classification codes. The data set contained 26 therapeutic classes at the two-digit level, 25 of which received a dummy.   (The class left out was respiratory drugs.) | n.a. | 0 to 1 |
| MNDUM | A dummy variable given to each manufacturer of a brand-name drug that had nine or more products in the sample.  There were 14 such manufacturers. | n.a. | 0 to 1 |

SOURCE:   Congressional Budget Office.

NOTE:   n.a. = not applicable.

a.   This price is reported by manufacturers as the average price charged on sales to the retail pharmacy class of trade (it does not include the wholesaler's markup).  The price is calculated by dividing total manufacturer sales to the retail pharmacy class of trade by the quantity sold (that is, the number of dosage units, such as tablets).

b.   Mean and range were taken over those observations in which GENDUM equals 1.

manufacturers). GENDUM takes a value of 1 if a generic form of the brand-name drug is available. The expected sign of the coefficient on GENDUM is negative since the best price should tend to be lower relative to the average price to pharmacies when a generic drug is available.

The variable INVNMG is interacted with GENDUM, taking the value of 1 divided by the number of generic manufacturers and distributors (with retail sales of $100,000 or more) when GENDUM equals 1 and taking the value of 0 when GENDUM equals 0. Larger values of INVNMG are associated with fewer generic manufacturers and therefore less competition. Thus, larger values of INVNMG are associated with higher values of BP relative to AP, and the expected sign on this variable is positive. When there are four generic manufacturers, GENDUM and INVNMG together yield $(1)*\text{GENDUM} + 0.25*(\text{INVNMG}) < 0$ as long as the expected sign on GENDUM dominates.

Medicaid market share was included as an explanatory variable (MDSHARE) because of the provision in Medicaid's rebate program that requires manufacturers to pay a larger rebate to Medicaid if they offer a price to any private purchaser that is more than 15.1 percent (15.4 percent in 1994) below the average price to pharmacies. Since Medicaid constitutes a large share of the retail pharmacy market—about 13 percent on average—that provision discourages manufacturers from offering large discounts. Medicaid market share varies widely among different types of drugs, and the larger Medicaid's share in a particular drug's market, the less incentive that manufacturer has to offer a large discount.[4] Therefore, the expected sign on this coefficient is positive, since a larger Medicaid market share will be associated with less difference between the best price and the average price to pharmacies.

To account for differences in the marginal cost of production between therapeutic classes, as well as competitive market characteristics not accounted for in the explanatory variables, the analysis included therapeutic-class dummies at the two-digit level (CLSDUM). And to account for possible differences

in pricing policies between manufacturers, those manufacturers with at least nine brand-name drug observations in the data set were given a dummy variable (MNDUM).

# The Results

The coefficients on INVNMBR, GENDUM, and MDSHARE are all significant at the 1 percent level, and the coefficient on INVNMG is significant at the 5 percent level (see Table B-2).[5] All four coefficients have the expected signs. Four of the manufacturer dummies and 12 of the class dummies are also significant at the 5 percent level.[6]

The coefficients on GENDUM and INVNMG together imply that when two generic manufacturers have entered a market, the BP/AP ratio is 10 percentage points lower, and when three or more generic manufacturers have entered that market, the BP/AP ratio is 12 to 17 percentage points lower (see Table B-3). That implies that discounts are larger when a generic drug is available, and the size of the discounts increases as more generic manufacturers enter the market.

The regression results also show that competition from other brand-name drugs can increase price dispersion. When there are three or more manufacturers of brand-name drugs in a therapeutic class, the BP/AP ratio is 10 to 14 percentage points lower than if there was only one brand-name manufacturer in that class. Moving from one to two brand-name manufacturers is a particularly important step, as the BP/AP ratio declines by 8 percentage points. Each subsequent brand-name entrant continues to reduce that ratio by a small amount. The more brand-name manufacturers in a class, the greater the difference between the best price

---

4.    See Congressional Budget Office, *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry.*

5.    A statistical test (the Goldfeld-Quandt test) showed heteroscedasticity. The error terms tend to be larger when MDSHARE is small. The standard errors were corrected for heteroscedasticity before calculating the statistical significance of the estimated parameters.

6.    A chi-square test of the hypothesis that the coefficients of the set of manufacturer dummies are jointly equal to zero can be rejected with 99 percent probability. And a similar test of whether the coefficients of the set of class dummies are jointly equal to zero can be rejected at the same probability level. Those results indicate that accounting for differences among manufacturers and between therapeutic classes is important in explaining changes in BP/AP.

**Table B-2.**
**Regression Results on Price Dispersion in 1994**

| Explanatory Variable | OLS Parameter Estimate | Standard Error[a] | t Statistic[b] |
|---|---|---|---|
| Intercept | 0.650** | 0.0560 | 11.61 |
| INVNMBR | 0.145** | 0.0532 | 2.73 |
| GENDUM | -0.172** | 0.0351 | -4.90 |
| INVNMG | 0.154* | 0.0778 | 1.97 |
| MDSHARE | 0.358** | 0.0942 | 3.79 |
| clsdum1 | 0.185 | 0.0927 | 1.99 |
| clsdum2 | 0.171* | 0.0782 | 2.19 |
| clsdum3 | 0.234** | 0.0587 | 3.98 |
| clsdum4 | 0.174** | 0.0699 | 2.48 |
| clsdum5 | 0.108** | 0.0527 | 2.05 |
| clsdum6 | 0.045 | 0.1146 | 0.39 |
| clsdum7 | -0.006 | 0.0773 | -0.08 |
| clsdum8 | 0.151* | 0.0627 | 2.41 |
| clsdum9 | 0.019 | 0.0520 | 0.37 |
| clsdum11[c] | 0.248** | 0.0533 | 4.65 |
| clsdum12 | 0.225** | 0.0860 | 2.62 |
| clsdum13 | 0.111* | 0.0526 | 2.11 |
| clsdum14 | 0.157 | 0.0991 | 1.58 |
| clsdum15 | -0.126 | 0.1254 | -1.01 |
| clsdum16 | -0.157 | 0.0972 | -1.62 |
| clsdum17 | 0.163* | 0.0766 | 2.12 |
| clsdum18 | 0.083 | 0.0960 | 0.87 |
| clsdum19 | 0.144** | 0.0515 | 2.79 |
| clsdum20 | -0.003 | 0.0813 | -0.04 |
| clsdum21 | 0.041 | 0.1170 | 0.35 |
| clsdum22 | 0.124 | 0.0851 | 1.46 |
| clsdum23 | 0.127* | 0.0627 | 2.03 |
| clsdum24 | 0.086 | 0.1243 | 0.69 |
| clsdum25 | 0.213** | 0.0526 | 4.05 |
| clsdum26 | 0.107 | 0.0815 | 1.31 |
| mndum1 | -0.180* | 0.0691 | -2.60 |
| mndum2 | 0.012 | 0.0414 | 0.29 |
| mndum3 | 0.005 | 0.0454 | 0.11 |
| mndum4 | -0.033 | 0.0709 | -0.46 |
| mndum5 | 0.016 | 0.0670 | 0.23 |
| mndum6 | -0.013 | 0.0592 | -0.22 |
| mndum7 | 0.188** | 0.0390 | 4.81 |
| mndum8 | -0.102 | 0.0593 | -1.73 |
| mndum9 | -0.216** | 0.0819 | -2.63 |
| mndum10 | -0.012 | 0.0427 | -0.27 |
| mndum11 | -0.124* | 0.0609 | -2.04 |
| mndum12 | -0.067 | 0.0601 | -1.11 |
| mndum13 | 0.109 | 0.0782 | 1.39 |
| mndum14 | -0.142 | 0.0816 | -1.74 |

SOURCE:   Congressional Budget Office.

NOTES:   The dependent variable is the ratio of the best price to the average price to pharmacies.  The R squared is 0.32 and the adjusted R squared
is 0.22.  The results are for the fourth quarter of 1994; there were 327 observations.

OLS = ordinary least squares; * = significant at the 5 percent level; ** = significant at the 1 percent level.

a.  The Goldfeld-Quandt test showed that heteroscedasticity is present.  The standard errors were corrected using a consistent covariance
matrix.

b.  The t statistic was calculated using the corrected standard errors.  The statistical significance of the five leading coefficients was confirmed using
a chi-square test.

c.  Clsdum10 was omitted.  That class represents respiratory drugs.

**Table B-3.**
**The Effects of Generic and Brand-Name Competition on Price Dispersion**

| Number of Manufacturers | Change in Ratio of Best Price to Average Pharmacy Price (BP/AP) |
|---|---|
| **Competition from Generic Drugs** | |
| 1 | -0.02 |
| 2 | -0.10 |
| 3 | -0.12 |
| 4 | -0.13 |
| 5 | -0.14 |
| 6 to 8 | -0.15 |
| 9 to 21 | -0.16 |
| 22 to 24 | -0.17 |
| **Competition from Other Brand-Name Drugs** | |
| 1 | 0.15 |
| 2 | 0.07 |
| 3 | 0.05 |
| 4 | 0.04 |
| 5 | 0.03 |
| 6 to 9 | 0.02 |
| 10 to 13 | 0.01 |

SOURCE:    Congressional Budget Office.

and the average price, which implies that discounts are larger.

The coefficient on Medicaid market share indicates that at the mean market share of 13 percent, the BP/AP ratio is 4.6 percentage points higher because of Medicaid's best-price provision. If Medicaid has just 5 percent of the market, then the BP/AP ratio is just 2 percentage points higher, and if Medicaid has 30 percent of the market, that ratio is 11 percentage points higher. As expected, a larger Medicaid market share is associated with less price dispersion.[7]

7.   The same regression was run using the BP/AP ratio for the fourth quarter of 1993. The variables GENDUM, INVNMG, INVNMBR, and MDSHARE were constructed based on 1993 annual sales. The coefficients on those variables and the intercept obtained from the 1993 regression did not differ with statistical significance from the values of those coefficients shown in Table B-2 (based on a chi-square test). Nor does the difference in the values of the coefficients obtained from the 1993 regression change the economic interpretation of those coefficients. The coefficient that changed the most between the two regressions was INVNMG. According to the 1993 regression, if two or more generic manufacturers enter the market, the BP/AP ratio declines by 7 to 20 percentage points.

# Assumptions Behind the Calculation of Returns from Marketing a New Drug

Despite the patent extensions included in the Hatch-Waxman Act, the present discounted value of the average returns from marketing a new drug have fallen by an estimated $27 million, or approximately 12 percent, because of the increase in generic market share since 1984. That calculation, presented in Chapter 4, employs a methodology used by economists Henry Grabowski and John Vernon in various analyses and by the Congressional Budget Office (CBO) in a 1994 study of returns from research and development in the pharmaceutical industry.[1] The calculation is based on estimates obtained from this study's analysis of generic entry after patent expiration. Assumptions similar to the ones in CBO's 1994 study were used to convert the change in the stream of sales revenues to the change in profits.

The key assumptions in the calculation—the rate at which sales revenues eroded before and after the Hatch-Waxman Act and the change in the length of patent protection—are based on analysis of CBO's retail pharmacy data set, data on patent extensions from the Patent and Trademark Office, and a study by

the Federal Trade Commission.[2] The change in returns is calculated by projecting the value of total U.S. sales revenues in the 12th to 20th year after market introduction for the average drug in CBO's sample of 67 drugs under two scenarios. First, what would sales revenues in those years have been if generic market share (for nonantibiotic drugs) were at its pre-1984 average? And second, what would sales revenues in those years be with a 2.8-year patent extension and increased generic market share at the end of year 14, as is the case today?

From those two revenue streams, the change in profits in years 12 to 20 is calculated assuming a marginal cost of production equal to 25 percent of the brand-name wholesale price. That assumption is well grounded in the literature on the pharmaceutical industry.[3] Since the appropriate measure of returns is after-tax profits, a marginal tax rate of 35 percent is also applied. Thus, an increase in sales revenues of $1 would add 49 cents to after-tax profits in a given year.[4] The change in profits is then discounted to the date of market introduction using a real interest rate of

---

1.    Henry Grabowski and John Vernon, "Returns to R&D on New Drug Introductions in the 1980s," *Journal of Health Economics* (1994); Grabowksi and Vernon, "Longer Patents for Lower Imitation Barriers: The 1984 Drug Act," *American Economic Review* (May 1986); and Congressional Budget Office, *How Health Care Reform Affects Pharmaceutical Research and Development* (June 1994).

2.    Alison Masson and Robert Steiner, *Generic Substitution and Prescription Drug Prices: Economic Effects of State Drug Product Selection Laws* (Federal Trade Commission, 1985).

3.    See, for example, Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards* (February 1993), p. 79. Also see CBO, *How Health Care Reform Affects Pharmaceutical Research and Development*, pp. 51-53.

4.    Because $(1 - 0.25)(1 - 0.35) = 0.49$.

10 percent (consistent with previous studies that have measured the average returns from marketing new drugs).

## Formulas

Because of the patent-term extensions available after 1984 and the delay between patent expiration and generic entry that existed before 1984, the sales streams in the two scenarios do not begin to diverge until year 14. The formula used for converting the difference between the pre- and post-1984 sales streams into profits (discounted to the date of market introduction) is:

$$\sum_{i=14-20} [(Pre84revenues_i - Post84revenues_i) * (1 - 0.25)(1 - 0.35)] \frac{1}{(1+r)^i}$$

where

    $i$ = the year on the market
    $r$ = a discount rate of 10 percent
    0.25 = unit cost as a proportion of price
    0.35 = the marginal tax rate

To obtain the pre- and post-1984 streams of sales revenues, an assumption is needed about the rate at which those revenues would erode without generic entry. For both streams, sales revenues were assumed to decline gradually starting in year 14 because of competition from other, improved innovator drugs. That erosion rate was assumed to be 6 percent in year 14 and to increase by 2 percentage points each year thereafter. The formula for sales revenue erosion caused by competition from other innovator drugs starting in year 14 is:

$$PreGenericRevenues_i = [PreGenericRevenues_{i-1}] * [1 - 0.06 - 0.02 (i - 14)]$$

That revenue stream is then further reduced depending on the size of the generic market. The bigger the generic market share, the smaller will be the sales revenues for the average innovator drug. The formula used to project the revenue stream, accounting for generic entry, is:

$$Revenues_i = (PreGenericRevenues_i) * (1 - GenericMarketShare_i)$$

## Generic Market Share Before 1984

Before the Hatch-Waxman Act, generic market share was very small for most multiple-source drugs, with the exception of antibiotics. Generic market share averaged just 12.7 percent for 29 multiple-source drugs that were among the top 100, rated by total U.S. sales revenues, in 1980.[5] Those were drugs for which generic entry had occurred, however. Actual generic market share for the average brand-name drug before 1984 was smaller than that after accounting for cases in which generic entry did not occur.

Besides generic market share being small, the probability of generic entry was low for an off-patent brand-name drug before 1984. After excluding antibiotics and drugs approved before 1962, only 35 percent of the remaining top 200 drugs had generic versions available in 1983.[6] A few of those drugs had had their patent expire in 1980 or later; hence, the overall probability of generic entry at the average time it occurred (three years after patent expiration) was assumed to be slightly higher, 40 percent (see Table C-1). As a result, average generic market share for all multiple-source drugs was assumed to be 5.1 percent (40 percent of 12.7 percent), although that figure would be a bit smaller in the first year after generic entry.

---

5.    The 12.7 percent average was calculated based on Table A5-1 in Masson and Steiner, *Generic Substitution and Prescription Drug Prices.* The sample in that report contained 45 multiple-source drugs. Ten were antibiotics, and six others were eliminated because they were still under patent, had minimal generic sales, or were only available under a generic name.

6.    Grabowski and Vernon, "Longer Patents for Lower Imitation Barriers," pp. 195-198.

**Table C-1.**
**Assumptions Used to Calculate the Change in Returns from Marketing a Drug**

| Assumption (For an average brand-name drug) | Before Hatch-Waxman Act | After Hatch-Waxman Act |
| --- | --- | --- |
| Length of Patent Protection | 11 years | 13.8 years |
| Time Between Patent Expiration and Generic Entry | 3 years | 1.2 months[a] |
| Probability of Generic Entry | 40 percent | 91.5 percent |
| Generic Market Share | | |
|   1 year after generic entry | 2.4 percent | 40 percent |
|   2 years after generic entry | 5.1 percent | 50 percent |
|   3 or more years after generic entry | 5.1 percent | 60 percent |

SOURCE:  Congressional Budget Office.

a.  This average does not account for cases in which generic entry was delayed. Such cases are taken into account in the estimated probability of generic entry.

# Generic Market Share After 1984

CBO assumed that in the post-Hatch-Waxman period, generic entry normally occurs within 1.2 months of patent expiration. That figure resulted from examining 17 top-selling nonantibiotic drugs whose patents expired between 1990 and 1993. For 14 of those drugs, the average delay between patent expiration and generic entry was just over one month. (The date of generic entry for those drugs was included in a paper by Grabowski and Vernon; CBO obtained the date of patent expiration from the Food and Drug Administration's so-called *Orange Book* for 1990.)[7] For the other three drugs, generic entry took 17 to 21 months after patent expiration; but according to an official of the Food and Drug Administration (FDA), that delay occurred largely because the agency was unable to evaluate those applications quickly since it was recovering from a scandal in the generic drug industry.[8]

CBO's assumption about the size of the generic market shortly after patent expiration and generic entry is based on an analysis of 21 innovator drugs in the retail pharmacy data set that first faced generic competition between 1991 and 1993. Generic sales constituted an average of 44.2 percent of total prescription sales for those drugs during the first full calendar year after generic entry.[9] Since that figure is based only on cases in which generic entry occurred, CBO adjusted it by the estimated probability of such entry—calculated to be 91.5 percent (see Box C-1). As a result, the average generic market share in the year following patent expiration, accounting for cases in which generic entry does not occur, is estimated to be about 40 percent.

By the time three years have elapsed since generic entry, the average generic market share for a drug is assumed to have reached 60 percent. CBO estimated that figure as follows. Overall generic market share—calculated as the volume of generic countable units sold to all purchasers in the United States divided by the volume of all drugs sold, including single-source drugs—was 40.4 percent in 1994, according to IMS America. (Note that this figure for 1994 generic market share is lower than the 50.5 percent figure in Box C-1 because it is taken as a percentage of all drug sales rather than just sales of multiple-source drugs.) Based on the retail pharmacy data set, CBO estimated that including all dosage forms in that average, rather than just those that are easily countable, such as tab-

7.  See Henry Grabowski and John Vernon, "Longer Patents for Increased Generic Competition in the U.S." *PharmacoEconomics* (1996), Table

1, p. 112; and Department of Health and Human Services, Food and Drug Administration, *Approved Drug Products with Therapeutic Equivalence Evaluations* (1990). The patent expiration dates are also available at http://www.fda.gov/cder/da/ patex17.htm.

8.  Personal communication with an FDA official on March 26, 1998.

9.  The unweighted average generic market share for the 21 drugs was 43 percent. Weighting that average (a volume measure) by the value of the drugs' retail pharmacy sales revenues in 1991 (thus giving higher-selling drugs a greater emphasis) yields an average generic market share of 44.2 percent.

## Box C-1.
## Calculating the Probability of Generic Entry

Not every brand-name prescription drug with an expired patent faces competition from generic copies. In some cases, generic entry is delayed or even prevented because generic manufacturers have particular difficulty proving bioequivalence. Premarin, a drug to help prevent osteoporosis, is one such case. Since not all of the key ingredients in Premarin have been clearly identified, bioequivalence is hard to demonstrate.[1] Although the patent for Premarin has expired, no generic versions are currently available. Premarin was the 11th-best-selling drug in the United States in 1997, with sales of $800 million.[2] A few manufacturers obtained approval from the Food and Drug Administration (FDA) for generic copies of Premarin, but that approval was later withdrawn.

Generic entry can also be delayed when a drug contains a very potent active ingredient that is dangerous if the body absorbs too much too quickly. Generic manufacturers have more difficulty obtaining FDA approval for such drugs, so fewer generic manufacturers may apply for approval. The immunosuppressive drug Imuran (whose chemical name is azathioprine) is an example. Although Imuran lost patent protection in 1979, a generic version was not approved by the FDA until 1996.[3] Generic entry can also be delayed because of lawsuits between innovator and generic firms over which patents actually protect a drug.

To fully account for cases in which generic entry is prevented or delayed, the Congressional Budget Office examined the patent and exclusivity status of all single-source drugs in its retail pharmacy data set in 1994 (277 drugs) to determine what was preventing generic entry. Patent protection or an exclusivity provision prevented generic entry for all but 77 drugs. Of those 77, only eight had significant sales through retail pharmacies (of $40 million a year or more).[4] Two other important cases, Premarin and Coumadin (an anticoagulant), had modest generic retail

sales in 1991, but those sales tapered off to an insignificant amount by 1994.[5]

Accounting for the 77 cases without generic competition, plus the cases in which such competition was severely limited, lowers the average generic market share in 1994 from 55.2 percent to 50.5 percent.[6] Thus, the implied probability of generic entry—adjusting generic market share (calculated as a percentage of the volume of sales of all multiple-source drugs) to account for cases in which generic entry does not occur soon after a drug's patent has expired—is 91.5 percent.[7] The higher percentage, 55.2 percent, was calculated by dividing the number of generic prescriptions dispensed by the total number of prescriptions dispensed for all multiple-source drugs with generic sales of $100,000 a year or more. To obtain the lower percentage, 50.5 percent, the calculation included in the denominator the number of prescriptions dispensed for off-patent brand-name drugs with no generic entry as well as for multiple-source drugs with any generic competition (including those with generic sales of less than $100,000).[8]

The estimate of 91.5 percent may not accurately reflect the probability of generic entry in the first year after patent expiration. That estimated probability is based on the overall market average and does not focus on drugs that lost their patent protection recently. Still, the cases in which generic entry does not occur are extremely limited for top-selling drugs and will not be accurately picked up if only a small number of drugs that recently lost patent protection are analyzed. The best approximation available was to take an overall market average. Applying that probability reduces generic market share in the first year after patent expiration from 44.2 percent to 40 percent. The sensitivity analysis discussed later in this appendix shows that CBO's estimate of the decline in returns is only slightly sensitive to reasonable variations in the assumed level of post-1984 generic market share.

---

1. "Wyeth-Ayerst Commits to Characterization of Premarin, FDA Says; Generic Conjugated Estrogens May Not Be Approved Until Premarin Is Characterized," *The Pink Sheet*, F-D-C Reports, May 12, 1997, p. 3.

2. "Post-1990 Launches Represent 43% of Rx Market, IMS Says," *The Pink Sheet*, F-D-C Reports, March 9, 1998, p. 9.

3. Personal communication with an FDA official, March 31, 1996. (The patent expiration date was obtained from a data set provided by David Dranove of Northwestern University.)

4. In 11 cases, drugs with annual retail sales through pharmacies that totaled $11 million to $33 million did not have generic copies. The remaining cases had sales of less than $10 million; many had sales of less than $1 million. Of the eight significant drugs with no generic competition in 1994, six now have generic competitors. One drug that still has no generic competitors is the birth control pill Lo/Ovral. The patent status of two other birth control pills in the data set that had sales of more than $50 million a year and no generic competition could not be determined, so they were not included in calculating the probability of generic entry.

5. Generic competition for Coumadin has been hampered. See "Barr Is Barring Warfarin Competitors with Bulk Agreement, Invamed Sues," *The Pink Sheet*, F-D-C Reports, March 2, 1998, p. 11; and "Dupont Merck Payments to PBMs Blocked Barr Warfarin Dispensing," *The Pink Sheet*, F-D-C Reports, March 16, 1998, p. 26. Generic sales for Coumadin dropped between 1991 and 1994 because the two previously approved generic drugs' manufacturers were forced to leave the market during a scandal involving certain generic drug manufacturers and FDA officials in the late 1980s.

6. That generic market share is calculated for all dosage forms. Confining the dosage forms only to tablets and capsules increases generic market share by 2.2 percentage points.

7. Because 50.5 divided by 55.2 equals 0.915.

8. The only brand-name drugs with retail pharmacy sales of over $20 million that had competing generic retail pharmacy sales of less than $100,000 were Premarin and Coumadin. Both of those were top-selling brand-name drugs.

**Table C-2.**
**Formulas for Calculating Generic Market Share**

| Year of Drug's Product Life | Before Hatch-Waxman Act | | After Hatch-Waxman Act | |
| --- | --- | --- | --- | --- |
| | Formula[a] | Value | Formula[b] | Value |
| 14 | None | 0 | (0.44)(0.915)(0.1) | 0.04 |
| 15 | (0.06)(0.4) | 0.024 | (0.44)(0.915)(0.9) + (0.5)(0.1) | 0.41 |
| 16 | (0.127)(0.4) | 0.051 | (0.5)(0.9) + (0.6)(0.1) | 0.51 |
| 17 to 20 | (0.127)(0.4) | 0.051 | (0.6) | 0.60 |

SOURCE:   Congressional Budget Office.

a.   Equal to average generic market share when generics are available times the probability of generic entry.

b.   Equal to average generic market share times the fraction of the year to which the average applies.  For example, in year 15, the formula is a
     weighted average of the average generic market share in the first and second years after patent expiration.

lets and capsules, reduces generic market share to 38.2 percent.[10]  To calculate average generic market share for drugs that have been off patent for three or more years, the 38.2 percent figure was divided by 66.7 percent, the share that off-patent drugs constituted of the retail pharmacy data set in 1994.  As a result, CBO estimated that generic sales represented 57.3 percent of all sales of multiple-source and off-patent single-source drugs in 1994.[11]  Since generic market share has continued to increase slightly since 1994, and since older drugs would have a slightly higher generic share than the market average (which includes drugs that recently went off patent), CBO adjusted that estimate of average generic market share upward to 60 percent.[12]

The figure for generic market share in the second year after patent expiration, 50 percent, is simply an average of the figures for the first and third years.

In CBO's calculations of generic market share, the estimated probability of generic entry (91.5 percent) helps to account for the cases in which generic entry is delayed by a year or more.  In the first year following patent expiration, generic market share equals 44.2 percent multiplied by 91.5 percent, or 40 percent. In the third year after patent expiration and later, the cases in which generic entry did not occur were incorporated into the calculation of a generic market share of 60 percent. How sensitive CBO's calculation of the change in returns from marketing is to those estimated generic market shares is analyzed below.

The formulas used to project generic market share based on this analysis are shown in Table C-2.  The first year of patent expiration is split between years 14 and 15 of a drug's product life.  Since generic entry is assumed to occur at the very end of year 14, in that year generic market share is equal to only 10 percent of 44.2 percent multiplied by 91.5 percent, which is 4 percent.  In year 15, generic market share is a weighted average of generic market share in the first year after patent expiration (90 percent) and the sec-

10.  Limiting the calculation only to tablets and capsules raises the average generic market share calculated from the retail pharmacy data set by 2.2 percentage points.

11.  That figure has already been adjusted to account for cases in which generic entry was prevented, since the sales of single-source, off-patent brand-name drugs were accounted for in the 66.7 percent.

12.  IMS America estimated that overall generic market share in 1996 was 42.6 percent. Adjusting that figure from mainly tablets and capsules to all dosage forms would imply a market share of 40.4 percent. Then, assuming the same split between brand-name and generic drugs in 1996 as in 1994 would yield a generic market share of 60.5 percent for drugs off patent.

ond year after patent expiration (10 percent). The average generic market share for year 15 is therefore 41 percent.

# Sensitivity Analysis

CBO examined the sensitivity of its estimate of the decline in the present discounted value of the average returns from marketing a new drug ($27 million) to the assumptions used to construct the pre- and post-1984 streams of sales revenues. The results indicate that the estimate is little affected by modest changes in the key assumptions (see Table C-3).

If, in constructing the pre-1984 sales stream, CBO assumed that generic drugs took four years instead of three to enter the market after patent expiration, the estimated decline in returns would be $28 million, just $1 million different. That change is small because the size of the pre-1984 generic market was small, so postponing generic entry by another year in that period does not have much effect on the basic result.

The effect would be greater if generic entry was further postponed in the post-1984 period (since generic market share is higher then), but the data that underlie CBO's estimate of a 2.8-year average postponement under the Hatch-Waxman Act are solid. If the average length of a patent extension was six months shorter, returns would fall by an additional $5 million. If the average length was six months longer, the decline in returns would be $4 million less. However, the data on patent-term extensions obtained for all drugs approved between 1992 and 1995 make it unlikely that the estimated average length of an extension would be off by as much as six months.

CBO's basic result is not very sensitive to a small increase in the size of the generic market. For example, if the post-1984 generic market share was 45 percent in the first year after generic entry, rising to 65 percent in the third year and beyond, the decline in returns would be $30 million—only $3 million more than the base case. Those alternative assumptions are based on what might be a reasonable upper bound for current levels of generic market share.

CBO assumed that the marginal cost of producing another unit of a prescription drug was 25 percent of its brand-name price. Varying the marginal cost from 20 percent to 30 percent of the brand-name price causes the total decline in returns to vary between $25 million and $29 million. Thus, CBO's estimate is not particularly sensitive to reasonable variations in incremental unit costs.

As a drug becomes obsolete and its efficacy is surpassed by that of newer innovator drugs, its sales revenues gradually erode. That erosion rate was assumed to be 6 percent in year 14 and 8 percent in year 15, increasing by 2 percentage points each year thereafter. If CBO had used a slightly slower rate of revenue erosion caused by product obsolescence—starting at 5 percent in year 14 and increasing by 1 percentage point each subsequent year—the total decline in returns would be an estimated $30 million. By contrast, with a faster erosion rate—6 percent in year 14, increasing by 3 percentage points each year thereafter—returns would decline by $25 million. Hence, the estimate is fairly robust to that assumption as well.

As discussed in Chapter 3, the extent to which brand-name prices respond to generic entry is unclear from previous studies. CBO's base case assumes that those prices do not respond to generic entry. If brand-name prices did change because of generic competition, they would primarily affect the profit stream in the post-1984 scenario, since generic market share was so small before 1984. If, because of increased discounting, the average brand-name price was 5 percent lower in each year after generic entry in the post-1984 scenario, the returns from marketing a new drug would fall by $29 million, a difference of $2 million. If, conversely, the average brand-name price was 5 percent higher in that period after generic entry, estimated returns would fall by $25 million. Thus, CBO's calculation is not highly sensitive to any effect that generic entry might have on brand-name prices.

An important number on which the calculation depends is sales revenues in year 13 (the average

**Table C-3.**
**How Sensitive Is the Calculation of Returns to Changes in the Base-Case Assumptions?**

| Base-Case Assumption | Alternative Assumptions | Decline in Returns (Millions of 1990 dollars) | |
|---|---|---|---|
| | | Total Decline | Variation from Base Case[a] |
| **Pre-1984 Delay Between Patent Expiration and Generic Entry** | | | |
| 3 years | 4 years | 28 | 1 |
| | 2 years | 26 | -1 |
| **Length of Hatch-Waxman Patent-Term Extension** | | | |
| 2.8 years | 6 months longer | 23 | -4 |
| | 6 months shorter | 32 | 5 |
| **Post-1984 Generic Market Share After Generic Entry** | | | |
| 40 percent one year later, 50 percent two years later, 60 percent three or more years later | Higher:  45 percent one year later, 55 percent two years later, 65 percent three or more years later | 30 | 3 |
| | Lower:  35 percent one year later, 45 percent two years later, 55 percent three or more years later | 24 | -3 |
| **Marginal Cost** | | | |
| 25 percent of unit price | 20 percent of unit price | 29 | 2 |
| | 30 percent of unit price | 25 | -2 |
| **Sales Erosion Rate from Brand-Name Competition** | | | |
| 6 percent in year 14, increasing by 2 percentage points each year thereafter | Higher:  6 percent in year 14, increasing by 3 percentage points each year thereafter | 25 | -2 |
| | Lower:  5 percent in year 14, increasing by 1 percentage point each year thereafter | 30 | 3 |
| **Post-1984 Change in Brand-Name Prices Because of Generic Entry** | | | |
| No price change | Brand-name price is 5 percent higher in years 14 to 20 | 25 | -2 |
| | Brand-name price is 5 percent lower in years 14 to 20 | 29 | 2 |

SOURCE:    Congressional Budget Office.

a.    The base case is a $27 million decline in the present discounted value of returns.

drug's peak year, before product obsolescence and generic entry occur). According to CBO's data set, those revenues averaged $139.2 million in 1990 dollars.[13] CBO's estimate of the change in returns is not very sensitive to modest changes in those revenues. For example, if sales revenues in year 13 were 10 percent lower, the estimated decline in returns would be $24 million. If sales revenues in year 13 were 10 percent higher, the estimated decline in returns would be $30 million. Of course, if revenues were 10 percent lower or higher in all years leading up to year 13, then total returns would also be lower or higher than the assumed $210 million to $230 million. But even accounting for the corresponding change in total returns, the result (taken as a percentage of the total expected returns from marketing a new drug) would remain a decline of about 12 percent, on average.

---

13. Average U.S. sales for the 67 drugs in CBO's sample were $139.2 million in year 11 and were assumed to continue at that level through year 13.

## Appendix D
# The Replacement Effect

Besides its primary effect of reducing the returns from marketing innovator drugs, generic entry can also have a small positive effect on the incentive to innovate. Economists have shown that a monopolist can have a tendency to "rest on his laurels."[1] Monopolists may have little incentive to research and develop new products that will compete directly with their currently marketed products—a phenomenon referred to as the replacement effect. When a cash flow model of the expected returns from marketing an innovative product incorporates that effect, it shows that in a few cases, the net impact of generic entry on a monopolist's incentives to innovate could be close to zero (although in general one would expect returns to decline). In those cases, generic entry may reduce the size of the replacement effect almost as much as it reduces the present discounted value of the returns from marketing an innovation.

Whether the reduced replacement effect significantly offsets the direct decline in returns caused by generic competition will depend on how much of the current product's market is being replaced and the timing of that replacement. The reduction in the replacement effect is more likely to be an important factor when the product being replaced is within a few years of patent expiration. That implies that when pharmaceutical companies invest in developing new drugs in therapeutic classes in which they are already market leaders, the rise in generic competition may not lower their incentive to innovate as much as the Congressional Budget Office's (CBO's) calculation of the returns from marketing a drug (presented in Chapter 4) would appear to indicate.

Still, only a limited number of cases exist in which the reduced replacement effect could be strong enough to nearly offset the direct decline in returns because of generic competition. Although companies do continue to develop drugs in therapeutic areas where they are market leaders, they also invest in therapeutic areas where few treatments exist. And it is in precisely those areas—where patients may benefit the most from a new drug—that the offsetting replacement effect is not present at all.

As Box D-1 shows, the profit stream from innovating is equal to the present discounted value of the returns from marketing the innovation, offset by any decline in the present discounted value of the profit stream from the currently marketed product (that decline, shown in brackets in the box, represents the replacement effect). Generic entry reduces the present discounted value of the returns from marketing the innovation (by an average of $27 million in 1990 dollars, according to CBO's analysis) but is offset somewhat by a decrease in the replacement effect.

That relationship can be expressed mathematically, as follows. Assuming that:

$t$ = number of years a product has been on the market

$t_g$ = year of generic entry

---

1.    Jean Tirole, *The Theory of Industrial Organization* (Cambridge: MIT Press, 1988), p. 392, quoting Kenneth J. Arrow. Although manufacturers of brand-name drugs usually do not have a pure monopoly, the analysis still applies to innovation in this industry.

---

**Box D-1.**
**Calculating the Impact of the Replacement Effect and Generic**
**Competition on the Returns from Innovation**

**Calculation of Returns from Innovation When New Products Replace Old Ones**

| Present Discounted Value (PDV) of Profits from Innovation | = | PDV of Returns from New Product | − | [ PDV of Returns from Currently Marketed Product | x | Share of Current Market Replaced by New Product ] |

**Calculation of How the Rise in Generic Entry Since 1984 Has Affected Returns**

| Change in PDV of Profits from Innovation Caused by Increased Generic Entry | = | Change in PDV of Returns from New Product | − | [ Change in PDV of Returns from Currently Marketed Product | x | Share of Current Market Replaced by New Product ] |

---

T =     number of years of product life

h =     year in the life of the currently marketed product when a new, competing product is introduced by the monopolist

$\alpha$ =     share of the current product's market that is absorbed by the new product

$\Pi^M(t)$ =     monopolist's profits in year $t$ with no generic entry

$\Pi^G(t, t_g)$ =     monopolist's profits in year $t$ with generic entry

$\Pi^C(t, t_g)$ =     $\Pi^M(t)$ if $t < t_g$
              $\Pi^G(t)$ if $t \geq t_g$

$V^M$ =     profit stream generated from introducing a new product after the current product has been on the market for $h$ years, in the absence of generic competition following patent expiration

$V^G$ =     profit stream generated from introducing a new product after the current product has been on the market for $h$ years, with generic entry in year $t_g$

It is assumed that the functions $\Pi^M(t)$ and $\Pi^G(t, t_g)$ are the same for the product that is currently on the market as for the new one. Those functions could be thought of as the average profits generated from marketing a new drug $t$ years after market introduction. In the absence of generic entry, the change in the profit stream from introducing a new product after the current one has had $h$ years on the market is equal to:

$$V^M = \sum_{t=1}^{T} \Pi^M(t)\left(\frac{1}{1+r}\right)^t - \alpha \sum_{t=h}^{T} \Pi^M(t)\left(\frac{1}{1+r}\right)^{t-h}$$

The first term equals the present discounted value of the profits from the innovation. The second term equals the decline in the present discounted value of the profit stream of the currently marketed product after the innovation is introduced (the replacement effect). After accounting for generic entry, the profit stream from innovation becomes:

$$V^G = \sum_{t=1}^{t_g} \Pi^M(t)\left(\frac{1}{1+r}\right)^t + \sum_{t=t_g}^{T} \Pi^G(t)\left(\frac{1}{1+r}\right)^t - \alpha \sum_{t=h}^{T} \Pi^C(t)\left(\frac{1}{1+r}\right)^{t-h}$$

The first two terms are equal to the present discounted value of the profits from the innovation. The second term accounts for lower postpatent revenues when generic entry occurs. Together, those equations imply that the effect of generic entry on the returns from marketing an innovation can be expressed as:

$$V^M - V^G = \sum_{t=t_g}^{T} [\Pi^M(t) - \Pi^G(t)]\left(\frac{1}{1+r}\right)^t - \alpha \sum_{t=h}^{T} [\Pi^M(t) - \Pi^C(t)]\left(\frac{1}{1+r}\right)^{t-h}$$

The first term in that combined equation equals the fall in the present discounted value of the profit stream from the innovation because of generic entry starting in year $t_g$. The second term equals the loss in the future profit stream from the currently marketed product because its sales volume declines after the more innovative product is introduced. The amount by which $V^M$ exceeds $V^G$ is diminished by the change in the replacement effect.

Note that using present discounted values diminishes the first term more than the second term. The effect of generic entry on the current profit stream is diminished because it occurs at the end of a drug's product life. But the change in the replacement effect under generic entry occurs sooner, as reflected by discounting by $t - h$ years rather than by $t$ years. Suppose that $h = 10$, so that a new product is introduced after the monopolist's current product has been on the market for 10 years. The model used in this study estimates that the effect of generic entry on the present discounted value of profits, when discounted back only to year 10, is more than twice the value when discounted back to year 0. If more than half of the current product's market is absorbed by the new product ($\alpha > 0.5$), the change in the replacement effect would completely offset the first term. The change in the replacement effect is largest when the currently marketed product approaches patent expiration.

# EXHIBIT K

ORIGINAL

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF VIRGINIA

3         Norfolk Division

FILED

APR 2 5 2002

CLERK, U.S.

7    SMIKTHKLINE BEECHAM CORPORATION,    )
                                         )
8              Plaintiff,                )
                                         )         CIVIL ACTION
9         v.                             )
                                         )         NO. 2:02cv51
10   EXCEL PHARMACEUTICALS, INC.,        )
                                         )
11             Defendant.                )

15         TRANSCRIPT OF PROCEEDINGS

16           Norfolk, Virginia

17            April 12, 2002

19    (Hearing on Motions for Summary Judgment)

22   Before:   THE HONORABLE REBECCA BEACH SMITH
23             United States District Judge

GLORIA S. SMITH, OFFICIAL REPORTER

134

1   decision, which we supplied to supplement as soon as we became

2   aware of it, did not wait and guess as to what the Supreme

3   Court may or may not do.

4        Then finally, Your Honor, I do agree that in

5   addition to the benefit to the public, certainly if we can end

6   litigation now, it does save all the parties costs and

7   resources so we can move forward.

8        On those grounds, we rest.  Thank you.

9        THE COURT:  All right.  The first thing that I will

10  rule on is plaintiff's motion for an extension of time

11  pursuant to Rule 56(f) at this juncture, and I deny that

12  motion, and I will give the reasons that I deny that motion.

13       Plaintiff bases his request for an extension of time

14  on three arguments.  The first argument, it says it believes

15  that New Jersey is the more appropriate venue for the case.

16  If that's the case, A, why, did you file it down here?

17  Clearly you can't just be out there choosing your forums and

18  say, all right, let's see where we think we are going to get

19  the better result.

20       On January 25, 2002, GlaxoSmithKline filed a

21  complaint in the Eastern District of Virginia, and they also

22  filed an identical complaint in the District of New Jersey.

23  There is no question that jurisdiction is appropriate here for

24  this case in the Eastern District of Virginia, and I see no

25  persuasive argument at this point, given particularly the

35

1  current status of the New Jersey case and its lack of movement

2  and so forth, that New Jersey is any more appropriate than the

3  Eastern District of Virginia, and you all chose the forum to

4  begin with.  So I'm certainly not going to open up discovery

5  on an issue like this at this juncture in the case.

6      The second argument was that the plaintiff had

7  insufficient information with which to oppose the motion for

8  summary judgment.  And despite this claim, I'm of the opinion

9  that you don't need more time to respond to the threshold

10  issue presented in the defendant's motion, basically whether

11  you are barred from pursuing an infringement claim under the

12  doctrine of equivalents.

13      The court doesn't get to the doctrine of equivalents

14  if prosecution history estoppel bars a plaintiff from arguing

15  infringement under the doctrine of equivalents.  So first, to

16  save everybody time and money, let's decide that question.  If

17  you prevail on that question, then there can be adequate

18  discovery.  I won't rule on the doctrine of equivalents.  But

19  I don't know that discovery is necessary there yet.

20      And the final argument for extension is that the

21  Supreme Court has granted cert in the case of Festo Corp. and

22  that Excel relies on Festo to argue that plaintiff is barred

23  from arguing the doctrine of equivalents in this case.  I note

24  three things.  Number one, Excel relies on numerous other

25  Federal Circuit cases which strongly support its position, as

GLORIA S. SMITH, OFFICIAL REPORTER

EXHIBIT L

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ADAMS RESPIRATORY THERAPEUTICS, INC.**<br>    **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 06-4418** |
| | : | |
| **PHARMACEUTICAL HOLDINGS CORP., et al.**<br>    **Defendants** | : | |

---

## ORDER

AND NOW, this 2nd day of November, 2006, it is **ORDERED** as follows:

1.      Plaintiff's Motion to Stay (Doc. No. 18), filed on October 24, 2006, is **DENIED**.

Plaintiff brings this action under the Hatch-Waxman Act, asking me to conclude that Defendants'

intended manufacture and sale of a generic drug would violate Plaintiff's patent for the drug

"Mucinex." See 21 U.S.C. § 355(j)(5)(B)(iii).  Plaintiff filed the instant Complaint only two days

after filing a nearly-identical Complaint in the District of New Jersey.  Adams Respiratory

Therapeutics, Inc. v. Pharmaceutical Holdings Corp., Civ. Action No. 2:06-cv-04700-HAA-MF

(D. N.J., filed October 2, 2006).  Defendants have disputed jurisdiction in New Jersey, but

concede that jurisdiction exists here.  Plaintiff has explained that it filed in this Court so that it

will have a "back-up" forum in the unlikely event that the New Jersey Court determines after

Plaintiff's statutory forty-five day window has elapsed that the District of New Jersey is without

jurisdiction to hear Plaintiff's first-filed action.  See 21 U.S.C. § 355(j)(5)(B)(iii) (to stay FDA

final approval of generic drug application, patent owner must bring suit within forty-five days of

receiving notice that generic drug applicant has filed a certification that the patent is invalid or

not infringed). Plaintiff now seeks a stay of the instant matter, pending the New Jersey Court's decision on jurisdiction. Should that Court determine it is without jurisdiction, Plaintiff would then seek to proceed against Defendants in this Court.

Defendants vigorously contend that Plaintiff seeks a stay solely for delay, so that Plaintiff can take advantage of Hatch-Waxman's thirty month non-compete period. See id. (if patent owner files suit within forty-five day window, FDA will place a thirty-month automatic stay on approval of generic drug application, unless the Court issues a decision before expiration of thirty-month period). Plaintiff responds with equal vigor that Defendants have filed an Answer, Counterclaim, and Summary Judgment Motion (before Plaintiff even served the instant Complaint) to create the false impression that the action before me is well on its way to conclusion.

Without impugning the motives of Plaintiff or Defendants, I believe granting a stay here would encourage judge-shopping. I do not believe the "first-filed" rule – on which Plaintiff almost exclusively relies – applies in the unique circumstances presented here. The decisions Plaintiff has cited – in which the "first-filed" rule is applied – are inapposite. See Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970) (plaintiff filed two cases in different districts, and defendant moved to stay); Old Charter Distillery Co. v. Continental Distilling Corp., 59 F. Supp. 528 (D. Del. 1945) (plaintiff filed two cases in different districts, and second court granted plaintiff's motion to stay after first court ruled that it had jurisdiction). I believe it would be inappropriate to allow a plaintiff to file identical actions in different courts and then pick the court in which it wishes to proceed while the other action is stayed pending the result in the first-filed action. Plaintiff has chosen to sue here; it can not credibly complain that proceeding with this suit is prejudicial. Accordingly, I will deny the Motion to Stay.

2.      Defendants' Motion for Summary Judgment (Doc. No. 10), filed on October 17, 2006, is **DENIED WITHOUT PREJUDICE** because it is premature.  Defendants are free to renew their Motion at the close of discovery or at another appropriate time.

3.      Defendants' Motion for Leave to File Trade Secrets and Confidential Business Information Under Seal (Doc. No. 11), filed on October 17, 2006, is **GRANTED**.

4.      The Declarations of Harry G. Brittain and Robert Dettery, along with the attached exhibits, shall be maintained under seal and shall not be made available to the public, except as provided by subsequent Order of this Court.

5.      Defendants shall file, as soon as practicable, a public record version of the Declarations of Harry G. Brittain and Roberty Dettery with redactions of the portions of the declarations that contain the trade secret and confidential business information.

6.      Defendants' Counterclaim (Doc. No. 4), filed on October 10, 2006, appears to turn entirely on the viability of Plaintiff's patent.  Accordingly, resolution of the merits of Plaintiff's Complaint should precede resolution of the Counterclaim.  Thus, Defendants' Counterclaim is **STAYED** pending resolution of the Plaintiff's claims.

IT IS SO ORDERED.

*/s Paul S. Diamond, J.*

_____

Paul S. Diamond, J.

EXHIBIT M

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHAMBERS OF
*HAROLD A. ACKERMAN*
SENIOR JUDGE

UNITED STATES DISTRICT COURT
POST OFFICE BOX 999
NEWARK, NEW JERSEY 07101-0999

November 16, 2006

## TO ALL COUNSEL OF RECORD

Re:    *Adams Respiratory Therapeutics, Inc. v. Mutual Pharm. Holdings Co.,* Civil Action No. 06-4700

Dear Counsel:

      I have reviewed the letters from counsel regarding Plaintiff's request that this Court hold an immediate status conference "to resolve issues relating to an identical case pending in the Eastern District of Pennsylvania." (Pl.'s Letter to Court 11/9/06 at 1.) After careful consideration, this Court denies Plaintiff's request.

      Plaintiff Adams Respiratory Therapeutics, Inc. ("Adams") filed the instant action in this Court on October 2, 2006. Prior to filing its Complaint in this Court, Adams learned that Defendant Mutual Pharmaceutical Holdings, Co. ("Mutual") had challenged this Court's personal jurisdiction in an unrelated case, *Eisai Co., Ltd. v. Mutual Pharmaceutical*, Civ. No. 06-3613 (D.N.J. filed August 3, 2006). As Adams notes, Eisai's response to Mutual's personal jurisdiction challenge has been stayed pending jurisdictional discovery.

      Understandably concerned that a successful challenge to the personal jurisdiction of this Court by Mutual in the *Eisai* action conceivably could cause Adams problems in its own suit against Mutual, Adams filed an identical action in the Eastern District of Pennsylvania two days after filing in this Court. This was necessary, from Adams's viewpoint, to preserve "certain substantive rights provided under the Hatch-Waxman Act." (Pl.'s Letter to Court 11/9/06 at 2.) Subsequent to filing in Pennsylvania, Adams moved that court to stay proceedings there pending the outcome of the jurisdictional issue in this Court. The Eastern District of Pennsylvania denied the motion to stay and the case is proceeding apace in that District.

      Adams requests that I exercise my discretion as the Court in which the first action was filed and enjoin the Eastern District of Pennsylvania from proceeding with the case filed in that jurisdiction. (Pl.'s Letter to Court 11/9/06 at 3 (citing *Triangle Conduit & Cable, Inc. v. National Electric Prod. Corp.*, 125 F.2d 1008, 1009-10 (3d Cir. 1942); *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941)).) While I recognize that I have the power to direct the Eastern District of Pennsylvania to stay its related, subsequently-filed proceeding, I decline to exercise that power.

1

The "first-filed rule" is intended to prevent duplicative litigation, but I do not believe the rule was intended to provide a single plaintiff the opportunity to institute identical suits in various jurisdictions and then put all but the first one on the back burner until such time as the plaintiff deems convenient. *See Triangle*, 125 F.2d at 1008-09 (reversing district court of first-filed case for not enjoining second case filed by *defendant* in another district).

Presumably, Adams would like me to decide the *Eisai v. Mutual* personal jurisdiction issue, which would give Adams some indication of whether it would prevail on the same issue, especially now that Mutual has raised the same personal jurisdiction issue in the *Adams v. Mutual* case as well. If Adams were satisfied with my ruling in the *Eisai v. Mutual* case, then, ostensibly, it would voluntarily dismiss the Pennsylvania action and proceed with its identical case in this Court. Alternatively, now that Mutual has moved this Court to dismiss for lack of personal jurisdiction, it would be of great benefit to Adams if I decided that motion out of turn.

With respect to the *Eisai v. Mutual* motion, I cannot decide a motion that has not been fully briefed and that is stayed pending jurisdictional discovery. With respect to the more recently filed motion by Mutual in this case, I am disinclined to make any decision of such importance in haste. Moreover, as I am sure counsel can appreciate, my docket contains many other motions that were filed well in advance of this one that are of equal importance to the respective parties. While I am sympathetic to Adams's predicament, the situation is of its own making. If Adams wants to proceed in its first choice of forum, it knows how to unilaterally effectuate that circumstance.

This Court hereby DENIES Adams's request for an immediate status conference and hereby DENIES Adams's request that this Court enjoin the Eastern District of Pennsylvania action.

SO ORDERED

s/ Harold A. Ackerman
U.S.D.J.

HAA:amb

2

# EXHIBIT N

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**CHAMBERS OF**
*HAROLD A. ACKERMAN*
**SENIOR JUDGE**

**UNITED STATES DISTRICT COURT**
**POST OFFICE BOX 999**
**NEWARK, NEW JERSEY 07101-0999**

November 17, 2006

## TO ALL COUNSEL OF RECORD

Re:    *Adams Respiratory Therapeutics, Inc. v. Mutual Pharm. Holdings Co.,* Civil Action No.
06-4700

Dear Counsel:

I have reviewed the letter from counsel regarding my Order dated November 16, 2006. I agree with counsel that Federal Rule of Civil Procedure 41(a) prevents Adams from unilaterally dismissing the Pennsylvania action without prejudice.

Nevertheless, the fact remains that the first-filed rule is not intended to benefit a party, such as Adams, who files in multiple jurisdictions but then complains of the speed of litigation in one forum versus another. Again, Adams created the circumstance in which it finds itself and, unfortunately, I can find no basis for undoing that which is Adams's own making.

This Court hereby DENIES Adams's request to reconsider its Order.

SO ORDERED

s/ Harold A. Ackerman
U.S.D.J.

HAA:amb

1

## CERTIFICATE OF SERVICE

I, John M. Seaman, hereby certify that on June 20, 2007, I caused to be electronically

filed a true and correct copy of the notice of the foregoing *Declaration of John M. Seaman* with

the Clerk of Court by CM/ECF which will send notification of such filing to the following

counsel of record:

> Philip A. Rovner, Esquire
> Potter Anderson & Corroon LLP
> 1313 N. Market Street
> Wilmington, DE 19801
> *provner@potteranderson.com*

I further certify that on June 20, 2007, I caused copies of the foregoing document to be

served by e-mail and by hand on the above-listed counsel and by e-mail and by U.S. Mail on the

following non-registered participants.

Anthony M. Insogna, Esquire
Lester J. Savit, Esquire
JONES DAY
12265 El Camino Real, Suite 200
San Diego, CA 92130
858.314.1200
*aminsogna@jonesday.com*
*ljsavit@jonesday.com*
*nnkallas@jonesday.com*

F. Dominic Cerrito, Esquire
JONES DAY
222 East 41st Street
New York, New York 10017-6702
*fdcerrito@jonesday.com*

Robert L. Baechtold, Esquire
Henry J. Renk, Esquire
Nicholas N. Kallas, Esquire
FITZPATRICK, CELLA HARPER &
SCINTO
30 Rockefeller Plaza
New York, NY 10112
*rbaechtold@fchs.com*
*hrenk@fchs.com*
*nkallas@fchs.com*

/s/ John M. Seaman
John M. Seaman (#3868) [jseaman@bmf-law.com]
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
302.573.3500
*Attorneys for Defendants Abrika Pharmaceuticals, Inc.*
*and Abrika Pharmaceutical, LLLP*

{BMF-W0060073.}